Jeffrey B. Isaacs, Esq., SBN 117104
Jerome H. Friedberg, Esq., SBN 125663
Paige Shen, Esq., SBN 162122
Robert F. Gookin, Esq., SBN 251601
**ISAACS | FRIEDBERG LLP**
555 South Flower Street, Suite 4250
Los Angeles, California 90071
Telephone: (213) 929-5550/Facsimile: (213) 955-5794
Email:  jisaacs@ifcounsel.com
           jfriedberg@ifcounsel.com
           pshen@ifcounsel.com
           rgookin@ifcounsel.com

*Attorneys for Plaintiffs STM Atlantic N.V.,*
*STM Group, Inc., Emil Youssefzadeh and*
*Umar Javed*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STM ATLANTIC N.V., a Dutch company; STM GROUP, INC., a Delaware corporation; EMIL YOUSSEFZADEH, an individual; and UMAR JAVED, an individual,<br><br>        Plaintiffs,<br><br>    vs.<br><br>DONG YIN DEVELOPMENT (HOLDINGS) LIMITED, a Hong Kong unlimited company; CHINA ORIENT ASSET MANAGEMENT (INTERNATIONAL) HOLDING LIMITED, a Hong Kong limited company; and LUDWIG CHANG, an individual,<br><br>        Defendants. | Case No. 2:18-cv-1269_____<br><br>**COMPLAINT FOR MONETARY AND OTHER RELIEF FOR:**<br><br>**1)   CIVIL CONSPIRACY;**<br><br>**2)   FRAUD;**<br><br>**3)   CIVIL THEFT (CAL. PEN.  CODE § 496):**<br><br>**4)   VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1962(b), 1964(c));**<br><br>**5)   VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1962(c), 1964(c));**<br><br>**6)   CONSPIRACY TO VIOLATE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1962(d), 1964(c));** |

7) **INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**

8) **VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200);**

9) **UNJUST ENRICHMENT; and**

10) **CONSTRUCTIVE TRUST.**

**DEMAND FOR JURY TRIAL**

**COMPLAINT**

239230.68

# TABLE OF CONTENTS

PAGE

**I.** **PRELIMINARY STATEMENT** ........................................................ 8

**II.** **THE PARTIES** .............................................................................. 11

    A.   Plaintiffs. ............................................................................. 11

    B.   Defendants........................................................................... 12

    C.   Principal Unnamed Co-Conspirators. .................................. 13

**III.** **JURISDICTION AND VENUE**. .................................................... 14

    A.   Subject Matter Jurisdiction. ................................................ 14

    B.   Personal Jurisdiction. ......................................................... 15

    C.   Venue. ................................................................................ 17

**IV.** **FACTUAL ALLEGATIONS**. ........................................................ 17

    A.   The Satellite Project. .......................................................... 17

        1.   *STM Atlantic*. ......................................................... 17

        2.   *The Orbital Slot Licenses*....................................... 17

        3.   *The Satellite Project Business Concept and Plan*. ...... 19

    B.   Introduction to DONG YIN. ............................................... 21

    C.   The Export Control Laws..................................................... 22

        1.   *The International Traffic In Arms Regulations*. ......... 23

        2.   *The Export Administration Regulations*. .................. 24

    D.   Defendants Undermine Plaintiffs' Deal with CCTG. ............ 26

    E.   The COSEIG Joint Venture Agreement................................ 27

    F.   The Bronzelink Joint Venture Agreement. ........................... 34

    G.   The Amore Facility Agreement. ........................................... 36

**COMPLAINT**

239230.68

# TABLE OF CONTENTS (CONT.)

**PAGE**

H.  The Series A Share Purchase Agreement. ............................................. 38

I.  The Shareholders Agreement. ................................................................ 41

J.  Plaintiffs Discover Material Inconsistencies Between the
SHA and the Amore Facility Agreement. .............................................. 43

K.  The Officers and Directors of GIP-Cayman and
GIP-USA. ............................................................................................... 46

L.  The False Certifications to SpaceX and Boeing. .................................. 47

M.  The Employment Contracts. .................................................................. 48

N.  DONG YIN's Control and Dominance over the
Governance, Management and Operations of the
Satellite Project. .................................................................................... 50

O.  Mr. Youssefzadeh and Mr. Javed Attempt,
Unsuccessfully, to Address Compliance and
Financing Issues with the GIP-Cayman Board. .................................... 61

P.  DONG YIN Alters and Falsifies the Official Minutes
from the GIP-Cayman Board of Directors Meetings. ........................... 67

Q.  DONG YIN Attempts to Purchase Plaintiffs' Silence .......................... 69

R.  Summary of Defendants' Wrongful Conduct. ...................................... 69

S.  Summary of Money and Property Lost and Stolen ............................... 71

FIRST CAUSE OF ACTION
(For Conspiracy to Defraud)
(By Plaintiffs Against All Defendants) ......................................................... 71

A.  Formation and Operation of the Conspiracy ........................................ 71

B.  Wrongful Acts in Furtherance of the Conspiracy. ............................... 72

C.  Resulting Damages ................................................................................ 84

239230.68

## <u>TABLE OF CONTENTS (CONT.)</u>

**PAGE**

**SECOND CAUSE OF ACTION**
**(For Fraud)**
(By Plaintiffs Against All Defendants).........................................................84

    A.    False and Misleading Representations and False
           Promises. ..............................................................................84

           *(As to DONG YIN's Role in the Governance,*
           *Management and Operations of GIP-Cayman)*..................85

           *(As to Bronzelink and its Relationship*
           *With DONG YIN)* ..................................................87

           *(As to Project Financing)*.........................................87

    B.    Concealment of Material Facts. .............................................88

           *(As to DONG YIN's Relationships*
           *With COSEIG and Bronzelink)* .........................88

           *(As to DONG YIN's Role in the Governance,*
           *Management and Operations of GIP-Cayman)*..................89

           *(As to The Facility Agreement)*.........................89

    C.    Resulting Damages.................................................................90

**THIRD CAUSE OF ACTION ACTION**
**(For Violation of California Penal Code Section 496)**
(By Plaintiffs Against DONG YIN) ...............................................90

**FOURTH CAUSE OF ACTION ACTION**
**(For Civil RICO in Violation of Title 18,**
**United States Code, Sections 1962(b) and 1964(c))**
(By Plaintiffs Against All Defendants).........................................................92

    A.    The "Victim Enterprise." ......................................................93

    B.    The Racketeering Acts. .........................................................93

           1.    *Wire Fraud*.................................................................93

**COMPLAINT**

239230.68

# TABLE OF CONTENTS (CONT.)

**PAGE**

2. *Money Laundering*..................................................................97

C. Injury to Business and Property. ..........................................98

**FIFTH CAUSE OF ACTION**
**(For Civil RICO Conspiracy in Violation of Title 18,**
**United States Code, Section 1962(d) and 1964(c))**
**(By Plaintiffs Against All Defendants)**.......................................98

**SIXTH CAUSE OF ACTION**
**(For Civil RICO in Violation of Title 18,**
**United States Code, Sections 1962(c) and 1964(c))**
**(By Plaintiffs Against All Defendants)**.......................................99

A. The Criminal Enterprise...................................................99

B. The Racketeering Acts. ...................................................100

C. Injury to Business and Property. ........................................100

**SEVENTH CAUSE OF ACTION**
**(For Civil RICO Conspiracy in Violation of Title 18,**
**United States Code, Sections 1962(d) and 1964(c))**
**(By Plaintiffs Against All Defendants)**.......................................100

**EIGHTH CAUSE OF ACTION**
**(For Interference with Prospective Business Advantage)**
**(By Plaintiffs Against DONG YIN)** .........................................101

**NINTH CAUSE OF ACTION**
**(For Unfair Business Practices**
**California Business & Professions Code Section 17200)**
**(By Plaintiffs Against All Defendants)**.......................................103

**TENTH CAUSE OF ACTION**
**(For Unjust Enrichment)**
**(By Plaintiffs Against DONG YIN)** .........................................108

**ELEVENTH CAUSE OF ACTION**
**(For Imposition of Constructive Trust)**
**(By Plaintiffs Against DONG YIN)** .........................................108

239230.68

## <u>TABLE OF CONTENTS (CONT.)</u>

**PAGE**

**PRAYER FOR RELIEF** ........................................................................ 109

**DEMAND FOR JURY TRIAL** ............................................................. 112

**COMPLAINT**

239230.68

Plaintiffs STM Atlantic N.V. ("STM Atlantic"), STM Group, Inc. ("STM Group"), Emil Youssefzadeh and Umar Javed (collectively, "Plaintiffs"), complain against defendants Dong Yin Development (Holdings) Limited ("DONG YIN"), China Orient Asset Management (International) Holding Limited ("COAMI"), and Ludwig Chang ("CHANG") as follows:

## I.      PRELIMINARY STATEMENT

1.      This case arises from Defendants' scheme to steal Plaintiffs' project to design, fabricate, launch and operate a sophisticated communications satellite by means of false and misleading representations, false promises, concealment of material facts and other acts of dishonesty.

2.      Beginning in 2008, Plaintiffs began an ambitious project to develop, launch and operate a state-of-the art communications satellite that would provide High Speed Internet Access ("HSIA") to under-served parts of Africa (the "Satellite Project").  They spent several years and millions of dollars of their own funds developing the Satellite Project.  In 2013, Plaintiffs founded Global-IP Cayman ("GIP-Cayman") as the corporation to own and operate the satellite.

3.      To raise financing for the project, Plaintiffs sought to sell an ownership interest in GIP-Cayman.  In or about October 2015, Plaintiffs were introduced to defendant DONG YIN, which expressed interest in providing financing to GIP-Cayman.  DONG YIN is owned by an instrumentality of the People's Republic of China ("PRC").  The U.S. export control laws place significant restrictions on the transfer of satellite and launch technology and related information to certain foreign governments, including the PRC.  Accordingly, if DONG YIN acquired ownership or control of GIP-Cayman, which had access to satellite and launch technology and related information, that would raise significant issues under U.S. export control laws.

4.      DONG YIN, being fully aware of these export control laws, agreed to provide financing to a purportedly independent company, which would acquire a partial ownership interest in GIP-Cayman.  Defendants repeatedly assured Plaintiffs,

239230.68

orally, in writing and in legal documents, that DONG YIN's role would be limited to providing debt financing to the independent purchaser, and that DONG YIN would not control GIP-Cayman or its Board of Directors as a result of these transactions.

5.     In reliance on these promises, in or about May and June 2016, Plaintiffs entered into a series of transactions with the purportedly independent company, Bronzelink Holdings Limited ("Bronzelink").  In return for agreeing to invest $175 million in, and provide a $25 million line of credit to, GIP-Cayman, Bronzelink obtained a controlling ownership interest in GIP-Cayman, with the right to appoint six members to the nine member GIP-Cayman Board of Directors.  Bronzelink also received valuable confidential and proprietary information pertaining to the Satellite Project, including Plaintiffs' business plan and marketing studies.

6.     In fact, these were among the first acts in a conspiracy that included Defendants and others, known and unknown to Plaintiffs, to effectively steal the Satellite Project from them by various fraudulent and other dishonest means and obtain illegal access to embargoed satellite and launch information technology.

7.     Bronzelink was not an independent company as represented, and DONG YIN was not merely acting as a lender to Bronzelink as also represented. Instead, DONG YIN controlled Bronzelink and used its power to appoint agents of DONG YIN to the GIP-Cayman Board of Directors.  DONG YIN, through its agents, obtained and exercised control over the governance, management and operations of GIP-Cayman, its U.S. subsidiary, Global-IP USA ("GIP-USA"), and the Satellite Project itself.

8.     Following the completion of these transactions, Plaintiffs became increasingly concerned that Defendants were in violation of, or about to violate, the export control laws.  They caused the attorneys for GIP-Cayman and GIP-USA and the General Counsel of these companies to prepare written analyses of potential violations of the export control laws, which were then distributed to both Boards of Directors.  After receiving these analyses, Plaintiff Emil Youssefzadeh called for a

9

**COMPLAINT**

meeting of the GIP-Cayman Board of Directors to discuss changes to their corporate governance to ensure compliance with the export control laws by limiting PRC control and influence over GIP-Cayman and GIP-USA.

9.     Rather than address the serious consequence of DONG YIN having assumed control over GIP-Cayman and GIP-USA, Defendants went into full cover up mode.  The GIP-Cayman Board of Directors, which was under the control of DONG YIN's agents, refused to meet, denying Plaintiffs a quorum, and thereby depriving them of the opportunity to raise this issue with the Board.  The GIP-Cayman Board of Directors also purported to appoint one of the DONG YIN Agents, Yuen Cheung (Tony) Wong ("Wong"), the Executive Director of GIP-Cayman, and place him in control of GIP-Cayman.  Wong and Shiwen Fan ("Fan"), another DONG YIN agent, told Plaintiffs that they could no longer serve as both directors and officers of GIP-Cayman and GIP-USA.

10.    In or about June 2017, Wong gave notice of a GIP-Cayman Board of Directors meeting in which he raised as an agenda item relieving Plaintiffs of their positions with GIP-Cayman and GIP-USA and stripping Mr. Youssefzadeh of the authority to act as GIP-Cayman's CEO.

11.    In view of these threats, and because the GIP-Cayman and GIP-USA Boards of Directors refused to address the serious issue of whether GIP-Cayman and GIP-USA were in violation of the export control laws, which had criminal implications, on June 26, 2017, Plaintiffs resigned as executives from GIP-Cayman and GIP-USA, the companies they had founded and run.

12.    As a result of Defendants' conspiracy, DONG YIN and its agents have obtained control over the Satellite Project, and there is a substantial risk that sensitive satellite and launch technology has fallen, or will fall, into the hands of the PRC.

239230.68

## II.    THE PARTIES

**A.    Plaintiffs.**

13.    Plaintiff STM Atlantic is a company organized under the laws of the Netherlands, with its principal place of business located in El Segundo, California. Prior to April 2016, STM's principal place of business had been in Irvine, California.

14.    Plaintiff STM Group is a Delaware corporation, with a principal place of business in El Segundo, California.  STM Group is the parent corporation of plaintiff STM Atlantic.

15.    Plaintiff Emil Youssefzadeh is an individual residing in Los Angeles County, California.  Mr. Youssefzadeh is the founder or STM Group, and his family trust owns a majority interest in STM Group.  He is also one of the founders of GIP-Cayman, which is discussed below.

16.    Mr. Youssefzadeh is a pioneer in the satellite industry, with Master of Science and Engineer degrees in electrical engineering, with a focus on information theory and satellite communications, from Stanford University.

17.    From 1979 to 1982, Mr. Youssefzadeh worked as a satellite systems engineer for Hughes Aircraft, which is now Boeing Satellite Systems International, Inc. ("Boeing").  His responsibilities included research and development programs for advanced satellite communications payloads and system design of commercial satellite programs.

18.    In 1982, Mr. Youssefzadeh founded STM Wireless, Inc. ("STM Wireless"), which was engaged in the manufacturing of satellite ground terminals.  STM Wireless helped launch the first advanced digital cellular network in Malaysia.  From 2003 to the present, he has been Chairman of STM Group, which acquired the assets of STM Wireless and was engaged in the development of technology, products and services in the communications satellite sector.

239230.68

19.     Plaintiff Umar Javed is an individual residing in Orange County, California.  He has over 20 years of experience in management and business development in the technology and satellite industry.

20.     From 1999 to 2002, Mr. Javed held various positions including commercial manger, sales and marketing director and vice president of sales at STM Wireless.  From 2003 to the present, he has served as President of STM Group, leading the business as it made a number of mergers and acquisitions in Europe, the Americas, the Middle East and Latin America.  While at STM Group, he headed the creation of start-up companies in Brazil and Spain, offering satellite-based solutions and services to the government, enterprise, mobility and maritime sectors.  He holds a master's degree in business administration.

21.     In 2013, Mr. Youssefzadeh and Mr. Javed founded GIP-Cayman as a corporate entity to own and carry on the Satellite Project.  GIP-Cayman is incorporated under the laws of the Grand Caymans; its principal place of business is in El Segundo, California.

**B.    Defendants.**

22.     Defendant DONG YIN is a Hong Kong unlimited company, organized under the laws of Hong Kong SAR, with its principal place of business in Hong Kong SAR.

23.     DONG YIN is a subsidiary of China Orient Asset Management Company ("COAMC"), an agency or instrumentality of the PRC.

24.     Defendant COAMI is a Hong Kong limited company, organized under the laws of Hong Kong SAR, and a subsidiary of DONG YIN.  Its principal place of business is in Hong Kong SAR, but it maintains a U.S. presence and operates through an office, located at 1114 Avenue of the Americas, Suite 3405, New York, New York 10036.

25.     DONG YIN is the 100% owner of, and controls Wise Leader Assets Ltd. ("Wise Leader"), a company formed in the British Virgin Islands.  DONG YIN and

239230.68

1   Wise Leader each is a 50% owner of, and together control, defendant COAMI, as a

2   result of which DONG YIN has 100% control, directly or indirectly, over COAMI.

3        26.    Plaintiffs are informed and believe, and thereon allege, that at all relevant

4   times, DONG YIN and COAMI were alter egos of each other in that there is and was

5   a unity of interest and ownership between DONG YIN and COAMI such that the

6   separateness of these corporations did not and does not really exist, and there would

7   be an inequitable result if the acts of either corporation are treated as those of that

8   corporation alone.

9        27.    Defendant CHANG is, and at all relevant times was, the Executive

10  Director and Co-President of COAMI.  At all relevant times, CHANG was also a

11  Director of Amore Resources Ltd. ("Amore"), which is discussed below.  At all

12  relevant times, CHANG operated out of his executive office, located at 1114 Avenue

13  of the Americas, Suite 3405, New York, New York 10036, which is the same address

14  as COAMI.

15  **C.**    **Principal Unnamed Co-Conspirators.**

16       28.    Fan is and at all relevant times was a citizen of the PRC and an attorney

17  practicing in Beijing, China.  In addition, Fan is and at all relevant times was a

18  member of the Boards of Directors of Bronzelink and GIP-Cayman.  Plaintiffs are

19  informed and believe, and thereon allege, that prior to his appointment to the

20  GIP-Cayman Board of Directors Fan did not have any experience managing or

21  governing a company involved in the design, ownership or operation of satellites or

22  satellite technology.  Fan is and at all relevant times was an agent of DONG YIN,

23  acting within the scope of that agency and with the intent to benefit DONG YIN and

24  in disregard of his duties to Bronzelink and GIP-Cayman.

25       29.    Wong is a relative of Xinyi Dong, a Director of DONG YIN and Amore

26  and a resident of Hong Kong, SAR.  In addition, Wang is and at all relevant times was

27  a member of the Boards of Directors of Bronzelink, GIP-Cayman and GIP-USA.  In

28  or about April, 2017, Wong was appointed Executive Director of GIP-Cayman.  In or

13

**COMPLAINT**

about July, 2017, he was appointed Chairman of the Board of Directors of GIP-Cayman.  Plaintiffs are informed and believe, and thereon allege, that prior to his appointment to the GIP-Cayman Board of Directors Wang did not have any experience managing or governing a company involved in the design, ownership and operation of satellites or satellite technology.  Wong is and at all relevant times was an agent of DONG YIN, acting within the scope of that agency and with the intent to benefit DONG YIN and in disregard of his duties to Bronzelink, GIP-Cayman and GIP-USA.

30.     Bonnie Shiyue Liu ("Liu") is and at all relevant times was a member of the Boards of Directors of Bronzelink, GIP-Cayman and GIP-USA, and the controller of GIP-Cayman and GIP-USA.  In or about July, 2017, Liu was appointed Secretary of the Board of Directors of GIP-Cayman.  Plaintiffs are informed and believe, and thereon allege, that prior to her appointment to the GIP-Cayman Board of Directors Liu did not have any experience managing or governing a company involved in the design, ownership and operation of satellites or satellite technology.  Liu is and at all relevant times was an agent of DONG YIN, acting within the scope of that agency and with the intent to benefit DONG YIN and in disregard of her duties to Bronzelink, GIP-Cayman and GIP-USA.

### III.     JURISDICTION AND VENUE.

**A.     Subject Matter Jurisdiction.**

31.     This Court has subject matter jurisdiction over this matter pursuant to Title 28, United States Code, section 1331, in that it includes claims that arise under the laws of the United States, and pursuant to Title 28, United States Code, section 1367, in that the claims arising under state law are so related to the claims arising under United States law that they form part of the same case or controversy under Article III of the United States Constitution.

**B.      Personal Jurisdiction.**

32.      This Court has personal jurisdiction over Defendants in this action pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and California Code of Civil Procedure section 410.10 in that (a) Defendants, and each of them, have purposefully directed their activities and consummated transactions with residents of California and have purposefully availed themselves of the privilege of conducting activities in California, thereby invoking the benefits and protections of its laws; (b) the claims against Defendants, and each of them, arise out of and relate to each Defendants' forum-related activities; and (c) the exercise of jurisdiction over Defendants, and each of them, comports with fair play and substantial justice.

33.      This court has personal jurisdiction over Defendants *inter alia* because:

(a)      Plaintiffs resided in California at all relevant times, and were located in California when Defendants, and each of them, made fraudulent representations, fraudulent promises and/or concealed material facts from them in furtherance of the scheme to defraud them and steal their property, as alleged herein;

(b)      Some of the false representations and promises alleged above were made by Defendants in California, as alleged herein;

(c)      Property that Defendants obtained by theft, including Plaintiffs' confidential business plan, was at all relevant times located in California;

(d)      The theft was accomplished in part through contracts that were executed by certain Plaintiffs in California based on false representations, false promises and the concealment of material facts;

(e)      One of these contracts was also executed by Fan, acting as an agent of DONG YIN, in California.

(f)      The principle place of business of GIP-Cayman is El Segundo, California;

(g)      The principle place of business of GIP-USA is El Segundo, California;

239230.68

(h)     As the controller for GIP-Cayman, and GIP-USA Liu worked in the GIP-USA offices in El Segundo, California;

(i)     Fan and Wong often travelled to the GIP-USA offices in El Segundo, California in their capacities as agents of DONG YIN, and on these trips furthered their scheme to defraud Plaintiffs and take control of the governance, management and operations of GIP-Cayman and GIP-USA, as alleged herein;

(j)     Fan, Wong and Liu, acting as agents of DONG YIN, attended meetings of the GIP-Cayman Board of Directors in California;

(k)      In or about August, 2016, GIP-Cayman entered into a contract with Boeing to manufacture the satellite and provide other services for the Satellite Project which was executed and to be performed in California;

(l)     In or about March, 2017, GIP-Cayman entered into a contract with Space Explorations Technology Corp. ("SpaceX") to launch the satellite which was executed and to be performed in part in California; and

(m)     In June, 2017, after Plaintiffs raised the issue of whether Defendants and their conspirators were violating the export control laws, Wong travelled to El Segundo, California, told Plaintiffs that they should not concern themselves with compliance issues pertaining to the export control laws, and retaliated against Plaintiffs by informing them that they could be either officers or directors of GIP-Cayman but could no longer hold both positions.

(n)     In November, 2017, two DONG YIN consultants travelled to California and informed Plaintiffs that they were willing to pay them if they stopped insisting on compliance with the export control laws and agreed to remain shareholders in GIP-Cayman.

239230.68

**C.     Venue.**

34.     Venue for this matter properly lies within the Central District of California pursuant to Title 18, United States Code, section 1391(b)(2), in that a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

## IV.     FACTUAL ALLEGATIONS.

**A.     The Satellite Project.**

     *1.     STM Atlantic.*

35.     STM Atlantic was founded by Mr. Youssefzadeh in 2003. STM Atlantic's original business was to manufacture and sell very small aperture terminal ("VSAT") equipment, which is a two-way ground station that transmits and receives data from satellites.  STM Atlantic was successful in manufacturing and selling VSAT equipment.

36.     In the mid- 2000s, STM Atlantic began to transition into the provision of satellite services, creating the Satellite Project with the goal of designing, financing, fabricating, launching, operating and owning communications satellites that provided HSIA and other Broadband services to portions Africa and elsewhere.

     *2.     The Orbital Slot Licenses.*

37.     In August 2008, as an initial step in bringing the Satellite Project to fruition, STM Group, through its subsidiary STM Norway, made its first regulatory filing for Orbital Slots with the International Telecommunications Union ("ITU") in Switzerland and the government of Norway.

38.     The ITU is a specialized agency of the United Nations that coordinates the shared global use of the radio spectrum, promotes international cooperation in assigning satellite orbit positions, works to improve telecommunication infrastructure in the developing world, and assists in the development and coordination of worldwide technical standards.

239230.68

39.     A key function of the ITU is to assign and coordinate Orbital Slots for geosynchronous satellites.  Geosynchronous satellites are satellites that have an orbital period that is the same as the Earth's rotation period.  As a result, they stay in the same place in the sky, relative to a position on the ground, which makes them useful for communications, television broadcasting and providing HSIA.

40.     Any company or government that wants to place a satellite in geosynchronous orbit is required to obtain a license, known as an Orbital Slot License, from the ITU.  Among other things, this requirement prevents satellites from interfering with each other.

41.     In 2012, STM Group, through STM Norway, applied to the Administration of Norway for Orbital Slot Licenses.  STM Group chose Norway for their filing because it had a strong presence in that country, employed qualified technical staff there, and intended to manage and control the satellite through its presence in Norway.

42.     To obtain the desired Orbital Slot Licenses, STM Norway needed to pay filing fees to the ITU and to the Administration of Norway.  STM Norway also needed to demonstrate that it had sufficient expertise in the satellite field to convince the government of Norway that it would be able to launch a satellite during the license period.  Finally, STM Norway needed to demonstrate that its proposed satellite would not interfere with any existing satellites.  Plaintiffs made the necessary payments and were able to satisfy each of these conditions.

43.     In or about June 2012, STM Norway obtained Orbital Slot Licenses for 18W and 15.5W (the "STM Orbital Slots").  The STM Orbital Slots were extremely valuable because they were in a priority position relative to others for the expected time the proposed satellite could be Brought Into Use ("BIU"); had a good view towards the earth in relation to the target coverage area (sub-Saharan Africa); and could be coordinated with other adjacent satellites in frequency to be able to access the largest amount of frequency spectrum over the coverage area.

**COMPLAINT**

239230.68

44.     Orbital Slot Licenses are valid for a period of seven years.  If they are not used during that time frame, they expire and have no value.  The STM Project Orbital Slot Licenses expire in June 2019.

45.     In 2013, STM Norway transferred its rights in the Orbital Slot Licenses to Dub Dub, a Norwegian Company that in 2015 became a wholly-owned subsidiary of GIP-Cayman.

### 3.     *The Satellite Project Business Concept and Plan.*

46.     In or about 2009 and 2010, as part of the Satellite Project, STM Group and STM Atlantic further developed their business concept of providing communication satellite services to sub-Saharan Africa.  Their goal was to design, fabricate and launch a satellite and become a dominant provider of Broadband services, including HSIA, in sub-Saharan Africa.  Internet service in Africa is typically limited to the largest cities.  But approximately 70% of Africa's population does not live in the cities.  Accordingly, Plaintiffs wanted to become the driver for providing, and bringing down costs for, Broadband services and HSIA in those unserved, or under-served, parts of Africa.

47.     Plaintiffs planned to profit from the Satellite Project by leasing capacity on the satellite to governments and private providers.  The Satellite Project was projected to earn approximately US$1.5 billion in profits over the life of the satellite.

48.     STM Atlantic commissioned and paid for marketing studies, identifying their biggest competitors and attempting to ascertain potential customers for the Satellite Project.  The target customers were governments, mobile network operators and Internet Service Providers.

49.     In or about 2010, STM Atlantic started discussions with various companies, including Mitsubishi (in Japan), Space Systems Loral (in Palo Alto), Thales (in France) and Boeing (in El Segundo) to manufacture the satellite.

50.     In or about 2010, STM Atlantic engaged a law firm in the District of Columbia (the "Washington Law Firm"), which had an attorney experienced with

**COMPLAINT**

satellite related export restrictions (the "Washington Attorney") to provide advice regarding regulations and financing for the Satellite Project.

51.    In or about February 2012, Plaintiffs completed their first business plan for the Satellite Project.  The plan needed to, and did, address every component of that project, including:  (a) financing; (b) development; (c) manufacture; (d) delivery; (e) launch; (f) maintenance and operation of the satellite using satellite control facilities; (g) orbital locations; (h) ground system and gateways; and (i) required launch and in-orbit insurance.  This was an extremely involved process that required significant time, money and expertise.

52.    A key component of the business plan was the technical design of the satellite.  Plaintiffs prepared the initial design for a state-of-the-art 7.7-ton solar-powered satellite, with maximum Broadband capacity and a 15-year anticipated lifespan.  The design had to factor in the weight, power and performance of the satellite, and had to provide sufficient capacity in the specific markets and at geographic locations where the capacity would be needed.  The design also had to consider the whereabouts of approximately a dozen gateways to the Internet cloud to be established in Europe in such a way that interference with the satellite could be minimized.

53.    The satellite design work was begun at STM Group in or about 2011.  It involved significant amounts of Mr. Youssefzadeh's time and skills, the participation of the STM Atlantic engineering staff, and the work of a satellite expert hired by STM Atlantic and supervised by Mr. Youssefzadeh.

54.    In or about 2013, STM Atlantic sold its operating assets so it could focus exclusively on the Satellite Project.  In or about April 2013, Plaintiffs incorporated GIP-Cayman under the laws of the Grand Caymans.  GIP-Cayman became a subsidiary of STM Atlantic.  Plaintiffs created GIP-Cayman to be the company that owned and operated the satellite.

239230.68

55.     In or about July 2012, Mr. Youssefzadeh and Mr. Javed recruited Bahram Pourmand ("Pourmand") to become part of the Satellite Project.  At that time, Pourmand was an executive with Hughes Communications, Inc. ("Hughes"), and was well-known in the satellite industry.  At the time, Mr. Youssefzadeh and Mr. Javed believed that Pourmand could be instrumental in raising funds to further finance the Satellite Project.  Accordingly, they offered him a 37% share of GIP-Cayman.  Pourmand agreed, acquiring and holding his interest in GIP-Cayman through his company, Steadyspace Limited.

**B.     Introduction to DONG YIN.**

56.     Satellite projects typically require several hundred million dollars in financing to fabricate, launch and operate the satellite.  Plaintiffs sought to sell an equity interest in GIP-Cayman to obtain the first tranche of funding needed for the next step in the Satellite Project.

57.     In or about July 2015, Pourmand introduced Mr. Youssefzadeh and Mr. Javed to Hady Hartanto ("Hartanto"), who was introduced as a principal in a company called TechCap.  Hartanto expressed immediate interest in the Satellite Project and assured Mr. Youssefzadeh and Mr. Javed that he and his company had valuable contacts in Asia that could help them obtain financing for the Satellite Project.

58.     Based on Hartanto's representations, Mr. Youssefzadeh and Mr. Javed offered him an ownership interest in GIP-Cayman if he was able to secure $100 million dollars in financing for the Satellite Project and arrange for EXIM financing or an additional loan.

59.     In or about July 2015, Hartanto and his partner, Ruifeng Lyu ("Lyu"), introduced Mr. Youssefzadeh, Mr. Javed and Pourmand to Zhiyuan Geng ("Geng"), a high ranking PRC official.  Plaintiffs are informed and believe, and based thereon allege, that Geng was also a high level executive at DONG YIN.

239230.68

60.     Mr. Javed subsequently visited Beijing at the request of Pourmand, where he and Geng met with representatives of COAMC, which is fully owned by the PRC. COAMC expressed an interest in the Satellite Project and the acquisition of an interest in GIP-Cayman.

61.     On or about September 9, 2015, Pourmand met with Hartanto; Charles Lau of TechCap; Yang Zeng, the Chairman of the DONG YIN Board of Directors; Din Yi Dong, DONG YIN's Vice Managing Director; Terry Long, a DONG YIN executive; and CHANG, COAMI's Executive Director and Co-President.

62.     During that September 9, 2015 meeting, Hartanto pressured Pourmand to set up meetings with satellite manufacturers.  Pourmand set up meetings for Hartanto and representatives of DONG YIN with Hughes and SSL.

63.     Mr. Youssefzadeh, Mr. Javed and Pourmand provided a draft financing agreement to TechCap.  On or about September 10, 2015, Lau sent a revised draft of that agreement back to Mr. Youssefzadeh, Mr. Javed and Pourmand, proposing to acquire 75% of GIP-Cayman in return for a $100 million investment.

64.     On or about September 10, 2015, Pourmand responded to Hartanto's email, rejecting the proposed terms.

65.     The potential involvement in the Satellite Project of a company related to the PRC raised important compliance issues under U.S. export control laws.  Plaintiffs understood that the involvement of any PRC person or entity in the Satellite Project would require that proper firewalls be put in place to ensure compliance with those laws, the violation of which could be punished criminally.

**C.     The Export Control Laws.**

66.     In order to safeguard the national security, a comprehensive series of federal regulations, including the International Traffic in Arms Regulations ("ITAR") and the Export Administration Regulations ("EAR"), provide that certain technology required to build and launch satellites cannot be exported or provided to specified foreign countries, including the People's Republic of China ("PRC").

**COMPLAINT**

239230.68

### 1. *The International Traffic In Arms Regulations.*

67.   ITAR are import/export regulations established under the U.S. Arms Export Control Act, Title 22, United States Code section 2751, *et seq.*

68.   ITAR provides that it is the policy of the U.S. to deny licenses and other approvals for exports and imports of defense articles and defense services, including satellite technology, to the PRC (the "PRC Proscription").  Title 22, Code of Federal Regulations, section 126.1(d).

69.   The transfer of control of a satellite subject to ITAR to a "foreign person" is considered an "export" under ITAR.  Title 22, Code of Federal Regulations, section 120.17(c).

70.   ITAR defines "foreign person" to include natural persons who are not lawful permanent residents, foreign corporations and business associations, as well as any agency or subdivision of a foreign government.  Title 22, Code of Federal Regulations, section 120.16.

71.   ITAR further provides that the transfer of technical data subject to ITAR to a foreign person is deemed to be an export to all countries in which the foreign person has held or holds citizenship or holds permanent residency.  Title 22, Code of Federal Regulations, sections 120.17, 120.50.  The satellite and launch technology involved in the Satellite Project includes "technical data" subject to ITAR.

72.   Any person, including a corporation, who engages in the U.S. in the business of manufacturing or exporting, temporarily importing defense articles, or furnishing defense services, is required to register with the Directorate of Defense Trade Controls.  If the intended registrant is foreign owned, or foreign controlled, the certification must include an explanation of such ownership or control, including the identities of the foreign person or persons who ultimately own or control the registrant.  Title 22, Code of Federal Regulations, section 122.2.

73.   Under ITAR, "foreign ownership" means that more than 50% of the outstanding voting securities of the company are owned by one or more foreign

239230.68

persons Title 22, Code of Federal Regulations, section 120.16. "Foreign control" means one or more foreign persons have the authority or ability to establish or direct the general policies or day-to-day operations of the company. Foreign control is presumed to exist where foreign persons own 25% or more of the outstanding voting securities of the company, unless one U.S. person controls an equal or larger percentage. Title 22, Code of Federal Regulations, section 120.37.

74. The penalties for violating ITAR are severe. Any person who knowingly violates any provision of the Arms Control Act could be sentenced to 20 years in prison and fined for each violation as much as $1,000,000. *See* 22 C.F.R. §§ 127.3, 2778, 2779. The violation of ITAR may also result in civil penalties and debarment from participating in any activities that are subject to ITAR. Title 22, Code of Federal Regulations, sections 127.7, 127.10.

### 2. *The Export Administration Regulations.*

75. EAR are regulations promulgated by the U.S. Department of Commerce's Bureau of Industry and Security for the purpose of implementing the U.S. Export Administration Act of 1979, Title 50, United States Code Appendices section 2401, *et seq.*

76. The export control provisions of EAR are intended to serve the national security, foreign policy, nonproliferation of weapons of mass destruction, and other interests of the U.S. Some controls are designed to restrict access to items subject to EAR by countries or persons that might apply such items to uses inimical to U.S. interests. Title 15, Code of Federal Regulations, section 730.6.

77. Like ITAR, EAR contains a PRC Proscription, which prohibits certain technology from being exported to the PRC. Any license applications to export items or services to the PRC that are categorized as being controlled for reasons of "National Security," are subject to a policy of denial. Title 15, Code of Federal Regulations, section 742.4(b)(1)(iii).

**COMPLAINT**

239230.68

78.     EAR provides that satellites cannot be exported to the PRC.  In addition, the satellite and launch technology involved in the Satellite Project includes technology that falls within EAR's PRC Proscription.  Title 15, Code of Federal Regulations, section 772.1.

79.     As with ITAR, violations of EAR carry significant civil and criminal penalties, including, for a willful violation of EAR, imprisonment for up to ten years.

80.     Depending upon the facts of the particular case, conduct that constitutes a violation of ITAR or EAR, also often involves a violation of another federal criminal law, such as Title 18, United States Code ("U.S.C.") section 371 (criminal conspiracy), 18 U.S.C. § 1001 (false statements to a federal agency), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. §§ 1956 and 1957 (money laundering).

81.     Three recent cases demonstrate the potentially serious consequences of violating the export control laws.  In *U.S. v. Zuccarelli*, U.S. District Court for the Eastern District of Texas, Case No. 4:17-cr-00117-ALM-KPJ, a Texas man was sentenced to 46 months in prison, a $50,000 fine, and three years of supervised release for violating the export control laws by conspiring to smuggle and illegally export radiation hardened integrated circuits for use in Russia's and China's space programs.  In *U.S. v. Xu*, U.S. District Court for the Southern District of New York, Case No. 7:16-cr-00010-KMK, a Chinese national was sentenced to five years in prison pursuant to his guilty plea for stealing proprietary source code from his former employer with the intent of benefitting the PRC. And in *U.S. v. Shih*, U.S. District Court for the Central District of California, Case No. 2:18-cr-00050-JAK, two Southern California men were arrested in January 2018, and charged with, among other things, conspiring to have a U.S. company make special high-speed computer chips that were then exported to a Chinese company in violation of the export control laws.

239230.68

82.     Because of the importance of ensuring compliance with ITAR and EAR, companies that deal in satellite technology may require customers seeking access to that technology to certify that they are not owned or controlled, directly or indirectly, by countries such as the PRC.  Based on their understanding of ITAR, EAR, and the PRC Proscription, Plaintiffs determined that they did not want to pursue any business relationship in which COAMC obtained an equity interest in GIP-Cayman.

**D.      Defendants Undermine Plaintiffs' Deal with CCTG.**

83.     As of September 2015, Plaintiffs had come to believe that Hartanto and Lyu had misrepresented their ability to provide and/or raise financing for the Satellite Project.  While they had initially represented themselves as businessmen and investors, it became clear that they were just middlemen looking to connect Plaintiffs with potential funding sources in the PRC.  As a result, Plaintiffs began to seriously question Hartanto and Lu's ability to actually structure a viable financing transaction, and decided that they did not want to have any further business involvement with TechCap.  Accordingly, in or about August 2015, Plaintiffs entered into direct negotiations with another potential financing source, Huaxun Shenzhen/CCT Group ("CCTG").

84.     The negotiations with CCTG gained momentum in or about September 2015, and, on or about September 12, 2015, Mr. Youssefzadeh and Mr. Javed signed a Memorandum of Understanding ("MOU") with CCTG.

85.     Pursuant to the terms of the MOU, CCTG assumed responsibility for securing equity and debt financing for the Satellite Project in return for 63% of the shares in GIP-Cayman.

86.     On September 17, 2015, Pourmand sent an email to Mr. Youssefzadeh and Mr. Javed, referring to the CCTG deal as "a dream," and indicating that he was no longer interested in working with Hartanto.

87.     On or about September 19, 2015, Lau from TechCap sent an email to Pourmand, Mr. Youssefzadeh and Mr. Javed, copying Hartanto.  In his email, Lau

239230.68

1   stated that "[w]e have come this far and really hate to see this project go."  Lau then

2   proposed certain steps to preserve TechCap's participation in the project, including

3   producing a letter from COAMC confirming its "in-principle approval for the $200m

4   loan."

5       88.     In or about late September 2016, CCTG's representative informed

6   Mr. Youssefzadeh and Mr. Javed that CCTG had to withdraw from the deal.  The

7   representative indicated that he had been pressured by Hartanto and Lyu from

8   TechCap as well as persons representing COAMC and DONG YIN to withdraw.

9   **E.      The COSEIG Joint Venture Agreement.**

10      89.     On or about October 5, 2015, Mr. Youssefzadeh received an email from

11  Ivan Chow.  Ivan Chow introduced himself as "the sole representative of

12  Mr. Geng Zhiyuan and Yang Zeng of Dong Yin Development (Holdings) Limited

13  regarding the business dealings related to the [*sic*] Global IP."

14      90.     On or about October 5, 2015, in response to an email from

15  Mr. Youssefzadeh, Ivan Chow falsely represented that neither he nor his company,

16  COSEIG, had any affiliation with TechCap or its associates.  In fact, TechCap was

17  still involved in the transaction, and had been promised a 12% interest in COSIEG for

18  its role in the anticipated transaction.

19      91.     On or about October 14, 2015, Ivan Chow sent an email to Mr. Javed,

20  enclosing a letter from his company's lawyer, falsely certifying that COSEIG's

21  shareholders and management did not have any connection with TechCap, and that

22  COSEIG did not have any existing agreement or business dealings with TechCap.

23      92.     On or about October 15, 2015, Mr. Javed sent an email to Ivan Chow,

24  asking for additional information regarding COSEIG, as well as information regarding

25  Fan, a PRC national, and his involvement in any deal with COSEIG.  (Mr. Javed had

26  first met Fan when he was first introduced to COAMC in or about July 2015).

27      93.     Ivan Chow responded to Mr. Javed's email, representing that:

28  (a) COSEIG was a Special-Purpose Vehicle for investment; (b) COSEIG would fully

---

27

**COMPLAINT**

disclose its registry documents (registration certificate, Memorandum and Articles of Associations, directors, shareholders and beneficiaries) once both parties are ready to pursue a deal; (c) DONG YIN was COSEIG's financial partner; (d) Fan was DONG YIN's lawyer; and (e) Ivan Chow's role was to identify, evaluate and negotiate with potential companies to invest $200 million in funds on deposit in a Hong Kong bank.

94.     In October 2015, Ivan Chow travelled to California to meet with Mr. Youssefzadeh and Mr. Javed.  In the course of arranging this meeting, both Ivan Chow and Fan informed Mr. Youssefzadeh and Mr. Javed that they were representatives of DONG YIN.

95.     During that October 2015 visit, Ivan Chow met with Mr. Youssefzadeh and Mr. Javed in Newport Beach, California.  During this meeting, Mr. Youssefzadeh asked for assurances that DONG YIN did not own or control COSEIG, and Ivan Chow provided those assurances.

96.     Ivan Chow further represented to Mr. Youssefzadeh and Mr. Javed that COSEIG was solely owned by Pok Kit Chow, a wealthy Hong Kong businessman and investor who intended to borrow money from DONG YIN to invest in GIP-Cayman, and that COSEIG was completely independent of PRC influence and control. Ivan Chow did not disclose, however, that Pok Kit Chow was his brother and that Pok Kit Chow had recently obtained ownership of COSEIG when Hoi Ying (Charles) Yiu ("Yiu") transferred the ownership of all 50,000 shares of COSEIG stock, at $1 per share, to him in or about August 2015.  Plaintiffs are informed and believe, and thereon allege, that at all relevant times, COSEIG was controlled by DONG YIN and that DONG YIN had merely arranged for Pot Kit Chow to be the nominal owner of COSEIG.

97.     During a meeting in Irvine, California on or about December 3, 2015, Ivan Chow represented to Mr. Youssefzadeh and Mr. Javed that COSEIG was a

239230.68

1   special purpose investment company with no desire or intent to become engaged in

2   the operation of GIP-Cayman.

3       98.    On or about December 3 and 4, 2015, Mr. Youssefzadeh and Mr. Javed

4   attended meetings at STM Atlantic's offices in Irvine, California.  Those meetings

5   were also attended by Fan, Ivan Chow, Pourmand and Amir Irani ("Irani"),

6   Pourmand's stepson.  The purpose of those meetings was to finalize the terms of a

7   Joint Venture Agreement between COSEIG, Plaintiffs, Pourmand and SteadySpace.

8       99.    During these meetings, Fan asked if there would be any compliance

9   issues under the export control laws given that COSEIG intended to borrow money

10  from DONG YIN.  Mr. Youssefzadeh and Mr. Javed told Fan that DONG YIN's

11  involvement as a lender would not create a compliance problem as long as

12  (a) DONG YIN's role was limited to providing debt financing; (b) COSEIG was truly

13  independent; and (c) the GIP-Cayman Board of Directors was independent and free of

14  any PRC influence.  Fan expressly promised Mr. Youssefzadeh and Mr. Javed that a

15  structure that complied with the U.S. export control laws was being put into place.

16      100.   On or about December 4, 2016, after Fan made this promise, he signed

17  the COSEIG Joint Venture Agreement on behalf of COSEIG.  The Joint Venture

18  Agreement was executed in Irvine, California.  Plaintiffs STM Atlantic,

19  Mr. Youssefzadeh and Mr. Javed all signed the Joint Venture Agreement in reliance

20  on the representations that COSEIG was an independent company and that it was not

21  under the control of DONG YIN.

22      101.   In fact, COSEIG was not an independent company as represented; it was

23  controlled by DONG YIN.  In reality, DONG YIN never intended to be merely a

24  passive lender; rather, it intended to acquire control over the Satellite Project through

25  COSEIG or another sham owner.

26      102.   The COSEIG Joint Venture Agreement provided that, subject to certain

27  "due diligence conditions and other conditions for Completion," COSEIG would

28  make a $175 million dollar equity investment in GIP-Cayman in return for 30,000,000

29

**COMPLAINT**

1    newly issued shares in GIP-Cayman, which would give COSEIG a 75% ownership

2    interest in GIP-Cayman.  The COSEIG Joint Venture Agreement further provided that

3    COSEIG would have the right to appoint six directors to the nine-member

4    GIP-Cayman Board of Directors.

5         103.   The relationship was characterized as a joint venture because COSEIG

6    did not intend to passively rely on Plaintiffs to manage GIP-Cayman and make the

7    Satellite Project successful.  Rather, COSEIG demanded a role in the governance,

8    management and operations of GIP-Cayman.

9         104.   Subsequent to entering into the COSEIG Joint Venture Agreement,

10   Mr. Youssefzadeh and Mr. Javed asked the Washington Attorney to review the

11   Agreement to determine if it provided sufficient safeguards to ensure compliance with

12   the export control laws considering that the financing was being provided by

13   DONG YIN.

14        105.   After reviewing the COSEIG Joint Venture Agreement, the Washington

15   Attorney told Mr. Youssefzadeh and Mr. Javed that he could help ensure compliance

16   with the export control laws, and suggested that the Washington Law Firm represent

17   DONG YIN to make sure that DONG YIN knew and respected the limits on its

18   participation as a lender to COSEIG.  Plaintiffs agreed with this approach, and trusted

19   the Washington Attorney to ensure that DONG YIN's role in the transaction was

20   properly limited.  In fact, rather than assisting Plaintiffs in making sure that COSEIG

21   would be an effective firewall between DONG YIN and GIP-Cayman, the

22   Washington Attorney actively facilitated DONG YIN's effort to obtain dominance

23   and control over the Satellite Project by aiding and abetting DONG YIN's deception

24   of Plaintiffs.

25        106.   In or about early December 2015, Plaintiffs learned that Hartanto and

26   Lyu owned a 12% share in COSEIG.  Plaintiffs are informed and believe, and based

27   thereon allege, that Hartanto and Lyu were given this interest in COSEIG as a

28   "finder's fee" for introducing Plaintiffs to DONG YIN.

**COMPLAINT**

239230.68

107.   In or about early December 2015, Hartanto sent a text message to Pourmand expressing concern that COSEIG did not intend to honor its deal with TechCap.  Pourmand shared that text message with Plaintiffs.

108.   On or about December 11, 2015, Mr. Javed sent an email to Pourmand, copying Mr. Youssefzadeh.  In that email, Mr. Javed confirmed that he and Mr. Youssefzadeh had told Ivan Chow that while they have no objections to Hartanto and Lyu owning a 12% interest in COSEIG, they were adamant in insisting that Hartanto and Lyu could not have any involvement in the Global IP business.

109.   On or about December 12, 2015, Mr. Javed forwarded his correspondence with Pourmand, including Hartanto's text message, to Ivan Chow. Ivan Chow responded that same day, indicating that he had "no intention nor the authority to change the 12% status."

110.   After they entered into the COSEIG joint venture, COSEIG proposed conducting due diligence jointly with DONG YIN.  That due diligence took place in Dubai or about on January 11 and 12, 2016.  Mr. Youssefzadeh and Mr. Javed arranged for COSEIG and DONG YIN to meet with a potential customer.  The attendees were CHANG; Fan; Yang Zeng, Chairman of the Board of DONG YIN; Xinyi Dong, Vice Managing Director of DONG YIN; Zhanyu David Zhang, a DONG YIN executive; Terry Long, also a DONG YIN executive; Zhaohui Sui, from DONG YIN; Senlin Liang, from DONG YIN; Ivan Chow, from COSEIG; and Mr. Javed.

111.   During the January 11and 12, 2016 due diligence meeting in Dubai, CHANG, Fan, Ivan Chow, CHANG, Yang Zeng, David Zhang, and Xinyi Dong repeatedly represented to Mr. Javed that COSEIG was independent from DONG YIN and that DONG YIN was only a lender.  As stated above, these representations were false because at all relevant times COSEIG was controlled by DONG YIN.

112.   On or about January 28, 2016, Ivan Chow emailed Mr. Youssefzadeh, Mr. Javed and Pourmand, on behalf of Fan, that COSEIG's $250 million financial

**COMPLAINT**

239230.68

proposal had been formally approved by DONG YIN, creating the false impression that COSEIG and DONG YIN were independent, unrelated entities, and concealing the fact that COSEIG was, in reality, under the control of DONG YIN.

113.   On or about January 31, 2016, Ivan Chow informed Mr. Youssefzadeh and Mr. Javed that to have a "smooth EXIM bank loan process," they would need to split the COSEIG Joint Venture Agreement into two separate agreements: a Share Purchase Agreement and a Shareholders Agreement.

114.   In or about early February 2016, Ivan Chow suddenly disappeared from the transaction.  Mr. Youssefzadeh and Mr. Javed attempted to locate him, but they were told by Fan cease their efforts.

115.   On or about February 7, 2016, Mr. Youssefzadeh and Mr. Javed attended a meeting in Washington, D.C.  The meeting was also attended by Fan; Henry Fan, who was a paid advisor to DONG YIN and Fan; the Washington Attorney; and others. At that meeting, Plaintiffs were told that COSEIG was being replaced in the transaction by a different entity, later identified as Bronzelink.

116.   On or about February 16, 2016, during an in-person meeting at Bronzelink's Washington attorneys' office, CHANG orally represented and promised to Mr. Youssefzadeh (participating telephonically from California), Mr. Javed and Pourmand that, (1) after the closing, DONG YIN would have no control of GIP-Cayman; and (2) DONG YIN had no intention of controlling or influencing GIP-Cayman and was relying on the Mr. Youssefzadeh and Mr. Javed to run the business after the closing.

117.   The Washington Attorney explained that this change was being made at DONG YIN's insistence.  At that time, Fan represented to Plaintiffs that Bronzelink, like COSEIG, was owned by wealthy Hong Kong investors who had no affiliation to DONG YIN.  Mr. Youssefzadeh and Mr. Javed would learn only later, however, that Yiu, the prior owner of COSEIG, was also the purportedly "wealthy" owner of Bronzelink; that Bronzelink's Board of Directors was selected by DONG YIN; and

**COMPLAINT**

that the misrepresentations that COSEIG, and later Bronzelink, were separate and independent from DONG YIN was a ruse by DONG YIN to gain dominance and control over GIP-Cayman and the Satellite Project.

118.   On or about February 11, 2016, Fan emailed Plaintiffs a "bridge" document identifying terms of the then-existing COSEIG – GIP-Cayman Agreement that had to be revised and eventually separated into an investment agreement and a shareholder agreement with the new, yet to be identified, Hong Kong entity.  The "bridge" document included terms allowing COSEIG/NewCo to have the right to appoint a majority of the directors to GIP-Cayman's Board, and provided that this right attached to the terms of the stock in GIP-Cayman that COSEIG/NewCo was to receive, such that if DONG YIN foreclosed on the shares, it would have the right to control the Board.

119.   On or about February 16, 2016, during a meeting at the offices of Bronzelink's attorney, CHANG represented to Mr. Youssefzadeh and Mr. Javed, as well as Pourmand, that after the closing: (a) DONG YIN would have no control of GIP-Cayman; and (b) DONG YIN had no intention of controlling or influencing GIP-Cayman and was relying on Mr. Youssefzadeh and Mr. Javed to operate the business after the closing.  The meeting was attended by Mr. Youssefzadeh by telephone from his home in Los Angeles.

120.   On or about February 18, 2016, Yiu, as sole director of Bronzelink, issued an authorization that "Mr. Fan Shiwen be [the] authorized representative to sign the agreement related to equity investment into GLOBAL-IP CAYMAN."

121.   On or about February 21, 2016, the Washington Attorney, counsel for DONG YIN, emailed Mr. Youssefzadeh, Mr. Javed, Fan and others, noting that, as a general matter, the parties needed to be mindful of any direct or indirect PRC influence or control of GIP-Cayman, via Board Members or otherwise.

122.   On or about February 23, 2016, during a meeting at the offices of Bronzelink's Washington attorneys, Fan, Henry Fan, acting as agents of DONG YIN,

**COMPLAINT**

239230.68

1   and their attorneys falsely represented to Plaintiffs that Bronzelink was an

2   independent, stand-alone entity with no affiliation with DONG YIN.

3   **F.     The Bronzelink Joint Venture Agreement.**

4          123.   On February 25, 2016, the COSEIG Joint Venture Agreement was

5   terminated.  It was replaced by the Bronzelink Joint Venture Agreement dated

6   February 25, 2016, which was virtually the same as the COSEIG Joint Venture

7   Agreement, except for the name change.  Bronzelink, like COSEIG, did not intend to

8   passively rely on Plaintiffs to manage GIP-Cayman and make the Satellite Project

9   successful, but instead demanded a role in the governance, management and

10   operations of GIP-Cayman.

11          124.   Prior to entering into the Bronzelink Joint Venture Agreement,

12   Mr. Youssefzadeh and Mr. Javed were falsely assured on multiple occasions by

13   DONG YIN's agents and representatives that Bronzelink was fully independent of

14   DONG YIN, including as follows:

15          (a)    Between in or about late January and early February 2016, DONG YIN's

16                 Washington Attorney telephoned Mr. Javed in California and represented

17                 that COSEIG would be swapped out in the Agreement for another

18                 company, which was yet to be identified, because COSEIG's name was

19                 too similar to COAMC.  In this and other telephone conversations during

20                 this time period, the Washington Attorney, counsel for DONG YIN,

21                 falsely promised that DONG YIN would not control or dominate the

22                 governance, management and operation of GIP-Cayman.

23          (b)    On or about February 16, 2016, during a meeting in Washington, D.C.,

24                 CHANG represented to Mr. Youssefzadeh, Mr. Javed and Pourmand that

25                 after the closing DONG YIN had no intention to assert, and would not

26                 assert, control over GIP-Cayman or the Satellite Project.  Fan was present

27                 when this statement was made and did not disagree with it.

28

125.   As a result, Plaintiffs believed that Bronzelink was an independent company that would not be under DONG YIN's control and dominance.

126.   The Bronzelink Joint Venture Agreement recognized that the "Business" of GIP-Cayman was "[a]cquiring, launching and operating the Satellite or any other satellite (s) to provide connectivity services in any part of the African continent or elsewhere."  Bronzelink Joint Venture Agreement ("JVA"), p. 3.

127.   Paragraph 3.7 (vii) of the Bronzelink JVA provided that Pourmand would be the first CEO of GIP-Cayman pursuant to an employment agreement.

128.   Paragraph 3.6 of the Bronzelink JVA provides that GIP-Cayman "would be responsible for securing loans from export credit agencies and others of up to US$475 million."

129.   In Paragraph 4.4 of the Bronzelink JVA, Bronzelink represented that it was an independent entity that "has the power to execute, perform its obligations under and enter into all transactions contemplated by this Agreement," and that "the execution and performance of this Agreement . . . do not violate . . . "any agreement or instrument to which it is subject."

130.   Paragraph 8 of the Bronzelink JVA gave Bronzelink the right to appoint six members to the nine member GIP-Cayman Board of Directors, thus giving Bronzelink control over the governance of GIP-Cayman.

131.   A February 25, 2016 Amendment to the Bronzelink JVA set forth a procedure which assured that the Common Directors [Mr. Youssefzadeh, Mr. Javed and Pourmand] would maintain the right to select the CEO of GIP-Cayman.

132.   Paragraph 6.1 of the Amendment states that "[t]he Common Holders shall be entitled to nominate a person to be the initial Chief Executive Officer (CEO)."

133.   Paragraph 6.2 of the Amendment states that "[i]n the event the CEO is removed prior to the date five (5) years after the closing of the Equity Investment, any replacement or successor CEO shall be subject to the approval of at least one (1) Common Director (other than the initial CEO)."

**COMPLAINT**

239230.68

134.   In or about February and March 2016, Mr. Youssefzadeh and Mr. Javed were told by Fan, acting as an agent of DONG YIN, and the Washington Attorney, as counsel for DONG YIN, that the Bronzelink JVA was essentially a "placeholder" agreement that would eventually be superseded by a Share Purchase Agreement ("SPA") and a Shareholders Agreement ("SHA").

**G.     The Amore Facility Agreement.**

135.   Amore was incorporated in the British Virgin Islands, on January 11, 2016.

136.   At all relevant times, Amore was controlled by DONG YIN.  As of March 10, 2016, Amore's Board of Directors was comprised of at least two high level DONG YIN executives, including Yang Zeng, Chairman of the Board of DONG YIN, and Xinyi Dong.  CHANG and Guoxing Zhong, who were both directors of COAMI, were also members of the Amore Board of Directors.

137.   Unbeknownst to Plaintiffs, on or about March 15, 2016, Bronzelink entered into a secret Facility Agreement with Amore (the "Facility Agreement"). Xinyi Dong of DONG YIN singed on behalf of Amore.

138.   The Facility Agreement gave Amore control over Bronzelink.  Because Amore was at all times controlled by DONG YIN, the Facility Agreement gave DONG YIN control over Bronzelink, and, by extension, GIP-Cayman, once Bronzelink acquired its majority ownership interest in GIP-Cayman, thus secretly eliminating the fire-wall between DONG YIN and the PRC, and GIP-Cayman.

139.   Part 3 of Schedule 2 to the Facility Agreement provides that Amore has the right to approve the appointment of four members to the five-member Bronzelink Board of Directors, all of whom would then be appointed as GIP-Cayman Board members.

140.   Paragraph 3.1(a)(ii) of the Facility Agreement provides that Bronzelink shall use the funds it borrows from Amore for "investing in the preferred equity of [GIP-Cayman] on terms satisfactory to [Amore]."

239230.68

141.   In Paragraph 14.3 of the Facility Agreement, Bronzelink represents that the "entry into and performance by it of, and the transactions contemplated by [the Facility Agreement]," do not and will not conflict with "any law or regulation applicable to it" or "*any agreement or instrument binding upon it*."  (Emphasis added).

142.   On or about March 15, 2016, the Washington Attorney emailed Mr. Youssefzadeh and Mr. Javed, stating that his law firm was DONG YIN's counsel and could not act for Bronzelink, adding to the false impression that DONG YIN and Bronzelink were independent entities.  The Washington Attorney also confirmed that his partner in the firm's Hong Kong office coordinated the Facility Agreement between Amore and Bronzelink, that it had been signed and that funding was "imminent," while failing to disclose: (a) terms of the Facility Agreement that were in conflict with the pending Agreement between Bronzelink and Plaintiffs; and (b) that DONG YIN and Bronzelink were not independent entities that were dealing with each other at arms' length.

143.   On or about April 5, 2016, the Washington Attorney, as counsel for DONG YIN, provided his comments to a draft of the SPA by email, representing that he had intended to align the conditions precedent in the SPA with the terms of the Facility Agreement between DONG YIN and Bronzelink, while not disclosing that other terms of the SPA were contrary to, undermined by, or otherwise subject to the terms of the Facility Agreement.

144.   On or about April 5, 2016, David Zhang of DONG YIN forwarded, by email, a copy of a letter from DONG YIN to Bronzelink, stating that DONG YIN, acting through Amore, had provided debt financing to Bronzelink.  The letter further stated that the proceeds of the loan were being used by Bronzelink to make a $175 million investment in GIP-Cayman, in accordance with the SPA and Bronzelink JVA, dated February 25, 2016.  Neither the letter nor the cover email disclosed that

**COMPLAINT**

239230.68

Bronzelink was controlled and dominated by DONG YIN, and not independent of DONG YIN.

145.   On or about April 23, 2016, the Washington Attorney, as counsel for DONG YIN, emailed various parties, including Mr. Youssefzadeh, Mr. Javed, and Bronzelink's attorney, noting that DONG YIN agreed that a provision in the draft SPA that allowed Bronzelink to appoint individuals to senior management positions was "an issue of undue influence by the lender."  In the email, he referred Bronzelink's attorney to the revised Facility Agreement between Amore and Bronzelink, which had been concealed and withheld from Plaintiffs, not disclosing that under the Facility Agreement, Bronzelink had agreed that Amore had the power to approve the appointment of four directors to the Bronzelink Board of Directors and that those same directors had to be appointed to the GIP-Cayman Board of Directors.

146.   On or about April 27, 2016, Calvin Tang ("Tang") emailed documents to Mr. Javed relating to Amore, including the Certificate of Incorporation and the Certificate of Incumbency, noting that they were from DONG YIN with instructions that the documents were only for opening a HSBC bank account for GIP-Cayman, and that without written consent, GIP-Cayman was not to furnish any other lending institution with any documents or information about Amore.

147.   On or about April 27 or April 28, 2016, the Washington Attorney, as counsel for DONG YIN, and David Zhang of DONG YIN verbally represented to Plaintiffs that Amore was a wholly-owned subsidiary of DONG YIN.

**H.     The Series A Share Purchase Agreement.**

148.   On or about May 11, 2016, Bronzelink and the Satellite Project Team (including Plaintiffs) signed the SPA, the SHA and the First Amendment to the SHA (the "SHA Amendment").  Mr. Youssefzadeh signed all of those documents in his home in California.  Fan signed the SPA, the SHA and the Amendment on behalf of Bronzelink.  (Neither DONG YIN, Amore, nor COAMI are signatories to the SPA, the SHA, or the SHA Amendment.)

**COMPLAINT**

239230.68

149.   In connection with the SPA, DONG YIN's agents and representatives continued to represent to Plaintiffs that DONG YIN would have no control over GIP-Cayman or the Satellite Project, and that Bronzelink was a fully independent stand-alone entity, thus ensuring compliance with the U.S. export control laws.  For example:

(a)   On or about February 23, 2016, during a meeting in Washington, D.C., Fan, acting as an agent of DONG YIN, falsely represented to Mr. Youssefzadeh, Mr. Javed, Pourmand and Irani that Bronzelink was an independent, stand-alone entity with no affiliation with DONG YIN.

(b)   On or about May 11, 2016, the day after the signing of the SPA, during a dinner in Hong Kong organized by Bronzelink, Yang Zeng of DONG YIN falsely confirmed that DONG YIN was merely a lender, and that it would have no control or influence over GIP-Cayman or the Satellite Project.

150.   As a result of these representations, Plaintiffs continued to believe that Bronzelink was an independent company that would not be subject to DONG YIN's control or influence.

151.   Pursuant to the SPA, GIP-Cayman agreed to issue and sell to Bronzelink an aggregate of 30,000,000 newly issued Series A convertible preferred shares (the "Series A Preferred Shares").  These Series A Preferred Shares represented a 75% ownership interest in GIP-Cayman.  At the same time, the SPA reduced Plaintiffs' controlling ownership interest in GIP-Cayman from 63% to a minority interest of 15.75%.  Plaintiffs understood, based on the representations made to them by DONG YIN's agents, that GIP-Cayman would be under the control of an independent Board and managed by a CEO approved by Plaintiffs, without any control or influence by DONG YIN or its representatives.  Subsequent events, however, revealed that those representations had been false.  Not only was the Board controlled and

239230.68

dominated by DONG YIN, but it did not allow Plaintiffs to have any say in the management of GIP-Cayman.

152.    Bronzelink had agreed to purchase the Series A Preferred Shares for a lump sum payment of US$175,000,000, paid to GIP-Cayman (the "Equity Investment").  Additionally, Bronzelink agreed to provide a $25 million line of credit to GIP-Cayman.  As a result of these transactions, Plaintiffs gave up their controlling ownership of the Satellite Project based on the false and fraudulent pretenses described above, not receiving any remuneration under the SPA.

153.    In addition, as a condition to the closing between Bronzelink and GIP-Cayman, Plaintiffs were required to provide Bronzelink with confidential and proprietary documents that had been created as part of the Satellite Project, including:

(a)    A signed Letter of Intent ("LOI") for entering into a Satellite Manufacture Agreement by and between GIP-Cayman and a reputable satellite manufacturer (such as SSL-Loral, Boeing, or Airbus), along with a draft agreement;

(b)    A signed insurance rate-locking instrument issued by a reputable insurance broker to GIP-Cayman;

(c)    The "High Throughput Ka-Band Satellite Project for Africa Demand and Supply Analysis and Outline Project for Africa Demand and Supply Analysis and Outline Project Assessment" conducted by COMSYS of the United Kingdom;

(d)    A "Milestones of Progress" document setting forth in detail planning schedules, payment schedules, timetables, milestones and documents for development, fabrication and launch of the satellite;

(e)    GIP-Cayman's confidential marketing plan for the Pre-Launch Market Development;

(f)    A comfort letter from the satellite manufacturer that it will support an application for a loan from EXIM Bank; and

239230.68

(g)     Written confirmation from Norwegian counsel for GIP-Cayman, in form and substance reasonably satisfactory to Bronzelink and its lenders, confirming that the ownership of Dub Dub had been properly transferred to GIP-Cayman, and that the transfer did not invalidate, or in any way otherwise adversely affect, Dub Dub's rights to the Orbital Slots and associated radio-frequency use licenses.

154.   In addition, as a condition to the closing, STM Group was required to assign the valuable Global-IP trademark to GIP-Cayman.

155.   All of these deliverables were of tremendous value, representing years of work and millions of dollars of investment by Plaintiffs.  They were all provided to Bronzelink prior to the closing.

156.   At all relevant times, Plaintiffs maintained their share certificates in GIP-Cayman and the confidential and proprietary documents that they provided to Bronzelink in the Central District of California.

**I.     The Shareholders Agreement.**

157.   After the Facility Agreement was signed, on or about June 2, 2016, during a Skype call amongst Mr. Javed, Fan, Wong, Charles and Tang, Fan, acting as an agent of DONG YIN, began requesting additional documents that were not deliverables under the SHA.  Fan indicated that these documents were requested by DONG YIN, the purported lender.  Mr. Javed objected.  Fan, acting as an agent of DONG YIN, later telephoned Mr. Javed, to convince him to proceed with the closing, and again represented falsely that DONG YIN and Bronzelink were two completely different entities and unrelated, and that after the closing DONG YIN would not have any control or say in the governance, management, or operations of GIP-Cayman. Fan further assured Mr. Javed that after the closing, Bronzelink would have an independent board which would make all decisions free of DONG YIN's influence.

**COMPLAINT**

239230.68

158.   On or about June 3, 2016 Bronzelink and Plaintiffs finalized and executed the closing documents for the SHA.  Plaintiffs executed the closing documents in California.

159.   Under the SHA, Bronzelink was not a mere passive investor in GIP-Cayman; rather, it had a role in the governance, management and operations of GIP-Cayman.

(a)    The SHA provided that Bronzelink would control the GIP-Cayman Board of Directors.  Paragraph 3.2 of the SHA provides that the GIP-Cayman Board of Directors shall have nine members.  Paragraph 3.3 of the SHA provides that Bronzelink is entitled to appoint six members to the GIP-Cayman Board (the "Bronzelink Directors"), and that Plaintiffs, and Pourmand are entitled to appoint three members (the "Common Directors").

(b)    Paragraph 3.5 of the SHA provides that Bronzelink has the right to designate the Chairman of the GIP-Cayman Board of Directors.

(c)    Paragraph 3.12 of the SHA provides that Plaintiffs have the right to select the Chief Executive Officer of GIP-Cayman, but that Bronzelink had the right to select the Chief Financial Officer.

(d)    Paragraph 6 of the SHA provided that GIP-Cayman is responsible for securing Export Credit Agency or other non-recourse or limited-recourse project financing in an amount anticipated to be up to US$475,000,000.

(e)    Paragraph 8 of the SHA places significant restrictions on the ability of Plaintiffs to transfer their shares in GIP-Cayman.

160.   Accordingly, in entering into the SHA, Plaintiffs gave up the majority of their ownership interest in GIP-Cayman and their control of the Satellite Project, all based on false promises, material misrepresentations and the concealment of material information.

**COMPLAINT**

239230.68

161.   DONG YIN continued to conceal its control over GIP-Cayman after the SHA was signed.  Soon after the closing, in early June 2016, Mr. Youssefzadeh drafted a press release to announce the Bronzelink deal.  On June 7, 2016, Wong rejected the idea of issuing a press release at that time, stating in an email that he did not want to jeopardize the $25 million line of credit from Amore, and, "therefore for the moment being, we should corporate [*sic*] and listen to the opinion from relevant party in order to facilitate more smooth business corporation [*sic*] going forward." Wong's professed concern that Bronzelink needed to appease Amore was pretextual; his actual concern was to keep DONG YIN's control of Amore and Bronzelink hidden.

**J.     Plaintiffs Discover Material Inconsistencies Between the SHA and the Amore Facility Agreement.**

162.   In discussions with DONG YIN's agents, including Fan, Henry Fan and the Washington Attorney, about various issues related to the SHA, Plaintiffs repeatedly asked to see the Amore Facility Agreement.  Those requests were uniformly rejected.

163.   In mid-2017, after leaving their employment at GIP, Plaintiffs by happenstance found and were able to review an electronic copy of the Facility Agreement.

164.   As a result of that review, Mr. Youssefzadeh and Mr. Javed discovered that the Facility Agreement contained provisions that gave Amore control of Bronzelink and GIP-Cayman, which meant that in reality, DONG YIN was in control of Bronzelink and GIP-Cayman.  Moreover, these provisions were in direct conflict with the terms of the SHA, and precluded Bronzelink from meeting its obligations under the SHA.

165.   Based on this review, Plaintiffs realized that, despite their promise to limit DONG YIN's role to that of a lender, the Washington Attorney and the

Washington Law Firm had actually conspired with DONG YIN and its agents to give DONG YIN control of the Satellite Project.  In particular:

(a)     Under the Facility Agreement, Amore has the power to approve the appointment of four directors to the Bronzelink Board of Directors, and those same four directors had to be appointed to the GIP-Cayman Board of Directors.  Given that Amore was controlled and dominated by DONG YIN, this provision effectively gave DONG YIN control over GIP-Cayman.

(b)     The Facility Agreement requires Bronzelink to provide Amore with free access at all reasonable times to the GIP-Cayman premises, assets, books, accounts, records, and senior management.  The SHA does not provide such access, which Plaintiffs would never have agreed to or allowed.

(c)     The Facility Agreement provides that Amore must approve all GIP-Cayman contracts in excess of $1,000,000.  There is no such restriction in the SHA.  Furthermore, that restriction is inconsistent with the understanding between Bronzelink and Plaintiffs that GIP-Cayman would be a stand-alone company governed by an independent board of directors.

(d)     The Facility Agreement requires GIP-Cayman to allow Amore to engage a financial advisor, technical consultant, marketing consultant and tax expert for GIP-Cayman, *at GIP-Cayman's expense*.  The SHA has no such provision.  Moreover, Plaintiffs would never have agreed to or allowed Amore to have such involvement in and influence over the operations of GIP-Cayman.

(e)     Under the Facility Agreement, Bronzelink was required to use reasonable efforts to prevent GIP-Cayman from entering into any joint venture.  There is no such restriction in the SHA; nor would Plaintiffs have agreed to or allowed such a restriction.  In fact, this secret restriction directly

impacted GIP-Cayman's ability to enter into a proposed joint venture with a technology company that Mr. Youssefzadeh and Mr. Javed had determined was a fundamental element of the business plan they had submitted to the GIP-Board of Directors and to Citigroup.  On or about June 12, 2017, Mr. Youssefzadeh sent a detailed memorandum to the GIP-Cayman Board of Directors, outlining the proposed joint venture and asking for permission to proceed.  The Board did not respond to Mr. Youssefzadeh's memorandum.  Plaintiffs are informed and believe, and based thereon allege, that the Board failed to act because, under the Facility Agreement, Bronzelink could not permit GIP-Cayman to enter into any such joint venture.

(f)   Under the Facility Agreement, Bronzelink gave Amore a charge over on the GIP-Cayman shares owned by Bronzelink.  This provision conflicted with the SHA, which allows GIP-Cayman to demand that Bronzelink provide its shares in GIP-Cayman to an Export Credit Agency ("ECA"), or alternative lender, as additional collateral.

(g)   Under the Facility Agreement, GIP-Cayman is precluded from creating a stock option pool.  The SHA, however, allows GIP-Cayman to create such a pool for its key employees.

(h)   Under the Facility Agreement, GIP-Cayman could only raise additional funds through Export Control Agency financing.  But neither the Bronzelink JVA nor the SHA contain any such limitation.  To the contrary, both of those agreements allow GIP-Cayman to raise funds from either an ECA or an alternative lending source.  Plaintiffs are informed and believe, and based thereon allege, that this secret restriction in the Facility Agreement was one reason that the GIP-Cayman Board refused to consider the Citigroup debt financing proposal, as approving

**COMPLAINT**

1      that proposal would have placed Bronzelink in breach of its agreement

2      with Amore.

**K.     The Officers and Directors of GIP-Cayman and GIP-USA.**

3

4      166.   In accordance with an oral agreement between Plaintiffs and Bronzelink,

5      three of the six directors Bronzelink appointed to the GIP-Cayman Board would not

6      have any other affiliation with Bronzelink, and would be satellite industry

7      professionals.

8      167.   On or about May 31, 2016, Plaintiffs were informed of Bronzelink's

9      nominations of its GIP-Cayman Series-A directors:  (1) Fan; (2) Wong; (3) Liu;

10     (4) Guanhong (Jason) Luo ("Luo"); (5) Julian Zhongliang Zhao ("Zhao"); and

11     (6) Wang Zheng ("Zheng").

12     168.   Mr. Javed requested a call with the Washington Attorney to ask if the

13     directors were independent of, and unaffiliated with, the PRC, and sent a text listing

14     the names of the Bronzelink directors to the Washington Attorney.  During a

15     telephone call on or about May 31, 2016, the Washington Attorney, as counsel for

16     DONG YIN, represented to Mr. Javed as follows regarding the Bronzelink

17     directors:  (1) Four of the Bronzelink-appointed directors, Liu, Zheng, Luo and Zhao,

18     were completely independent and unaffiliated with DONG YIN; and (2) since there

19     were four independent Bronzelink-appointed directors and three Common directors,

20     GIP-Cayman would have solid protection from PRC control and influence.  The

21     Washington attorney also represented to Mr. Javed that, although Wong worked for

22     Bronzelink, he was not affiliated with DONG YIN.

23     169.   Plaintiffs would subsequently discover, however, that at all relevant

24     times Fan, Wong and Liu were agents of DONG YIN, and were acting within the

25     course and scope of their agency and for the sole or primary benefit of DONG YIN.

26     Fan had already been identified as a known PRC national, and a DONG YIN lawyer

27     and representative, during negotiations.  Wong and Liu routinely acted at Fan's

28     direction and did his bidding; neither of them exercised any meaningful independence

46

**COMPLAINT**

239230.68

from Fan in making decisions as members of the GIP-Cayman Board of Directors or with respect to the governance, management and operations of GIP-Cayman and GIP-USA.

170.   On or about June 21, 2016, the first GIP-Cayman Board of Directors meeting was held in Hong Kong.  The Board appointed Jason Luo as the Chairman of the Board.  Pourmand was appointed CEO of GIP-Cayman.

171.   At that meeting, Plaintiffs learned that, prior to the Board meeting, Pourmand had secretly negotiated with Fan, to be CEO of GIP-Cayman.  Plaintiffs are informed and believe, and based thereon allege, that Fan, acting as an agent of DONG YIN, negotiated a contract with Pourmand to buy his loyalty to DONG YIN.

**L.     The False Certifications to SpaceX and Boeing.**

172.   On or about August 5, 2016, in reliance on the false representations described above that had been made to him and Mr. Youssefzadeh, Mr. Javed falsely certified to SpaceX that GIP-CAYMAN was not "owned or controlled, or acting on behalf of, directly or indirectly, any individuals or entities domiciled, headquartered, incorporated, residing in or otherwise affiliated with [the PRC or other specified countries]."

173.   In or about August 2016, GIP-Cayman formed GIP-USA as a wholly owned subsidiary.  At all relevant times, the GIP-Cayman Board of Directors controlled the governance of GIP-USA, which meant that DONG YIN, through Amore, Bronzelink and GIP-Cayman, controlled GIP-USA.

174.   In addition, after GIP-USA was formed, Wong and Liu, along with Mr. Javed, became members of the GIP-USA Board of Directors.  Because the GIP-USA Board of Directors consisted of only three members, at all relevant times, DONG YIN, through Wong and Liu, had control of the GIP-USA board.

175.   In or about August 28, 2016, GIP-Cayman entered into a contract with Boeing to design, develop, manufacture, test and transport the satellite to the launch

**COMPLAINT**

239230.68

site, and to provide launch support and other services for the Satellite Project.  The contract specifically provided that:

(a)  "The Contract Deliverable Data, Satellite, and any other hardware ('Products') furnished under this Contract are subject the U.S. International Traffic in Arms Regulations (the 'ITAR') or the U.S. Export Administration Regulations (the 'EAR')."

(b)  "The Products furnished under this Contract are subject to the ITAR or the EAR and will be authorized by the United States Government for export only to Customer in North Atlantic Treaty Organization or major non-North Atlantic Treaty Organization ally countries, as recognized at the time by the USG, or to the Designated Launch Site for launch into space.  Customer represents and warrants that the ultimate end use of the Products is for commercial purposes.  The Products may not be resold, diverted, transferred, trans-shipped or otherwise disposed of in any other country or in any other manner, either in their original form or after being incorporated through an intermediate process into other end items, without the prior written approval of the United States Government, which approvals are the sole responsibility of Customer.  Additionally, transferring registration, control or ownership to any other person or business entity of the Products furnished under this Contract is considered an export and as such also requires prior written approval from the United States Government, which approvals are the sole responsibility of Customer."

## M.    The Employment Contracts.

176.    In or about September 2016, Pourmand's employment agreement was modified.  Although he retained the title of CEO, he was stripped of the authority and responsibilities of the CEO.  At that time, Mr. Youssefzadeh orally agreed to act as the

239230.68

1   de facto CEO of GIP-Cayman and GIP-USA, and assumed the responsibilities and

2   authority of CEO of both companies.

3       177.   Effective October 1, 2016, Mr. Youssefzadeh entered into parallel written

4   employment agreements with GIP-Cayman and GIP-USA.

5       178.   Mr. Youssefzadeh's employment agreement with GIP-USA provided that

6   he was to perform the duties of GIP-USA's Chief Technical Officer and Chairman of

7   the Management Committee.  Mr. Youssefzadeh was required to report to the

8   GIP-USA and GIP-Cayman Boards of Directors.  The employment agreement

9   provided that Mr. Youssefzadeh would render his services at GIP-USA's offices in

10  El Segundo, California.

11      179.   Mr. Youssefzadeh's employment agreement with GIP-Cayman contained

12  similar provisions, and also named him as the Chief Technical Officer and Chairman

13  of the Management Committee, reporting to the GIP-Cayman and GIP-USA Boards

14  of Directors.

15      180.   Effective October 1, 2016, Mr. Javed entered into written employment

16  agreements with GIP-Cayman and GIP-USA.

17      181.   Mr. Javed's employment agreement with GIP-USA provided that he was

18  to perform the duties of GIP-USA's President and Chief Operating Officer.  Mr. Javed

19  was required to report to the GIP-USA and GIP-Cayman Boards of Directors.  The

20  employment agreement provided that Mr. Javed would render his services at

21  GIP-USA's offices in El Segundo, California.

22      182.   Mr. Javed's employment agreement with GIP-Cayman contained similar

23  provisions and also named him as GIP-Cayman's President and Chief Operating

24  Officer, reporting to the GIP-Cayman and GIP-USA Boards of Directors.

25

26

27

28

239230.68

**N.     DONG YIN's Control and Dominance over the Governance, Management and Operations of the Satellite Project.**

183.   Prior to the execution of the SPA and SHA, and even before appointment of the GIP-Cayman Board of Directors, DONG YIN began to assert control and dominance over the governance, management and operations of the Satellite Project.

184.   On multiple occasions, including April 15, 18, 27, 29, and May 3, 2016, CHANG, Charles Yiu, Fan and Wong, acting as agents of DONG YIN, each separately emailed Mr. Youssefzadeh and Mr. Javed to request a detailed operating plan, including the schedule of tasks, critical paths, timing, personnel needed and milestones for the Satellite Project.

185.   On or about April 15, 2016, both Tang and Henry Fan emailed Mr. Javed expressing DONG YIN's concern about the control and signing authority for any bank account opened by GIP-Cayman.  Tang emailed that Terry Long preferred to have Bronzelink handle the communications and exchange of documentation with DBS Bank, Ltd. ("DBS") to open the DBS off-shore account.

186.   Also on or about April 15, 2016, CHANG emailed Mr. Javed requesting GIP-Cayman's detailed operating plan, including schedule of tasks, critical paths, timing, and personnel needed, indicating that Amore was in control of, and unwilling to grant, authorization for Bronzelink to disperse funds without knowing more about the specific uses, milestones and conditions.

187.   On or about April 18, 2016, Charles Yiu emailed Mr. Javed requesting GIP-Cayman's detailed work plan for 2016, including tasks, scheduling, timing and milestones.

188.   During a telephone call on or about April 23, 2016, Bronzelink notified Mr. Youssefzadeh and Mr. Javed that Fan would lead the Bronzelink team, Wong would coordinate all Bronzelink related matters, Charles would be the contact for Bronzelink business decisions and Tang would be the contact for the parties' legal team.  Soon after the call, Wong emailed Mr. Javed, indicating that Fan had appointed

50

**COMPLAINT**

Wong as signatory to the GIP-Cayman HSBC bank account, even though he had no executive role in the company.

189.   On or about April 27, 2016, Fan, acting as an agent of DONG YIN, emailed Mr. Youssefzadeh and Mr. Javed, asking that they travel to Hong Kong to meet the following week, and requesting a detailed work plan (including milestones, timeframe and staff arrangements), detailed budget plan and a detailed operation plan for GIP-Cayman.

190.   On or about April 27, 2016, CHANG had a telephone conversation with Mr. Youssefzadeh, who was in Orange County, California, and Mr. Javed, who was in Los Angeles, California, stating that DONG YIN wished to hire management consultants that CHANG knew to assist in the operation of GIP-Cayman.

191.   On or about April 29, 2016, Wong, acting as an agent of DONG YIN, emailed Pourmand and copied Mr. Youssefzadeh and Mr. Javed, indicating that Fan expected to receive the information and documents relating to the work, budget and operation plans by May 4, 2016, prior to Mr. Youssefzadeh's and Mr. Javed's visit to Hong Kong.

192.   On or about May 3, 2016, Tang, acting as an agent of DONG YIN, again emailed Pourmand, requesting that the GIP-Cayman team bring the work, budget and operation plans with them to Hong Kong, so that they could be discussed during their meetings on May 9 and 10, 2016.

193.   On or about July 8, 2016, Tang, acting as an agent of DONG YIN, prepared and circulated drafts of a GIP-Cayman's organizational chart and charts delineating the duties and responsibilities of GIP-Cayman executives and its Board. The proposed charts required GIP-Cayman executives to seek approval from the DONG YIN-controlled GIP-Cayman Board of Directors to make decisions and engage in activities that are typically the sole responsibility of a company's executives and employees, including:  (a) issuance of press releases, company publications and public statements that do not involve financial matters; (b) entering into equipment

239230.68

leases regardless of the amount involved; (c) maintenance of general ledger and operating expenditures; (d) contact with regulators and other governmental authorities; (e) hiring and termination of staff at all levels; (f) determining issues of computer access; (g) authorizing sales and marketing at operational levels; (h) authorizing domestic and international travel for staff; and (i) authorizing communications with the company's bankers and signing checks on behalf of the company.

194.   On or about July 15, 2016, Fan travelled to Washington, D.C. to meet with Mr. Youssefzadeh, Mr. Javed and Pourmand, in advance of holding a Board meeting in Washington, D.C.  Fan wanted to inspect and approve offices that Pourmand had located in Maryland and formalize Liu's position inside GIP-Cayman as Controller.

195.   At the July 18, 2016 Board meeting, which was held in Washington, D.C., Mr. Youssefzadeh presented the status of negotiations with Boeing and SSL and recommended that the company sign a LOI with Boeing, which was approved by the Board.

196.   At the same Board meeting, it was agreed that after execution of the Boeing LOI, $10 million would be transferred from GIP-Cayman's DBS Bank Hong Kong account for capital expenditures.  Despite this determination, Wong, acting as an agent of DONG YIN, took control of the transaction, emailed GIP-Cayman and instructed that the $10 million payment instead be made from GIP-Cayman's HSBC account in the U.S.

197.   On or about July 29, 2016, after the Boeing LOI was finalized and reviewed by the Washington Attorney, Mr. Youssefzadeh requested authorization from Luo, the Chairman of the GIP-Cayman Board of Directors, to execute the Boeing LOI.  But rather than acting as an independent Chairman, Luo emailed that "[he] would like Mr. Fan/DONG YIN to review/agreed [sic][the Letter of Intent] before we move on."

198.   On or about August 22, 2016, Tang, acting as an agent of DONG YIN, sent Pourmand a list of candidates for the GIP-Cayman CFO and company Secretary positions, requesting that Pourmand video conference with those candidates in advance of Fan's arrival in California, so that when Fan arrived, they could discuss the suitability of each candidate.

199.   Concerned with Fan's encroachment into the company's operations, on August 24, 2016, Mr. Javed insisted that they follow the Washington Attorney's guidelines to ensure full compliance with the export control regulations.

200.   Fan, Charles and Wong, acting as agents of DONG YIN, came to Los Angeles on August 23, 2016, to meet with Mr. Youssefzadeh, Mr. Javed and Pourmand individually, followed by a group meeting.  During these meetings, Fan and Wong made several statements that, in reality, indicated they were acting at DONG YIN's behest and on its behalf with respect to the Satellite Project.  For example:

(a)   Even though the GIP-Cayman Board had authorized Mr. Youssefzadeh to proceed with finalizing a definitive agreement with Boeing, Wong told Mr. Javed that he was reluctant to release the formal authorization to do so because of pressure from Fan, who was waiting for the final "go ahead" from DONG YIN.

(b)   When Mr. Javed warned Fan that GIP-Cayman was on the verge of missing a deadline with Boeing, Fan refused to take any action, saying that he did not have permission from DONG YIN to act.

(c)   At every opportunity, Fan, acting as an agent of DONG YIN, sought to interject himself into the daily operations of GIP-Cayman and GIP-USA. Fan and his team wanted to read each and every document that was being negotiated between GIP-Cayman and Boeing, and demanded to know every detail of the commercial and technical negotiations and updates.

239230.68

201.   On or about September 20, 2016, Wong emailed Mr. Youssefzadeh, Mr. Javed and Pourmand with an agenda for the third GIP-Cayman Board meeting, which was to be held in Hong Kong, requesting the following updates: (a) Pourmand – CEO update; (b) Mr. Javed – business & market plan update; and (c) Mr. Youssefzadeh – technical update.

202.   On or about October 14, 2016, Wong emailed Mr. Youssefzadeh, Mr. Javed and Pourmand concerning his and Fan's plans to visit Los Angeles, California on October 18, 2016 and requested a meeting to discuss the following: (a) the relationship and strategic partnership with Boeing; (b) ECA debt financing; (c) sales and marketing; (d) the roles and duties of GIP-Cayman's management team; (e) the GIP-Cayman business plan; and (f) hiring staff.

203.   Fan and Wong, acting as agents of DONG YIN, visited the GIP-Cayman offices in El Segundo, California, again on October 18, 19 and 20, 2016.  The purpose of that visit was to discuss the six matters listed above, even though those matters should have been handled by GIP-Cayman executive and employees, and not the individual members of the GIP-Cayman Board of Directors.

204.   During the months that followed, Mr. Youssefzadeh and Mr. Javed observed that Fan controlled the GIP-Cayman Board of Directors, and that Wong, Liu and others routinely acted exclusively at his direction and did his bidding.

205.   By these means, DONG YIN, through Fan, Wong, Liu and others, assumed control and dominance of GIP-Cayman and GIP-USA and continued to insinuate themselves into the daily management and operations of both companies. For example:

(a)   On or about October 26, 2016, Wong, acting as an agent of DONG YIN, emailed Mr. Javed, attaching a revised GIP-Cayman financial model, requesting his input before he sent it to Fan.  Wong also requested the names of the top 10 to 15 African countries that were most likely to purchase satellite capacity from GIP-Cayman.

**COMPLAINT**

239230.68

(b)   On or about October 26 and 27, 2016, Wong and Mr. Javed exchanged drafts of the GIP-Cayman internal organization chart by email, which was subject to review and finalization by Fan.

(c)   On or about November 1, 2016, Fan, acting as an agent of DONG YIN, requested that Helen Zhao, a Financial Advisor at Wells Fargo Advisors, open an investment account for GIP-Cayman for cash management purposes.  When Zhao asked for clarification, Liu responded that they needed to seek clarification from Fan.

(d)   On or about November 5, 2016, Wong, acting as an agent of DONG YIN, emailed Mr. Javed to request his input on the GIP-Cayman financial model, stating that he wanted to present the financial model to Fan for his final review.

(e)   On or about November 17, 2016, Fan, acting as an agent of DONG YIN, emailed Mr. Youssefzadeh, Mr. Javed and Pourmand requesting an update on the meeting in South Africa, and the status of marketing attempts in Ethiopia.

(f)   On or about November 18, 2016, Tang, acting as an agent of DONG YIN, emailed Mr. Javed, requesting technical details for Multi-Beam Architecture, Beam Size, Broadcasting, Design Process, Capacity Allocation and coverage map.

(g)   On or about November 18, 2016, Fan, acting as an agent of DONG YIN, emailed Mr. Javed, suggesting creation of a price management department responsible for pricing mechanism implementation, control and incentives.

206.   Again, these actions, requests and approvals are normally within the purview of a company's executives and employees, and not an individual board member or representative of a lender.

**COMPLAINT**

239230.68

207.   On or about November 18, 2016, Tang, acting as an agent of DONG YIN, sent an email to Mr. Javed requesting sensitive technical data regarding the satellite project.  Mr. Javed responded on November 19, 2016, refusing to provide the requested technical data.  In his email, Mr. Javed stated as follows:

> Your questions below has raised a red flag and made Emil quite concerned.  He has shared his concerns with Bahram and I and as such you will not receive any reply from him.
>
> As you are well aware, we all are operating based on the understanding that Bronzelink is an investor in Global-IP and other than its investment interest it has no intentions to extract technical information which may violate Global-IP's compliance obligations.
>
> Your questions below for sure has crossed the line.  Please confirm to us urgently that NO information from Global-IP is being shared with anyone outside Bronzelink and Bronzelink is not using the information for any purpose other than monitoring the company's general progress.  Also, in the future, please refrain from inquiring about information which goes beyond what Global-IP can share publicly.

208.   In or about November 2016, GIP-Cayman and GIP-USA hired Chris Chen ("Chen") as their General Counsel.  Prior to hiring Chen, Fan and Wong, acting as agents of DONG YIN, had mandated that while the General Counsel would report to Mr. Javed, he had to be fluent in Chinese.  After Mr. Javed referred Chen as a qualified candidate, and unbeknownst to Mr. Javed, Wong flew Chen to Hong Kong for interviews with DONG YIN before allowing the Board to consider and approve his hiring.

209.   On or about December 8, 2016, the GIP-Cayman Board of Directors held a meeting at the company's office in El Segundo, California.  At that meeting, Wong, acting as an agent of DONG YIN, requested a two-week delay before any board resolutions were approved.  Plaintiffs are informed and believe, and based thereon allege, that the reason Wong requested this delay was to have time to first present the resolutions to DONG YIN for its approval, before any contemplated Board actions.

239230.68

210.   The Board approved the selection of SpaceX as the launch service provider at the Board meeting on December 8, 2016.  The formal approval of the SpaceX contract, however, was delayed for three months by Fan and Wong.  Plaintiffs are informed and believe, and based thereon allege, that Fan and Wong, acting as agents of DONG YIN, delayed Board approval of the SpaceX contract because they first needed to obtain DONG YIN's approval of the contract.  The SpaceX contract was not signed until on or about March 8, 2017.

211.   On or about December 20, 2016, Mr. Youssefzadeh provided Wong with an update about negotiations with SpaceX and Arianespace as potential launch service providers.  Wong thereafter replied by email that he would "inform Mr. Fan [of] the same."

212.   On or about December 21, 2016, Peter Lui, GIP-Cayman's CFO, forwarded to Bonnie Lui email exchanges between Mr. Youssefzadeh and Arianespace relating to launch services.  Ms. Liu, acting as an agent of DONG YIN, requested that Peter Lui copy "Tony & Co" on any correspondence between GIP-Cayman and Arianespace.

213.   At the December 2016 GIP-Cayman Board of Directors meeting, Wong proposed that Board members be compensated.  Mr. Youssefzadeh objected, stating that this was typically an issue that should be addressed by the Board's Compensation Committee.  Although Wong had no authority to decide the issue, he overruled Mr. Youssefzadeh and directed that compensation was subject to previous agreements between Bronzelink and those directors.

214.   On or about January 9, 2017, Luo inquired regarding when GIP-Cayman would pay Board members their fees for 2016.  Wong responded that, "[w]e are currently arranging for the payment for the outstanding directors' fee in 2016."  Wong also emailed Mr. Javed informing him that Luo's director fees for GIP-Cayman were $35,000 per quarter, while Zhao and Zheng each received $2,500 per quarter, and

239230.68

1   directed Mr. Javed to have Liu pay the three directors for fiscal year 2016 from

2   GIP-Cayman bank accounts.

3      215.   After reviewing Wong's email, Mr. Youssefzadeh did some research

4   concerning the standard compensation for board members in similarly situated

5   companies.  He determined that the proposed compensation for Luo - $140,000

6   annually - was far in excess of the industry standard.

7      216.   On or about January 18, 2017, Mr. Youssefzadeh emailed Wong to

8   suggest that non-executive, non-investor directors each receive $2,500 per meeting,

9   while the Chairman would receive $5,000, with these directors also receiving

10  GIP-Cayman stock options.  Wong replied that the remuneration package to

11  non-investor directors had gone through lengthy negotiation and discussion as part of

12  "[Bronzelink's] appointment process." Prior to this time, Plaintiffs were not aware

13  that Bronzelink had separately negotiated the compensation of GIP-Cayman Board

14  members.

15     217.   Plaintiffs are informed and believe, and based thereon allege, that

16  Bronzelink, acting at DONG YIN's direction, made secret deals with the GIP-Cayman

17  Directors, agreeing to dramatically overpay Luo in an attempt to guarantee his

18  allegiance to DONG YIN, rather than to GIP-Cayman, and that Wong was acting as

19  an agent of DONG YIN when he insisted on the payments to the board members as set

20  forth above.

21     218.   On or about February 1, 2017, Fan and Wong, acting as agents of

22  DONG YIN, were again in Los Angeles, California, visiting the GIP-Cayman offices

23  in El Segundo, California.  During that visit:

24     (a)   Fan told Mr. Youssefzadeh that he was under pressure from DONG YIN

25          for GIP-Cayman to obtain more orbital slots.

26     (b)   Fan insisted that he participate in GIP-Cayman's planning and strategy

27          and advised that he intended to take an active role in sales and marketing.

28

**COMPLAINT**

239230.68

(c)     Fan and Wong sought to get deeply involved in budgeting and operational matters.

(d)     Fan asked to meet privately with senior staff.

(e)     Fan and Wong insisted on meeting privately with Liu.

219.   In response to Fan's overreaching during his visit, on February 7, 2017, Mr. Youssefzadeh and Mr. Javed each gave 60-days' notice of their resignation as executive officers of GIP-Cayman.

220.   On or about February 25, 2017, Wong and Charles, acting as agents of DONG YIN, visited the GIP-Cayman and GIP-USA offices in El Segundo, California, on very short notice.  Upon arrival, Wong met with Mr. Youssefzadeh and Mr. Javed. The purpose was to hand-deliver two letters from Fan to them.  One of them was a letter from Fan stating, "I still believe the position I have taken to select you to be in charge for the project is the right decision, and I will be the same as always to support and trust you."  In response to these letters, Mr. Youssefzadeh and Mr. Javed subsequently withdrew their resignations.

221.   On the same day, Wong and Charles, acting as agents of DONG YIN, informed Mr. Youssefzadeh and Mr. Javed that they had instructions from Fan and DONG YIN to terminate GIP-Cayman's then CFO, Peter Lui.  Mr. Youssefzadeh and Mr. Javed explained that only the GIP-Cayman Board could terminate Lui.  In response, Wong insisted on calling an immediate telephonic board meeting.  He was unable to do so, however, because a board meeting could not be called on less than five days' notice.  Adamant that Lui must be fired immediately, Wong, acting as an agent of DONG YIN, informed Mr. Youssefzadeh and Mr. Javed that he and Fan would hold up authorization for the SpaceX contract unless Lui was terminated. Eventually, the two sides reached an accord: (a) they would delay Lui's termination for five days, and then agree to terminate Lui by unanimous written consent; and (b) the Board would hold a telephonic meeting to address approval of the SpaceX contract on March 3, 2017.

**COMPLAINT**

239230.68

222.   On or about March 1, 2017, the GIP-Cayman Board terminated Lui as CFO by unanimous written consent.  Because GIP-Cayman never appointed a replacement CFO, Wong was left with full control over all GIP-Cayman bank accounts.

223.   On or about March 3, 2017, the GIP-Cayman Board held a telephonic board meeting, at which it reviewed and approved the proposed SpaceX contract.

224.   On or about March 7, 2017, GIP-Cayman entered into a contract with SpaceX to provide launch services for the satellite.  The SpaceX contract provided that, "[p]rovision of all items and information identified in this [Statement of Work] by SpaceX to any non-US parties (including Customer and/or Customer's Related Third Parties, if applicable) is subject to US export control restrictions imposed by regulatory authorities including the U.S. Department of State.  Customer shall be responsible for any U.S. Customs or other export/import compliance with respect to the Payload and any Customer provided hardware . . . ."

225.   The term, "Related Third Parties" is defined in the SpaceX contract to include GIP-Cayman's "directors, officers, employees and agents," as well as "any entity or person with any financial, property or other material interest" in the satellite.

226.   On or about April 21, 2017, Wong purported to assume the position of "Executive Director" of GIP-Cayman, with authority to act on behalf of the GIP-Cayman Board of Directors, even though the corporate governance documents do not recognize any such position.  Plaintiffs are informed and believe, and thereon allege, that Wong and Fan, acting as agents of DONG YIN, agreed that Wong would become the Executive Director of GIP-Cayman and, with the support of the other Bronzelink-appointed directors, installed Wong as the Executive Director in furtherance of DONG YIN's scheme to control, dominate and direct the governance, management and operations of GIP-Cayman and GIP-USA.

**COMPLAINT**

239230.68

**O.     Mr. Youssefzadeh and Mr. Javed Attempt, Unsuccessfully, to Address Compliance and Financing Issues with the GIP-Cayman Board.**

227.    In or about March and April, 2017, Mr. Youssefzadeh and Mr. Javed had multiple discussions with Luo, expressing their concerns that GIP-Cayman was not being properly governed by its Board and that Fan, Wong, Liu and others were violating, and conspiring to violate, the export control laws.

228.    In or about April 2017, Luo agreed to Mr. Youssefzadeh's request to intervene and instructed Chen to direct the Washington Law Firm to prepare a memorandum analyzing the export control laws.

229.    On or about April 25, 2017, the Washington Attorney ─ who had been counsel to DONG YIN but was now counsel to GIP-Cayman ─ prepared a memorandum for the GIP-Cayman Board of Directors, of which Mr. Youssefzadeh and Mr. Javed were members, analyzing the export control laws.  On April 27, 2017, Chen submitted the memorandum to the GIP-Cayman Board of Directors.

230.    On or about May 16, 2017, Mr. Youssefzadeh obtained a proposal for debt financing from Citigroup.  This was a major achievement as debt financing was necessary for GIP-Cayman and GIP-USA to survive as going concerns, given the high cost of building and launching the satellite.

231.    On or about May 24, 2017, Mr. Youssefzadeh noticed a meeting of the GIP-Cayman Board of Directors for June 1, 2017, to discuss two items: (a) the issue of whether GIP-Cayman's corporate governance was in compliance with the export control laws and what corrective action to take; and (b) the proposal to engage Citigroup in order to obtain debt financing.  The board meeting was noticed as a telephonic meeting, with Mr. Youssefzadeh, Mr. Javed, Chen and Liu participating from their residences or offices in Southern California.

232.    The board meeting did not occur, however.  Fan, Wong, Liu, acting as agents of DONG YIN, and other board members under their control refused to participate in the meeting, as a result of which there was no quorum for the Board to

take action.  Immediately, Luo resigned his position as the Chairman of the GIP-Cayman Board of Directors.  Shortly thereafter, Julian Zhao also resigned from the GIP-Cayman Board of Directors.

233.   Wong told Mr. Javed that Fan and DONG YIN fired Luo and Zhao because they were not pleased with them.  The formal justification given for their removal was that all of the Bronzelink-appointed directors to the GIP-Cayman Board of Directors had one year terms that ended on June 1, 2017.  This was the first time that Mr. Youssefzadeh and Mr. Javed learned that all of the Bronzelink-appointed directors to the GIP-Cayman Board were under formal contract to Bronzelink.

234.   On or about June 2, 2017, Mr. Youssefzadeh instructed Chen to independently investigate and assess the matters and conclusions reported in the April 25, 2017 memorandum from the Washington Attorney.

235.   Also on June 2, 2017, Mr. Youssefzadeh re-noticed a meeting of the GIP- Cayman Board of Directors for June 8, 2017, to discuss the two agenda items listed above.  As before, the Board meeting was noticed as a telephonic meeting, with Mr. Youssefzadeh, Mr. Javed, Chen and Liu participating from their residences or offices in Southern California.  But Fan, and Wong, acting as agents of DONG YIN, and other Board members under their control, again refused to participate in the board meeting, again denying a quorum.

236.   On or about June 5, 2017, Wong and Tang, acting as agents of DONG YIN, met with Mr. Youssefzadeh and Mr. Javed at the GIP offices in El Segundo, California.  During this meeting, Wong, acting as an agent of DONG YIN, stated that he was in charge of GIP-Cayman and had the authority to make decisions regarding the governance and management of the company.  Wong further told Mr. Youssefzadeh and Mr. Javed that there were no compliance issues pertaining to the export control laws and that they should not concern themselves with this issue. Neither Wong nor Tang offered any explanation or analysis to support this claim.

239230.68

237.   Mr. Youssefzadeh and Mr. Javed told Wong and Tang that they believed there were serious compliance issues and that the GIP-Cayman Board of Directors needed to address them immediately.  Wong told Plaintiffs that they could either be directors or executives of GIP-Cayman, but could no longer hold both positions. Plaintiffs are informed and believe, and based thereon allege, that Wong and Tang were sent to this meeting by Fan, acting as an agent of DONG YIN, and that Wong told Plaintiffs that they could not remain as both directors and executives at Fan's direction.

238.   The resignations of Luo and Zhao created two open positions on the GIP-Cayman Board of Directors.  On or about June 13, 2017, the open positions were filled with two new member: (a) Henry Fan, who had previously worked as an outside consultant for Fan and/or DONG YIN; and (b) Hai Ming Zhang, who had previously been a paid advisor to Bronzelink.  These appointments further cemented DONG YIN's control and dominance over the governance, management and operations of GIP-Cayman and GIP-USA.

239.   On or about June 14, 2017, Fan held a telephone call via Skype with Mr. Youssefzadeh and Mr. Javed, who participated in the call from Washington, D.C., where they were meeting with GIP's Washington-based suppliers and with satellite insurance advisors.  During the telephone call, Fan, acting as an agent of DONG YIN, stated that there were no compliance issues pertaining to the export control laws, but did not offer any explanation or analysis to support this position.  In response, Mr. Youssefzadeh and Mr. Javed stated their disagreement with Fan's assertion, reiterating that it was apparent that there were serious compliance issues.  Fan, acting as an agent of DONG YIN, also reiterated Wong's prior demand that Mr. Youssefzadeh and Mr. Javed had to resign as either directors or executives, and could not continue to hold both positions.

240.   On June 14, 2017, Chen provided Mr. Youssefzadeh with a memorandum setting forth his conclusions based on his independent legal review and

**COMPLAINT**

investigation of the issues the Washington Attorney raised and addressed in his April 25, 2017 memorandum.  Chen's conclusions were reported to the GIP-Cayman Board of Directors.

241.   On or about June 14, 2014, Mr. Youssefzadeh once again noticed a meeting of the GIP-Cayman Board of Directors to discuss the same two agenda items he had attempted to raise previously: compliance with the export control laws and the proposal to engage Citigroup in order to obtain debt financing.  This time, he noticed the meeting for June 22, 2017, and invited the Washington Attorney to attend the meeting telephonically.  The Board meeting was noticed as a telephonic meeting.  Wong also separately noticed a telephonic meeting for the same date but did not distribute any agenda.

242.   Mr. Youssefzadeh and Mr. Javed asked that all Board members call on the company's conference bridge.  However, Fan, Wong, acting as agents of DONG YIN, and other directors under their control, failed to call in on the company conference bridge, while Liu called into the meeting but quickly disconnected.  As a result, Mr. Youssefzadeh, Mr. Javed and Chen were forced to declare that there was no quorum and cancel the meeting.

243.   Immediately thereafter, Wong, acting as an agent of DONG YIN, decided to release his previously concealed agenda and noticed a GIP-Cayman Board of Directors meeting for June 29, 2017 in Hong Kong.  His agenda included: (a) appointing himself as Chairman of the GIP-Cayman Board; (b) accepting the resignations of Mr. Youssefzadeh and Mr. Javed (who did not have resignation offers outstanding); (c) the removal of Chen as the Board Secretary; and (d) the reappointment of Pourmand as the GIP-Cayman CEO.  Wong transmitted this agenda directly and through Chen to Mr. Youssefzadeh's and Mr. Javed's offices in El Segundo, California.

244.   On June 26, 2017, Mr. Youssefzadeh and Mr. Javed both resigned their positions as GIP-Cayman and GIP-USA executives.

239230.68

245.   In his resignation letter, Mr. Youssefzadeh stated his belief that GIP-Cayman "cannot demonstrate compliance with the export control rules of the United States."  He also noted that he had communicated this issue to the GIP-Cayman Board of Directors, but that, instead of addressing it, the Board had "stonewalled" in an attempt to cover-up its wrongdoing and silence him, Mr. Javed and Chen.

246.   In his resignation letter, Mr. Javed similarly expressed concern with the Board's refusal to address the export control compliance issues.  He further stated that, "Wong has taken full control of the Company and has paralyzed the management structure and its authority," and is "apparently under the control of PRC person[s] and PRC related parties."

247.   Neither Fan, nor Wong, nor Liu, nor anyone else, denied the statements made by Mr. Youssefzadeh and Mr. Javed in their resignation letters.

248.   Chen resigned as General Counsel, Senior Vice President and Secretary of GIP-Cayman and GIP-USA on the same day that Mr. Youssefzadeh and Mr. Javed submitted their resignations, June 26, 2017.

249.   On July 10, 2017 Wong assembled the GIP-Cayman Board of Directors in Hong Kong and, acting as an agent of DONG YIN, nominated himself as Chairman of the Board.  Before Wong put his nomination to a vote, Mr. Youssefzadeh asked for Wong's qualifications, other than being a relative of a DONG YIN executive.  No answer was forthcoming.  Over the objections of Mr. Youssefzadeh and Mr. Javed, the Bronzelink-appointed directors voted to appoint Wong Chairman of the Board.

250.   The Board then considered the re-appointment of Pourmand as GIP-Cayman CEO.  Mr. Youssefzadeh objected on the grounds that, pursuant to the SHA, Plaintiffs controlled the CEO appointment.  In response, Fan instructed Wong to adjourn the meeting, to be reconvened on July 17, 2017.

251.   Plaintiffs are informed and believe, and thereon allege, that Wong and Fan, acting as agents of DONG YIN, agreed that Wong would become the Chairman

239230.68

of the Board of GIP-Cayman and Pourmand the CEO and, with the support of the other Bronzelink-appointed directors, installed Wong and Pourmand in those positions in furtherance of DONG YIN's scheme to control, dominate and direct the governance, management and operations of GIP-Cayman and GIP-USA.

252.   On or about July 15, 2017, Mr. Youssefzadeh and Mr. Javed emailed Wong a detailed list of questions regarding the relationships between DONG YIN and Bronzelink and its shareholders and officers, for purposes of determining whether GIP-USA were in compliance with ITAR and EAR.

253.   On or about July 16, 2017, Wong, acting as an agent of DONG YIN, responded to this email, indicating that the questions posed by Mr. Youssefzadeh and Mr. Javed were "the very same type of questions our ITAR lawyer is addressing in his detailed review of Bronzelink," and that "the most proper way forward is for our ITAR lawyer to respond on these points to your ITAR lawyer."  Plaintiffs have never received the promised response, notwithstanding multiple inquiries.

254.   On or about July 17, 2017, Fan and Wong, acting as agents of DONG YIN, put Pourmand's appointment as CEO to a vote and the GIP-Cayman Board approved him over the objections of Mr. Youssefzadeh and Mr. Javed, who then exercised their right to dismiss Pourmand as a Board member.

255.   In response to a letter from Boeing requesting GIP-Cayman's certification of compliance with ITAR and EAR, on or about July 20, 2017, Pourmand sent a letter to Boeing, falsely stating that "GIP is fully committed to compliance with the Export Administration Regulations ('EAR') and the International Traffic in Arms Regulations ('ITAR')."

256.   With the appointments of Wong as Chairman of the GIP-Cayman Board, Pourmand as CEO and Henry Fan and Hai Ming Zhang as Directors, DONG YIN cemented its control and dominance over the Satellite Project and the governance, management and operations of GIP-Cayman and GIP-USA.

239230.68

257.   On July 25, 2017, Wong sent an email to Mr. Javed, responding to Mr. Youssefzadeh's and Mr. Javed's July 15, 2017 email.  Wong, acting as an agent of DONG YIN, indicated that the matters raised in that email were currently being reviewed in detail by counsel specializing in export controls that Bronzelink retained ("Bronzelink's Compliance Counsel").  Wong stated that "we expect that the answers to [the questions in the July 15, 2017 email] and the nature and extent of any changes or improvements that may be required or suggested will be determined by the Company upon receipt of [the Washington Attorney's and Bronzelink's Compliance Counsel's] reports which are to be provided by August 11, 2017."

258.   Wong's statement proved to be yet another false promise: the GIP-Cayman Board never received any reports prepared by the Washington Law Firm or Bronzelink's Compliance Counsel concerning any of the issues raised in the July 15, 2017 email.

**P.     DONG YIN Alters and Falsifies the Official Minutes from the GIP-Cayman Board of Directors Meetings.**

259.   To further conceal its total control over GIP-Cayman, DONG YIN, through Wong and Liu, systematically altered and falsified GIP-Cayman corporate records, including board minutes, as follows:

(a)     On or about January 20, 2017, Wong, acting as an agent of DONG YIN, emailed modifications to the minutes of the December 8, 2016 GIP-Cayman Board of Directors meeting to Mr. Javed, removing references to discussions regarding technical satellite program updates, and to Fan's role in leading discussions concerning Export Control Agency financing, the GIP-Cayman business plan and sales and marketing.  Plaintiffs are informed and believe, and based thereon allege, that Wong sought to doctor these corporate records to hide evidence of DONG YIN's control of GIP-Cayman and to avoid any questions about

239230.68

1  whether the export control laws were violated when DONG YIN and its

2  agents received technical information.

3  (b)  On or about April 20 and 21, 2017, a GIP-Cayman Board meeting was

4  held in Hong Kong, during which Wong was purportedly appointed

5  "Executive Director" for the specific purpose of facilitating

6  communications between the GIP-Cayman Management Committee and

7  the Board of Directors concerning various operational and management

8  matters.  It was noted in the draft minutes that Wong was not an officer

9  of GIP-Cayman, and that the title did not bestow any additional authority

10  on Wong.  These limitations, however, were not reflected in the final

11  version of the minutes prepared by Liu, acting as an agent of

12  DONG YIN, and adopted by the Board after July 2017.

13  (c)  The final version of the minutes of the April 2017 board meeting were

14  altered by Liu, acting as an agent of DONG YIN, to state that Wong had

15  been authorized to require Chen, as the Board Secretary, to submit draft

16  minutes to Wong for his modifications and "comment" prior to

17  circulation to the other Board members, including Mr. Youssefzadeh and

18  Mr. Javed.

19  (d)  During the July 7, 2017 GIP-Cayman board meeting, Pourmand was

20  appointed GIP-Cayman CEO by the Bronzelink-controlled GIP-Cayman

21  Board, in disregard of Plaintiff's veto rights.  In his closing statements,

22  Pourmand denied that GIP-Cayman had any compliance issues, stating

23  that it was "Bronzelink's God given right" to do as it pleased.  These

24  remarks were omitted from the formal minutes Liu prepared.

25  260.  On or about September 13, 2017, the GIP-Cayman Board of Directors

26  approved the minutes of their April and July 2017 board meetings that had been

27  altered and falsified by the DONG YIN-controlled Board members, as described

28  above.

**Q.    DONG YIN Attempts to Purchase Plaintiffs' Silence**

261.   At Wong's request, Plaintiffs met two DONG YIN consultants, Michael Altwein and Pin Fen Miao, on November 16, 2017 at the GIP-USA offices in El Segundo, California.  The consultants informed Mr. Youssefzadeh and Mr. Javed that DONG YIN wanted them to remain involved in GIP-Cayman and would reward them if they did not pursue the issue of compliance with the export control laws. Mr. Altwein specifically asked Mr. Youssefzadeh and Mr. Javed, "What does it take to entice you to keep you in the company if you both are willing to back off and stop further pursuit and insistence on compliance."  Mr. Youssefzadeh and Mr. Javed declined this offer and terminated the meeting.

**R.    Summary of Defendants' Wrongful Conduct.**

262.   As described in this Complaint, Defendants DONG YIN, COAMI and CHANG, acting through their agents and employees, succeeded in their scheme by which DONG YIN seized control and dominance over the Satellite Project from Plaintiffs through the following false, fraudulent and dishonest means:

(a)    Falsely representing to Plaintiffs that COSEIG was an independent company and not under DONG YIN's control;

(b)    Falsely representing to Plaintiffs that Bronzelink was an independent company and not under DONG YIN's control;

(c)    Falsely denying to Plaintiffs that TechCap had an interest in the anticipated transaction between COSEIG and Plaintiffs;

(d)    Misrepresenting and concealing from Plaintiffs that Wong, Liu and others were agents of DONG YIN acting under Fan's control;

(e)    Controlling the Board of Directors of GIP-Cayman;

(f)    Controlling the Board of Directors of GIP-USA;

(g)    Secretly negotiating a contract with Pourmand to act as the CEO of GIP-Cayman;

(h)    Appointing Liu as the Controller for GIP-USA;

**COMPLAINT**

239230.68

(i)    Giving the GIP-Cayman Board, which was under Fan's control, the ability to control decisions which should have been made by GIP-Cayman executives and employees, such as Mr. Youssefzadeh and Mr. Javed, rather than directors;

(j)    Having Fan and Wong, acting as agents of DONG YIN, make decisions independently of the GIP-Cayman Board of Directors as if they ran the company, which they had no authority to do in their capacities as directors or otherwise;

(k)    Appointing Wong GIP-Cayman Executive Director and then Chairman of the Board;

(l)    Retaliating against Mr. Youssefzadeh and Mr. Javed and others for raising the issue that it appeared that GIP-Cayman and GIP-USA were under the control of the PRC, and not in compliance with ITAR and EAR;

(m)    Having secret contracts with their appointed directors;

(n)    Bypassing the GIP-Cayman Compensation Committee to compensate the Directors at far above industry standards;

(o)    Dramatically overpaying Luo for acting as the Chairman of the GIP-Cayman Board;

(p)    After Luo and Zhao resigned, replacing them with new Directors who were advisors or consultants to DONG YIN and Bronzelink;

(q)    Refusing to convene board meetings to discuss GIP-Cayman's corporate governance issues and compliance with the export control laws;

(r)    Forcing the resignations of Mr. Youssefzadeh, Mr. Javed and Chen;

(s)    Reappointing Pourmand as GIP-Cayman CEO over Plaintiffs' objections and despite their veto of the appointment; and

(t)    Altering and falsifying the minutes from GIP-Cayman board meetings to hide Defendants' malfeasance.

**S.**      **Summary of Money and Property Lost and Stolen.**

263.   Defendants' wrongful conduct caused Plaintiffs to suffer losses to their money and property including, without limitation, the following:

(a)   Control of the Satellite Project that they had spent years developing;

(b)   A 75% ownership interest in GIP-Cayman, the parent corporation of GIP-USA and Dub Dub (including 47.25% of GIP-Cayman that had been previously owned by Plaintiffs);

(c)   The benefit of the advantageous contracts with Boeing and SpaceX that had been negotiated by members of the Satellite Project Team;

(d)   The benefit of the advantageous insurance terms that had been negotiated by members of the Satellite Project Team;

(e)   Confidential and Proprietary information and documents that Plaintiffs prepared or had prepared at their expense, including

i.   Plaintiffs' design of the 7.7 ton state of the art satellite;

ii.   Plaintiffs' confidential business plan; and

iii.   Plaintiffs' confidential marketing studies.

(f)    Plaintiffs' intellectual property, including the Global-IP trademark; and

(g)   The opportunity for Plaintiffs to obtain a share of the projected U.S. $1.5 billion or more in anticipated profits if to the Satellite Project was successfully completed.

**FIRST CAUSE OF ACTION**

**(For Conspiracy to Defraud)**

**(By Plaintiffs Against All Defendants)**

264.   Plaintiffs repeat and reallege paragraphs 1 through 263 of this Complaint as if fully alleged herein.

**A.**      **Formation and Operation of the Conspiracy.**

265.   Beginning in or about December 2015, DONG YIN, CHANG and COAMI, together with COSEIG, TechCap, Amore, Bronzelink, the Washington Law

71

**COMPLAINT**

Firm, the Washington Attorney and others known and unknown to Plaintiffs and each of them, conspired and agreed to:

  (a) Make misrepresentations regarding important facts, as described further throughout this Complaint, knowing that the representations were false or misleading and intending that Plaintiffs would rely upon them;

  (b) Make false promises regarding important matters, as described further throughout this Complaint, with no intention of performing those promises and intending that Plaintiffs would rely upon them;

  (c) Conceal and withhold from Plaintiffs important facts that they had a duty to disclose, as described further throughout this Complaint, knowingly and with the intent to deceive Plaintiffs; and

  (d) Obtain ownership and control of Plaintiffs' property by theft, including theft by trick and theft by false pretenses, as described further throughout this Complaint.

 266. Plaintiffs acted reasonably in relying upon the false and misleading representations, false promises and undisclosed facts in, among other things, relinquishing ownership and control of the Satellite Project and its constituent parts, including 75% of their ownership interest in GIP-Cayman, as described throughout this Complaint.

**B. Wrongful Acts in Furtherance of the Conspiracy.**

 267. On or about the dates indicated below, DONG YIN, CHANG and COAMI, together with COSEIG, Amore, Bronzelink, the Washington Law Firm, the Washington Attorney and others known and unknown to Plaintiffs, and each of them, committed, caused and aided and abetted the following acts, among others, in furtherance of and to accomplish the objectives of the conspiracy:

 <u>Act No. 1:</u> On or about October 5, 2015, Ivan Chow sent an email to Mr. Youssefzadeh, stating that he was the newly appointed sole representative for

72

**COMPLAINT**

239230.68

Zhiyuan Geng and Yang Zeng of DONG YIN for business dealings related to Global IP.

Act No. 2: On October 5, 2015, Ivan Chow sent an email to Mr. Youssefzadeh falsely representing that neither he nor his company, COSEIG, had any affiliation with TechCap and its associates.

Act No. 3: On or about October 14, 2015, Ivan Chow sent an email to Mr. Javed enclosing a letter from his company's lawyer, falsely certifying that COSEIG's shareholders and management did not have any connection with TechCap, and that COSEIG did not have any existing agreement or business exchanges with TechCap.

Act No. 4: In or about October 2015, Ivan Chow falsely represented to Mr. Youssefzadeh and Mr. Javed that DONG YIN did not own or control COSEIG.

Act No. 5: On or about December 3, 2015, Ivan Chow falsely represented to Mr. Youssefzadeh and Mr. Javed that COSEIG had no desire or intent to become involved in GIP-Cayman operations.

Act No. 6: On or about December 4, 2015, COSEIG executed a JVA with Plaintiffs.

Act No. 7: On or about December 4, 2015, in reliance on the false and fraudulent representations and promises of DONG YIN's agents described in this Complaint, Mr. Youssefzadeh signed the JVA with COSEIG on behalf of STM Atlantic.

Act No. 8: On or about December 4, 2015, in reliance on the false and fraudulent representations and promises of DONG YIN's agents described in this Complaint, Mr. Youssefzadeh signed the JVA with COSEIG on behalf of himself.

Act No. 9: On or about December 4, 2015, in reliance on the false and fraudulent representations and promises of DONG YIN's agents described in this Complaint, Mr. Javed signed the JVA with COSEIG on behalf of himself.

**COMPLAINT**

1       Act No. 10:      On or about December 16, 2015, Ivan Chow emailed Mr. Javed

2   and represented that COSEIG's sole shareholder and director was Pok Kit Chow

3   concealing the fact that Pok Kit Chow was merely the nominal owner of COSEIG

4   acting on behalf of DONG YIN.

5       Act No. 11:      On or about January 28, 2016, Ivan Chow emailed

6   Mr. Youssefzadeh, Mr. Javed and Pourmand, on behalf of Fan, that COSEIG's

7   $250 million financial proposal had been formally approved by DONG YIN, creating

8   the false and misleading impression that COSEIG and DONG YIN were independent,

9   unrelated entities, and concealing the fact that, in reality, COSEIG was dominated and

10   controlled by DONG YIN.

11       Act No. 12:      Between in or about late January and early February 2016, the

12   Washington Attorney told Mr. Javed that COSEIG would be swapped out in the

13   agreement for another company, yet to be identified, and falsely promised that

14   DONG YIN would have no control or influence over GIP-Cayman.

15       Act No. 13:      On or about February 16, 2016, CHANG falsely represented to

16   Mr. Youssefzadeh and Mr. Javed, as well as to Pourmand, that after the closing:

17   (1) DONG YIN would have no control of GIP-Cayman; and (2) DONG YIN had no

18   intention of controlling or influencing GIP-Cayman and was relying on the founders

19   to run the business after the closing.

20       Act No. 14:      On or about February 21, 2016, the Washington Attorney

21   emailed Mr. Youssefzadeh, Mr. Javed, Fan and others, noting that, as a general matter,

22   the parties needed to be mindful of any direct or indirect PRC influence or control

23   over GIP-Cayman, via board members or otherwise, while failing to disclose that the

24   Washington Law Firm was negotiating a confidential Facility Agreement between

25   Amore and Bronzelink that would give the PRC control over GIP-Cayman's Board of

26   Directors.

27       Act No. 15:      On or about February 23, 2016, Fan, Henry Fan and their

28   attorneys disclosed the identity of the new company, Bronzelink, to Mr. Youssefzadeh

239230.68

and Mr. Javed and others for the first time, falsely representing that Bronzelink was an independent, stand-alone entity with no affiliation to DONG YIN.

Act No. 16:     On or about February 25, 2016, the COSEIG JVA was terminated and replaced by the Bronzelink JVA, which was virtually the same as the COSEIG JVA, except for the name change.

Act No. 17:     On or about February 25, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents described in this Complaint, Mr. Youssefzadeh signed the JVA with Bronzelink on behalf of STM Atlantic.

Act No. 18:     On or about February 25, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents described in this Complaint, Mr. Youssefzadeh signed the JVA with Bronzelink on behalf of himself.

Act No. 19:     On or about February 25, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents described in this Complaint, Mr. Javed signed the JVA with Bronzelink on behalf of himself.

Act No. 20:     On or about March 9, 2016, Amore appointed four individuals to its Board of Directors, all of whom were closely affiliated with DONG YIN or COAMI.

Act No. 21:     On or about March 15, 2016, Amore and Bronzelink executed the Facility Agreement but did not disclose its terms to Plaintiffs.

Act No. 22:     On or about March 15, 2016, the Washington Attorney emailed Mr. Youssefzadeh and Mr. Javed, stating that his law firm was DONG YIN's counsel and thus could not represent Bronzelink, creating the false and misleading impression that DONG YIN and Bronzelink were independent companies.  The Washington Attorney also confirmed that the Facility Agreement had been signed, failing to disclose that material terms of the Facility Agreement were in conflict with the intended agreement between Bronzelink and Plaintiffs.

**COMPLAINT**

239230.68

Act No. 23:      On or about March 28, 2016, the Washington Attorney responded to a request for written confirmation that DONG YIN was providing financing to Bronzelink, stating, "Given our stated concerns regarding the role of DY as a lender, and the need to attenuate PRC interests in both BL and GIP, having a letter from DY or its counsel 'on the record' does not serve the interests of any of the parties to this transaction."

Act No. 24:      On or about April 3, 2016, Henry Fan sent Mr. Youssefzadeh and Mr. Javed, among others, drafts of the SPA and the SHA.

Act No. 25:      On or about April 5, 2016, the Washington Attorney provided his comments to the SPA, representing that he had intended to align the conditions precedent set forth in the SPA with the terms of the Facility Agreement, but failing to disclose that other terms of the SPA were contrary to, inconsistent with or were undermined by the Facility Agreement.

Act No. 26:      On or about April 5, 2016, both David Zhang of DONG YIN and the Washington Attorney stated that DONG YIN understood that any PRC control or influence, directly or indirectly, would be in violation of U.S. laws and falsely represented that DONG YIN had no intention of exerting control over GIP-Cayman.

Act No. 27:      On or about May 11, 2016, Bronzelink executed the SPA, the SHA and the First Amendment to the SHA.  To conceal DONG Yin's plan to obtain and exercise control over the Satellite Project, neither DONG YIN, nor Amore, nor COAMI were signatories to the SPA, the SHA, or the SHA Amendment.

Act No. 28:      On or about May 11, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents described in this Complaint, Mr. Youssefzadeh signed the SPA, the SHA and the SHA Amendment on behalf of STM Atlantic.

Act No. 29:      On or about May 11, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents described in this

**COMPLAINT**

239230.68

Complaint, Mr. Youssefzadeh signed the SPA, the SHA and the SHA Amendment on behalf of himself.

Act No. 30:  On or about May 11, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents described in this Complaint, Mr. Javed signed the SPA, the SHA and the SHA Amendment on behalf of himself.

Act No. 31:  On or about May 11, 2016, Yang Zeng of DONG YIN falsely represented to Mr. Javed that DONG YIN was merely a lender to Bronzelink, and that, after the closing, DONG YIN would not have any control or influence in GIP-Cayman matters.

Act No. 32:  On or about May 31, 2016, Bronzelink's attorneys identified the directors that Bronzelink was appointing to the GIP-Cayman Board: Fan, Wong, Liu, Zheng, Luo and Zhao.

Act No. 33:  On or about May 31, 2016, the Washington Attorney represented to Mr. Javed as follows regarding the Bronzelink directors: (1) Four of the Bronzelink-appointed directors, Liu, Zheng, Luo and Zhao, were completely independent and unaffiliated with DONG YIN; and (2) since there were four independent Bronzelink-appointed directors and three Common directors, GIP-Cayman would have solid protection from PRC control and influence. The Washington attorney also represented to Mr. Javed that, although Wong worked for Bronzelink, he was not affiliated with DONG YIN.

Act No. 34:  On or about June 2, 2016, Fan falsely represented to Mr. Javed that DONG YIN and Bronzelink were completely different entities and were not related, and that after the closing DONG YIN would not have control of or any say in any GIP-Cayman matters. Fan also falsely promised Mr. Javed that after the closing, Bronzelink would have an independent Board of Directors that would make all the decisions free of DONG YIN's influence.

**COMPLAINT**

239230.68

Act No. 35:      On or about June 3, 2016 Bronzelink and Plaintiffs finalized and executed the closing documents for the SHA.

Act No. 36:      On or about June 3, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents described in this Complaint, Mr. Youssefzadeh signed the closing documents for the SHA on behalf of STM Atlantic.

Act No. 37:      On or about June 3, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents described in this Complaint, Mr. Youssefzadeh signed the closing documents for the SHA on behalf of STM Atlantic.

Act No. 38:      On or about June 3, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents described in this Complaint, Mr. Youssefzadeh signed the closing documents for the SHA on behalf of himself.

Act No. 39:      On or about June 3, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents described in this Complaint, Mr. Javed signed the closing documents for the SHA on behalf of himself.

Act No. 40:      On or about June 3, 2016, Bronzelink caused HSBC Bank to execute a wire transfer of $25 million from Hong Kong to GIP-Cayman's HSBC account in California.

Act No. 41:      On or about July 8, 2016, Tang prepared and circulated drafts of GIP-Cayman's organization chart and charts delineating the authority, duties and responsibilities of GIP-Cayman executives and the Board of Directors.  The latter charts empowered the GIP-Cayman Board to oversee and approve activities that are typically the responsibility of the officers and employees of a company.

Act No. 42:      On or about July 18, 2016, the GIP-Cayman Board of Directors held a board meeting in Washington, D.C., at which it was resolved that GIP-Cayman

was authorized to establish a legal presence in the U.S. by creating a wholly-owned U.S. subsidiary, GIP-USA.

Act No. 43:     On or about July 18, 2016, the GIP-Cayman Board of Directors further resolved that there would be three GIP-USA Directors, two of whom would be nominated by Bronzelink, such that GIP-USA would remain under the control of Bronzelink.

Act No. 44:     On or about July 29, 2016, after the Boeing LOI was finalized, Luo, the Chairman of the GIP-Cayman Board, deferred the decision to execute the LOI, stating in an email that "[he] would like Mr. Fan/DONG YIN to review/agreed [sic][the Letter of Intent] before we move on."

Act No. 45:     On or about July 29, 2016, Wong responded to Luo's email stating, that "you have the agreement from both parties to proceed."

Act No. 46:     Between on or about mid-October and mid-November 2016, Liu and/or Wong, acting on Fan's instructions, arranged for Chen, a candidate for the GIP-Cayman General Counsel and Board Secretary positions, to travel to Hong Kong to meet Fan, Wong, Terry Long and Mr. Dong of DONG YIN.

Act No. 47:     On or about November 18, 2016, Calvin Tang emailed Mr. Javed requesting sensitive technical data regarding the satellite project.

Act No. 48:     At the December 8, 2016 GIP-Cayman board meeting, Wong proposed paying compensation to the Board members, and indicated that the compensation was subject to a previous agreement between Bronzelink and the Bronzelink affiliated directors.

Act No. 49:     On or about January 9, 2017, Wong emailed Mr. Javed to inform him that Luo's fee for serving as a GIP-Cayman director was $35,000 per quarter, while Zhao and Zheng would each receive $2,500 per quarter.

Act No. 50:     On or about January 20, 2017, Wong emailed alterations to the minutes of the December 8, 2016 GIP-Cayman Board of Directors meeting to Mr. Javed, removing references to a discussion regarding technical satellite program

239230.68

updates and to Fan having led the discussions regarding Export Control Agency financing, the GIP-Cayman business plan, and sales and marketing.

Act No. 51:     On or about February 1, 2017, Fan and Wong visited the GIP-Cayman offices in El Segundo, California and told Mr. Youssefzadeh that he was under pressure from DONG YIN for GIP-Cayman to obtain more orbital slots.

Act No. 52:     On or about February 25, 2017, Wong and Charles informed Mr. Youssefzadeh and Mr. Javed that they had instructions from Fan and DONG YIN to terminate the employment of GIP-Cayman's CFO, Peter Lui.

Act No. 53:     On or about February 25, 2017, Wong informed Mr. Youssefzadeh and Mr. Javed that he and Fan would hold up authorization for the SpaceX contract if Lui was not fired immediately.

Act No. 54:     On or about March 1, 2017, the GIP-Cayman Board terminated Lui as CFO by unanimous written consent, but never appointed a replacement CFO, leaving Wong with full control over all GIP-Cayman bank accounts.

Act No. 55:     On or about April 27, 2017, Wong telephoned Mr. Javed to express his displeasure at not having been given an opportunity to preview and comment on the April 25, 2017 memorandum on export control laws prepared by the Washington Law Firm prior to its distribution to the GIP-Cayman Board of Directors.

Act No. 56:     In preparing the final version of the minutes of the April 2017 GIP-Cayman Board meeting, Liu altered the minutes to falsely state that Wong had been authorized to require Chen, as the Board Secretary, to submit draft minutes to Wong for his modifications and "comment" prior to circulation to the other Board members.

Act No. 57:     From on or about May 17, 2017 until the end of May 2017, after management requested approval to proceed with the Citigroup engagement letter to obtain debt financing, the Bronzelink-appointed directors to the GIP-Cayman Board followed Fan's lead and remained silent about the engagement letter.

**COMPLAINT**

239230.68

Act No. 58:      On or about May 24, 2017, after Mr. Youssefzadeh noticed a special meeting of the GIP-Cayman Board of Directors to discuss (1) compliance with the export control laws and corporate governance; and (2) the proposal to engage Citigroup in order to obtain debt financing, Wong stated that all of the Bronzelink-appointed directors were unavailable, thereby denying a quorum.

Act No. 59:      On or about May 25, 2017, Fan sent an email to Mr. Javed, falsely denying that Wong was his proxy.

Act No. 60:      On or about May 30, 2017, Fan sent an email to Mr. Javed, copying the other members of the GIP-Cayman Board of Directors, in which he denied Mr. Javed's allegation that governance of the Board was extremely defective.

Act No. 61:      On or about June 2, 2017, Wong thwarted Mr. Youssefzadeh's efforts to call a special meeting of the GIP-Cayman Board of Directors to discuss the company's compliance with U.S. export control laws by sending an email indicating that Bronzelink was in the process of electing directors for a new term so the Board could not have a quorum.

Act No. 62:      On or about June 5, 2017, Wong and Calvin Tang, another DONG YIN agent, met with Plaintiffs.  During this meeting, Wong stated that he was in charge of GIP-Cayman and had the authority to make decisions regarding the governance and management of the company.  He told Plaintiffs that there were no compliance issues pertaining to the export control laws and that they should not concern themselves with this matter.  Neither Wong nor Tang offered any explanation or analysis to support the statement that there were no compliance issues.

Act No. 63:      During the June 5, 2017 meeting, after Plaintiffs stated that there were serious compliance issues that the GIP-Cayman Board of Directors needed to address, Wong told Plaintiffs that they could be either officers or directors of GIP-Cayman, but could no longer hold both positions.

239230.68

<u>Act No. 64</u>:      On or about June 13, 2017, Bronzelink selected two directors to fill the vacancies on the GIP-Cayman Board of Directors, both of whom had allegiances to and took their direction from DONG YIN.

<u>Act No. 65</u>:      On or about June 14, 2017, Fan held a telephone call via Skype with Plaintiffs.  During the call, Fan stated that there were no compliance issues pertaining to the export control laws but did not provide any explanation or analysis to support this claim.

<u>Act No. 66</u>:      During the June 14, 2017 telephone call, after Plaintiffs stated reiterated that there were serious compliance issues, Fan informed them that they had to resign as either officers or directors, and could not continue to hold both positions.

<u>Act No. 67</u>:      On or about June 20, 2017, Wong sent an email to Mr. Javed, copying Mr. Youssefzadeh and others, falsely denying that his role and actions were subject to PRC influence.

<u>Act No. 68</u>:      On or about June 22, 2017, Fan, Wong and other directors under their control failed to call in on the company conference line for the Board of Directors meeting that Mr. Youssefzadeh had noticed to discuss (1) compliance with the export control laws and corporate governance; and (2) the proposal to engage Citigroup, and Liu called into the meeting but quickly disconnected.  As a result, there was no quorum.

<u>Act No. 69</u>:      On or about June 29, 2017, during a meeting with Mr. Javed, DONG YIN representatives Terry Long, and Xinyi Dong claimed ignorance as to the ongoing dispute over DONG YIN's dominance and control of the governance, management and operations of GIP-Cayman.

<u>Act No. 70</u>:      On or about July 9, 2017, a day before a GIP-Cayman Board of Directors meeting scheduled for July 10, 2017, Terry Long requested another meeting that was attended by Mr. Javed, Mr. Youssefzadeh and Chen.  During the meeting, DONG YIN representatives again feigned ignorance of the on-going dispute over DONG YIN's attempt to gain control over GIP-Cayman.

82
**COMPLAINT**

Act No. 71:     On or about July 10, 2017, at a GIP-Cayman Board meeting, Wong and Fan announced that they intended to appoint Wong as Chairman of the Board.  Mr. Youssefzadeh and Mr. Javed objected, but all six of the Bronzelink-appointed directors voted in favor of Wong's appointment and he was installed as GIP-Cayman's new Chairman of the Board.

Act No. 72:     During the July 10, 2017 Board meeting, Wong and Fan announced that they intended to appoint Pourmand as the CEO of GIP-Cayman.  The Bronzelink-appointed directors voted to appoint Pourmand as the CEO, ignoring Mr. Youssefzadeh and Mr. Javed, who objected to and vetoed the appointment.

Act No. 73:     During the July 10, 2017 Board meeting, Pourmand encouraged the Board to disregard Mr. Youssefzadeh's and Mr. Javed's veto, declaring that it was Bronzelink's "God given right" to appoint whomever they pleased.

Act No. 74:     Between July 10 and July 12, 2017, in a series of conversations, Fan told Mr. Youssefzadeh and Mr. Javed that he and DONG YIN wanted to maintain full control over all matters related to the Satellite Project.

Act No. 75:     On or about July 16, 2017, Wong responded to a July 15, 2017 email from Mr. Javed, in which he completely ignored questions raised by Mr. Javed relating to DONG YIN's control over GIP-Cayman.

Act No. 76:     On or about July 18, 2017, at a GIP-Cayman Board of Directors meeting called by the Bronzelink-appointed directors, Wong indicated that as the issue of compliance with U.S. export control laws was not on the agenda, it would not be discussed.

Act No. 77:     In preparing the minutes of the July 18, 2017 GIP-Cayman Board meeting, Liu omitted any reference to the discussion concerning compliance with U.S. export control laws or the questions about DONG YIN's affiliation with Bronzelink.

**COMPLAINT**

239230.68

Act No. 78:     On July 20, 2017, Pourmand sent a letter to Boeing, falsely stating that, "GIP is fully committed to compliance with the Export Administration Regulations ("EAR") and the International Traffic in Arms Regulations ("ITAR").

Act No. 79:     On or about September 4, 2017, Liu distributed the minutes that she had prepared of the July 18, 2017 GIP-Cayman board meeting, which omitted any mention of the Board's refusal to discuss compliance issues beyond Pourmand's denial that there were any such issues.

Act No. 80:     On or about September 13, 2017, the Bronzelink-appointed directors approved and adopted the altered and falsified minutes of the April and July 2017 GIP-Cayman board meetings.

Act No. 81:     On or about November 16, 2017, DONG YIN consultants informed Mr. Youssefzadeh and Mr. Javed that DONG YIN would reward them if they did not pursue the issue of compliance with the export control laws.

## C.    Resulting Damages.

268.    As a direct and proximate result of the conspiracy to defraud, Plaintiffs were damaged in an amount to be determined at trial.

269.    In engaging in the conspiracy to defraud Plaintiffs, Defendants acted fraudulently, oppressively, maliciously and with a willful and conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to exemplary and punitive damages pursuant to California Civil Code section 3294.

**SECOND CAUSE OF ACTION**

**(For Fraud)**

**(By Plaintiffs Against All Defendants)**

270.    Plaintiffs repeat and reallege paragraphs 1 through 269 of this Complaint as if fully alleged herein.

## A.    False and Misleading Representations and False Promises.

271.    Beginning in or about July 2015, Defendants made and caused others to make the following false and misleading representations and false promises, among

84

**COMPLAINT**

others, to Plaintiffs, knowing that they were false and with the intention that Plaintiffs would rely upon them:

**(As to DONG YIN's Role in the Governance,**

**Management and Operations of GIP-Cayman)**

(a)  That DONG YIN did not intend to exercise influence and control over GIP-Cayman, when in truth and in fact DONG YIN always intended to control, dominate and direct the governance, management and operations of GIP-Cayman;

(b)  That DONG YIN did not intend to have any direct dealings with GIP-Cayman, when in truth and in fact DONG YIN always intended to place agents of DONG YIN on the GIP-Cayman Board of Directors in order to control, dominate and direct the governance, management and operations of GIP-Cayman;

(c)  That DONG YIN was relying on Mr. Youssefzadeh and Mr. Javed to run GIP-Cayman after the closing, when in truth and in fact DONG YIN always intended to place agents of DONG YIN on the GIP-Cayman Board of Directors in order to control, dominate and direct the governance, management and operations of GIP-Cayman;

(d)   That four of the Bronzelink-appointed members of the GIP-Cayman Board of Directors would be independent of DONG YIN, when in truth and in fact there were never four independent Bronzelink-appointed Board members because DONG YIN always intended to place agents of DONG YIN on the Board and never intended the Bronzelink-appointed Board members to be independent of DONG YIN;

(e)   That Bronzelink-appointed directors Wong, Liu and Zheng were independent of and unaffiliated with DONG YIN, when in truth and in fact at all relevant times each of them was an agent of DONG YIN;

**COMPLAINT**

239230.68

(f)     That the GIP-Cayman Board of Directors would not be under the influence and control of the PRC, when in truth and in fact DONG YIN, which is owned and controlled by an instrumentality of the PRC, always intended to control, dominate and direct the GIP-Cayman Board of Directors;

### (As to COSEIG and its Relationship
### With DONG YIN and TechCap)

(g)     That DONG YIN did not own or control COSEIG, when in truth and in fact COSEIG was under the control, dominance and direction of DONG YIN;

(h)     That COSEIG was an independent company solely owned by Pok Kit Chow, when in truth and in fact Pot Kit Chow was merely the nominal owner acting on behalf of DONG YIN;

(i)     That Pot Kit Chow a wealthy businessman and investor from Hong Kong, when in truth and in fact he was neither wealthy nor a *bona fide* investor;

(j)     That DONG YIN's only role in the anticipated transaction between Plaintiffs and COSEIG was as a lender to COSEIG, when in truth and in fact COSEIG was under the control, dominance and direction of DONG YIN and DONG YIN always intended to use COSEIG as a vehicle in order to control, dominate and direct the governance, management and operations of GIP-Cayman;

(k)     That COSEIG did not have any affiliation, agreements or business dealings with TechCap and its associates, when in truth and in fact TechCap had been promised a 12% interest in COSEIG for its role in the anticipated transaction between COSEIG and Plaintiffs;

**(As to Bronzelink and its Relationship**

**With DONG YIN)**

(l)     That Bronzelink was an independent, stand-alone entity that did not have any affiliation with DONG YIN, when in truth and in fact Bronzelink was under the control, dominance and direction of DONG YIN;

(m)    That Bronzelink would have an independent Board of Directors that would make all decisions free of DONG YIN's influence, when in truth and in fact DONG YIN always intended to place agents of DONG YIN on the Bronzelink Board of Directors;

(n)     That Bronzelink's execution and performance of its obligations under the SHA would "not violate . . . "any agreement or instrument to which it is subject," when in truth and in fact the execution and performance of its obligations under the SHA would violate the Facility Agreement;

(o)     That Bronzelink was an independent entity that had "the power to execute [and] perform its obligations under and enter into all transactions contemplated by [the SHA]," when in truth and in fact under the Facilities Agreement Bronzelink could not perform all of its obligations and enter into all of the transactions contemplated by the SHA;

(p)     That upon demand, Bronzelink would provide its shares in GIP-Cayman as collateral to support a financing arrangement with an Export Credit Agency or another lender, when in truth and in fact Bronzelink could not provide its shares in GIP-Cayman as collateral because it had already given Amore a charge over its stock in GIP-Cayman; and

**(As to Project Financing)**

(q)     That GIP-Cayman would have the ability to secure additional financing from a lender other than an Export Credit Agency; when in truth and in fact under the Facilities Agreement Bronzelink had agreed that

**COMPLAINT**

239230.68

GIP-Cayman could only raise additional funds through financing provided by an Export Control Agency.

272.   All of the above representations and promises, and each of them, were important because they would have influenced a reasonable person's judgment or conduct, and Defendants knew that they were likely to have influenced Plaintiffs' judgment or conduct.

273.   Plaintiffs, and each of them, would have acted differently if they had known that these representations and promises were false.

**B.    Concealment of Material Facts.**

274.   At all times relevant hereto, Defendants owed Plaintiffs a duty of disclosure by virtue of the existence of one or more of the following circumstances:

(a)    To the extent Defendants made any disclosures to Plaintiffs, they disclosed only some facts, but intentionally withheld or caused others to withhold other facts, making the disclosures misleading;

(b)    Defendants intentionally failed or caused others to fail to disclose important facts to Plaintiffs that were known to them, and which Plaintiffs could not have discovered on their own; and

(c)    Defendants actively concealed and caused others to conceal important facts from Plaintiffs or acted to prevent them from discovering such facts.

275.   Beginning in or about July 2015, DONG YIN intentionally concealed, withheld and failed to disclose, and caused others to conceal, withhold and fail to disclose, the following facts, with the intent to deceive Plaintiffs:

**(As to DONG YIN's Relationships**

**With COSEIG and Bronzelink)**

(a)    At all relevant times, DONG YIN exercised control and dominance over COSEIG;

(b)    At all relevant times, Pot Kit Chow was merely the nominal owner of COSEIG acting on behalf of DONG YIN;

88

**COMPLAINT**

(c)     At all relevant times, DONG YIN exercised control and dominance over Bronzelink;

**(As to DONG YIN's Role in the Governance,**

***Management and Operations of GIP-Cayman)***

(d)     DONG YIN never intended to merely provide financing to COSEIG or Bronzelink, but at all relevant times intended to acquire control over the governance, management and operations of GIP-Cayman through its dominance and control of COSEIG and Bronzelink;

(e)     Fan was appointed to the GIP-Cayman Board of Directors for the purpose of enabling DONG YIN to control, dominate and direct the governance, management and operations of GIP-Cayman;

(f)     At all relevant times Wong, Liu and Zheng were agents of DONG YIN acting under Fan's control;

**(As to The Facility Agreement)**

(g)     The Facility Agreement between Bronzelink and Amore gives Amore the power to approve four of the five directors to the Bronzelink Board of Directors and that Bronzelink is then required to appoint those same four directors to the GIP-Cayman Board of Directors;

(h)     The Facility Agreement requires Bronzelink to provide Amore with free access at all reasonable times to the GIP-Cayman premises, assets, books, accounts and records;

(i)     The Facility Agreement provides that Amore has the right to meet with the GIP-Cayman senior management upon request;

(j)     The Facility Agreement requires GIP-Cayman to obtain Amore's approval for any contracts in excess of $1,000,000;

(k)     The Facility Agreement gives Amore the right to engage a financial advisor, technical consultant, marketing consultant and tax expert for GIP-Cayman, at GIP-Cayman's expense;

239230.68

(l)   The Facility Agreement requires Bronzelink to use its control of GIP-Cayman to preclude GIP-Cayman from entering into any joint ventures;

(m)   The Facility Agreement requires Bronzelink to use its control of GIP-Cayman to preclude GIP-Cayman from obtaining debt financing through any lender other than an Export Credit Agency; and

(n)   The Facility Agreement requires Bronzelink to use its control of GIP-Cayman to prohibit GIP-Cayman from creating a stock option pool.

276.   All of these facts, and each of them, were important in that they would have influenced a reasonable person's judgment or conduct, or Defendants knew that their disclosure was likely to have influenced Plaintiffs' judgment or conduct.

277.   Plaintiffs, and each of them, would have acted differently if they had known of these undisclosed facts.

**C.   Resulting Damages.**

278.   As a direct and proximate result of Defendants' false and misleading representations, false promises and concealment and withholding of important information, Plaintiffs were damaged in an amount to be determined at trial.

279.   In making these false and misleading representations and false promises, and in concealing, withholding and not disclosing these facts, Defendants acted fraudulently, oppressively, maliciously and with a willful disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to exemplary and punitive damages pursuant to California Civil Code section 3294.

**THIRD CAUSE OF ACTION**

**(For Violation of California Penal Code Section 496)**

**(By Plaintiffs Against DONG YIN)**

280.   Plaintiffs repeat and reallege paragraphs 1 through 279 of this Complaint as if fully alleged herein.

**COMPLAINT**

239230.68

281.   California Penal Code section 496(c) provides, in relevant part, that "[a]ny person who has been injured by a violation of subdivision (a) . . . may bring an action for three times the amount of the actual damages, if any, sustained by the plaintiff, cost of suit, and reasonable attorney's fees."

282.   California Penal Code section 496(a) provides, in relevant part, that "[e]very person who receives any property that has been stolen or that has been obtained in any manner constituting theft . . . knowing the property to be so stolen or obtained, or who conceals, . . . withholds, or aids in concealing . . . or withholding any property from the owner, knowing the property to be so stolen or obtained, [is guilty of a criminal offense]."

283.   California Penal Code section 484 defines "theft" to include: (a) theft by trick, which involves obtaining possession of another's property with his consent by fraud or deceit; and (b) theft by false pretenses, which involves obtaining possession and ownership of another's property by false or fraudulent representations or promise.

284.   On or about June 3, 2016, DONG YIN obtained from Plaintiffs property; namely, control of the Satellite Project and its component parts, including a 47.25% ownership interest in GIP-Cayman that was previously owned by Plaintiffs and confidential and proprietary information developed as part of the Satellite Project, including the Business Plan and marketing studies.

285.   The control of the Satellite Project and its component parts were stolen and obtained by theft in that:

(a)   They were obtained with Plaintiffs' consent by means of fraud and deceit, as described herein; and

(b)   They were obtained by means of intentionally false and fraudulent representations and promises and the concealment of material facts, as described herein.

239230.68

286.   In receiving this stolen property, DONG YIN acted knowing that the property had been stolen and with the intent to receive stolen property, and to conceal, withhold, and aid in the concealment and withholding of the property from Plaintiffs.

287.   As a direct and proximate result of these violations of California Penal Code section 496(a), Plaintiffs have been injured in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**

**(For Civil RICO in Violation of**

**Title 18, United States Code, Sections 1962(b) and 1964(c))**

**(By Plaintiffs Against All Defendants)**

288.   Plaintiffs repeat and reallege paragraphs 1 through 287 of this Complaint as if fully alleged herein.

289.   Title 18, United States Code, section 1962(b) provides, in relevant part, that "[i]t shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise . . . ."

290.   Title 18, United States Code, section 1961(4) defines the term "enterprise" to include "any individual, partnership, or other legal entity, and any . . . group of individuals associated in fact although not a legal entity."

291.   Title 18, United States Code, section 1964(c), provides, in relevant part, that "[a]ny person injured in his business or property be reason of a violation of section 1962 of this chapter may sue thereafter . . . and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ."

292.   At all times relevant hereto, each Plaintiff was a "person" within the meaning of Title 18, United States Code, sections 1961(3) and 1964(c).

293.   At all times relevant hereto, DONG YIN, COAMI, CHANG, COSEIG, Amore, Bronzelink, GIP- Cayman, GIP-USA, Dub Dub and the Washington Law

92

**COMPLAINT**

239230.68

Firm were each a "person" within the meaning of Title 18, U.S. Code, section 1961(3).

**A.    The "Victim Enterprise."**

294.    At all relevant times, Plaintiffs STM Atlantic, STM Group, Emil Youssefzadeh, Umar Javed, GIP- Cayman, GIP- USA and Dub Dub were a group of persons associated together for the common purpose of generating legitimate income, revenue and profits by performing the work necessary to successfully complete the Satellite Project, and constituted an association-in-fact enterprise within the meaning of Title 18, United States Code, section 1961(4) (the "Victim Enterprise").

295.    At all relevant times, the Victim Enterprise was engaged in, and its activities affected, interstate and foreign commerce in that, among other things, it was involved in acts, transactions and events occurring in, among other places, California, Washington, D.C., the Cayman Islands and Hong Kong.

**B.    The Racketeering Acts.**

296.    Beginning in or about July 2015, DONG YIN, together with COAMI, CHANG, COSEIG, Amore and Bronzelink, acquired and maintained, directly and indirectly, an interest in and/or control of the Victim Enterprise through the pattern a racketeering activity in violation of Title 18, United States Code, section 1962(b).

### *1.    Wire Fraud.*

297.    Title 18, United States Code, section 1343 provides in relevant part that, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representation, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice [is guilty of a criminal offense].".

298.    Beginning in or about July 2015, DONG YIN, acting through Fan, Wong, Liu and others, and COAMI, acting through CHANG, knowingly and with

93

**COMPLAINT**

intent to defraud, devised, participated in and executed a scheme and artifice to defraud Plaintiffs and to obtain money and property from them by means of false and fraudulent pretenses, representations and promises and the concealment of material facts, as described throughout this Complaint.

299.   On or about the dates set forth below, for purposes of carrying out such scheme or artifice, DONG YIN, COAMI and CHANG, together with COSEIG, Amore, Bronzelink and the Washington Law Firm, caused the following transmissions by wire or radio communication in interstate and foreign commerce, among others, in violation of Title 18, United States Code, section 1343:

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| 1 | Oct. 5, 2015 | Ivan Chow sent an email to Mr. Youssefzadeh stating that he was the newly appointed sole representative for Geng Zhiyuan and Yang Zeng of DONG YIN regarding business dealings related to Global IP. |
| 2 | Oct. 5, 2015 | Ivan Chow sent an email to Mr. Youssefzadeh falsely representing that neither he nor his company, COSEIG, had any affiliation with TechCap and its associates. |
| 3 | Oct. 14, 2015 | Ivan Chow sent an email to Mr. Javed enclosing a letter from his company's lawyer, falsely certifying that COSEIG's shareholders and management did not have any connection with TechCap and that COSEIG did not have any existing agreement or business exchanges with TechCap. |
| 4 | Dec. 16, 2015 | Ivan Chow emailed Mr. Javed and represented that COSEIG's sole shareholder and director was Pok Kit Chow but did not disclose the Pok Kit Chow was merely a nominal owner and that COSEIG was in fact controlled and dominated by DONG YIN. |

**COMPLAINT**

239230.68

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| 5 | Jan. 28, 2016 | Ivan Chow emailed Mr. Youssefzadeh, Mr. Javed and Pourmand, on behalf of Fan, that COSEIG's $250 million financial proposal had been formally approved by DONG YIN, creating the false impression that COSEIG and DONG YIN were independent, unrelated entities, and concealing the fact that COSEIG was actually dominated and controlled by DONG YIN. |
| 6 | Jan. – Feb. 2016 | Between late January and early February 2016, DONG YIN's Washington Attorney telephoned Mr. Javed in California, informed him that that COSEIG would be swapped out in the agreement for another company, yet to be identified, and falsely promised that DONG YIN would have no control or influence over GIP-Cayman. |
| 7 | Feb. 16, 2016 | During a meeting in Washington, D.C. that Mr. Youssefzadeh participated in by telephone from California, CHANG falsely represented to Mr. Youssefzadeh and Mr. Javed, as well as to Pourmand, that after the closing, (1) DONG YIN would have no control of GIP-Cayman; and (2) DONG YIN had no intention of controlling or influencing GIP-Cayman and was relying on the founders to run the business after closing. |
| 8 | Feb. 21, 2016 | The Washington Attorney emailed Mr. Youssefzadeh, Mr. Javed, Fan and others, and noted that as a general matter, parties need to be mindful of any direct or indirect PRC influence or control of GIP-Cayman, via board Members or otherwise, while failing to disclose that the Washington Law Firm was in the process of negotiating a confidential Facility Agreement between Amore and Bronzelink to give the PRC control over GIP-Cayman's Board of Directors. |

95

**COMPLAINT**

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| 9 | Mar. 15, 2016 | The Washington Attorney emailed Mr. Youssefzadeh and Mr. Javed, stating that his law firm was DONG YIN's counsel and could not act for Bronzelink, creating the false impression that DONG YIN and Bronzelink were independent companies.  The Washington Attorney also confirmed that the Facility Agreement had been signed, failing to disclose that material terms of the Facility Agreement were in conflict with the intended agreement between Bronzelink and Plaintiffs. |
| 10 | Mar. 28, 2016 | The Washington Attorney sent an email responding to a request for written confirmation that DONG YIN was providing financing to Bronzelink stating, "Given our stated concerns regarding the role of DY as a lender, and the need to attenuate PRC interests in both BL and GIP, having a letter from DY or its counsel 'on the record' does not serve the interests of any of the parties to this transaction." |
| 11 | Apr. 3, 2016 | Henry Fan emailed Mr. Youssefzadeh and Mr. Javed, among others, the drafts of the Share Purchase Agreement and Shareholders Agreement. |
| 12 | Apr. 5, 2016 | The Washington Attorney provided his comments to the SPA by email, representing that he had intended to align the conditions precedent set forth in the SPA with the terms of the Facility Agreement between DONG YIN and Bronzelink, but not disclosing that other terms of the SPA were contrary to, undermined, or otherwise interfered with by the Facility Agreement. |

96

**COMPLAINT**

239230.68

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| **13** | May 31, 2016 | After Bronzelink identified Fan, Wong, Liu, Luo, Zhao and Zheng as the directors Bronzelink appointed to the GIP-Cayman Board, the Washington attorney spoke by telephone to Mr. Javed and falsely represented as follows: (1) Four of the Bronzelink-appointed directors, Liu, Zheng, Luo and Zhao, were completely independent of and unaffiliated with DONG YIN; and (2) with four independent Bronzelink-appointed directors and three Common directors, GIP-CAYMAN would have solid protection from PRC influence and control.  The Washington Attorney also falsely represented to Mr. Javed that, although Wong worked for Bronzelink, he was not affiliated with DONG YIN. |
| **14** | Jun. 2, 2016 | Fan telephoned Mr. Javed and represented that DONG YIN and Bronzelink were two completely different entities and were unrelated and that after the closing DONG YIN would not have control or any say in any GIP-Cayman matters.  Fan further promised Mr. Mr. Javed that after the closing Bronzelink would have an independent Board of Directors that would make all the decisions free of DONG YIN's influence. |
| **15** | Jun. 3, 2016 | Bronzelink caused HSBC Bank to execute a wire transfer of $25 million from its bank in Hong Kong to GIP-Cayman's HSBC USA account located in California as part of its payment for the acquisition of a controlling interest in GIP-Cayman. |

### 2. *Money Laundering.*

300.   Title 18, United States Code, section 1956(a)(2) provides in relevant part that, "[w]hoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States–

239230.68

(A)   With the intent to promote the carrying on of specified unlawful  activity [is guilty of a criminal offense]."

301.   On or about June 3, 2016, DONG YIN and Bronzelink, knowingly conducted and conspired to conduct the wire transfer of $25,000,000 from a place outside the United States; namely, Hong Kong, to a place in the United States; namely, GIP-Cayman's HSBC bank account in California, with the intent to promote the carrying on of Specified Unlawful Activity; namely, obtaining control of the Satellite Project by wire fraud in violation of Title 18, United States Code, section 1343, in violation of Title 18, United States Code, section 1956(a)(2)(A).

**C.     Injury to Business and Property.**

302.   By reason of the foregoing violations of Title 18, United States Code, section 1962(c), Plaintiffs have been injured in their business and property in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**

**(For Civil RICO Conspiracy in Violation of**

**Title 18, United States Code, Sections 1962(d) and 1964(c))**

**(By Plaintiffs Against All Defendants)**

303.   Plaintiffs repeat and reallege paragraphs 1 through 302 of this Complaint as if fully alleged herein.

304.   Title 18, United States Code, section 1962(d) provides, in relevant part, that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsections . . . (b) or (c) of this section [1962]."

305.   Beginning in or about July 2015, DONG YIN, COAMI, CHANG, COSEIG, Amore, Bronzelink and TechCap, and each of them, knowingly and willfully conspired and agreed to:

(a)   Violate Title 18, United States Code, section 1962(b), by being employed by or associated with the Victim Enterprise and acquiring and maintaining, directly and indirectly, an interest in or control of the Victim

98

**COMPLAINT**

Enterprise through the pattern of racketeering activity described in the Fourth Cause of Action; and

(b)     Commit two or more of the racketeering acts of wire fraud and money laundering as described in the Fourth Cause of Action, knowing of the essential nature and scope of the Victim Enterprise and intending to acquire or maintain an interest in or control of it.

306.    GIP-Cayman joined the conspiracy in or about June 2016, and GIP-USA joined the conspiracy in or about August 2016, when DONG YIN assumed control and dominance over the governance, management and operations of those companies.

307.    By reason of the foregoing violations of Title 18, United States Code, section 1962(d), Plaintiffs have been injured in their business and property in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**

**(For Civil RICO in Violation of**

**Title 18, United States Code, Sections 1962(c) and 1964(c))**

**(By Plaintiffs Against All Defendants)**

308.    Plaintiffs repeat and reallege paragraphs 1 through 307 of this Complaint as if fully alleged herein.

309.    Title 18, United States Code, section 1962(c) provides, in relevant part, that "[i]t shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

**A.     The Criminal Enterprise.**

310.    At all times relevant hereto, DONG YIN, COAMI, CHANG, COSEIG, Amore, Bronzelink, TechCap and the Washington Law Firm were a group of persons associated for the common purpose of defrauding Plaintiffs of ownership and control of the Satellite Project, so that DONG YIN could acquire and maintain control of the Satellite Project, and constituted an association-in-fact enterprise within the meaning

99

**COMPLAINT**

of Title 18, United States Code, section 1961(4) (the "Criminal Enterprise").

GIP-Cayman joined the Criminal Enterprise in or about June 2016, and GIP-USA

joined the Criminal Enterprise in or about August 2016, when DONG YIN assumed

control and dominance over the governance, management and operations of those

companies.

311.   At all times relevant hereto, the Criminal Enterprise was engaged in, and

its activities affected, interstate and foreign commerce as alleged in the Fourth Cause

of Action.

**B.    The Racketeering Acts.**

312.   Beginning in or about July 2015, DONG YIN, COAMI and CHANG

together with COSEIG, Amore, Bronzelink, TechCap and the Washington Law Firm,

and subsequently GIP-Cayman and GIP-USA, being employed by or associated with

the Criminal Enterprise, conducted and participated in the conduct of the affairs of the

Criminal Enterprise, directly and indirectly, through a pattern of racketeering activity

that included the above described acts of wire fraud and money laundering, in

violation of Title 18, United States Code, section 1962(c).

**C.    Injury to Business and Property.**

313.   By reason of the foregoing violations of Title 18, United States Code,

section 1962(c), Plaintiffs have been injured in their business and property in an

amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**

**(For Civil RICO Conspiracy in Violation of**

**Title 18, United States Code, Sections 1962(d) and 1964(c))**

**(By Plaintiffs Against All Defendants)**

314.   Plaintiffs repeat and reallege paragraphs 1 through 313 of this

Complaint as if fully alleged herein.

**COMPLAINT**

239230.68

315.    Beginning in or about July 2015, DONG YIN, COAMI, CHANG, COSEIG, Amore, Bronzelink, TechCap and the Washington Law Firm, and each of them, knowingly and willfully conspired and agreed to:

      (a)    Violate Title 18, United States Code, section 1962(c), by conducting the affairs and participating in the conduct of the affairs of the Criminal Enterprise, directly and indirectly, through the pattern of racketeering activity described in the Fifth Cause of Action; and/or

      (b)    Commit two or more of the racketeering acts of wire fraud and money laundering as described in the Fifth Cause of Action, knowing of the essential nature and scope of the Criminal Enterprise and intending to participate in it.

316.    GIP-Cayman joined the conspiracy in or about June 2016, and GIP-USA joined the conspiracy in or about August 2016, when DONG YIN assumed control and dominance over the governance, management and operations of those companies.

317.    By reason of the foregoing violations of Title 18, United States Code, section 1962(d), Plaintiffs have been injured in their business and property in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

### (For Interference with Prospective Business Advantage)

### (By Plaintiffs Against DONG YIN)

318.    Plaintiffs repeat and reallege paragraphs 1 through 317 of this Complaint as if fully alleged herein.

319.    In or about February 2016, Plaintiffs entered into an economic relationship with Bronzelink under which Bronzelink would substitute for COSEIG and enter into a transaction to provide financing for the Satellite Project, in exchange for equity in GIP-Cayman and other consideration, as described above.  That economic relationship was substantially likely to result in economic benefits to

**COMPLAINT**

239230.68

Plaintiffs, including a share of the projected $1.5 billion or more in anticipated profits if to the Satellite Project was successfully completed.

320.   In April 2017, DONG YIN caused Amore to enter into the secret Facilities Agreement with Bronzelink, which contained provisions that were contrary to and inconsistent with DONG YIN's representations and promises to Plaintiffs, and which prohibited Bronzelink from providing the benefits Plaintiffs were substantially likely to receive under their intended transaction with Bronzelink.  Specifically, the Facilities Agreement:

    (a)    Gives DONG YIN, through Amore, access to and control over GIP-Cayman and the Satellite Project;

    (b)    Undermines Plaintiffs' ability to obtain additional financing necessary to complete the Satellite Project, by preventing GIP-Cayman from obtain financing through any source other than the ECA; and

    (c)    Places limitations and restrictions on the operations of GIP-Cayman that were never disclosed to Plaintiffs and to which Plaintiffs never agreed.

321.   In entering into the Facilities Agreement, and at all relevant times prior to June 3, 2016, DONG YIN knew about Plaintiffs' prospective economic relationship with Bronzelink.

322.   In entering into the Facilities Agreement, DONG YIN intended to interfere with Plaintiffs' economic relationship with Bronzelink, or knew that its conduct was substantially certain to interfere with this relationship.

323.   In fact, DONG YIN did interfere with Plaintiffs' economic relationship with Bronzelink.  Although Bronzelink entered into the SPA and the SHA on or about May 10, 2016, Bronzelink's performance under those contracts has been undermined and substantially impaired by its obligations to Amore and DONG YIN under the Facilities Agreement.

**COMPLAINT**

239230.68

324.   As a direct and proximate result of DONG YIN's knowing and intentional conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

325.   By engaging in the conduct described in this cause of action, DONG YIN acted fraudulently, oppressively, maliciously and with a willful and conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to exemplary and punitive damages.

**NINTH CAUSE OF ACTION**

**(For Unfair Business Practices**

**California Business & Professions Code Section 17200)**

**(By Plaintiffs Against All Defendants)**

326.   Plaintiffs repeat and reallege paragraphs 1 through 325 of this Complaint as if fully alleged herein.

327.   California's Unfair Competition Law (the "UCL"), California Business and Professions Code section 17200, *et seq*., creates a statutory private right of action for "unfair competition," which is defined to include "any unlawful, unfair or fraudulent business act or practice."

328.   Defendants engaged in unlawful, unfair and fraudulent business acts and practices as alleged herein in violation of the UCL.

329.   Defendants engaged in the following *unlawful* business acts and practices, among others, in violation of the UCL:

(a)   Conspiring to violate ITAR and EAR, in violation of Title 18, United States Code, section 371;

(b)   Committing wire fraud, in violation of Title 18, United States Code, section 1343, as described herein;

(c)   Engaging in money laundering, in violation of Title 18, United States Code, section 1956(a)(1)(A), as described herein;

239230.68

(d)     Violating and conspiring to violate RICO, in violation of Title 18, United States Code, sections 1962(b), (c) and (d) and 1964(c), as described herein;

(e)     Engaging in the torts of deceit, in violation of California Civil Code section 1709, as described herein; and

(f)     Obtaining and receiving stolen property, in violation of California Penal Code section 494(a), as described herein.

330.    Defendants also engaged in the following *unfair* business practices, among others, in violation of the UCL:

(a)     Causing Amore to enter into the secret Facilities Agreement with Bronzelink that gave DONG YIN, through Amore, the ability to place its agents on the Board of Directors of GIP-Cayman and GIP-USA; gave DONG YIN control over GIP-Cayman and the Satellite Project; interfered with Plaintiffs' ability to obtain additional financing necessary to complete the Satellite Project; and placed limitations and restrictions on the operations of GIP-Cayman that were never disclosed to Plaintiffs and to which Plaintiffs never agreed;

(b)     Placing agents of DONG YIN on the Board of Directors of GIP-Cayman;

(c)     Placing agents of DONG YIN on the Board of Directors of GIP-USA;

(d)     Causing GIP-Cayman to enter into an agreement with Pourmand regarding his initial employment as CEO without Plaintiffs' involvement or approval even though the SHA provides that Plaintiffs and Pourmand would collectively nominate the CEO and the CEO's compensation should have approved by the GIP-Cayman Board of Directors and/or the GIP-Cayman Compensation Committee of which Mr. Youssefzadeh was a member;

(e)     Causing GIP-Cayman to enter into contracts to compensate Bronzelink-appointed directors of GIP-Cayman and GIP-USA without

obtaining the approval of the GIP-Cayman Compensation Committee, to ensure their loyalty to DONG YIN;

(f) Substantially overcompensating Jason Luo, the Chairman of the GIP-Cayman Board of Directors, and doing so without the approval of the GIP-Cayman Compensation Committee, in an attempt to ensure his loyalty to DONG YIN;

(g) Giving the GIP-Cayman Board of Directors, which was under Fan's control, the ability to make and control decisions which should have been made by officers or employees, rather than the directors;

(h) Acting through Fan and Wong to make decisions independently of the GIP-Cayman Board of Directors and which Fan and Wong did not have the authority to make by themselves;

(i) Appointing Wong Executive Director of GIP-Cayman without the legal authority to do so;

(j) Retaliating against Plaintiffs for raising the issue of whether DONG YIN's control and dominance of GIP-Cayman was in violation of U.S. export control laws;

(k) Causing the resignations of Luo and Zhao as directors of GIP-Cayman;

(l) Replacing Luo and Zhao as directors of GIP-Cayman with agents of DONG YIN and who were under the control of and took direction from Fan;

(m) Causing Wong to be appointed Chairman of the GIP-Cayman Board of Directors;

(n) Reappointing Pourmand as CEO, even after Plaintiffs vetoed the appointment;

(o) Refusing to convene duly noticed meetings of the GIP-Cayman Board of Director to discuss and resolve the issue of whether GIP-Cayman's

**COMPLAINT**

239230.68

corporate governance, management and operations were in compliance with U.S. export control laws;

(p)    Refusing to convene duly noticed meetings of the GIP-Cayman Board of Directors to discuss and resolve the proposal to engage Citigroup in order to obtain debt financing;

(q)    Forcing Mr. Youssefzadeh and Mr. Javed to resign as officers and executives of GIP-Cayman and GIP-USA;

(r)    Forcing Chen's resignation as General Counsel of GIP-Cayman;

(s)    Altering and falsifying minutes of GIP-Cayman Board of Director meetings;

(t)    Preparing records of GIP-Cayman Board of Director meetings that omitted important information;

(u)    Offering to pay Plaintiffs if they did not pursue the issue of whether DONG YIN had violated the export control laws;

(v)    Obtaining control and dominance over the governance, management and operations of GIP-Cayman by fraudulent and dishonest means, as described herein;

(w)    Obtaining control and dominance over the governance, management and operations of GIP-USA by fraudulent and dishonest means, as described herein; and

(x)    Obtaining control and dominance over the Satellite Project by fraudulent and dishonest means, as described herein.

331.    Defendants also engaged in the following *fraudulent* business acts and practices among others in violation of the UCL:

(a)    Falsely representing to Plaintiffs that DONG YIN did not intend to exercise and influence and control over GIP-Cayman;

(b)    Falsely representing to Plaintiffs that DONG YIN did not intend to have any direct dealings with GIP-Cayman;

239230.68

(c)     Falsely representing to Plaintiffs that DONG YIN was relying on Mr. Youssefzadeh and Mr. Javed to run GIP-Cayman after the closing;

(d)     Falsely representing to Plaintiffs that Bronzelink-appointed directors Wong, Liu and Zheng were completely independent of and unaffiliated with DONG YIN;

(e)     Falsely representing to Plaintiffs that DONG YIN did not own or control COSEIG;

(f)     Falsely representing to Plaintiffs that COSEIG was an independent company solely owned by Pok Kit Chow;

(g)     Falsely representing to Plaintiffs that Pot Kit Chow a wealthy businessman and investor from Hong Kong;

(h)     Falsely representing to Plaintiffs that DONG YIN's only role in the anticipated transaction between Plaintiffs and COSEIG was as a lender to COSEIG;

(i)     Falsely denying to Plaintiffs that TechCap had an interest in the anticipated transaction between COSEIG and Plaintiffs;

(j)     Falsely representing to Plaintiffs that Bronzelink was an independent, stand-alone entity that did not have any affiliation with DONG YIN; and

(k)     Falsely representing to Plaintiffs that Bronzelink had "the power to execute [and] perform its obligations under and enter into all transactions contemplated by [the SHA]".

332.    Plaintiffs have lost money and property as a direct and proximate result of Defendant's unfair, unlawful and fraudulent business acts and practices.

333.    As a result, Plaintiffs are entitled to restitutionary disgorgement in an amount to be determined at trial.

334.    As a further result, Plaintiffs are entitled to an injunction enjoining Defendants from engaging in such further unlawful, unfair and fraudulent business acts and practices, which injunction will benefit both Plaintiffs and the general public.

**COMPLAINT**

239230.68

### TENTH CAUSE OF ACTION

### (For Unjust Enrichment)

### (By Plaintiffs Against DONG YIN)

335.   Plaintiffs repeat and reallege paragraphs 1 through 334 of this Complaint as if fully alleged herein.

336.   As set forth above, the Satellite Project was the culmination of Mr. Youssefzadeh's and Mr. Javed's combined four decades of experience in the satellite industry.  Further, between 2008 and 2016, Plaintiffs invested thousands of hours and millions of dollars in developing and advancing the Satellite Project.  As a direct result of Plaintiffs' hard work and multi-million-dollar investments, the Satellite Project became a viable project with an estimated profit potential of US$1.5 billion or more over the life of the satellite.

337.   DONG YIN has received a valuable benefit from Plaintiffs consisting of control over the Satellite Project, including obtaining confidential and proprietary information and a 75% interest in GIP-Cayman, of which 47.25% previously belonged to Plaintiffs.  As alleged in this Complaint, DONG YIN obtained this benefit by unjust and inequitable means, including fraudulent misrepresentations, false promises, the concealment of material facts and acts of theft by trick and false pretenses. DONG YIN has been and is being unjustly enriched by its retention of and ability to exercise control over the Satellite Project.

338.   Plaintiffs are entitled to be compensated for the value of the benefits that DONG YIN has received unjustly, in an amount to be determined at trial.

### ELEVENTH CAUSE OF ACTION

### (For Imposition of Constructive Trust)

### (By Plaintiffs Against DONG YIN)

339.   Plaintiffs repeat and reallege paragraphs 1 through 338 of this Complaint as if fully alleged herein.

**COMPLAINT**

239230.68

340.   By reason of the fraudulent, wrongful and criminal manner in which DONG YIN obtained control over the Satellite Project, DONG YIN has no legal or equitable right, claim, or interest in that Project or its constituent parts.

341.   Plaintiffs therefore request that the Court impose a constructive trust on DONG YIN's interest in and control of the Satellite Project and any proceeds, directly or indirectly, derived therefrom.  Furthermore, DONG YIN should be required to hold its interest in and control of the Satellite Project and any proceeds derived therefrom in trust for Plaintiffs, to provide those proceeds to Plaintiffs, and to restore any and all of its rights, title and interest in and control of the Satellite Project to Plaintiffs.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment against Defendants, as follows:

**As to the First Cause of Action for Conspiracy to Defraud:**

    1.    For compensatory and special damages; and

    2.    For punitive and exemplary damages.

**As to the Second Cause of Action for Fraud:**

    1.    For compensatory and special damages; and

    2.    For punitive and exemplary damages.

**As to the Third Cause of Action for Violation of California Penal Code Section 496:**

    1.    For compensatory and special damages;

    2.    For the trebling of those damages; and

    3.    For Plaintiffs' reasonable costs, including reasonable attorney's fees.

**As to the Fourth Cause of Action for Civil RICO – Victim Enterprise:**

    1.    For compensatory and special damages;

    2.    For the trebling of those damages;

    3.    For punitive and exemplary damages; and

    4.    For Plaintiffs' reasonable costs, including reasonable attorney's fees.

239230.68

1    **As to the Fifth Cause of Action RICO Conspiracy –Victim Enterprise:**

2         1.      For compensatory and special damages;

3         2.      For the trebling of those damages;

4         3.      For punitive and exemplary damages; and

5         4.      For Plaintiffs' reasonable costs, including reasonable attorney's fees.

6    **As to the Sixth Cause of Action Civil RICO – Criminal Enterprise:**

7         1.      For compensatory and special damages;

8         2.      For the trebling of those damages;

9         3.      For punitive and exemplary damages; and

10        4.      For Plaintiffs' reasonable costs, including reasonable attorney's fees.

11   **As to the Seventh Cause of Action for RICO Conspiracy – Criminal Enterprise:**

12        1.      For compensatory and special damages;

13        2.      For the trebling of those damages;

14        3.      For punitive and exemplary damages; and

15        4.      For Plaintiffs' reasonable costs, including reasonable attorney's fees.

16   **As to the Eighth Cause of Action for Interference with**

17   **Prospective Business Advantage:**

18        1.      For compensatory and special damages; and

19        2.      For punitive and exemplary damages.

20   **As to the Ninth Cause of Action for Violation of the UCL:**

21        1.      For restitutionary disgorgement; and

22        2.      For injunctive relief.

23   **As to the Tenth Cause of Action for Unjust Enrichment:**

24        1.      To be compensated for the value of any and all benefits conferred by

25                Plaintiffs that DONG YIN has unjustly received and retained.

26

27

28

---

110

**COMPLAINT**

1 | **As to the Eleventh Cause of Action for a Constructive Trust:**

2 |        1.        For the imposition of a constructive trust on any of DONG YIN's rights,

3 | title and interest in and control of the Satellite Project and any proceeds

4 | derived therefrom.

5 | **For All Causes of Action:**

6 |        1.        For prejudgment interest at the maximum rate permitted by law;

7 |        2.        For costs of suit; and

8 |        3.        For such other and further relief as the Court may deem just and proper.

9 |

10 | Dated:  February 15, 2018                **ISAACS | FRIEDBERG LLP**

11 |

                                                 By:   */s/ Jerome H. Friedberg*

12 |                                                        JEFFREY B. ISAACS, ESQ.

13 |                                                        JEROME H. FRIEDBERG, ESQ.

                                                        PAIGE SHEN, ESQ.

14 |                                                        ROBERT GOOKIN, ESQ.

15 |                                                        *Attorneys for Plaintiffs STM Atlantic N.V.,*

16 |                                                        *STM Group, Inc., Emil Youssefzadeh and*
                                                        *Umar Javed*

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

**COMPLAINT**

239230.68

**DEMAND FOR JURY TRIAL**

Plaintiffs STM Atlantic N.V, STM Group, Inc., Emil Youssefzadeh and Umar Javed hereby request a jury trial on all issues properly triable to a jury.

Dated:  February 15, 2018                    **ISAACS | FRIEDBERG LLP**

By:    */s/ Jerome H. Friedberg*
                JEFFREY B. ISAACS, ESQ.
                JEROME H. FRIEDBERG, ESQ.
                PAIGE SHEN, ESQ.
                ROBERT GOOKIN, ESQ.

                *Attorneys for Plaintiffs STM Atlantic N.V.,*
                *STM Group, Inc., Emil Youssefzadeh and*
                *Umar Javed*

**COMPLAINT**

239230.68