Jeffrey B. Isaacs, Esq., SBN 117104
Jerome H. Friedberg, Esq., SBN 125663
Paige Shen, Esq., SBN 162122
Robert F. Gookin, Esq., SBN 251601
**ISAACS | FRIEDBERG LLP**
555 South Flower Street, Suite 4250
Los Angeles, California 90071
Telephone: (213) 929-5550/Facsimile: (213) 955-5794
Email:  jisaacs@ifcounsel.com
            jfriedberg@ifcounsel.com
            pshen@ifcounsel.com
            rgookin@ifcounsel.com

*Attorneys for Plaintiffs STM Atlantic N.V.,*
*STM Group, Inc., Emil Youssefzadeh and*
*Umar Javed*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STM ATLANTIC N.V., a Dutch company; STM GROUP, INC., a Delaware corporation; EMIL YOUSSEFZADEH, an individual; and UMAR JAVED, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> DONG YIN DEVELOPMENT (HOLDINGS) LIMITED, a Hong Kong unlimited company; CHINA ORIENT ASSET MANAGEMENT (INTERNATIONAL) HOLDING LIMITED, a Hong Kong limited company; and LUDWIG CHANG, an individual, <br><br> Defendants. | Case No. 2:18-cv-01269-JLS-JCG <br><br> **FIRST AMENDED COMPLAINT FOR MONETARY AND OTHER RELIEF FOR:** <br><br> 1)  **CIVIL CONSPIRACY;** <br><br> 2)  **FRAUD;** <br><br> 3)  **CIVIL THEFT (CAL. PEN. CODE § 496);** <br><br> 4)  **VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1962(b), 1964(c));** <br><br> 5)  **VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1962(c), 1964(c));** <br><br> 6)  **CONSPIRACY TO VIOLATE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1962(d), 1964(c));** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

7)   **INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**

8)   **VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200);**

9)   **UNJUST ENRICHMENT; and**

10)  **CONSTRUCTIVE TRUST.**

**DEMAND FOR JURY TRIAL**

**FIRST AMENDED COMPLAINT**

239671.4

# TABLE OF CONTENTS

PAGE

I.   PRELIMINARY STATEMENT ...................................................................... 8

II.  THE PARTIES ............................................................................................. 9

   A.   Plaintiffs. ........................................................................................ 9

   B.   Defendants. ................................................................................... 10

   C.   Principal Unnamed Co-Conspirators. ........................................... 11

III. JURISDICTION AND VENUE. ............................................................... 12

   A.   Subject Matter Jurisdiction. ......................................................... 12

   B.   Personal Jurisdiction. ................................................................... 13

   C.   Venue. ........................................................................................... 15

IV.  FACTUAL ALLEGATIONS. .................................................................... 15

   A.   The Satellite Project. .................................................................... 15

     1.   *STM Atlantic*. ..................................................................... 15

     2.   *The Orbital Slot Licenses* ................................................. 15

     3.   *The Satellite Project Concept and Business Plan*. ...................... 17

   B.   Introduction to DONG YIN. ........................................................ 19

   C.   U.S. Export Control Laws. ........................................................... 21

     1.   *The International Traffic In Arms Regulations*. ........................ 21

     2.   *The Export Administration Regulations*. ................................ 22

   D.   Defendants Undermine Plaintiffs' Deal with CCTG. ........................... 24

   E.   The COSEIG Joint Venture Agreement. ................................................ 25

   F.   The Bronzelink Joint Venture Agreement. ............................................ 32

   G.   The Amore Facility Agreement. ............................................................ 35

**FIRST AMENDED COMPLAINT**

239671.4

# TABLE OF CONTENTS (CONT.)

PAGE

H.   The Series A Share Purchase Agreement. .............................................. 37

I.   The Shareholders Agreement. ............................................................... 40

J.   Plaintiffs Discover Material Inconsistencies Between the
     SHA and the Amore Facility Agreement. ............................................... 42

K.   The Officers and Directors of GIP-Cayman and
     GIP-USA. ........................................................................................... 45

L.   The False Certification to SpaceX and GIP-Cayman's
     Export Control Obligations Under the Boeing Contract. ...................... 46

M.   The Employment Contracts. ................................................................ 48

N.   DONG YIN's Exercise of Control and Dominance Over
     the Governance, Management and Operations of the
     Satellite Project. ................................................................................ 49

O.   Mr. Youssefzadeh and Mr. Javed Attempt,
     Unsuccessfully, to Address Compliance and
     Financing Issues with the GIP-Cayman Board. ................................... 60

P.   Mr. Youssefzadeh and Mr. Javed are
     Constructively Discharged. ................................................................. 64

Q.   The Cover Up Continues. .................................................................... 65

R.   DONG YIN Alters and Falsifies the Official Minutes
     from the GIP-Cayman Board of Directors Meetings. ........................... 67

S.   DONG YIN Attempts to Purchase Plaintiffs' Silence. ......................... 69

T.   Defendants' Continuing Deception and Their
     Violations of U.S. Export Control Laws. .............................................. 69

U.   Summary of Defendants' Wrongful Conduct. ...................................... 69

V.   Summary of Money and Property Lost and Stolen. .............................. 72

**FIRST AMENDED COMPLAINT**

239671.4

## TABLE OF CONTENTS (CONT.)

**PAGE**

**FIRST CAUSE OF ACTION**
**(For Conspiracy to Defraud)**
(By Plaintiffs Against All Defendants)........................................................72

    A.    Formation and Operation of the Conspiracy...........................72

    B.    Wrongful Acts in Furtherance of the Conspiracy. ................73

    C.    Resulting Damages...................................................................82

**SECOND CAUSE OF ACTION**
**(For Fraud)**
(By Plaintiffs Against All Defendants)........................................................82

    A.    Misrepresentations and False Promises. ................................82

          As to U.S. Export Control Laws. ..........................................82

          As to DONG YIN's Role in the Governance,
          Management and Operations of GIP-Cayman......................83

          As to COSEIG and its Relationship
          With DONG YIN and TechCap.............................................84

          As to Bronzelink and its Relationship With DONG YIN.....84

          As to Project Financing.........................................................85

    B.    Concealment of Material Facts. ..............................................85

          As to DONG YIN's Relationships
          With COSEIG and Bronzelink...............................................86

          As to DONG YIN's Role in the Governance,
          Management and Operations of GIP-Cayman......................86

          As to The Facility Agreement................................................87

    C.    Resulting Damages...................................................................88

**FIRST AMENDED COMPLAINT**

239671.4

## <u>TABLE OF CONTENTS (CONT.)</u>

**PAGE**

**THIRD CAUSE OF ACTION**
**(For Violation of California Penal Code Section 496)**
(By Plaintiffs Against DONG YIN) ...................................................................88

**FOURTH CAUSE OF ACTION**
**(For Civil RICO in Violation of Title 18,**
**United States Code, Sections 1962(b) and 1964(c))**
(By Plaintiffs Against All Defendants)...............................................................89

    A.    The "Victim Enterprise." ....................................................90

    B.    The Racketeering Acts. .......................................................91

        1.    *Wire Fraud*.................................................................91

        2.    *International Money Laundering*..............................94

    C.    Injury to Business and Property. .........................................95

**FIFTH CAUSE OF ACTION**
**(For Civil RICO Conspiracy in Violation of Title 18,**
**United States Code, Sections 1962(d) and 1964(c))**
(By Plaintiffs Against All Defendants)...............................................................95

**SIXTH CAUSE OF ACTION**
**(For Civil RICO in Violation of Title 18,**
**United States Code, Sections 1962(c) and 1964(c))**
(By Plaintiffs Against All Defendants) ...............................................................96

    A.    The Criminal Enterprise.....................................................96

    B.    The Racketeering Acts. .......................................................97

    C.    Injury to Business and Property. .........................................97

**SEVENTH CAUSE OF ACTION**
**(For Civil RICO Conspiracy in Violation of Title 18,**
**United States Code, Sections 1962(d) and 1964(c))**
(By Plaintiffs Against All Defendants)................................................................97

**FIRST AMENDED COMPLAINT**

239671.4

## <u>TABLE OF CONTENTS (CONT.)</u>

**PAGE**

**EIGHTH CAUSE OF ACTION**
**(For Interference with Prospective Business Advantage)**
(By Plaintiffs Against DONG YIN) ............................................................98

**NINTH CAUSE OF ACTION**
**(For Violation of California Unfair Competition Law,**
**California Business & Professions Code Section 17200)**
(By Plaintiffs Against All Defendants)....................................................100

**TENTH CAUSE OF ACTION**
**(For Unjust Enrichment)**
(By Plaintiffs Against DONG YIN) ..........................................................105

**ELEVENTH CAUSE OF ACTION**
**(For Imposition of Constructive Trust)**
(By Plaintiffs Against DONG YIN) ..........................................................106

**PRAYER FOR RELIEF** .........................................................106

**DEMAND FOR JURY TRIAL**..........................................................109

**FIRST AMENDED COMPLAINT**

239671.4

Plaintiffs STM Atlantic N.V. ("STM Atlantic"), STM Group, Inc.
("STM Group"), Emil Youssefzadeh and Umar Javed (collectively, "Plaintiffs"),
complain against defendants Dong Yin Development (Holdings) Limited
("DONG YIN"), China Orient Asset Management (International) Holding Limited
("COAMI") and Ludwig Chang ("CHANG") (collectively, "Defendants") as follows:

## I.      PRELIMINARY STATEMENT.

1.      Beginning in 2008, Plaintiffs undertook an ambitious project to develop,
launch and operate a state-of-the art communications satellite that would provide
High Speed Internet Access ("HSIA") to under-served parts of Africa (the
"Satellite Project" or the "Project").  They spent several years and millions of dollars
of their own funds developing the Satellite Project.

2.      In the guise of providing indirect debt financing for the Satellite Project,
DONG YIN, through its agents and co-conspirators, obtained ownership and control
of the Satellite Project from Plaintiffs by various dishonest means, including false and
fraudulent pretenses, representations and promises and the concealment of material
facts.  With that ownership and control, DONG YIN and its agents obtained access to
confidential and sensitive satellite and launch technology and data that was subject to
U.S. export control laws.

3.      Because DONG YIN is itself owned and controlled by the People's
Republic of China ("PRC"), and because the transfer of such technology and data to
the PRC or its foreign agents is a violation of U.S. export control laws (and, if done
willfully, a violation of federal criminal law), DONG YIN could not openly maintain
its ownership and control of the Satellite Project.  It therefore sought to conceal and
disguise its true relationship to the Satellite Project by engaging in further acts of
deception and by resisting and ignoring Mr. Youssefzadeh's and Mr. Javed's efforts to
ensure that the Project was in compliance with U.S. laws and regulations prohibiting
the transfer of satellite and launch technology and data to the PRC, which ultimately

**FIRST AMENDED COMPLAINT**

239671.4

forced Mr. Youssefzadeh and Javed to resign their positions and cease their association with the Project.

4.     Plaintiffs have suffered substantial losses of money and property as a result of Defendants' fraud and theft as detailed below.

## II.     THE PARTIES.

### A.     Plaintiffs.

5.     Plaintiff STM Atlantic is a company organized under the laws of the Netherlands, with its principal place of business located in El Segundo, California. Prior to April 2016, STM's principal place of business was in Irvine, California.

6.     Plaintiff STM Group is a Delaware corporation, with its principal place of business in El Segundo, California. STM Group is the parent corporation of plaintiff STM Atlantic.

7.     Plaintiff Emil Youssefzadeh is an individual residing in Los Angeles County, California. Mr. Youssefzadeh is the founder of STM Group, and his family trust owns a majority interest in STM Group. He is also one of the founders of Global-IP Cayman ("GIP-Cayman"), which is discussed below.

8.     Mr. Youssefzadeh holds master degrees in electrical engineering from Stanford University, with a focus on information theory and satellite communications.

9.     Mr. Youssefzadeh is a pioneer in the satellite industry. From 1979 to 1982, he worked as a satellite systems engineer for Hughes Aircraft, which is now Boeing Satellite Systems International, Inc. ("Boeing"). His responsibilities included research and development programs for advanced satellite communications payloads and system design of commercial satellite programs.

10.     In 1982, Mr. Youssefzadeh founded STM Wireless, Inc. ("STM Wireless"), which was engaged in the manufacturing of satellite ground terminals. STM Wireless helped launch the first advanced digital cellular network in Malaysia. From 2003 to the present, he has been Chairman of STM Group, which

**FIRST AMENDED COMPLAINT**

239671.4

acquired the assets of STM Wireless and was engaged in the development of technology, products and services in the communications satellite sector.

11. Plaintiff Umar Javed is an individual residing in Orange County, California. He holds a master's degree in business administration, and has over 20 years of experience in management and business development in the technology and satellite industry.

12. From 1999 to 2002, Mr. Javed held various positions including commercial manager, sales and marketing director and vice president of sales at STM Wireless. From 2003 to the present, he has served as President of STM Group, leading the business as it made a number of mergers and acquisitions in Europe, the Americas, the Middle East and Latin America. While at STM Group, he headed the creation of start-up companies in Brazil and Spain, offering satellite-based solutions and services to the government, enterprise, mobility and maritime sectors.

13. In 2013, Mr. Youssefzadeh and Mr. Javed founded GIP-Cayman as a corporate entity to own and carry on the Satellite Project. GIP-Cayman is incorporated under the laws of the Grand Caymans, but its principal place of business is in El Segundo, California.

**B.     Defendants.**

14. Defendant DONG YIN is a company organized under the laws of Hong Kong SAR, with its principal place of business in Hong Kong SAR.

15. DONG YIN is a subsidiary of China Orient Asset Management Company ("COAMC"), an agency and/or instrumentality of the PRC.

16. Defendant COAMI is a Hong Kong limited company, organized under the laws of Hong Kong SAR, and a subsidiary of DONG YIN. Its principal place of business is in Hong Kong SAR, but it maintains a U.S. presence and operates through an office located at 1114 Avenue of the Americas, Suite 3405, New York, New York 10036.

**FIRST AMENDED COMPLAINT**

239671.4

1      17. DONG YIN is the 100% owner of and controls Wise Leader Assets Ltd.

2    ("Wise Leader"), a company formed in the British Virgin Islands.  DONG YIN and

3    Wise Leader each is a 50% owner of, and together control, defendant COAMI, as a

4    result of which DONG YIN has 100% control over COAMI.

5      18. Plaintiffs are informed and believe, and based thereon allege, that at all

6    relevant times, DONG YIN and COAMI were alter egos of each other in that there is

7    and was a unity of interest and ownership between DONG YIN and COAMI such that

8    the separateness of these corporations did not and does not really exist, and there

9    would be an inequitable result if the acts of either corporation are treated as those of

10   that corporation alone.

11     19. Defendant CHANG is, and at all relevant times was, the Executive

12   Director and Co-President of COAMI.  At all relevant times, CHANG was also a

13   Director of Amore Resources Ltd. ("Amore"), which is discussed below.  At all

14   relevant times, CHANG operated from his executive office, located at 1114 Avenue of

15   the Americas, Suite 3405, New York, New York 10036, which is the same address as

16   COAMI.

17   **C. Principal Unnamed Co-Conspirators.**

18     20. Shiwen Fan ("Fan") is, and at all relevant times was, a citizen of the

19   PRC and an attorney practicing in Beijing, China.  In addition, Fan is, and at all

20   relevant times was, a member of the Boards of Directors of Bronzelink Holdings

21   Limited ("Bronzelink") and GIP-Cayman.  Plaintiffs are informed and believe, and

22   based thereon allege, that prior to his appointment to the GIP-Cayman Board of

23   Directors, Fan did not have any experience directing, managing, or governing a

24   company involved in the design, ownership, or operation of satellites or satellite

25   technology.  Fan is, and at all relevant times was, an agent of DONG YIN, acting

26   within the scope of that agency and with the intent to benefit DONG YIN in whole or

27   in part, and, in such capacity, disregarded or subordinated his duties to Bronzelink and

28   GIP-Cayman.

**FIRST AMENDED COMPLAINT**

239671.4

21.    Yuen-Cheung (Tony) Wong ("Wong") is a relative of Xinyi Dong, who is a Director of DONG YIN and Amore and a resident of Hong Kong SAR.  In addition, Wong is, and at all relevant times was, a member of the Boards of Directors of Bronzelink, GIP-Cayman and its subsidiary, Global-IP USA ("GIP-USA").  In or about April 2017, Wong was appointed Executive Director of GIP-Cayman.  In or about July 2017, he was appointed Chairman of the Board of Directors of GIP-Cayman.  Plaintiffs are informed and believe, and based thereon allege, that prior to his appointment to the GIP-Cayman Board of Directors, Wong did not have any experience directing, managing, or governing a company involved in the design, ownership and operation of satellites or satellite technology.  Wong is, and at all relevant times was, an agent of DONG YIN, acting within the scope of that agency and with the intent to benefit DONG YIN in whole or in part, and in such capacity disregarded or subordinated his duties to Bronzelink, GIP-Cayman and GIP-USA.

22.    Bonnie Shiyue Liu ("Liu") is, and at all relevant times was, a member of the Boards of Directors of Bronzelink, GIP-Cayman and GIP-USA, and the controller of GIP-Cayman and GIP-USA.  In or about July 2017, Liu was appointed Secretary of the Board of Directors of GIP-Cayman.  Plaintiffs are informed and believe, and based thereon allege, that prior to her appointment to the GIP-Cayman Board of Directors, Liu did not have any experience directing, managing, or governing a company involved in the design, ownership and operation of satellites or satellite technology. Liu is, and at all relevant times was, an agent of DONG YIN, acting within the scope of that agency and with the intent to benefit DONG YIN in whole or in part, and, in such capacity, disregarded or subordinated her duties to Bronzelink, GIP-Cayman and GIP-USA.

### III.    JURISDICTION AND VENUE.

**A.    Subject Matter Jurisdiction.**

23.    This Court has subject matter jurisdiction over this action pursuant to Title 28, United States Code, section 1331, in that it includes claims that arise under

**FIRST AMENDED COMPLAINT**

239671.4

the laws of the United States, and pursuant to Title 28, United States Code, section 1367, in that the claims arising under state law are so related to the claims arising under federal law that they form part of the same case or controversy under Article III of the United States Constitution.

**B.    Personal Jurisdiction.**

24.    This Court has personal jurisdiction over Defendants in this action pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and California Code of Civil Procedure section 410.10 in that: (a) Defendants, and each of them, have purposefully directed their activities and consummated transactions with residents of California and have purposefully availed themselves of the privilege of conducting activities in California, invoking the benefits and protections of its laws; (b) the claims against Defendants, and each of them, arise out of and relate to each Defendants' California-related activities; and (c) the exercise of jurisdiction over Defendants, and each of them, comports with fair play and substantial justice.

25.    More specifically, this Court has personal jurisdiction over Defendants, and each of them because, among other things:

(a)    Plaintiffs resided in California at all relevant times, and were located in California when Defendants, and each of them, made some of the false and fraudulent representations and promises and/or concealed material facts from them in furtherance of the conspiracy and scheme to defraud plaintiffs alleged herein;

(b)    Defendants made false representations and promises to Plaintiffs in California, as further described below;

(c)    Some of the property that Defendants obtained by the theft described herein, including Plaintiffs' confidential business plan, was at all relevant times located in California;

(d)    The fraud and theft was accomplished in part through contracts that were executed by Mr. Youssefzadeh and Mr. Javed while physically located in

**FIRST AMENDED COMPLAINT**

239671.4

1   California and based on false and fraudulent pretenses, representations

2   and promises made to, and the concealment of material facts from, them

3   while they were physically located in California;

4   (e)   One of these contracts was also executed by Fan, acting as an agent of

5   DONG YIN, while physically located in California.

6   (f)   The principal place of business of GIP-Cayman is El Segundo,

7   California;

8   (g)   The principal place of business of GIP-USA is El Segundo, California;

9   (h)   As the controller for GIP-Cayman and GIP-USA and an agent of

10   Dong Yin, Liu worked in the GIP-USA offices in El Segundo, California;

11   (i)   Fan and Wong often traveled to and visited the GIP-USA offices in

12   El Segundo, California as agents of DONG YIN, and on these trips

13   furthered the conspiracy and scheme to defraud Plaintiffs and obtain and

14   maintain control and dominance over, and direct the governance,

15   management and operations of, GIP-Cayman and GIP-USA, as described

16   further below;

17   (j)   Fan, Wong and Liu, acting as agents of DONG YIN, attended meetings

18   of the GIP-Cayman Board of Directors in California;

19   (k)   In or about August 2016, GIP-Cayman entered into a contract with

20   Boeing to manufacture the satellite and provide other services for the

21   Satellite Project, which was executed and to be performed in California;

22   (l)   In or about March 2017, GIP-Cayman entered into a contract with

23   Space Explorations Technology Corp. ("SpaceX") to launch the satellite,

24   which was executed and to be performed in part in California;

25   (m)   In or about June 2017, after Plaintiffs raised the issue of whether

26   Defendants and their co-conspirators were violating U.S. export control

27   laws, Wong travelled to El Segundo, California, told Plaintiffs that they

28   should not concern themselves with compliance with such laws, and

**FIRST AMENDED COMPLAINT**

239671.4

1  retaliated against Plaintiffs by informing them that they could be either
2  executives of GIP-Cayman or officers of GIP-Cayman, but could no
3  longer hold both positions; and

4  (n)    In or about November 2017, two DONG YIN consultants travelled to
5  California and informed Plaintiffs that they were willing to pay them if
6  they stopped insisting on ensuring compliance with U.S. export control
7  laws and agreed to remain shareholders in GIP-Cayman.

8  **C.    Venue.**

9  26.    Venue for this matter properly lies within the Central District of
10  California pursuant to Title 18, United States Code, section 1391(b)(2), in that a
11  substantial part of the events and omissions giving rise to Plaintiffs' claims occurred
12  in this district.

13  **IV.    FACTUAL ALLEGATIONS.**

14  **A.    The Satellite Project.**

15  ***1.    STM Atlantic.***

16  27.    STM Atlantic was founded by Mr. Youssefzadeh in 2003.
17  STM Atlantic's original business was to manufacture and sell very small aperture
18  terminal ("VSAT") equipment, which is a two-way ground station that transmits and
19  receives data from satellites.  STM Atlantic was successful in manufacturing and
20  selling VSAT equipment.

21  28.    In the mid- 2000s, STM Atlantic began to transition into the business of
22  providing satellite services, creating the Satellite Project with the goal of designing,
23  financing, fabricating, launching, operating and owning communications satellites that
24  provided HSIA and other Broadband services to portions of Africa and elsewhere.

25  ***2.    The Orbital Slot Licenses.***

26  29.    In or about August 2008, as an initial step in bringing the Satellite Project
27  to fruition, STM Group, through its subsidiary STM Norway, made its first regulatory

28

**FIRST AMENDED COMPLAINT**

239671.4

filing for Orbital Slots with the International Telecommunications Union ("ITU") in Switzerland and the government of Norway.

30.     The ITU is a specialized agency of the United Nations that coordinates the shared global use of the radio spectrum, promotes international cooperation in assigning satellite orbit positions, works to improve telecommunication infrastructure in the developing world, and assists in the development and coordination of worldwide technical standards.

31.     A key function of the ITU is to assign and coordinate Orbital Slots for geosynchronous satellites.  Geosynchronous satellites are satellites that have an orbital period that is the same as the Earth's rotation period.  As a result, they stay in the same place in the sky, relative to a position on the ground, which makes them useful for communications, television broadcasting and providing HSIA.

32.     Any company or government that wants to place a satellite in geosynchronous orbit is required to obtain a license, known as an Orbital Slot License, from the ITU.  Among other things, this requirement prevents satellites from interfering with each other.

33.     In 2012, STM Group, through STM Norway, applied to the government of Norway for Orbital Slot Licenses.  STM Group chose Norway for their filing because it had a strong presence in that country, employed qualified technical staff there, and intended to manage and control the satellite through its presence in Norway.

34.     To obtain the desired Orbital Slot Licenses, STM Norway needed to pay filing fees to the ITU and to the government of Norway.  STM Norway also needed to demonstrate that it had sufficient expertise in the satellite field to convince the government of Norway that it would be able to launch a satellite during the license period.  Finally, STM Norway needed to demonstrate that its proposed satellite would not interfere with any existing satellites.  Plaintiffs made the necessary payments and were able to satisfy each of these conditions.

**FIRST AMENDED COMPLAINT**

239671.4

35.     In or about June 2012, STM Norway obtained Orbital Slot Licenses for 18W and 15.5W (the "STM Orbital Slots").  The STM Orbital Slots were extremely valuable because they were in a priority position relative to others for the expected time the proposed satellite could be Brought Into Use ("BIU"); had a good view towards the earth in relation to the target coverage area (sub-Saharan Africa); and could be coordinated with other adjacent satellites in frequency to be able to access the largest amount of frequency spectrum over the coverage area.

36.     Orbital Slot Licenses are valid for a period of seven years.  If they are not used during that time frame, they expire and have no value.  The STM Project Orbital Slot Licenses expire in June 2019.

37.     In 2013, STM Norway transferred its rights in the Orbital Slot Licenses to Dub Dub, a Norwegian Company that in 2015 became a wholly owned subsidiary of GIP-Cayman.

### 3.     *The Satellite Project Concept and Business Plan.*

38.     In or about 2009 and 2010, as part of the Satellite Project, STM Group and STM Atlantic further developed their business concept of providing communication satellite services to sub-Saharan Africa.  Their goal was to design, fabricate and launch a satellite that would make them a dominant provider of Broadband services, including HSIA, in sub-Saharan Africa.  Internet service in Africa is typically limited to the largest cities.  But approximately 70% of Africa's population does not live in the cities.  Accordingly, Plaintiffs wanted to become the driver for providing, and bringing down costs for, Broadband services and HSIA in those unserved, or under-served, parts of Africa.

39.     Plaintiffs planned to profit from the Satellite Project by leasing capacity on the satellite to governments and private HSIA providers.  The Satellite Project was projected to earn approximately US$1.5 billion in profits over the life of the satellite.

40.     STM Atlantic commissioned and paid for marketing studies, identifying their biggest competitors and attempting to ascertain potential customers for the

17

**FIRST AMENDED COMPLAINT**

239671.4

Satellite Project.  The target customers were governments, mobile network operators and Internet Service Providers.

41.     In or about 2010, STM Atlantic started discussions with various companies, including Mitsubishi (in Japan), Space Systems Loral (in Palo Alto), Thales (in France) and Boeing (in El Segundo) to manufacture the satellite.

42.     In or about 2010, STM Atlantic engaged a law firm in the District of Columbia (the "Washington Law Firm"), which had an attorney experienced with satellite-related export restrictions (the "Washington Attorney") to provide advice regarding regulations and financing for the Satellite Project.

43.     In or about February 2012, Plaintiffs completed their first business plan for the Satellite Project.  The plan needed to, and did, address every component of the Project, including:  (a) financing; (b) development; (c) manufacture; (d) delivery; (e) launch; (f) maintenance, control and operation; (g) satellite control facilities; (h) orbital locations; (i) ground system and gateways; and (j) required launch and in-orbit insurance.  This was an extremely involved process that required significant time, money and expertise.

44.     A key component of the business plan was the technical design of the satellite.  Plaintiffs prepared the initial design for a state-of-the-art 7.7-ton solar-powered satellite, with maximum Broadband capacity and a 15-year anticipated lifespan.  The design had to factor in the weight, power and performance of the satellite, and had to provide sufficient capacity in the specific markets and at geographic locations where the capacity would be needed.  The design also had to consider the whereabouts of approximately a dozen gateways to the Internet cloud to be established in Europe in such a way that interference with the satellite could be minimized.

45.     The satellite design work was begun at STM Group in or about 2011.  It involved significant amounts of Mr. Youssefzadeh's time and expertise, the

**FIRST AMENDED COMPLAINT**

1  participation of the STM Atlantic engineering staff, and the work of a satellite expert

2  hired by STM Atlantic and supervised by Mr. Youssefzadeh.

3        46.    In or about 2013, STM Atlantic sold its operating assets so it could focus

4  exclusively on the Satellite Project.  In or about April 2013, Plaintiffs incorporated

5  GIP-Cayman under the laws of the Grand Caymans.  GIP-Cayman became a

6  subsidiary of STM Atlantic.  Plaintiffs created GIP-Cayman to be the company that

7  owned and operated the satellite.

8        47.    In or about July 2012, Mr. Youssefzadeh and Mr. Javed recruited

9  Bahram Pourmand ("Pourmand") to become part of the Satellite Project.  At that time,

10  Pourmand was an executive with Hughes Communications, Inc. ("Hughes"), and was

11  well-known in the satellite industry.  At the time, Mr. Youssefzadeh and Mr. Javed

12  believed that Pourmand could be instrumental in raising funds to further finance the

13  Satellite Project.  Accordingly, they offered him a 37% share of GIP-Cayman.

14  Pourmand agreed, acquiring and holding his interest in GIP-Cayman through his

15  company Steadyspace Limited ("Steadyspace").

16  **B.    Introduction to DONG YIN.**

17        48.    Satellite projects typically require several hundred million dollars in

18  financing to build, launch and operate the satellite.  Plaintiffs sought to sell an equity

19  interest in GIP-Cayman to obtain the first tranche of funding needed for the next steps

20  in the Satellite Project.

21        49.    In or about July 2015, Pourmand introduced Mr. Youssefzadeh and

22  Mr. Javed to Hady Hartanto ("Hartanto"), who was introduced as a principal in a

23  company called TechCap.  Hartanto expressed immediate interest in the Satellite

24  Project and assured Mr. Youssefzadeh and Mr. Javed that he and his company had

25  valuable contacts in Asia that could help them obtain financing for the

26  Satellite Project.

27        50.    Based on Hartanto's representations, Mr. Youssefzadeh and Mr. Javed

28  offered him an ownership interest in GIP-Cayman, but only if he was able to secure

**FIRST AMENDED COMPLAINT**

239671.4

$100 million dollars in financing for the Satellite Project and arrange for EXIM financing or an additional loan.

51.    In or about July 2015, Hartanto and his partner, Ruifeng Lyu ("Lyu"), introduced Mr. Youssefzadeh, Mr. Javed and Pourmand to Zhiyuan Geng ("Geng"), a high ranking PRC official.  Plaintiffs are informed and believe, and based thereon allege, that Geng was also a high level executive at DONG YIN.

52.    Mr. Javed subsequently visited Beijing at the request of Pourmand, where he and Geng met with representatives of COAMC, which is 100% owned by the PRC. COAMC expressed an interest in the Satellite Project and the acquisition of an interest in GIP-Cayman.

53.    On or about September 9, 2015, Pourmand met with Hartanto; Charles Lau ("Lau") of TechCap; Yang Zeng, the Chairman of the DONG YIN Board of Directors; Din Yi Dong, DONG YIN's Vice Managing Director; Terry Long, a DONG YIN executive; and CHANG, COAMI's Executive Director and Co-President.

54.    During that September 9, 2015 meeting, Hartanto pressured Pourmand to set up meetings with satellite manufacturers.  Pourmand set up meetings for Hartanto and representatives of DONG YIN with Hughes and SSL.

55.    Mr. Youssefzadeh, Mr. Javed and Pourmand provided a draft financing agreement to TechCap.  On or about September 10, 2015, Lau sent a revised draft of that agreement back to Mr. Youssefzadeh, Mr. Javed and Pourmand, proposing to acquire 75% of GIP-Cayman in return for a $100 million investment.

56.    On or about September 10, 2015, Pourmand responded to Hartanto's email, rejecting the proposed terms.

57.    The potential involvement in the Satellite Project of a company affiliated with the PRC raised important compliance issues under U.S. export control laws. Plaintiffs understood that the involvement of any PRC entity in the Satellite Project would be limited to indirect debt financing and require that proper firewalls be erected

239671.4

1  to ensure compliance with those laws, the violation of which could be punished

2  criminally.

3  **C.    U.S. Export Control Laws.**

4         58.    To safeguard national security, a comprehensive series of federal

5  regulations provide that certain confidential and sensitive technology and data

6  involved in the construction and launch of satellites cannot be exported or provided to

7  specified foreign countries, including the PRC.  These regulations include the

8  international Traffic in Arms Regulations ("ITAR") and the Export Administration

9  Regulations ("EAR").

10        ***1.    The International Traffic In Arms Regulations.***

11        59.    ITAR is a series of import/export regulations established under the

12  U.S. Arms Export Control Act, Title 22, United States Code, section 2751, *et seq.*

13        60.    ITAR provides that it is the policy of the U.S. to deny licenses and other

14  approvals for exports and imports of defense articles and defense services, including

15  satellite technology, to the PRC (the "PRC Proscription").  (Title 22, Code of Federal

16  Regulations, section 126.1(d).)

17        61.    The transfer of control of a satellite subject to ITAR to a "foreign person"

18  is considered an "export" under ITAR.  (Title 22, Code of Federal Regulations,

19  section 120.17(c).)

20        62.    ITAR defines "foreign person" to include natural persons who are not

21  lawful permanent U.S. residents, foreign corporations and business associations, as

22  well as any agency or subdivision of a foreign government.  (Title 22, Code of

23  Federal Regulations, section 120.16.)

24        63.    ITAR further provides that the transfer of certain designated technical

25  data to a foreign person is deemed to be an export to all countries in which the foreign

26  person has held or holds citizenship or holds permanent residency.  (Title 22, Code of

27  Federal Regulations, sections 120.17 and 120.50.)  The satellite and launch

28  technology involved in the Satellite Project includes "technical data" subject to ITAR.

21

**FIRST AMENDED COMPLAINT**

239671.4

64.     Any person, including a corporation, that engages in the U.S. in the business of manufacturing or exporting, or temporarily importing, defense articles, or furnishing defense services, is required to register with the Directorate of Defense Trade Controls.  If the intended registrant is foreign owned, or foreign controlled, the certification must include an explanation of such ownership or control, including the identities of the foreign person or persons who ultimately own or control the registrant.  (Title 22, Code of Federal Regulations, section 122.2.)

65.     Under ITAR, "foreign ownership" means that more than 50% of the outstanding voting securities of the company are owned by one or more foreign persons.  (Title 22, Code of Federal Regulations, section 120.16.)  "Foreign control" means one or more foreign persons have the authority or ability to establish or direct the general policies or day-to-day operations of the company.  Foreign control is presumed to exist where a foreign person or persons own 25% or more of the outstanding voting securities of the company, unless one U.S. person controls an equal or larger percentage.  (Title 22, Code of Federal Regulations, section 120.37.)

66.     The penalties for violating ITAR are severe.  Any person who knowingly violates any provision of the Arms Control Act could be sentenced to 20 years in federal prison and fined for each violation as much as $1,000,000.  (Title 22, United States Code, section 2778; Title 22, Code of Federal Regulations, section 127.3.)  A violation of ITAR may also result in civil penalties and debarment from participating in any activities that are subject to ITAR.  (Title 22, Code of Federal Regulations, sections 127.7 and 127.10.)

## 2. ***The Export Administration Regulations.***

67.     EAR is a set of regulations issued by the U.S. Department of Commerce's Bureau of Industry and Security for the purpose of implementing the U.S. Export Administration Act of 1979, Title 50, United States Code, section 4601, *et seq*.

**FIRST AMENDED COMPLAINT**

239671.4

68.     The export control provisions of EAR are intended to further national security, foreign policy, nonproliferation of weapons of mass destruction, and other such interests of the U.S.  EAR controls are designed, in part, to restrict access to items subject to EAR by countries or persons that might apply such items to uses inimical to U.S. interests.  (Title 15, Code of Federal Regulations, section 730.6.)

69.     Like ITAR, EAR contains a PRC Proscription, which prohibits certain technology from being exported to the PRC.  Any license application seeking to export items or services to the PRC that may compromise national security is subject to a policy of denial.  (Title 15, Code of Federal Regulations, section 742.4(b)(1)(iii).)

70.     EAR provides that satellites cannot be exported to the PRC.  (Title 15, Code of Federal Regulations, section 772.1.)  The satellite and launch technology involved in the Satellite Project includes technology that falls within this proscription.

71.     As with ITAR, violations of EAR carry significant criminal and civil penalties, including, for a willful violation of EAR, imprisonment for up to ten years. (Title 50, United States Code, section 4610.)

72.     Depending upon the facts of the particular case, conduct that constitutes a violation of ITAR or EAR also often involves a violation of another federal criminal law, such as Title 18, United States Code, sections 371 (criminal conspiracy), 1001 (false statements to a federal agency), 1341 (mail fraud), 1343 (wire fraud) and 1956 and 1957 (money laundering).

73.     Three recent cases demonstrate the potentially serious consequences of violating the export control laws.  In *U.S. v. Zuccarelli*, U.S. District Court for the Eastern District of Texas, Case No. 4:17-cr-00117-ALM-KPJ, a Texas man was sentenced to 46 months in prison, a $50,000 fine and three years of supervised release for violating U.S. export control laws by conspiring to illegally export radiation hardened integrated circuits to Russia and China for use in their space programs. In *U.S. v. Xu*, U.S. District Court for the Southern District of New York, Case No. 7:16-cr-00010-KMK, a Chinese national was sentenced to five years in

23

**FIRST AMENDED COMPLAINT**

prison, pursuant to a plea agreement, for stealing proprietary source code from his former employer with the intent of benefitting the PRC.  And in *U.S. v. Shih*, U.S. District Court for the Central District of California, Case No. 2:18-cr-00050-JAK, two Southern California men were arrested in January 2018, and charged with, among other things, conspiring to cause a U.S. company to make special high-speed computer chips that were then exported to a Chinese company, in violation of the export control laws.

74.     Because of the importance of ensuring compliance with ITAR and EAR, companies that deal in satellite and launch technologies may require customers seeking access to that technology to certify that they are not owned or controlled, directly or indirectly, by countries such as the PRC.  Based on their understanding of ITAR, EAR and the PRC Proscription, Plaintiffs determined that they should not pursue any business relationship in which COAMC would obtain an equity interest in GIP-Cayman.

**D.     Defendants Undermine Plaintiffs' Deal with CCTG.**

75.     As of September 2015, Plaintiffs had come to believe that Hartanto and Lyu had misrepresented their ability to provide and/or raise financing for the Satellite Project.  While they had initially represented themselves as businessmen and investors, it became clear that they were just middlemen looking to connect Plaintiffs with potential funding sources in the PRC.  As a result, Plaintiffs began to seriously question Hartanto and Lyu's ability to actually structure a viable financing transaction, and decided that they did not want to have any further business involvement with TechCap.  Accordingly, in or about August 2015, Plaintiffs entered into direct negotiations with another potential financing source, Huaxun Shenzhen/CCT Group ("CCTG").

76.     The negotiations with CCTG gained momentum in or about September 2015, and, on or about September 12, 2015, Mr. Youssefzadeh and Mr. Javed signed a Memorandum of Understanding ("MOU") with CCTG.

**FIRST AMENDED COMPLAINT**

239671.4

77.     Pursuant to the terms of the MOU, CCTG assumed responsibility for securing equity and debt financing for the Satellite Project in return for 63% of the shares in GIP-Cayman.

78.     On September 17, 2015, Pourmand sent an email to Mr. Youssefzadeh and Mr. Javed, referring to the CCTG deal as "a dream," and indicating that he was no longer interested in working with Hartanto.

79.     On or about September 19, 2015, Lau sent an email to Pourmand, Mr. Youssefzadeh and Mr. Javed, copying Hartanto, stating that "[w]e have come this far and really hate to see this project go."  Lau then proposed certain steps to preserve TechCap's participation in the project, including producing a letter from COAMC confirming its "in-principle approval for the $200m loan."

80.     In or about late September 2016, CCTG's representative informed Mr. Youssefzadeh and Mr. Javed that CCTG had to withdraw from the deal.  The representative indicated that he had been pressured by Hartanto and Lyu, as well as persons representing COAMC and DONG YIN, to withdraw.

**E.     The COSEIG Joint Venture Agreement.**

81.     On or about October 5, 2015, Mr. Youssefzadeh received an email from Ivan Chow, who introduced himself as "the sole representative of Mr. Geng Zhiyuan and Yang Zeng of Dong Yin Development (Holdings) Limited regarding the business dealings related to the [*sic*] Global IP."

82.     On or about October 5, 2015, in response to an email from Mr. Youssefzadeh, Ivan Chow falsely represented that neither he nor his company, COSEIG, had any affiliation with TechCap or its associates.  In fact, TechCap was still involved in the transaction, and had been promised a 12% interest in COSEIG for its role in the anticipated transaction.

83.     On or about October 14, 2015, Ivan Chow sent an email to Mr. Javed, enclosing a letter from his company's lawyer, falsely certifying that COSEIG's shareholders and management did not have any connection with TechCap, and that

**FIRST AMENDED COMPLAINT**

239671.4

COSEIG did not have any existing agreement or business dealings with TechCap. However, as stated above, TechCap was still involved in the transaction, and had been promised a 12% interest in COSEIG for its role in the anticipated transaction.

84.     On or about October 15, 2015, Mr. Javed sent an email to Ivan Chow, asking for additional information regarding COSEIG, as well as information regarding Fan, a PRC national, and his involvement in any deal with COSEIG.  (Mr. Javed had initially met Fan when he was first introduced to COAMC in or about July 2015).

85.     Ivan Chow responded to Mr. Javed's email, representing that: (a) COSEIG was a Special-Purpose Vehicle for investment; (b) COSEIG would fully disclose its registry documents (registration certificate, Memorandum and Articles of Association, directors, shareholders and beneficiaries) once both parties were ready to pursue a deal; (c) DONG YIN was COSEIG's financial partner; (d) Fan was DONG YIN's lawyer; and (e) Ivan Chow's role was to identify, evaluate and negotiate with potential companies to invest $200 million in funds on deposit in a Hong Kong bank.

86.     In October 2015, Ivan Chow travelled to California to meet with Mr. Youssefzadeh and Mr. Javed.  In the course of arranging this meeting, both Ivan Chow and Fan informed Mr. Youssefzadeh and Mr. Javed that they were representatives of DONG YIN.

87.     During that October 2015 visit, Ivan Chow met with Mr. Youssefzadeh and Mr. Javed in Newport Beach, California.  In that meeting, Mr. Youssefzadeh asked for assurances that DONG YIN did not own or control COSEIG, and Ivan Chow provided those assurances.  In fact, COSEIG was under the control, dominance and direction of DONG YIN.

88.     Ivan Chow further represented to Mr. Youssefzadeh and Mr. Javed that COSEIG was solely owned by Pok Kit Chow, a wealthy Hong Kong businessman and investor who intended to borrow money from DONG YIN to invest in GIP-Cayman, and that COSEIG was completely independent of PRC influence and control.  In fact,

**FIRST AMENDED COMPLAINT**

239671.4

these representations were false and misleading.  Among other things, Ivan Chow did not disclose that Pok Kit Chow was his brother and that Pok Kit Chow had recently obtained ownership of COSEIG when Hoi Ying (Charles) Yiu ("Yiu") transferred the ownership of all 50,000 shares of COSEIG stock, at $1 per share, to him in or about August 2015.

89.    During a meeting in Irvine, California, on or about December 3, 2015, Ivan Chow represented to Mr. Youssefzadeh and Mr. Javed that COSEIG was a special purpose investment company with no desire or intent to become engaged in the operation of GIP-Cayman.  In fact, COSEIG was under the control, dominance and direction of DONG YIN and DONG YIN planned and intended to use COSEIG as a vehicle in order to control, dominate and direct the governance, management and operations of GIP-Cayman.

90.    On or about December 3 and 4, 2015, Mr. Youssefzadeh and Mr. Javed attended meetings at STM Atlantic's offices in Irvine, California.  Those meetings were also attended by Fan, Ivan Chow, Pourmand and Amir Irani ("Irani"), Pourmand's stepson.  The purpose of those meetings was to finalize the terms of a Joint Venture Agreement between COSEIG, Plaintiffs, Pourmand and Steadyspace (the "COSEIG JVA").

91.    During these meetings, Fan asked if there would be any compliance issues under U.S. export control laws given that COSEIG intended to borrow money from DONG YIN.  Mr. Youssefzadeh and Mr. Javed told Fan that DONG YIN's involvement as a lender would not create a compliance problem as long as: (a) DONG YIN's role was limited to providing debt financing; (b) COSEIG was truly independent; and (c) the GIP-Cayman Board of Directors would be independent and free of any PRC influence.  Fan expressly represented and promised Mr. Youssefzadeh and Mr. Javed that a structure that complied with the U.S. export control laws was being put into place.

**FIRST AMENDED COMPLAINT**

239671.4

92.     In fact, the representations that Fan made to Plaintiffs were false and misleading.  DONG YIN's role was not limited to providing debt financing; rather, DONG YIN planned and intended that it would dominate and control the GIP-Cayman Board of Directors on behalf of the PRC, to obtain access to confidential and sensitive satellite and launch technology and data.  Furthermore, at all relevant times, COSEIG was controlled by DONG YIN and DONG YIN had merely arranged for Pot Kit Chow to be the nominal owner of COSEIG, for purposes of concealing and disguising its plan to obtain ownership and control of the Satellite Project.

93.     On or about December 4, 2016, Fan signed the COSEIG JVA on behalf of COSEIG.  The COSEIG JVA was executed in Irvine, California.  Plaintiffs STM Atlantic, Mr. Youssefzadeh and Mr. Javed all signed the COSEIG JVA in reliance on the false representations and promises that COSEIG was, and would remain, an independent company and that it was not under DONG YIN's control.

94.     The COSEIG JVA provided that, subject to certain "due diligence conditions and other conditions for Completion," COSEIG would make a $175 million dollar equity investment in GIP-Cayman in return for 30,000,000 newly issued shares in GIP-Cayman, which would give COSEIG a 75% ownership interest in GIP-Cayman.  The COSEIG JVA further provided that COSEIG would have the right to appoint six directors to the nine-member GIP-Cayman Board of Directors.

95.     The relationship between COSEIG and Plaintiffs was characterized as a joint venture because COSEIG did not intend to passively allow Plaintiffs to manage GIP-Cayman and rely upon them to make the Satellite Project successful.  Rather, COSEIG demanded a role in the governance, management and operations of GIP-Cayman.

96.     Subsequent to entering into the COSEIG JVA, Mr. Youssefzadeh and Mr. Javed asked the Washington Attorney to review that Agreement to determine if it provided sufficient safeguards to ensure compliance with the export control laws considering that DONG YIN was the lender that would be providing the financing.

28

**FIRST AMENDED COMPLAINT**

97.     After reviewing the COSEIG JVA, the Washington Attorney told Mr. Youssefzadeh and Mr. Javed that he could help ensure compliance with the export control laws, and suggested that the Washington Law Firm represent DONG YIN to make sure that DONG YIN knew and complied with the limits on its participation as a lender to COSEIG.  Plaintiffs agreed with this approach, and trusted the Washington Attorney to ensure that DONG YIN's role in the transaction was appropriately limited.  In fact, rather than assisting Plaintiffs in making sure that COSEIG would be an effective firewall between DONG YIN and GIP-Cayman, the Washington Attorney actively assisted DONG YIN in its effort to obtain dominance and control over the Satellite Project by aiding and abetting DONG YIN's deception of Plaintiffs.

98.     In or about early December 2015, Plaintiffs learned that Hartanto and Lyu owned a 12% share in COSEIG.  Plaintiffs are informed and believe, and based thereon allege, that Hartanto and Lyu were given this interest in COSEIG as a "finder's fee" for introducing Plaintiffs to DONG YIN, as part of the conspiracy and scheme to defraud.

99.     In or about early December 2015, Hartanto sent a text message to Pourmand expressing concern that COSEIG did not intend to honor its deal with TechCap.  Pourmand shared that text message with Plaintiffs.

100.    On or about December 11, 2015, Mr. Javed sent an email to Pourmand, copying Mr. Youssefzadeh.  In that email, Mr. Javed confirmed that he and Mr. Youssefzadeh had told Ivan Chow that while they have no objections to Hartanto and Lyu owning a 12% interest in COSEIG, they were adamant in insisting that Hartanto and Lyu could not have any involvement in the GIP-Cayman's business operations.

101.    On or about December 12, 2015, Mr. Javed forwarded his correspondence with Pourmand, including Hartanto's text message, to Ivan Chow. Ivan Chow responded that same day, indicating that he had "no intention nor the authority to change the 12% status."

**FIRST AMENDED COMPLAINT**

239671.4

102.   After they entered into the COSEIG JVA, COSEIG proposed conducting due diligence jointly with DONG YIN.  That due diligence took place in Dubai on or about January 11 and 12, 2016.  Mr. Youssefzadeh and Mr. Javed arranged for COSEIG and DONG YIN to meet with a potential customer.  The attendees at these meetings were CHANG; Fan; Yang Zeng, Chairman of the DONG YIN Board; Xinyi Dong, Vice Managing Director of DONG YIN; Zhanyu David Zhang, a DONG YIN executive; Terry Long, also a DONG YIN executive; Zhaohui Sui, from DONG YIN; Senlin Liang, from DONG YIN; Ivan Chow, from COSEIG; and Mr. Javed.

103.   During the January 11 and 12, 2016 due diligence meetings in Dubai, CHANG, Fan, Ivan Chow, CHANG, Yang Zeng, David Zhang and Xinyi Dong repeatedly represented and promised to Mr. Javed that COSEIG was independent from DONG YIN and that DONG YIN was only a lender.  In fact, these representations and promises were false and misleading because, at all relevant times, COSEIG was controlled by DONG YIN and it was always DONG YIN's intent and plan to own and control the Satellite Project.

104.   On or about January 28, 2016, Ivan Chow emailed Mr. Youssefzadeh, Mr. Javed and Pourmand, on behalf of Fan, that COSEIG's $250 million financial proposal had been formally approved by DONG YIN, creating the false and misleading impression that DONG YIN was only a lender and that COSEIG and DONG YIN were independent, unrelated entities when, in reality, DONG YIN was more than a lender, and COSEIG was under the control of DONG YIN.

105.   On or about January 31, 2016, Ivan Chow informed Mr. Youssefzadeh and Mr. Javed that to have a "smooth EXIM bank loan process," they would need to split the COSEIG JVA into two separate agreements: a Share Purchase Agreement and a Shareholders Agreement.

**FIRST AMENDED COMPLAINT**

239671.4

106.   In or about early February 2016, Ivan Chow suddenly disappeared from the transaction.  Mr. Youssefzadeh and Mr. Javed attempted to locate him, but they were told by Fan to cease their efforts.

107.   On or about February 7, 2016, Mr. Youssefzadeh and Mr. Javed attended a meeting in Washington, D.C.  The meeting was also attended by Fan; Henry Fan, a paid advisor to DONG YIN and Fan; the Washington Attorney; and others.  At that meeting, Plaintiffs were told that COSEIG was being replaced in the joint venture by a different entity, later identified as Bronzelink.

108.   The Washington Attorney explained that the change from COSEIG to Bronzelink was being made at DONG YIN's insistence.  At that time, Fan misrepresented to Plaintiffs that Bronzelink, like COSEIG, was owned by wealthy Hong Kong investors who had no affiliation to DONG YIN.  In fact, however: (a) Yiu, the prior owner of COSEIG, was also the purportedly "wealthy" owner of Bronzelink; (b) Bronzelink's Board of Directors was selected by DONG YIN; (c) DONG YIN's true role in the Satellite Project was more than that of a lender; and (d) DONG YIN's intent and plan was to gain control and dominance over GIP-Cayman and the Satellite Project and to use that control and dominance to obtain access to confidential and sensitive satellite and launch technology and data subject to ITAR, EAR and the PRC Proscription.

109.   On or about February 11, 2016, Fan emailed Plaintiffs a "bridge" document identifying terms of the then-existing COSEIG – GIP-Cayman Agreement that had to be revised and eventually separated into an investment agreement and a shareholder agreement with the new, yet to be identified, Hong Kong entity ("NewCo").  The "bridge" document included terms allowing COSEIG/NewCo to have the right to appoint a majority of the directors to GIP-Cayman's Board, and provided that this right attached to the terms of the stock in GIP-Cayman that COSEIG/NewCo was to receive, such that if DONG YIN foreclosed on the shares, it would have the right to control the Board.

**FIRST AMENDED COMPLAINT**

239671.4

110.   On or about February 16, 2016, during an in-person meeting at the offices of Bronzelink's Washington attorneys, CHANG orally represented and promised, falsely, to Mr. Youssefzadeh (participating telephonically from California), Mr. Javed and Pourmand that: (a) after the closing, DONG YIN would have no control of GIP-Cayman; and (b) DONG YIN had no intention of controlling or seeking to influence GIP-Cayman and was relying on Mr. Youssefzadeh and Mr. Javed to run the business after the closing.

111.   On or about February 18, 2016, Yiu, as sole director of Bronzelink, issued an authorization that "Mr. Fan Shiwen be [the] authorized representative to sign the agreement related to equity investment into GLOBAL-IP CAYMAN."

112.   On or about February 21, 2016, the Washington Attorney, as counsel for DONG YIN, emailed Mr. Youssefzadeh, Mr. Javed, Fan and others, noting that, as a general matter, the parties needed to be mindful of any direct or indirect PRC control or influence of GIP-Cayman, via Board Members or otherwise.

113.   On or about February 23, 2016, during a meeting at the offices of Bronzelink's Washington attorneys, Fan and Henry Fan, acting as agents of DONG YIN, and their attorneys falsely represented to Plaintiffs that Bronzelink was an independent, stand-alone entity with no affiliation to DONG YIN.

F.     **The Bronzelink Joint Venture Agreement.**

114.   On or about February 25, 2016, the COSEIG JVA was terminated.  It was replaced by the Bronzelink Joint Venture Agreement ("Bronzelink JVA"), dated February 25, 2016, which was virtually the same as the COSEIG JVA, except for the name change.  Bronzelink, like COSEIG, did not intend to passively allow Plaintiffs to manage GIP-Cayman and rely upon them to make the Satellite Project successful, but instead demanded a role in the governance, management and operations of GIP-Cayman.

115.   Prior to entering into the Bronzelink JVA, Mr. Youssefzadeh and Mr. Javed were falsely assured and promised, by DONG YIN's agents and

**FIRST AMENDED COMPLAINT**

239671.4

representatives on multiple occasions, that Bronzelink was fully independent of DONG YIN, including as follows:

(a)     Between in or about late January and early February 2016, DONG YIN's Washington Attorney telephoned Mr. Javed in California and represented that COSEIG would be swapped out in the Joint Venture Agreement for another company, which was yet to be identified, because COSEIG's name was too similar to COAMC. In this and other telephone conversations during this time period, the Washington Attorney, as counsel for DONG YIN, falsely promised Plaintiffs that DONG YIN would not be permitted to gain control or come to dominate the governance, management, or operations of GIP-Cayman.

(b)     On or about February 16, 2016, during a meeting in Washington, D.C., CHANG falsely represented and promised to Mr. Youssefzadeh, Mr. Javed and Pourmand that after the closing DONG YIN had no intention to assert, and would not assert, control over GIP-Cayman or the Satellite Project. Fan was present when this statement was made and did not disagree with it.

116.    As a result of these falsehoods and half-truths, Plaintiffs believed that Bronzelink was an independent, stand-alone entity that would not be under DONG YIN's control and dominance. In fact, however, Bronzelink, like COSEIG, was merely a front company that DONG YIN was using to further its plan and efforts to gain control and dominance over GIP-Cayman and the Satellite Project, and to use that control and dominance to obtain access to confidential and sensitive satellite and launch technology and data.

117.    The Bronzelink JVA recognized that the "Business" of GIP-Cayman was "[a]cquiring, launching and operating the Satellite or any other satellite(s) to provide connectivity services in any part of the African continent or elsewhere." (Bronzelink JVA, p. 3.)

**FIRST AMENDED COMPLAINT**

239671.4

118.   Paragraph 3.7 (vii) of the Bronzelink JVA provided that Pourmand would be the first CEO of GIP-Cayman pursuant to an employment agreement.

119.   Paragraph 3.6 provides that GIP-Cayman "would be responsible for securing loans from export credit agencies and others of up to US$475 million."

120.   In Paragraph 4.4, Bronzelink represented that it was an independent entity that "has the power to execute, perform its obligations under and enter into all transactions contemplated by this Agreement," and that "the execution and performance of this Agreement . . . do not violate . . . any agreement or instrument to which it is subject."

121.   Paragraph 8 gave Bronzelink the right to appoint six members to the nine-member GIP-Cayman Board of Directors, thus giving Bronzelink control over the governance of GIP-Cayman.

122.   In addition, a February 25, 2016 Amendment to the Bronzelink JVA set forth a procedure which assured that the Common Directors [Mr. Youssefzadeh, Mr. Javed and Pourmand] would maintain the right to select the CEO of GIP-Cayman.

123.   Paragraph 6.1 of the Amendment states that, "[t]he Common Holders shall be entitled to nominate a person to be the initial Chief Executive Officer (CEO)."

124.   Paragraph 6.2 of the Amendment states that, "[i]n the event the CEO is removed prior to the date five (5) years after the closing of the Equity Investment, any replacement or successor CEO shall be subject to the approval of at least one (1) Common Director (other than the initial CEO)."

125.   In or about February and March 2016, Mr. Youssefzadeh and Mr. Javed were told by Fan, while acting as an agent of DONG YIN, and the Washington Attorney, as counsel for DONG YIN, that the Bronzelink JVA was essentially a "placeholder" agreement that would eventually be superseded by a Share Purchase Agreement ("SPA") and a Shareholders Agreement ("SHA").

239671.4

**G.     The Amore Facility Agreement.**

126.   Amore was incorporated in the British Virgin Islands on January 11, 2016.

127.   At all relevant times, Amore was controlled by DONG YIN.  As of March 10, 2016, Amore's Board of Directors was comprised of at least two high level DONG YIN executives, including Yang Zeng, Chairman of the DONG YIN Board, and Xinyi Dong.  CHANG and Guoxing Zhong, who were both directors of COAMI, were also members of the Amore Board of Directors.

128.   Unbeknownst to Plaintiffs, on or about March 15, 2016, Bronzelink entered into a secret Facility Agreement with Amore (the "Facility Agreement").  Xinyi Dong of DONG YIN signed on behalf of Amore.

129.   The Facility Agreement gave Amore control over Bronzelink.  But because Amore was at all times controlled by DONG YIN, the Facility Agreement also gave DONG YIN control over Bronzelink, and, by extension, GIP-Cayman, once Bronzelink acquired its majority ownership interest in GIP-Cayman.  The result of these relationships and transactions was to secretly eliminate the firewall between DONG YIN, the purported lender, and the PRC, on the one hand, and GIP-Cayman and the Satellite Project, on the other hand.

130.   Part 3 of Schedule 2 to the Facility Agreement provides that Amore has the right to approve the appointment of four members to the five-member Bronzelink Board of Directors, all of whom would then be appointed as GIP-Cayman Board members.

131.   Paragraph 3.1(a)(ii) of the Facility Agreement provides that Bronzelink shall use the funds it borrows from Amore for "investing in the preferred equity of [GIP-Cayman] on terms satisfactory to [Amore]."

132.   In Paragraph 14.3 of the Facility Agreement, Bronzelink represents that the "entry into and performance by it of, and the transactions contemplated by [the Facility Agreement]," do not and will not conflict with "any law or regulation

**FIRST AMENDED COMPLAINT**

239671.4

applicable to it" or "***any agreement or instrument binding upon it***."  (Emphasis added.)

133.   On or about March 15, 2016, the Washington Attorney emailed Mr. Youssefzadeh and Mr. Javed, stating that his law firm was DONG YIN's counsel and could not act for Bronzelink, adding to the false and misleading impression that DONG YIN and Bronzelink were independent entities.  The Washington Attorney also confirmed that his partner in the firm's Hong Kong office coordinated the Facility Agreement between Amore and Bronzelink, that it had been signed and that funding was "imminent."  These representations were false and misleading in that they concealed and failed to disclose: (a) that terms of the Facility Agreement were in conflict with the pending Agreement between Bronzelink and Plaintiffs; and (b) that DONG YIN and Bronzelink were not independently owned and controlled entities that dealt with each other at arms' length, but rather Bronzelink was a fraudulent device for DONG YIN to gain ownership and control of GIP-Cayman and the Satellite Project.

134.   On or about April 5, 2016, the Washington Attorney, as counsel for DONG YIN, provided his comments to a draft of the SPA by email, representing that he had intended to align the conditions precedent in the SPA with the terms of the Facility Agreement between DONG YIN and Bronzelink.  These representations were misleading in that other material terms of the SPA were contrary to, undermined by, or otherwise subject to the terms of the Facility Agreement.

135.   On or about April 5, 2016, David Zhang of DONG YIN forwarded, by email, a copy of a letter from DONG YIN to Bronzelink, stating that DONG YIN, acting through Amore, had provided debt financing to Bronzelink.  The letter further stated that the proceeds of the loan were being used by Bronzelink to make a $175 million investment in GIP-Cayman, in accordance with the SPA and the Bronzelink JVA, dated February 25, 2016.  The letter and the cover email were false

**FIRST AMENDED COMPLAINT**

239671.4

and misleading in that neither disclosed that Bronzelink was controlled and dominated by DONG YIN, and not an independent entity.

136.   On or about April 23, 2016, the Washington Attorney, as counsel for DONG YIN, emailed various parties, including Mr. Youssefzadeh, Mr. Javed and Bronzelink's attorney, noting that DONG YIN agreed that a provision in the draft SPA that allowed Bronzelink to appoint individuals to senior management positions was "an issue of undue influence by the lender."  In the email, he referred Bronzelink's attorney to the revised Facility Agreement between Amore and Bronzelink, which had been withheld from Plaintiffs.  The Washington Attorney also failed to disclose to Mr. Youssefzadeh and Mr. Javed that under the Facility Agreement, Bronzelink had agreed that Amore had the power to approve the appointment of four directors to the Bronzelink Board of Directors and that those same directors had to be appointed to the GIP-Cayman Board of Directors.

137.   On or about April 27, 2016, Calvin Tang ("Tang") emailed documents to Mr. Javed relating to Amore, including the Certificate of Incorporation and the Certificate of Incumbency, noting that they were from DONG YIN with instructions that the documents were only for opening a HSBC bank account for GIP-Cayman, and that without written consent, GIP-Cayman was not to furnish any other lending institution with any documents or information about Amore.

138.   On or about April 27 or 28, 2016, the Washington Attorney, as counsel for DONG YIN, and David Zhang of DONG YIN verbally represented to Plaintiffs that Amore was a wholly owned subsidiary of DONG YIN.

**H.     The Series A Share Purchase Agreement.**

139.   On or about May 11, 2016, Bronzelink and Plaintiffs, as well as other interested parties, signed the SPA, the SHA and the First Amendment to the SHA (the "SHA Amendment").  Mr. Youssefzadeh signed all of these documents in his home in California.  Fan signed the SPA, the SHA and the Amendment on behalf of

**FIRST AMENDED COMPLAINT**

239671.4

Bronzelink.  (Neither DONG YIN, Amore, nor COAMI are signatories to the SPA, the SHA, or the SHA Amendment.)

140.  To induce Plaintiffs to enter into the SPA, DONG YIN's agents and representatives continued to falsely represent and promise to Plaintiffs that DONG YIN would have no control over GIP-Cayman or the Satellite Project, and that Bronzelink was a fully independent, stand-alone entity, thus ensuring compliance with the U.S. export control laws.  For example:

(a)  On or about February 23, 2016, during a meeting in Washington, D.C., Fan, acting as an agent of DONG YIN, falsely represented to Mr. Youssefzadeh, Mr. Javed, Pourmand and Irani that Bronzelink was an independent, stand-alone entity with no affiliation to DONG YIN.

(b)  On or about May 11, 2016, the day after the signing of the SPA, during a dinner in Hong Kong organized by Bronzelink, Yang Zeng of DONG YIN falsely confirmed that DONG YIN was merely a lender, and that it would have no control or influence over GIP-Cayman or the Satellite Project.

141.  As a result of these false representations and promises, Plaintiffs continued to believe that DONG YIN was merely a lender and that Bronzelink was an independent company that would not be subject to DONG YIN's control or influence.

142.  Pursuant to the SPA, GIP-Cayman agreed to issue and sell to Bronzelink an aggregate of 30,000,000 newly issued Series A convertible preferred shares (the "Series A Preferred Shares").  These Series A Preferred Shares represented a 75% ownership interest in GIP-Cayman.  At the same time, the SPA reduced Plaintiffs' controlling ownership interest in GIP-Cayman from 63% to a minority interest of 15.75%.  Plaintiffs understood, based on the false representations and promises made to them by DONG YIN's agents, that GIP-Cayman would be under the control of an independent Board and managed by a CEO approved by Plaintiffs, without any control or influence by DONG YIN or its representatives.  In fact, not only was the

38

**FIRST AMENDED COMPLAINT**

1  Board controlled and dominated by DONG YIN, but it ultimately did not allow

2  Plaintiffs to have any say in the governance of GIP-Cayman.

3      143.   Bronzelink had agreed to purchase the Series A Preferred Shares for a

4  lump sum payment of US$175,000,000, paid to GIP-Cayman (the "Equity

5  Investment").  Additionally, Bronzelink agreed to provide a $25 million line of credit

6  to GIP-Cayman.  As a result of these transactions, and the false and fraudulent

7  pretenses, representations and promises described above, Plaintiffs gave up their

8  controlling ownership interest in the Satellite Project without receiving any

9  remuneration under the SPA.

10      144.   In addition, as a condition to the closing between Bronzelink and

11 GIP-Cayman, Plaintiffs were required to provide Bronzelink with confidential,

12 proprietary and valuable documents, information and data that had been created as

13 part of the Satellite Project, including:

14      (a)   A signed Letter of Intent ("LOI") for entering into a Satellite

15           Manufacture Agreement between GIP-Cayman and a reputable satellite

16           manufacturer (such as SSL-Loral, Boeing, or Airbus), along with a draft

17           agreement;

18      (b)   A signed insurance rate-locking instrument issued by a reputable

19           insurance broker to GIP-Cayman;

20      (c)   The "High Throughput Ka-Band Satellite Project for Africa Demand and

21           Supply Analysis and Outline Project for Africa Demand and Supply

22           Analysis and Outline Project Assessment," conducted by COMSYS of

23           the United Kingdom;

24      (d)   A "Milestones of Progress" document setting forth in detail planning

25           schedules, payment schedules, timetables, milestones and documents for

26           the development, fabrication and launch of the satellite;

27      (e)   GIP-Cayman's confidential marketing plan for the Pre-Launch Market

28           Development;

39

**FIRST AMENDED COMPLAINT**

239671.4

(f)     A comfort letter from the satellite manufacturer that it will support an application for a loan from EXIM Bank; and

(g)     Written confirmation from Norwegian counsel for GIP-Cayman, in form and substance reasonably satisfactory to Bronzelink and its lenders, confirming that the ownership of Dub Dub had been properly transferred to GIP-Cayman, and that the transfer did not invalidate, or in any way otherwise adversely affect, Dub Dub's rights to the Orbital Slots and associated radio-frequency use licenses.

145.    As a further condition to the closing, STM Group was required to assign the valuable Global-IP trademark to GIP-Cayman.

146.    All of these deliverables were of tremendous value, representing years of work and millions of dollars of investment by Plaintiffs.  They were all provided to Bronzelink or GIP-Cayman prior to the closing.

147.    At all relevant times, Plaintiffs maintained their share certificates in GIP-Cayman and the confidential and proprietary documents, information and data that they provided to Bronzelink in Los Angeles County, California.

## I.     The Shareholders Agreement.

148.    On or about June 2, 2016, during a Skype call amongst Fan, Wong, Yiu, Tang and Mr. Javed, Fan, acting as an agent of DONG YIN, began requesting additional materials that were not deliverables under the SHA.  Fan indicated that these materials were requested by DONG YIN.  Mr. Javed objected because DONG YIN was only the lender and had no right to, or any need for, any of these materials.  Fan, acting as an agent of DONG YIN, later telephoned Mr. Javed to convince him to proceed with the closing, again falsely representing and promising that DONG YIN and Bronzelink were, and would remain, two completely distinct and unrelated entities, and that after the closing DONG YIN would not have any control over or say in the governance, management, or operations of GIP-Cayman.  Further, Fan falsely assured Mr. Javed that after the closing, Bronzelink would have an

**FIRST AMENDED COMPLAINT**

239671.4

independent Board of Directors, which would make all decisions free of DONG YIN's influence.

149.   On or about June 3, 2016, Bronzelink and Plaintiffs finalized and executed the closing documents for the SHA.  Mr. Youssefzadeh executed the closing documents in California.

150.   Under the SHA, Bronzelink was not supposed to be a mere passive investor in GIP-Cayman; rather, it had a role in the governance, management and operations of GIP-Cayman.  For example:

(a)   The SHA provided that Bronzelink would control the GIP-Cayman Board of Directors.  Paragraph 3.2 of the SHA provided that the GIP-Cayman Board of Directors shall have nine members.  Paragraph 3.3 provided that Bronzelink is entitled to appoint six members to the GIP-Cayman Board (the "Bronzelink Directors"), and that Plaintiffs and Pourmand are entitled to appoint three members (the "Common Directors").

(b)   Paragraph 3.5 provided that Bronzelink has the right to designate the Chairman of the GIP-Cayman Board of Directors.

(c)   Paragraph 3.12 provided that Plaintiffs have the right to select the CEO of GIP-Cayman, but that Bronzelink had the right to select the Chief Financial Officer.

(d)   Paragraph 6 provided that GIP-Cayman is responsible for securing Export Credit Agency ("ECA") or other non-recourse or limited-recourse project financing in an amount anticipated to be up to US$475,000,000.

(e)   Paragraph 8 placed significant restrictions on the ability of Plaintiffs to transfer their shares in GIP-Cayman.

151.   Accordingly, in entering into the SHA, Plaintiffs gave up the majority of their ownership interest in GIP-Cayman and their control of the Satellite Project,

**FIRST AMENDED COMPLAINT**

239671.4

based on false and fraudulent pretenses, representations and promises and the concealment of material information.

152.   Moreover, after the SHA was signed, DONG YIN continued to conceal and disguise its ownership and control of GIP-Cayman and the Satellite Project.  For example, soon after the closing, in early June 2016, Mr. Youssefzadeh drafted a press release to announce the Bronzelink deal.  On June 7, 2016, Wong rejected the idea of issuing a press release at that time.  In an email, he stated that he did not want to jeopardize the $25 million line of credit from Amore and, "therefore for the moment being, we should corporate [*sic*] and listen to the opinion from relevant party in order to facilitate more smooth business corporation [*sic*] going forward."  Wong's professed concern that Bronzelink needed to appease Amore was pretextual; his actual concern was to keep the true extent of DONG YIN's ownership and control of Amore and Bronzelink hidden.

**J.     Plaintiffs Discover Material Inconsistencies Between the SHA and the Amore Facility Agreement.**

153.   In discussions with DONG YIN's agents, including Fan, Henry Fan and the Washington Attorney, about various issues related to the SHA, Plaintiffs repeatedly asked to see the Amore Facility Agreement.  Those requests were consistently denied without explanation.

154.   In mid-2017, after resigning from their employment at GIP, Plaintiffs by happenstance found and were able to review an electronic copy of the Facility Agreement.

155.   As a result of that review, Mr. Youssefzadeh and Mr. Javed discovered that the Facility Agreement contained provisions that gave Amore control of Bronzelink and GIP-Cayman, which meant that, in reality, DONG YIN was, all along, in control of Bronzelink and GIP-Cayman.  Moreover, some of the other provisions in the Facility Agreement were in direct conflict with the terms of the SHA, precluding Bronzelink from meeting its obligations under the SHA.

**FIRST AMENDED COMPLAINT**

239671.4

156.   Based on this review, Plaintiffs realized that, despite their promise to limit DONG YIN's role to that of a lender, the Washington Attorney and the Washington Law Firm had actually conspired with DONG YIN and agents for DONG YIN to obtain ownership and control of the Satellite Project.  In particular:

(a)   Under the Facility Agreement, Amore has the power to approve the appointment of four directors to the Bronzelink Board of Directors, and those same four directors had to be appointed to the GIP-Cayman Board of Directors.  Given that Amore was controlled and dominated by DONG YIN, this provision effectively gave DONG YIN control over GIP-Cayman.

(b)   The Facility Agreement requires Bronzelink to provide Amore with free access at all reasonable times to the GIP-Cayman premises, assets, books, accounts, records and senior management.  The SHA does not provide for such access.  Especially given DONG YIN's control and dominance over Amore, and its affiliation with the PRC, Plaintiffs would never have agreed to or allowed such access.

(c)   The Facility Agreement provides that Amore must approve all GIP-Cayman contracts in excess of $1,000,000.  There is no such restriction in the SHA.  Furthermore, that restriction is inconsistent with the understanding between Bronzelink and Plaintiffs that GIP-Cayman would be a stand-alone company governed by an independent board of directors.

(d)   The Facility Agreement requires GIP-Cayman to allow Amore to engage a financial advisor, technical consultant, marketing consultant and tax expert for GIP-Cayman, *at GIP-Cayman's expense*.  The SHA has no such provision.  Moreover, especially given DONG YIN's control and dominance over Amore, Plaintiffs would never have agreed to or allowed

**FIRST AMENDED COMPLAINT**

239671.4

1    Amore to have such involvement in and influence over the policies,

2    direction and operations of GIP-Cayman.

3    (e)    Under the Facility Agreement, Bronzelink was required to use reasonable

4    efforts to prevent GIP-Cayman from entering into any joint venture.

5    There is no such restriction in the SHA, nor would Plaintiffs have agreed

6    to or allowed such a restriction.  In fact, this secret restriction directly

7    impacted GIP-Cayman's ability to enter into a proposed joint venture

8    with a technology company that Mr. Youssefzadeh and Mr. Javed had

9    determined was a fundamental element of the Satellite Project's business

10   plan.  When, on or about June 12, 2017, Mr. Youssefzadeh sent a detailed

11   memorandum to the GIP-Cayman Board of Directors outlining the

12   proposed joint venture and asking for permission to proceed, the Board

13   did not respond.  Plaintiffs are informed and believe, and based thereon

14   allege, that the Board failed to act because, under the Facility Agreement,

15   Bronzelink could not permit GIP-Cayman to enter into any such joint

16   venture.

17   (f)    Under the Facility Agreement, Bronzelink gave Amore a charge over the

18   GIP-Cayman shares owned by Bronzelink.  This provision conflicts with

19   the SHA, which allows GIP-Cayman to demand that Bronzelink provide

20   its shares in GIP-Cayman to an ECA, or alternative lender, as additional

21   collateral.

22   (g)    Under the Facility Agreement, GIP-Cayman is precluded from creating a

23   stock option pool.  The SHA, however, allows GIP-Cayman to create

24   such a pool for its key employees, which was important if GIP-Cayman

25   was to attract personnel with the skills, expertise and experience needed

26   to work on the Satellite Project.

27   (h)    Under the Facility Agreement, GIP-Cayman could only raise additional

28   funds through ECA financing.  But neither the Bronzelink JVA nor the

**FIRST AMENDED COMPLAINT**

SHA contain any such limitation.  To the contrary, both of those agreements allow GIP-Cayman to raise funds from either an ECA or an alternative lending source.  Plaintiffs are informed and believe, and based thereon allege, that this secret restriction in the Facility Agreement was one reason that the GIP-Cayman Board refused to consider the Citigroup debt financing proposal (discussed below), because approving that proposal would have placed Bronzelink in breach of its agreement with Amore.

**K.    The Officers and Directors of GIP-Cayman and GIP-USA.**

157.   In accordance with an oral agreement between Plaintiffs and Bronzelink, three of the six directors Bronzelink appointed to the GIP-Cayman Board were to be independent (*i.e.*, not have any other affiliation with Bronzelink) and would be satellite industry professionals.

158.   On or about May 31, 2016, Plaintiffs were informed that Bronzelink's nominations of its GIP-Cayman Series-A directors consisted of:  (a) Fan; (b) Wong; (c) Liu; (d) Guanhong (Jason) Luo ("Luo"); (e) Julian Zhongliang Zhao ("Zhao"); and (f) Wang Zheng ("Zheng").

159.   Mr. Javed requested a call with the Washington Attorney to ask if these nominees were independent of, and unaffiliated with, the PRC, and sent a text listing the names of the Bronzelink directors to the Washington Attorney.  During a telephone conference on or about May 31, 2016, the Washington Attorney, as counsel for DONG YIN, represented to Mr. Javed that: (a) four of the Bronzelink-nominated directors—Liu, Zheng, Luo and Zhao—were completely independent and unaffiliated with DONG YIN; and (b) since there would be four independent Bronzelink-appointed directors and three Common directors, GIP-Cayman would have solid protection from PRC control and influence.  The Washington Attorney further represented to Mr. Javed that, although Wong worked for Bronzelink, he was not affiliated with DONG YIN.

45

**FIRST AMENDED COMPLAINT**

239671.4

160.   If fact, at all relevant times: (a) Fan, Wong and Liu were agents of DONG YIN, and were acting within the course and scope of their agency and for the sole or primary benefit of DONG YIN; (b) Wong and Liu routinely acted at Fan's direction and did his bidding; (c) neither Wong nor Liu exercised any meaningful independence in making decisions as members of the GIP-Cayman Board of Directors or with respect to the governance, management and operations of GIP-Cayman and GIP-USA; and (d) as Wong would later reveal to Mr. Javed, he was related to Xinyi Dong, a director of Amore and a high-level executive of DONG YIN.

161.   On or about June 21, 2016, the first GIP-Cayman Board of Directors meeting was held in Hong Kong.  The Board appointed Luo as the Chairman of the Board.  Pourmand was appointed CEO of GIP-Cayman.

162.   In fact, prior to the Board meeting, Pourmand had secretly negotiated his compensation as the CEO of GIP-Cayman with Fan, acting as an agent of DONG YIN, and received a very favorable contract to ensure his loyalty to Fan and ultimately DONG YIN.  Fan negotiated Pourmand's contract without Plaintiffs' involvement or approval even though (a) the SHA provides that Plaintiffs and Pourmand would collectively nominate the CEO; and (b) the CEO's compensation should have been approved by the GIP-Cayman Board of Directors and/or the GIP-Cayman Compensation Committee, of which Mr. Youssefzadeh was a member.

**L.     The False Certification to SpaceX and GIP-Cayman's Export Control Obligations Under the Boeing Contract.**

163.   On or about August 5, 2016, in reliance on the false representations and promises described above, Mr. Javed falsely certified to SpaceX that GIP-Cayman was not "owned or controlled, or acting on behalf of, directly or indirectly, any individuals or entities domiciled, headquartered, incorporated, residing in or otherwise affiliated with [the PRC or other specified countries]."

164.   In or about August 2016, GIP-Cayman formed GIP-USA as a wholly owned subsidiary.  At all relevant times, the GIP-Cayman Board of Directors

**FIRST AMENDED COMPLAINT**

239671.4

controlled the direction and governance of GIP-USA, which meant that DONG YIN, through Amore, Bronzelink and GIP-Cayman, controlled GIP-USA.

165.    After GIP-USA was formed, Wong and Liu, along with Mr. Javed, became members of the GIP-USA Board of Directors.  Because the GIP-USA Board of Directors consisted of only three members, at all relevant times, DONG YIN, through Wong and Liu, possessed and was able to exercise control over the GIP-USA board.

166.    In or about August 28, 2016, GIP-Cayman entered into a contract with Boeing to design, develop, manufacture, test and transport the satellite to the launch site, and to provide launch support and other services for the Satellite Project.  The contract specifically provided that:

(a)     "The Contract Deliverable Data, Satellite, and any other hardware ('Products') furnished under this Contract are subject the U.S. International Traffic in Arms Regulations (the 'ITAR') or the U.S. Export Administration Regulations (the 'EAR')."

(b)     "The Products furnished under this Contract are subject to the ITAR or the EAR and will be authorized by the United States Government for export only to Customer in North Atlantic Treaty Organization or major non-North Atlantic Treaty Organization ally countries, as recognized at the time by the USG, or to the Designated Launch Site for launch into space.  Customer represents and warrants that the ultimate end use of the Products is for commercial purposes.  The Products may not be resold, diverted, transferred, trans-shipped or otherwise disposed of in any other country or in any other manner, either in their original form or after being incorporated through an intermediate process into other end items, without the prior written approval of the United States Government, which approvals are the sole responsibility of Customer.  Additionally, transferring registration, control or ownership to any other person or

47

**FIRST AMENDED COMPLAINT**

business entity of the Products furnished under this Contract is considered an export and as such also requires prior written approval from the United States Government, which approvals are the sole responsibility of Customer."

167.  Plaintiffs are informed and believe, and based thereon allege, that if Defendants had disclosed to Boeing and SpaceX the true relationship between DONG YIN and the PRC, on the one hand, and GIP-Cayman, GIP-USA and the Satellite Project, on the other hand, Boeing and SpaceX would never have entered into contracts with GIP-Cayman to build and launch the satellite, and would never have given GIP-Cayman and GIP-USA access to satellite and launch technology and data subject to ITAR, EAR and the PRC Proscription.

**M.    The Employment Contracts.**

168.  In or about September 2016, Pourmand's employment agreement was modified.  Although he retained the title of CEO, he was stripped of the authority and responsibilities of the CEO.  At that time, Mr. Youssefzadeh orally agreed to act as the de facto CEO of GIP-Cayman and GIP-USA, and assumed the duties, responsibilities and authority of CEO of both companies.

169.  Effective October 1, 2016, Mr. Youssefzadeh entered into parallel written employment agreements with GIP-Cayman and GIP-USA.

170.  Mr. Youssefzadeh's employment agreement with GIP-USA provided that he was to perform the duties of GIP-USA's Chief Technical Officer and Chairman of the Management Committee.  Mr. Youssefzadeh was required to report to the GIP-USA and GIP-Cayman Boards of Directors.  The employment agreement provided that Mr. Youssefzadeh would render his services at GIP-USA's offices in El Segundo, California.

171.  Mr. Youssefzadeh's employment agreement with GIP-Cayman contained similar provisions, and also named him as the Chief Technical Officer and Chairman

**FIRST AMENDED COMPLAINT**

239671.4

of the Management Committee, reporting to the GIP-Cayman and GIP-USA Boards of Directors.

172.   Effective October 1, 2016, Mr. Javed entered into written employment agreements with GIP-Cayman and GIP-USA.

173.   Mr. Javed's employment agreement with GIP-USA provided that he was to perform the duties of GIP-USA's President and Chief Operating Officer.  Mr. Javed was required to report to the GIP-USA and GIP-Cayman Boards of Directors.  The employment agreement provided that Mr. Javed would render his services at GIP-USA's offices in El Segundo, California.

174.   Mr. Javed's employment agreement with GIP-Cayman contained similar provisions and also named him as GIP-Cayman's President and Chief Operating Officer, reporting to the GIP-Cayman and GIP-USA Boards of Directors.

**N.   DONG YIN's Exercise of Control and Dominance Over the Governance, Management and Operations of the Satellite Project.**

175.   Prior to the execution of the SPA and SHA, and even before appointment of the GIP-Cayman Board of Directors, DONG YIN, through its agents and co-conspirators, began to assert control and dominance over the governance, management and operations of the Satellite Project.

176.   On multiple occasions, including April 15, 18, 27, 29 and May 3, 2016, CHANG, Yiu, Fan and Wong, acting as agents of DONG YIN, each separately emailed Mr. Youssefzadeh and Mr. Javed to request a detailed operating plan, including the schedule of tasks, critical paths, timing, personnel needed and milestones for the Satellite Project.

177.   On or about April 15, 2016, both Tang and Henry Fan emailed Mr. Javed expressing DONG YIN's concern about the control of and signing authority for any bank account opened by GIP-Cayman.  Tang emailed that Terry Long preferred to have Bronzelink handle the communications and exchange of documentation with DBS Bank, Ltd. ("DBS") to open the DBS off-shore account.

178.   Also on or about April 15, 2016, CHANG emailed Mr. Javed requesting GIP-Cayman's detailed operating plan, including schedule of tasks, critical paths, timing and personnel needed, indicating that Amore was unwilling to grant authorization for Bronzelink to disburse funds without knowing more about the specific uses, milestones and conditions.

179.   During a telephone call on or about April 23, 2016, Bronzelink notified Mr. Youssefzadeh and Mr. Javed that Fan would lead the Bronzelink team, Wong would coordinate all Bronzelink related matters, Yiu would be the contact for Bronzelink's business decisions and Tang would be the contact for the parties' legal team.  Soon after the call, Wong emailed Mr. Javed, indicating that Fan had appointed Wong as signatory to the GIP-Cayman HSBC bank account, even though he had no such executive powers or authority.

180.   On or about April 27, 2016, Fan, acting as an agent of DONG YIN, emailed Mr. Youssefzadeh and Mr. Javed, asking that they travel to Hong Kong to meet the following week, and requesting a detailed work plan (including milestones, timeframe and staff arrangements), detailed budget plan and a detailed operation plan for GIP-Cayman.

181.   On or about April 27, 2016, CHANG had a telephone conversation with Mr. Youssefzadeh, who was in Orange County, California, and Mr. Javed, who was in Los Angeles, California, stating that DONG YIN wished to hire management consultants that CHANG knew to assist in the operation of GIP-Cayman.

182.   On or about April 29, 2016, Wong, acting as an agent of DONG YIN, emailed Pourmand and copied Mr. Youssefzadeh and Mr. Javed, indicating that Fan expected to receive the documents and information he had demanded, relating to the work, budget and operational plans, by May 4, 2016, prior to Mr. Youssefzadeh's and Mr. Javed's visit to Hong Kong.

183.   On or about May 3, 2016, Tang, acting as an agent of DONG YIN, again emailed Pourmand, requesting that the GIP-Cayman team bring the work, budget and

**FIRST AMENDED COMPLAINT**

239671.4

1  operational plans with them to Hong Kong, so that they could be discussed during

2  meetings scheduled for May 9 and 10, 2016.

3      184.   On or about July 8, 2016, Tang, acting as an agent of DONG YIN,

4  prepared and circulated drafts of charts showing GIP-Cayman's organizational

5  structure delineating the duties and responsibilities of GIP-Cayman executives and its

6  Board.  The proposed charts required GIP-Cayman executives to seek approval from

7  the GIP-Cayman Board of Directors for decisions and activities that are typically

8  within the exclusive purview of a company's executives, including: (a) issuance of

9  press releases, company publications and public statements that do not involve

10  financial matters; (b) entering into equipment leases; (c) maintenance of general

11  ledger and operating expenditures; (d) contact with regulators and other governmental

12  authorities; (e) hiring and termination of staff; (f) computer access; (g) authorizing

13  sales and marketing at operational levels; (h) authorizing domestic and international

14  travel for staff; and (i) authorizing communications with the company's bankers and

15  signing checks on behalf of the company.

16      185.   On or about July 15, 2016, Fan, acting as an agent of DONG YIN,

17  travelled to Washington, D.C. to meet with Mr. Youssefzadeh, Mr. Javed and

18  Pourmand, in advance of holding a GIP-Cayman Board meeting in Washington, D.C.

19  Fan wanted to inspect and approve offices that Pourmand had located in Maryland and

20  formalize Liu's position inside GIP-Cayman as Controller, which are typically matters

21  handled by the company's executives and not an individual director.

22      186.   At the July 18, 2016 GIP-Cayman Board meeting, which was held in

23  Washington, D.C., Mr. Youssefzadeh presented the status of negotiations with Boeing

24  and SSL and recommended that the company sign an LOI with Boeing, which was

25  approved by the Board.

26      187.   At the same Board meeting, it was agreed that after execution of the

27  Boeing LOI, $10 million would be transferred from GIP-Cayman's DBS Bank

28  Hong Kong account for capital expenditures.  Despite this Board decision, Wong,

**FIRST AMENDED COMPLAINT**

239671.4

acting as an agent of DONG YIN, took control of the transaction, emailed GIP-Cayman and instructed that the $10 million payment instead be made from GIP-Cayman's HSBC account in the U.S.

188.   On or about July 29, 2016, after the Boeing LOI was finalized and reviewed by the Washington Attorney, Mr. Youssefzadeh requested authorization from Luo, the Chairman of the GIP-Cayman Board of Directors, to execute the Boeing LOI.  In response, Luo emailed that "[he] would like Mr. Fan/DONG YIN to review/agreed [sic][the Letter of Intent] before we move on."

189.   On or about August 22, 2016, Tang, acting as an agent of DONG YIN, sent Mr. Javed a list of candidates for the GIP-Cayman CFO and company Secretary positions, requesting that he video conference with those candidates in advance of Fan's arrival in California, so that when Fan arrived, they could discuss the suitability of each candidate.

190.   Concerned with Fan's encroachment into the company's operations, on or about August 24, 2016, Mr. Javed insisted that they follow the Washington Attorney's guidelines to ensure full compliance with the export control laws.

191.   Fan, Yiu and Wong, acting as agents of DONG YIN, came to Los Angeles on or about August 23, 2016, to meet with Mr. Youssefzadeh, Mr. Javed and Pourmand individually, followed by a group meeting.  During these meetings, Fan and Wong, acting as agents of DONG YIN, made several statements revealing that they were acting at DONG YIN's behest and on its behalf in matters relating to the Satellite Project.  For example:

(a)      Even though the GIP-Cayman Board had authorized Mr. Youssefzadeh to proceed with finalizing a definitive agreement with Boeing, Wong told Mr. Javed that he was reluctant to release the formal authorization to do so because of pressure from Fan, who was waiting for the final "go ahead" from DONG YIN.

**FIRST AMENDED COMPLAINT**

239671.4

(b)    When Mr. Javed warned Fan that GIP-Cayman was on the verge of missing a deadline with Boeing, Fan refused to take any action, saying that he did not have permission from DONG YIN to act.

(c)    At every opportunity, Fan, acting as an agent of DONG YIN, sought to interject himself into the day-to-day operations of GIP-Cayman and GIP-USA, which was inappropriate for an individual director with no executive position within the company.  Among other things, Fan and his team wanted to read each and every document that was being negotiated between GIP-Cayman and Boeing, and demanded to know every detail of the commercial and technical negotiations and updates.

192.    On or about September 20, 2016, Wong emailed Mr. Youssefzadeh, Mr. Javed and Pourmand with an agenda for the third GIP-Cayman Board meeting, which was to be held in Hong Kong.  Wong requested the following updates: (a) Pourmand – CEO update; (b) Mr. Javed – business & market plan update; and (c) Mr. Youssefzadeh – technical update.

193.    On or about October 14, 2016, Wong emailed Mr. Youssefzadeh, Mr. Javed and Pourmand concerning his and Fan's plans to visit Los Angeles, California on October 18, 2016, requesting a meeting to discuss the following: (a) the relationship and strategic partnership with Boeing; (b) ECA debt financing; (c) sales and marketing; (d) the roles and duties of GIP-Cayman's management team; (e) the GIP-Cayman business plan; and (f) hiring staff.

194.    Fan and Wong, acting as agents of DONG YIN, visited the GIP-Cayman offices in El Segundo, California, on or about October 18, 19 and 20, 2016.  The purpose of that visit was to discuss the six matters listed above, even though those matters were within the purview of GIP-Cayman's executive officers and not individual members of the GIP-Cayman Board of Directors.

195.    During the months that followed, Mr. Youssefzadeh and Mr. Javed observed that Fan controlled the GIP-Cayman Board of Directors, and that Wong, Liu

**FIRST AMENDED COMPLAINT**

239671.4

and others routinely acted at his direction and did his bidding, without regard for their duties and responsibilities to GIP-Cayman.  For example:

(a)     On or about October 26, 2016, Wong, acting as an agent of DONG YIN, emailed Mr. Javed, attaching a revised GIP-Cayman financial model, requesting his input before he sent it to Fan.  Wong also requested the names of the top 10 to15 African countries that were most likely to purchase satellite capacity from GIP-Cayman.

(b)     On or about October 26 and 27, 2016, Wong, acting as an agent of DONG YIN, and Mr. Javed exchanged drafts of the GIP-Cayman internal organization chart by email, which was subject to review and finalization by Fan.

(c)     On or about November 1, 2016, Fan, acting as an agent of DONG YIN, requested that Helen Zhao, a Financial Advisor at Wells Fargo Advisors, open an investment account for GIP-Cayman for cash management purposes.  When Zhao asked for clarification, Liu responded that they needed to seek clarification from Fan.

(d)     On or about November 5, 2016, Wong, acting as an agent of DONG YIN, emailed Mr. Javed to request his input on the GIP-Cayman financial model, stating that he wanted to present the financial model to Fan for his final review.

(e)     On or about November 17, 2016, Fan, acting as an agent of DONG YIN, emailed Mr. Youssefzadeh, Mr. Javed and Pourmand requesting an update on the meeting in South Africa, and the status of marketing attempts in Ethiopia.

(f)     On or about November 18, 2016, Tang, acting as an agent of DONG YIN, emailed Mr. Javed, requesting technical details for Multi-Beam Architecture, Beam Size, Broadcasting, Design Process, Capacity Allocation and coverage map.

**FIRST AMENDED COMPLAINT**

239671.4

(g)     On or about November 18, 2016, Fan, acting as an agent of DONG YIN, emailed Mr. Javed, suggesting creation of a price management department responsible for pricing mechanism implementation, control and incentives.

(h)     On or about December 20, 2016, Mr. Youssefzadeh provided Wong with an update about negotiations with SpaceX and Arianespace as potential launch service providers.  Wong thereafter replied by email that he would "inform Mr. Fan [of] the same."

(i)     On or about December 21, 2016, Peter Lui, GIP-Cayman's CFO, forwarded to Bonnie Lui email exchanges between Mr. Youssefzadeh and Arianespace relating to launch services.  Ms. Liu, acting as an agent of DONG YIN, requested that Peter Lui copy "Tony & Co" on any correspondence between GIP-Cayman and Arianespace.

196.    These actions, requests and approvals are normally within the purview of a company's executive officers, and are not matters directed by individual board members, much less a representative of a lender.

197.    On or about November 18, 2016, Tang, acting as an agent of DONG YIN, sent an email to Mr. Javed requesting confidential and sensitive technical information regarding the Satellite Project that was subject to ITAR, EAR and the PRC Proscription.  Mr. Javed responded on November 19, 2016, refusing to provide the requested technical data.  In his email, Mr. Javed stated as follows:

> Your questions below has raised a red flag and made Emil quite concerned.  He has shared his concerns with Bahram and I and as such you will not receive any reply from him.
>
> As you are well aware, we all are operating based on the understanding that Bronzelink is an investor in Global-IP and other than its investment interest it has no intentions to extract technical information which may violate Global-IP's [export laws] compliance obligations.

Your questions below for sure has crossed the line.  Please confirm to us urgently that NO information from Global-IP is being shared with anyone outside Bronzelink and Bronzelink is not using the information for any purpose other than monitoring the company's general progress.  Also, in the future, please refrain from inquiring about information which goes beyond what Global-IP can share publicly.

198.   On or about November 20, 2016, Tang responded, falsely assuring Plaintiffs that the information he had requested was intended to be "used internally for monitoring the general progress of the company."  Plaintiffs are informed and believe, and based thereon allege, that, in fact, Defendants did not request this information to monitor the progress of GIP-Cayman, but in an attempt to obtain confidential and sensitive technical information in violation of the U.S. export control laws and in furtherance of their plan and efforts to control, dominate and direct the governance, management and operations of GIP-Cayman.

199.   In or about November 2016, GIP-Cayman and GIP-USA hired Chris Chen ("Chen") as their General Counsel.  Prior to hiring Chen, Fan and Wong, acting as agents of DONG YIN, had mandated that while the General Counsel would report to Mr. Javed, he had to be fluent in Chinese (so that they could freely interact with him).  After Mr. Javed referred Chen as a qualified candidate, unbeknownst to Mr. Javed, Wong flew Chen to Hong Kong for interviews with DONG YIN before allowing the Board to consider and approve his hiring.

200.   On or about December 8, 2016, the GIP-Cayman Board of Directors held a meeting at the company's office in El Segundo, California.  At that meeting, Wong, acting as an agent of DONG YIN, requested a two-week delay before any Board resolutions were approved.  Plaintiffs are informed and believe, and based thereon allege, that the reason Wong requested this delay was to have time to first present the resolutions to DONG YIN for its approval, before any contemplated Board actions.

201.   The Board approved the selection of SpaceX as the launch service provider at the December 8, 2016 GIP-Cayman Board meeting.  The formal approval

**FIRST AMENDED COMPLAINT**

239671.4

1   of the SpaceX contract, however, was delayed for three months by Fan and Wong.

2   Plaintiffs are informed and believe, and based thereon allege, that Fan and Wong,

3   acting as agents of DONG YIN, delayed Board approval of the SpaceX contract

4   because they first needed to obtain DONG YIN's approval of the contract.  As a

5   result, the SpaceX contract was not signed until on or about March 7, 2017.

6       202.   At the December 2016 GIP-Cayman Board of Directors meeting, Wong

7   proposed that Board members be compensated.  Mr. Youssefzadeh objected, stating

8   that this was typically an issue that should be addressed by the Board's Compensation

9   Committee.  Although Wong had no authority to decide the issue, he overruled

10  Mr. Youssefzadeh and stated that compensation was subject to previous agreements

11  between Bronzelink and those directors and directed that it be paid accordingly.

12      203.   On or about January 9, 2017, Luo inquired regarding when GIP-Cayman

13  would pay Board members their fees for 2016.  Wong responded that, "[w]e are

14  currently arranging for the payment for the outstanding directors' fee in 2016."  Wong

15  also emailed Mr. Javed informing him that Luo's director fees for GIP-Cayman were

16  $35,000 per quarter (or $140,000 annually).

17      204.   After reviewing Wong's email, Mr. Youssefzadeh researched the

18  standard compensation for board members in similarly situated companies.  He

19  determined that the proposed compensation for Luo—$140,000 annually—was far in

20  excess of the industry standard.

21      205.   On or about January 18, 2017, Mr. Youssefzadeh emailed Wong to

22  suggest that non-executive, non-investor directors each receive $2,500 per meeting,

23  while the Chairman would receive $5,000, with these directors also receiving

24  GIP-Cayman stock options.  Wong replied that the remuneration package to

25  non-investor directors had been the subject of lengthy negotiations and discussions as

26  part of "[Bronzelink's] appointment process."  Prior to this disclosure, Plaintiffs were

27  not aware that Bronzelink had separately negotiated the compensation of GIP-Cayman

28  Board members.

---

57

**FIRST AMENDED COMPLAINT**

239671.4

206.   Plaintiffs are informed and believe, and based thereon allege, that Bronzelink, acting at DONG YIN's direction, made secret deals with the GIP-Cayman Directors, agreeing to dramatically overpay Luo in an attempt to ensure his allegiance to DONG YIN, rather than to GIP-Cayman, and that Wong was acting as an agent of DONG YIN when he insisted on the $140,000 in annual payments to Luo.

207.   On or about February 1, 2017, Fan and Wong, acting as agents of DONG YIN, travelled again to California, visiting the GIP-Cayman offices in El Segundo, California.  During that visit:

(a)   Fan told Mr. Youssefzadeh that he was under pressure from DONG YIN for GIP-Cayman to obtain more orbital slots.

(b)   Fan insisted that he participate in GIP-Cayman's planning and strategy discussions and determinations and advised that he intended to take an active role in sales and marketing.

(c)   Fan and Wong sought to become deeply involved in budgeting and daily operational matters.

(d)   Fan asked to meet privately with senior staff.

(e)   Fan and Wong insisted on meeting privately with Liu.

208.   In response to Fan's overreaching and inappropriate insinuation into GIP-Cayman's daily affairs during his visit, on February 7, 2017, Mr. Youssefzadeh and Mr. Javed each tendered 60-days' notice of their resignation as executives of GIP-Cayman.

209.   On or about February 25, 2017, Wong and Yiu, acting as agents of DONG YIN, visited the GIP-Cayman and GIP-USA offices in El Segundo, California, on very short notice.  Upon arrival, Wong met with Mr. Youssefzadeh and Mr. Javed and hand-delivered two letters from Fan to them.  One of them was a letter from Fan stating, "I still believe the position I have taken to select you to be in charge for the project is the right decision, and I will be the same as always to support and trust

**FIRST AMENDED COMPLAINT**

239671.4

you." In response to these letters, and believing that Fan was prepared to change his behavior, Mr. Youssefzadeh and Mr. Javed subsequently withdrew their resignations.

210. On the same day, Wong and Yiu, acting as agents of DONG YIN, informed Mr. Youssefzadeh and Mr. Javed that they had instructions from Fan and DONG YIN to terminate GIP-Cayman's then CFO, Peter Lui. Mr. Youssefzadeh and Mr. Javed explained that only the GIP-Cayman Board could terminate Lui. In response, Wong insisted on calling an immediate telephonic board meeting. Because, however, a board meeting could not be called on less than five days' notice, he was unsuccessful.

211. Adamant that Lui must be fired immediately, Wong, acting as an agent of DONG YIN, informed Mr. Youssefzadeh and Mr. Javed that he and Fan would delay authorization for the SpaceX contract unless Lui was terminated. Eventually, the two sides reached an accord: (a) they would delay Lui's termination for five days, and then agree to terminate Lui by unanimous written consent; and (b) the Board would hold a telephonic meeting on March 3, 2017, at which they would address approval of the SpaceX contract.

212. On or about March 1, 2017, the GIP-Cayman Board terminated Lui as CFO by unanimous written consent. Because GIP-Cayman never appointed a replacement CFO, Wong was left with full control over all GIP-Cayman bank accounts.

213. On or about March 3, 2017, the GIP-Cayman Board held a telephonic board meeting, at which it reviewed and approved the proposed SpaceX contract.

214. On or about March 7, 2017, GIP-Cayman entered into a contract with SpaceX to provide launch services for the satellite. The SpaceX contract provided that, "[p]rovision of all items and information identified in this [Statement of Work] by SpaceX to any non-US parties (including Customer and/or Customer's Related Third Parties, if applicable) is subject to US export control restrictions imposed by regulatory authorities including the U.S. Department of State. Customer shall be

**FIRST AMENDED COMPLAINT**

1    responsible for any U.S. Customs or other export/import compliance with respect to

2    the Payload and any Customer provided hardware . . . ."

3         215.   The term, "Related Third Parties" is defined in the SpaceX contract to

4    include GIP-Cayman's "directors, officers, employees and agents," as well as "any

5    entity or person with any financial, property or other material interest" in the satellite.

6         216.   On or about April 21, 2017, Wong purported to assume the position of

7    "Executive Director" of GIP-Cayman, with authority to act on behalf of the

8    GIP-Cayman Board of Directors, even though the corporate governance documents

9    did not recognize any such position.  Plaintiffs are informed and believe, and based

10   thereon allege, that Wong and Fan, acting as agents of DONG YIN, agreed that Wong

11   would become the Executive Director of GIP-Cayman and, with the support of the

12   other Bronzelink-appointed directors, installed Wong as the Executive Director in

13   furtherance of DONG YIN's plan and effort to control, dominate and direct the

14   governance, management and operations of GIP-Cayman and GIP-USA.

15   **O.   Mr. Youssefzadeh and Mr. Javed Attempt, Unsuccessfully, to Address**

16          **Compliance and Financing Issues with the GIP-Cayman Board.**

17        217.   In or about March and April 2017, Mr. Youssefzadeh and Mr. Javed had

18   multiple discussions with Luo, expressing their concerns that GIP-Cayman was not

19   being properly governed by its Board and that Fan, Wong, Liu and others were

20   violating, and conspiring to violate, U.S. export control laws.

21        218.   In or about April 2017, Luo agreed to Mr. Youssefzadeh's request to

22   intervene and instructed Chen to direct the Washington Law Firm to prepare a

23   memorandum analyzing certain issues under the export control laws.

24        219.   On or about April 25, 2017, the Washington Attorney — who had been

25   counsel to DONG YIN but had switched to GIP-Cayman — prepared a memorandum

26   for the GIP-Cayman Board of Directors, of which Mr. Youssefzadeh and Mr. Javed

27   were members, analyzing the export control laws.  On April 27, 2017, Chen submitted

28   the memorandum to the GIP-Cayman Board of Directors.

**FIRST AMENDED COMPLAINT**

220.    On or about May 16, 2017, Mr. Youssefzadeh obtained a proposal for debt financing from Citigroup.  This was a major achievement as debt financing was necessary for GIP-Cayman and GIP-USA to survive as going concerns, given the high cost of building, launching and operating the satellite.

221.    On or about May 24, 2017, Mr. Youssefzadeh noticed a meeting of the GIP-Cayman Board of Directors for June 1, 2017, to discuss two items: (a) the issue of whether GIP-Cayman's corporate governance was in compliance with U.S. export control laws and, if not, what corrective action to take; and (b) the proposal to engage Citigroup to obtain debt financing.  The board meeting was noticed as a telephonic meeting, with Mr. Youssefzadeh, Mr. Javed, Chen and Liu participating from their residences or offices in Southern California.

222.    The board meeting did not occur, however.  Fan, Wong and Liu, acting as agents of DONG YIN, together with other Board members under their control, refused to participate in the meeting, as a result of which there was no quorum for the Board to take action.  Immediately, Luo resigned his position as the Chairman of the GIP-Cayman Board of Directors.  Shortly thereafter, Julian Zhao also resigned from the GIP-Cayman Board of Directors.

223.    Wong told Mr. Javed that Fan and DONG YIN fired Luo and Zhao because they were not pleased with them.  The formal justification given for their removal was that all of the Bronzelink-appointed directors to the GIP-Cayman Board of Directors had one year terms that ended on June 1, 2017.  This was the first time that Mr. Youssefzadeh and Mr. Javed learned that all of the Bronzelink-appointed directors to the GIP-Cayman Board were under formal contract to Bronzelink.

224.    On or about June 2, 2017, Mr. Youssefzadeh instructed Chen to independently investigate and assess the issues and conclusions reported in the April 25, 2017 memorandum from the Washington Attorney.

225.    Also on June 2, 2017, Mr. Youssefzadeh re-noticed a meeting of the GIP-Cayman Board of Directors for June 8, 2017, to discuss the two agenda items

**FIRST AMENDED COMPLAINT**

1   listed above.  As before, the Board meeting was noticed as a telephonic meeting, with

2   Mr. Youssefzadeh, Mr. Javed, Chen and Liu participating from their residences or

3   offices in Southern California.  But Fan and Wong, acting as agents of DONG YIN,

4   and the other Board members under their control, again refused to participate in the

5   board meeting, again denying a quorum.

6       226.   On or about June 5, 2017, Wong and Tang, acting as agents of

7   DONG YIN, met with Mr. Youssefzadeh and Mr. Javed at the GIP offices in

8   El Segundo, California.  During this meeting, Wong, acting as an agent of

9   DONG YIN, stated that he was in charge of GIP-Cayman and had the authority to

10   make decisions about the governance, direction and management of the company.

11   Additionally, Wong instructed Mr. Youssefzadeh and Mr. Javed that there were no

12   issues involving the GIP-Cayman's compliance with the export control laws and that

13   they should not concern themselves with such issues.  Neither Wong nor Tang,

14   however, offered any explanation or basis for why there were no compliance issues,

15   which, as they well knew, was not the case.

16       227.   Mr. Youssefzadeh and Mr. Javed told Wong and Tang that they believed

17   there were serious compliance issues and that the GIP-Cayman Board of Directors

18   needed to address them immediately.  Wong, acting as an agent of DONG YIN, told

19   Plaintiffs that they could either be directors or executives of GIP-Cayman, but could

20   no longer hold both positions.  Plaintiffs are informed and believe, and based thereon

21   allege, that Wong and Tang were sent to this meeting by Fan, in his capacity as an

22   agent of DONG YIN, and that Wong told Plaintiffs that they could not remain as both

23   directors and executives at Fan's direction.

24       228.   The resignations of Luo and Zhao created two open positions on the

25   GIP-Cayman Board of Directors.  On or about June 13, 2017, the open positions were

26   filled with two new members: (a) Henry Fan, who had previously worked as an

27   outside consultant for Fan and/or DONG YIN; and (b) Hai Ming Zhang, who had

28   previously been a paid advisor to Bronzelink.  These appointments further cemented

**FIRST AMENDED COMPLAINT**

239671.4

DONG YIN's control and dominance over the governance, management and operations of GIP-Cayman, GIP-USA and the Satellite Project.

229.   On or about June 14, 2017, Fan held a telephone call via Skype with Mr. Youssefzadeh and Mr. Javed, who participated in the call from Washington, D.C. During the telephone conference, Fan, acting as an agent of DONG YIN, declared that there were no export control law compliance issues.  Fan did not offer any explanation or basis for this statement, which, as he well knew, was not the case.  In response, Mr. Youssefzadeh and Mr. Javed stated their disagreement with Fan's assertion, reiterating that it was apparent that there were serious compliance issues.  Fan, acting as an agent of DONG YIN, also reiterated Wong's prior demand that Mr. Youssefzadeh and Mr. Javed resign as either directors or executives of GIP-Cayman, and could no longer hold both positions.

230.   On or about June 14, 2017, Chen provided Mr. Youssefzadeh with a memorandum setting forth his conclusions based on his independent investigation and legal review of the issues raised and addressed in the Washington Attorney's April 25, 2017 memorandum.  Chen's conclusions were reported to the GIP-Cayman Board of Directors.

231.   On or about June 14, 2014, Mr. Youssefzadeh once again noticed a meeting of the GIP-Cayman Board of Directors to discuss the same two agenda items he had attempted to raise previously: compliance with the export control laws and the proposal to engage Citigroup to obtain debt financing.  This time, he noticed the meeting for June 22, 2017, and invited the Washington Attorney to attend the meeting telephonically.  The Board meeting was noticed as a telephonic meeting.  Wong also separately noticed a telephonic meeting for the same date, but did not distribute a competing, or any, agenda.

232.   Mr. Youssefzadeh and Mr. Javed asked that all Board members call on the company's conference bridge.  Fan and Wong, acting as agents of DONG YIN, and the other directors under their control, failed to call in on the company conference

**FIRST AMENDED COMPLAINT**

239671.4

bridge, and while Liu called into the meeting, she quickly disconnected.  As a result, Mr. Youssefzadeh, Mr. Javed and Chen were forced to declare that there was no quorum and cancel the meeting.

233.   Immediately thereafter, Wong, acting as an agent of DONG YIN, released his previously concealed Board meeting agenda and noticed a GIP-Cayman Board meeting for June 29, 2017 in Hong Kong.  His agenda included:  (a) appointing himself as Chairman of the GIP-Cayman Board; (b) accepting the resignations of Mr. Youssefzadeh and Mr. Javed (who did not have resignation offers outstanding); (c) the removal of Chen as the Board Secretary; and (d) the reappointment of Pourmand as the GIP-Cayman CEO.  Wong transmitted this agenda directly and through Chen to Mr. Youssefzadeh's and Mr. Javed's offices in El Segundo, California.

**P.     Mr. Youssefzadeh and Mr. Javed are Constructively Discharged.**

234.   On or about June 26, 2017, Mr. Youssefzadeh resigned his positions as Chief Technical Officer and Chairman of the Management Committees of GIP-Cayman and GIP-USA.  That same day, Mr. Javed resigned his positions as President and Chief Operating Officer of GIP-Cayman and GIP-USA.  Their resignations were effective August 25, 2017.

235.   Both Mr. Youssefzadeh and Mr. Javed had no alternative but to resign from these positions, or else risk becoming accomplices to Defendants' violation of the U.S. export control laws.

236.   In his resignation letter, Mr. Youssefzadeh stated his belief that GIP-Cayman "cannot demonstrate compliance with the export control rules of the United States."  He also noted that he had communicated this problem to the GIP-Cayman Board of Directors, but that, instead of addressing it, the Board had "stonewalled" in an attempt to cover-up its wrongdoing and silence him, Mr. Javed and Chen.

**FIRST AMENDED COMPLAINT**

239671.4

237.   In his resignation letter, Mr. Javed similarly expressed concern with the Board's refusal to address export control law compliance issues.  He further stated that, "Wong has taken full control of the Company and has paralyzed the management structure and its authority," and is "apparently under the control of PRC person[s] and PRC related parties."

238.   Neither Fan, Wong, Liu, nor anyone else, denied the statements made by Mr. Youssefzadeh and Mr. Javed in their resignation letters.

239.   Chen resigned as General Counsel, Senior Vice President and Secretary of GIP-Cayman and GIP-USA on the same day that Mr. Youssefzadeh and Mr. Javed submitted their resignations, June 26, 2017.  Chen's resignation became effective July 25, 2017.

**Q.    The Cover Up Continues.**

240.   On or about July 10, 2017, Wong assembled the GIP-Cayman Board of Directors in Hong Kong and, acting as an agent of DONG YIN, nominated himself as Chairman of the Board.  Before Wong put his nomination to a vote, Mr. Youssefzadeh asked for Wong's qualifications, other than being a relative of a DONG YIN executive.  No answer was forthcoming.  Over the objections of Mr. Youssefzadeh and Mr. Javed, the Bronzelink-appointed directors voted to appoint Wong as Chairman of the Board.

241.   The Board then considered the re-appointment of Pourmand as GIP-Cayman CEO.  Mr. Youssefzadeh objected on the grounds that, pursuant to the SHA, Plaintiffs controlled the decision of who should be appointed CEO.  In response, Fan instructed Wong to adjourn the meeting, to be reconvened on July 17, 2017.

242.   Plaintiffs are informed and believe, and based thereon allege, that Wong and Fan, acting as agents of DONG YIN, agreed that Wong would become the Chairman of the Board of GIP-Cayman and Pourmand the CEO and, with the support of the other Bronzelink-appointed directors, installed Wong and Pourmand in those

**FIRST AMENDED COMPLAINT**

239671.4

positions.  Plaintiffs are further informed and believe, and based thereon allege, that these actions were in furtherance of DONG YIN's plan and efforts to control, dominate and direct the governance, management and operations of GIP-Cayman and GIP-USA.

243.   On or about July 15, 2017, Mr. Youssefzadeh and Mr. Javed emailed Wong a detailed list of questions regarding the relationships between DONG YIN and Bronzelink and its shareholders and officers, for purposes of determining whether GIP-Cayman and GIP-USA were in compliance with ITAR and EAR.

244.   On or about July 16, 2017, Wong, acting as an agent of DONG YIN, responded to the July 15, 2017 email, indicating that the questions posed by Mr. Youssefzadeh and Mr. Javed were "the very same type of questions [Bronzelink's] ITAR lawyer is addressing in his detailed review of Bronzelink," and that "the most proper way forward is for our ITAR lawyer to respond on these points to your ITAR lawyer."  In fact, Plaintiffs never received the promised response, notwithstanding multiple inquiries.

245.   On or about July 17, 2017, Fan and Wong, acting as agents of DONG YIN, put Pourmand's appointment as CEO to a vote.  The GIP-Cayman Board approved him over the objections of Mr. Youssefzadeh and Mr. Javed, who then exercised their right to dismiss Pourmand as a Board member.

246.   In response to a letter from Boeing requesting GIP-Cayman's certification of compliance with ITAR and EAR, on or about July 20, 2017, Pourmand sent a letter to Boeing, falsely stating that "GIP is fully committed to compliance with the Export Administration Regulations ('EAR') and the International Traffic in Arms Regulations ('ITAR')."

247.   With the appointments of Wong as Chairman of the GIP-Cayman Board, Pourmand as CEO and Henry Fan and Hai Ming Zhang as directors, DONG YIN cemented its control and dominance over the governance, management and operations of GIP-Cayman, GIP-USA and the Satellite Project.

**FIRST AMENDED COMPLAINT**

239671.4

248.   On or about July 25, 2017, Wong sent an email to Mr. Javed, further responding to Mr. Youssefzadeh's and Mr. Javed's July 15, 2017 email.  Wong, acting as an agent of DONG YIN, indicated that the matters raised in that email were currently being reviewed in detail by counsel, specializing in export control laws, that Bronzelink had retained ("Bronzelink's Compliance Counsel").  Wong stated that "we expect that the answers to [the questions in the July 15, 2017 email] and the nature and extent of any changes or improvements that may be required or suggested will be determined by the Company upon receipt of [the Washington Attorney's and Bronzelink's Compliance Counsel's] reports which are to be provided by August 11, 2017."

249.   Wong's statement proved to be yet another false promise.  The GIP-Cayman Board never received any reports prepared by the Washington Law Firm or Bronzelink's Compliance Counsel concerning any of the issues raised in the July 15, 2017 email.

**R.   DONG YIN Alters and Falsifies the Official Minutes from the GIP-Cayman Board of Directors Meetings.**

250.   To further conceal its total control and dominance over GIP-Cayman, DONG YIN, through Wong and Liu, acting as agents of DONG YIN, systematically altered and falsified GIP-Cayman corporate records, including board minutes. For example:

(a)   On or about January 20, 2017, Wong, acting as an agent of DONG YIN, emailed alterations to the minutes of the December 8, 2016 GIP-Cayman Board of Directors meeting to Mr. Javed, removing references to discussions regarding technical satellite program updates, and to Fan's role in leading discussions concerning ECA financing, the GIP-Cayman business plan and sales and marketing.  Plaintiffs are informed and believe, and based thereon allege, that Wong sought to doctor these corporate records to hide evidence of DONG YIN's control of

239671.4

GIP-Cayman and to avoid any questions about whether the export control laws were violated when DONG YIN and its agents received technical information and data concerning the Satellite Project.

(b)     On or about April 20 and 21, 2017, a GIP-Cayman Board meeting was held in Hong Kong, during which Wong was purportedly appointed "Executive Director" for the specific purpose of facilitating communications between the GIP-Cayman Management Committee and the Board of Directors concerning various operational and management matters. It was noted in the draft minutes that Wong was not an officer of GIP-Cayman, and that the title did not bestow any additional authority on Wong. These limitations, however, were not reflected in the final version of the minutes prepared by Liu, acting as an agent of DONG YIN, and adopted by the Board after July 2017.

(c)     The final version of the minutes of the April 2017 Board meeting was altered by Liu. Acting as an agent of DONG YIN, she falsely stated that Wong had been authorized to require Chen, as the Board Secretary, to submit draft minutes to Wong for his modifications and "comment" prior to circulation to the other Board members, including Mr. Youssefzadeh and Mr. Javed.

(d)     During the July 7, 2017 GIP-Cayman Board meeting, Pourmand was appointed GIP-Cayman CEO by the Bronzelink-controlled GIP-Cayman Board, in disregard of Plaintiff's veto rights. In his closing statements, Pourmand denied that GIP-Cayman had any compliance issues, stating that it was "Bronzelink's God given right" to do as it pleased. These remarks were omitted from the formal minutes that Liu prepared.

251.    On or about September 13, 2017, the GIP-Cayman Board of Directors approved the minutes of their April and July 2017 Board meetings that had been altered and falsified as described above.

**FIRST AMENDED COMPLAINT**

239671.4

**S.     DONG YIN Attempts to Purchase Plaintiffs' Silence.**

252.   At Wong's request, Plaintiffs met two DONG YIN consultants, Michael Altwein and Pin Fen Miao, on or about November 16, 2017 at the GIP-USA offices in El Segundo, California.  The consultants informed Mr. Youssefzadeh and Mr. Javed that DONG YIN wanted them to remain involved in GIP-Cayman and would reward them if they did not pursue the export control law compliance issues. Mr. Altwein specifically asked Mr. Youssefzadeh and Mr. Javed: "What does it take to entice you to keep you in the company if you both are willing to back off and stop further pursuit and insistence on compliance?"  Mr. Youssefzadeh and Mr. Javed declined this offer and terminated the meeting.

**T.     Defendants' Continuing Deception and Their Violations of U.S. Export Control Laws.**

253.   Defendants have continued to conceal and disguise DONG YIN's ownership and control of the Satellite Project and its access to confidential and sensitive satellite and launch technology and data that is subject to U.S. export control laws to the present day.

254.   Plaintiffs are informed and believe, and based thereon allege, that Defendants, and each of them, have willfully and knowingly violated ITAR and EAR, in violation of Title 22, United States Code, section 2778 and Title 50, United States Code, section 4610.  Plaintiffs are also informed and believe, and based thereon allege, that Defendants, and each of them, conspired and agreed with each other, and with others known and unknown to Plaintiffs, to violate the export control laws, in violation of Title 18, United States Code, section 371.

**U.     Summary of Defendants' Wrongful Conduct.**

255.   As described in this First Amended Complaint ("FAC"), Defendants DONG YIN, COAMI and CHANG, acting through their agents and employees, succeeded in their plan for DONG YIN to seize control and dominance over the

239671.4

1  Satellite Project from Plaintiffs through the following false, fraudulent and dishonest

2  means:

3      (a)   Falsely representing to Plaintiffs that COSEIG was an independent

4            company and not under DONG YIN's control;

5      (b)   Falsely representing to Plaintiffs that Bronzelink was an independent

6            company and not under DONG YIN's control;

7      (c)   Falsely denying to Plaintiffs that TechCap held an interest in the

8            anticipated transaction between COSEIG and Plaintiffs;

9      (d)   Misrepresenting to and concealing from Plaintiffs that Wong, Liu and

10           others were agents of DONG YIN, acting under Fan's control;

11     (e)   Controlling and directing the Board of Directors of GIP-Cayman;

12     (f)   Controlling and directing the Board of Directors of GIP-USA;

13     (g)   Secretly negotiating a contract with Pourmand to be compensated far

14           above industry standards as the CEO of GIP-Cayman;

15     (h)   Appointing Liu as the Controller for GIP-Cayman and GIP-USA;

16     (i)   Giving the GIP-Cayman Board of Directors, which was under Fan's

17           control, the ability to control decisions that should have been made by

18           GIP-Cayman executives, such as Mr. Youssefzadeh and Mr. Javed, rather

19           than directors;

20     (j)   Having Fan and Wong, acting as agents of DONG YIN, make decisions

21           independently of the GIP-Cayman Board of Directors as if they ran the

22           company;

23     (k)   Appointing Wong the Executive Director and then the Chairman of the

24           GIP-Cayman Board;

25     (l)   Retaliating against Mr. Youssefzadeh, Mr. Javed and Chen for

26           questioning whether GIP-Cayman and GIP-USA were under the control

27           of the PRC;

28

**FIRST AMENDED COMPLAINT**

239671.4

(m)   Retaliating against Mr. Youssefzadeh, Mr. Javed and Chen for warning that GIP-Cayman and GIP-USA were not in compliance with ITAR, EAR and the PRC Proscription;

(n)   Having secret contracts with Bronzelink-appointed directors;

(o)   Bypassing the GIP-Cayman Compensation Committee to compensate the Bronzelink-appointed Directors at far above industry standards;

(p)   Buying Luo's loyalty by dramatically overpaying him for acting as the Chairman of the GIP-Cayman Board;

(q)   After Luo and Zhao resigned, replacing them with new directors who were advisors or consultants to DONG YIN and Bronzelink;

(r)   Refusing to convene board meetings to discuss GIP-Cayman's corporate governance and export control law compliance issues;

(s)   Forcing the resignations of Mr. Youssefzadeh, Mr. Javed and Chen;

(t)   Reappointing Pourmand as GIP-Cayman CEO over Plaintiffs' objections, despite their veto of the appointment and notwithstanding his demonstrated incompetence in that position;

(u)   Altering and falsifying the minutes from GIP-Cayman board meetings to hide Defendants' malfeasance;

(v)   Concealing and disguising DONG YIN'S role as more than a lender and its plan and efforts to obtain ownership and control of the Satellite Project;

(w)   Willfully and knowingly violating ITAR, EAR and the PRC Proscription; and

(x)   Conspiring and agreeing with each other and others known and unknown to Plaintiff, to violate U.S. export control laws.

**FIRST AMENDED COMPLAINT**

239671.4

**V.      Summary of Money and Property Lost and Stolen.**

256.   Defendants' wrongful conduct caused Plaintiffs to suffer losses of their money and to their property, including, without limitation:

(a)    Control of the Satellite Project that they had spent years developing;

(b)    A 75% ownership interest in GIP-Cayman, the parent corporation of GIP-USA and Dub Dub (including 47.25% of GIP-Cayman that had been previously owned by Plaintiffs);

(c)    The benefits of the contracts they had negotiated with Boeing and SpaceX;

(d)    The benefits of the insurance terms that they had negotiated;

(e)    Confidential and proprietary reports, studies, designs, analyses and other documents and information that Plaintiffs prepared, or had prepared, at their expense, including

   i.     Plaintiffs' design of the 7.7 ton state of the art satellite;

   ii.    Plaintiffs' confidential business plan; and

   iii.   Plaintiffs' confidential marketing studies.

(f)     Plaintiffs' intellectual property, including the Global-IP trademark; and

(g)    The opportunity for Plaintiffs to obtain a share of the projected US$1.5 billion or more in anticipated profits from the Satellite Project when completed and the satellite is operational.

**FIRST CAUSE OF ACTION**

**(For Conspiracy to Defraud)**

**(By Plaintiffs Against All Defendants)**

257.   Plaintiffs repeat and reallege paragraphs 1 through 256 of this FAC as if fully alleged herein.

**A.      Formation and Operation of the Conspiracy.**

258.   Beginning in or about December 2015, and continuing until the present, DONG YIN, CHANG and COAMI, together with COSEIG, Amore, Bronzelink,

72

**FIRST AMENDED COMPLAINT**

239671.4

TechCap, the Washington Law Firm, the Washington Attorney and others known and unknown to Plaintiffs, and each of them, conspired and agreed to:

(a)  Make misrepresentations regarding important facts, as described further throughout this FAC, knowing that the representations were false or misleading and intending that Plaintiffs would rely upon them;

(b)  Make false promises regarding important matters, as described further throughout this FAC, with no intention of performing those promises and intending that Plaintiffs would rely upon them;

(c)  Conceal and withhold from Plaintiffs important facts that they had a duty to disclose, as described further throughout this FAC, knowingly and with the intent to deceive Plaintiffs; and

(d)  Obtain ownership and control of Plaintiffs' property comprising the Satellite Project by theft, including theft by trick and theft by false pretenses, as described further throughout this FAC.

259.  Plaintiffs acted reasonably in relying upon the false and misleading representations, false promises and undisclosed facts in, among other things, relinquishing ownership and control of the Satellite Project, including 75% of their ownership interest in GIP-Cayman, and the property comprising that Project, including confidential and sensitive reports, studies, analyses, designs, data, intellectual property, contracts, rights, title and interests, as described throughout this FAC.

**B.    Wrongful Acts in Furtherance of the Conspiracy.**

260.  On or about the dates indicated below, DONG YIN, CHANG and COAMI, together with COSEIG, Amore, Bronzelink, the Washington Law Firm, the Washington Attorney and others known and unknown to Plaintiffs, and each of them, committed, caused and aided and abetted the following acts, among others, in furtherance of and to accomplish the objectives of the conspiracy:

**FIRST AMENDED COMPLAINT**

239671.4

Act No. 1:  On October 5, 2015, Ivan Chow sent an email to Mr. Youssefzadeh falsely representing that neither he nor his company, COSEIG, had any affiliation with TechCap and its associates.

Act No. 2:  On or about October 14, 2015, Ivan Chow sent an email to Mr. Javed enclosing a letter from his company's lawyer, falsely certifying that COSEIG's shareholders and management did not have any connection with TechCap, and that COSEIG did not have any existing agreement or business exchanges with TechCap.

Act No. 3:  In or about October 2015, Ivan Chow falsely represented to Mr. Youssefzadeh and Mr. Javed that DONG YIN did not own or control COSEIG.

Act No. 4:  On or about December 3, 2015, Ivan Chow falsely represented to Mr. Youssefzadeh and Mr. Javed that COSEIG had no desire or intention of becoming involved in GIP-Cayman operations.

Act No. 5:  On or about December 4, 2015, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Youssefzadeh signed the COSEIG JVA on behalf of STM Atlantic.

Act No. 6:  On or about December 4, 2015, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Youssefzadeh signed the COSEIG JVA on behalf of himself.

Act No. 7:  On or about December 4, 2015, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Javed signed the COSEIG JVA on behalf of himself.

Act No. 8:  On or about December 16, 2015, Ivan Chow emailed Mr. Javed, falsely representing that COSEIG's sole shareholder and director was Pok Kit Chow, when, in fact, Pok Kit Chow was merely the nominal owner of COSEIG and acting on behalf of DONG YIN.

Act No. 9:  On or about January 28, 2016, Ivan Chow emailed Mr. Youssefzadeh, Mr. Javed and Pourmand, on behalf of Fan, that COSEIG's

**FIRST AMENDED COMPLAINT**

239671.4

$250 million financial proposal had been formally approved by DONG YIN, creating the false and misleading impression that COSEIG and DONG YIN were independent, unrelated entities, when, in fact, COSEIG was controlled and dominated by DONG YIN.

Act No. 10:  Between in or about late January and early February 2016, the Washington Attorney told Mr. Javed that COSEIG would be swapped out in the JVA for another,  yet to be identified company, and falsely promising that DONG YIN would have no control or influence over GIP-Cayman.

Act No. 11:  On or about February 16, 2016, CHANG falsely represented to Mr. Youssefzadeh, Mr. Javed and Pourmand that after the closing: (a) DONG YIN would have no control over GIP-Cayman; (b) it had no intention of controlling or seeking to influence GIP-Cayman; and (c) it was relying on Mr. Youssefzadeh and Mr. Javed to run the business.

Act No. 12:  On or about February 21, 2016, the Washington Attorney emailed Mr. Youssefzadeh, Mr. Javed, Fan and others, noting that, as a general matter, the parties needed to be mindful of any direct or indirect PRC influence or control over GIP-Cayman, via board members or otherwise, while concealing and failing to disclose that the Washington Law Firm was negotiating a confidential Facility Agreement between Amore and Bronzelink that would give the PRC control over GIP-Cayman's Board of Directors.

Act No. 13:  On or about February 23, 2016, Fan, Henry Fan and their attorneys disclosed for the first time the identity of the new company, Bronzelink, to Mr. Youssefzadeh, Mr. Javed and others, falsely representing that Bronzelink was an independent, stand-alone entity with no affiliation to DONG YIN.

Act No. 14:  On or about February 25, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Youssefzadeh signed the Bronzelink JVA on behalf of STM Atlantic.

**FIRST AMENDED COMPLAINT**

239671.4

Act No. 15:  On or about February 25, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Youssefzadeh signed the Bronzelink JVA on behalf of himself.

Act No. 16:  On or about February 25, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Javed signed the Bronzelink JVA on behalf of himself.

Act No. 17:  On or about March 9, 2016, Amore appointed four individuals to its Board of Directors, all of whom were closely affiliated with DONG YIN or COAMI, in furtherance of its plan and efforts to gain and exercise control and dominance over the governance, management and operation of GIP-Cayman.

Act No. 18:  On or about March 15, 2016, Amore and Bronzelink executed the Facility Agreement, but did not disclose its terms to Plaintiffs.

Act No. 19:  On or about March 15, 2016, the Washington Attorney emailed Mr. Youssefzadeh and Mr. Javed: (a) stating that his law firm was DONG YIN's counsel and thus could not represent Bronzelink, creating the false and misleading impression that DONG YIN and Bronzelink were independent, stand-alone companies; and (b) confirmed that the Facility Agreement had been signed, but concealed and failed to disclose that material terms of the Facility Agreement were in conflict with the intended Bronzelink SHA.

Act No. 20:  On or about March 28, 2016, the Washington Attorney responded to a request for written confirmation that DONG YIN was providing financing to Bronzelink, stating, "[g]iven our stated concerns regarding the role of DY as a lender, and the need to attenuate PRC interests in both BL and GIP, having a letter from DY or its counsel 'on the record' does not serve the interests of any of the parties to this transaction."

Act No. 21:  On or about April 5, 2016, the Washington Attorney provided his comments to the SPA, representing that he had intended to align the conditions precedent set forth in the SPA with the terms of the Facility Agreement, but failing to

**FIRST AMENDED COMPLAINT**

1  disclose that other material terms of the SPA were contrary to, inconsistent with, or

2  undermined by the Facility Agreement.

3      Act No. 22:  On or about April 5, 2016, both David Zhang of DONG YIN and

4  the Washington Attorney stated that DONG YIN understood that any PRC control or

5  influence, directly or indirectly, would be in violation of U.S. laws, falsely

6  representing and promising that DONG YIN had no intention or plan of exerting

7  control over GIP-Cayman.

8      Act No. 23:  On or about May 11, 2016, Bronzelink executed the SPA, the SHA

9  and the First Amendment to the SHA.  To conceal DONG YIN's intention and plan to

10  gain and exercise control and dominance over the Satellite Project, neither

11  DONG YIN, Amore, nor COAMI were signatories to the SPA, the SHA, or the SHA

12  Amendment.

13      Act No. 24:  On or about May 11, 2016, in reliance on the false and fraudulent

14  representations and promises of DONG YIN's agents, Mr. Youssefzadeh signed the

15  SPA, the SHA and the SHA Amendment on behalf of STM Atlantic.

16      Act No. 25:  On or about May 11, 2016, in reliance on the false and fraudulent

17  representations and promises of DONG YIN's agents, Mr. Youssefzadeh signed the

18  SPA, the SHA and the SHA Amendment on behalf of himself.

19      Act No. 26:  On or about May 11, 2016, in reliance on the false and fraudulent

20  representations and promises of DONG YIN's agents, Mr. Javed signed the SPA, the

21  SHA and the SHA Amendment on behalf of himself.

22      Act No. 27:  On or about May 11, 2016, Yang Zeng of DONG YIN falsely

23  represented to Mr. Javed that DONG YIN was merely a lender to Bronzelink, and

24  that, after the closing, DONG YIN would not have any control over or seek to

25  influence GIP-Cayman governance, direction, management, or operations.

26      Act No. 28:  On or about May 31, 2016, the Washington Attorney falsely

27  represented to Mr. Javed that: (a) four of the Bronzelink-appointed directors—Liu,

28  Zheng, Luo and Zhao—were completely independent of and had no affiliation to

77
**FIRST AMENDED COMPLAINT**

239671.4

DONG YIN; (b) since there would be four independent Bronzelink-appointed directors and three Common directors, GIP-Cayman would have solid protection from PRC control and influence; and (c) although Wong worked for Bronzelink, he was not affiliated with DONG YIN.

Act No. 29:  On or about June 2, 2016, Fan (a) falsely represented and promised to Mr. Javed that DONG YIN and Bronzelink were completely different entities and were not related; (b) falsely represented and promised that after the closing, DONG YIN would not have control over or any say in GIP-Cayman's direction and operations; and (c) falsely represented and promised Mr. Javed that, after the closing, Bronzelink would have an independent Board of Directors that would make all of the decisions free of DONG YIN's influence.

Act No. 30:  On or about June 3, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Youssefzadeh signed the closing documents for the SHA on behalf of STM Atlantic.

Act No. 31:  On or about June 3, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Youssefzadeh signed the closing documents for the SHA on behalf of himself.

Act No. 32:  On or about June 3, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Javed signed the closing documents for the SHA on behalf of himself.

Act No. 33:  On or about June 3, 2016, Bronzelink caused HSBC Bank to execute a wire transfer of $25 million from Hong Kong to GIP-Cayman's HSBC account in California.

Act No. 34:  On or about July 29, 2016, after the Boeing LOI was finalized, Luo, as the Chairman of the GIP-Cayman Board, deferred the decision to execute the LOI, stating in an email that "[he] would like Mr. Fan/DONG YIN to review/agreed [sic][the Letter of Intent] before we move on."

**FIRST AMENDED COMPLAINT**

Act No. 35:  On or about November 18, 2016, Tang emailed Mr. Javed requesting confidential and sensitive technical information about the Satellite Project.

Act No. 36:  On or about November 20, 2016, Tang falsely assured Plaintiffs that the sensitive technical information he had requested was intended to be "used internally for monitoring the general progress of the company."

Act No. 37:  Beginning in or about January 2017, to buy Luo's loyalty, he was paid $140,000 annually for serving as a GIP-Cayman director.

Act No. 38:  On or about January 20, 2017, Wong emailed alterations to the minutes of the December 8, 2016 GIP-Cayman Board of Directors meeting to Mr. Javed, removing references to a discussion concerning technical satellite program updates and to Fan having led the discussions about ECA financing, the GIP-Cayman business plan, and sales and marketing.

Act No. 39:  On or about April 27, 2017, Wong telephoned Mr. Javed to express his displeasure at not having been given an opportunity to preview and comment on the April 25, 2017 memorandum on export control laws prepared by the Washington Law Firm, prior to its distribution to the GIP-Cayman Board of Directors.

Act No. 40:  In preparing the final version of the minutes of the April 2017 GIP-Cayman Board meeting, Liu altered them to falsely state that Wong had been authorized to require Chen, as the Board Secretary, to submit draft minutes to Wong for his modifications and "comment" prior to circulation to the other Board members.

Act No. 41:  On or about May 24, 2017, Mr. Youssefzadeh noticed a special meeting of the GIP-Cayman Board of Directors, but Wong responded that all of the Bronzelink-appointed directors were unavailable.

Act No. 42:  On or about May 25, 2017, Fan sent an email to Mr. Javed, falsely denying that Wong was his proxy.

Act No. 43:  On or about May 30, 2017, Fan sent an email to Mr. Javed, copying the other members of the GIP-Cayman Board of Directors, in which he denied Mr. Javed's allegation that governance of the Board was extremely defective.

**FIRST AMENDED COMPLAINT**

1
2
3

Act No. 44:  On or about June 2, 2017, Wong again thwarted Mr. Youssefzadeh's efforts to call a special meeting of the GIP-Cayman Board of Directors to discuss the company's lack of compliance with U.S. export control laws.

4
5
6
7
8

Act No. 45:  On or about June 5, 2017, Wong and Tang, as agents of DONG YIN, met with Mr. Youssefzadeh and Mr. Javed, at which time Wong falsely stated there were no issues concerning GIP-Cayman's compliance with the export control laws and that Mr. Youssefzadeh and Mr. Javed should not concern themselves with such issues.

9
10
11
12

Act No. 46:  During the aforementioned June 5, 2017 meeting, Wong, as an agent of DONG YIN, told Mr. Youssefzadeh and Mr. Javed that they could be directors or executives of GIP-Cayman, but that they could no longer hold both positions.

13
14
15

Act No. 47:  On or about June 13, 2017, Bronzelink selected two directors to fill the vacancies on the GIP-Cayman Board of Directors, both of whom had allegiances to and took their direction from DONG YIN.

16
17
18

Act No. 48:  On or about June 14, 2017, Fan held a telephone call via Skype with Mr. Youssefzadeh and Mr. Javed during which he falsely stated that there were no export control law compliance issues.

19
20
21

Act No. 49:  During the aforementioned June 14, 2017 telephone call, Fan informed Mr. Youssefzadeh and Mr. Javed that they had to resign as either directors or executives, and could not continue to hold both positions.

22
23
24

Act No. 50:  On or about June 20, 2017, Wong sent an email to Mr. Javed, copying Mr. Youssefzadeh and others, falsely denying that his role and actions as a GIP-Cayman director were subject to PRC influence.

25
26
27
28

Act No. 51:  On or about June 22, 2017, Fan, Wong and other GIP-Cayman directors under their control refused to participate in a Board of Directors meeting that Mr. Youssefzadeh had noticed to discuss, among other things, compliance with U.S. export control laws.

**FIRST AMENDED COMPLAINT**

239671.4

Act No. 52:  On or about July 10, 2017, at a GIP-Cayman Board meeting, Wong was appointed Chairman of the Board over the objections of Mr. Youssefzadeh and Mr. Javed, with all six of the Bronzelink-appointed directors voting in favor of Wong's appointment.

Act No. 53:  During the aforementioned July 10, 2017 Board meeting, Pourmand was appointed the CEO of GIP-Cayman, over the objection and veto of Mr. Youssefzadeh and Mr. Javed, with all six of the Bronzelink-appointed directors voting in favor of Pourmand's appointment.

Act No. 54:  On or about July 16, 2017, Wong responded to a July 15, 2017 email from Mr. Javed, altogether ignoring questions raised by Mr. Javed relating to DONG YIN's control over GIP-Cayman.

Act No. 55:  On or about July 18, 2017, at a GIP-Cayman Board of Directors meeting called by the Bronzelink-appointed directors, Wong indicated that since the issue of compliance with U.S. export control laws was not on the agenda, it would not be discussed.

Act No. 56:  In preparing the minutes of the July 18, 2017 GIP-Cayman Board meeting, Liu omitted all reference to discussions concerning compliance with U.S. export control laws or questions about DONG YIN's affiliation with Bronzelink.

Act No. 57:  On July 20, 2017, Pourmand sent a letter to Boeing, falsely stating that, "GIP is fully committed to compliance with the Export Administration Regulations ('EAR') and the International Traffic in Arms Regulations ('ITAR')."

Act No. 58:  On or about September 4, 2017, Liu distributed the minutes that she had prepared of the July 18, 2017 GIP-Cayman Board meeting, which were falsified to omit any mention of the Board's refusal to discuss export control law compliance issues beyond Pourmand's denial that there were any such issues.

Act No. 59:  On or about September 13, 2017, the Bronzelink-appointed directors approved and adopted the altered and falsified minutes of the April and July 2017 GIP-Cayman Board meetings.

**FIRST AMENDED COMPLAINT**

239671.4

**C.    Resulting Damages.**

261.   As a direct and proximate result of the conspiracy to defraud, Plaintiffs were damaged in an amount to be determined at trial.

262.   In engaging into the conspiracy to defraud Plaintiffs, Defendants acted fraudulently, oppressively, maliciously and with a willful and conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to exemplary and punitive damages pursuant to California Civil Code section 3294.

**SECOND CAUSE OF ACTION**

**(For Fraud)**

**(By Plaintiffs Against All Defendants)**

263.   Plaintiffs repeat and reallege paragraphs 1 through 262 of this FAC as if fully alleged herein.

**A.    Misrepresentations and False Promises.**

264.   Beginning in or about July 2015, and continuing until the present, Defendants, and each of them, made and caused others to make the following misrepresentations and false promises, among others, to Plaintiffs, knowing that they were false and misleading and with the intention that Plaintiffs would rely upon them:

***[As to U.S. Export Control Laws.]***

(a)    That DONG YIN intended to comply with the U.S. export control laws, when, in fact, DONG YIN always intended and planned to obtain confidential and sensitive satellite and launch technology and data in violation of those laws;

(b)    That DONG YIN intended to comply with the U.S. export control laws, when, in fact, DONG YIN was conspiring with the other Defendants, together with others, to violate those laws;

**FIRST AMENDED COMPLAINT**

239671.4

*[As to DONG YIN's Role in the Governance,*
*Management and Operations of GIP-Cayman.]*

(c) That DONG YIN did not intend to exercise control and influence over GIP-Cayman, when, in fact, DONG YIN always intended and planned to control, dominate and direct the governance, management and operations of GIP-Cayman;

(d) That DONG YIN did not intend to have any direct dealings with GIP-Cayman, when, in fact, DONG YIN always intended and planned to place its agents on the GIP-Cayman Board of Directors to gain control, dominate and direct the governance, management and operations of GIP-Cayman;

(e) That DONG YIN was relying on Mr. Youssefzadeh and Mr. Javed to run GIP-Cayman after the closing, when, in fact, it always intended and planned that its agents would control, dominate and direct the governance, management and operations of GIP-Cayman;

(f) That four of the Bronzelink-appointed members of the GIP-Cayman Board of Directors would be independent of DONG YIN, when, in fact, there were never four independent Bronzelink-appointed Board members and Defendants never intended the Bronzelink-appointed Board members to be independent of DONG YIN;

(g) That Bronzelink-appointed directors Wong, Liu and Zheng were independent of and unaffiliated with DONG YIN, when, in fact, each of them was an agent of DONG YIN;

(h) That the GIP-Cayman Board of Directors would not be under the influence and control of the PRC, when, in fact, the PRC, through DONG YIN, Amore and Bronzelink, intended and planned to control, dominate and direct the GIP-Cayman Board of Directors;

**FIRST AMENDED COMPLAINT**

239671.4

*[As to COSEIG and its Relationship*
*With DONG YIN and TechCap.]*

(i)    That DONG YIN did not own or control COSEIG, when, in fact, COSEIG was under the control, dominance and direction of DONG YIN;

(j)    That COSEIG was an independent company 100% owned by Pok Kit Chow, when, in fact, Pot Kit Chow was merely a nominal owner acting on behalf of DONG YIN;

(k)    That Pot Kit Chow was a wealthy businessman and investor from Hong Kong, when, in fact, he was neither wealthy nor a *bona fide* investor;

(l)    That DONG YIN's only role in the transaction between Plaintiffs and COSEIG would be as a lender to COSEIG, when, in fact, COSEIG was under the control, dominance and direction of DONG YIN;

(m)    That COSEIG did not have any affiliation, agreements, or business dealings with TechCap and its associates, when, in fact, TechCap had been promised a 12% interest in COSEIG for its role in that transaction;

*[As to Bronzelink and its*
*Relationship With DONG YIN.]*

(n)    That Bronzelink was an independent, stand-alone entity that did not have any affiliation with DONG YIN, when, in fact, it was under the control, dominance and direction of DONG YIN;

(o)    That Bronzelink would have an independent Board of Directors that would make all decisions free of DONG YIN's control and influence, when, in fact, the Bronzelink Board consisted of agents of DONG YIN and was always under the control of and took direction from DONG YIN;

(p)    That Bronzelink's execution and performance of its obligations under the SHA would "not violate . . . any agreement or instrument to which it is

84
**FIRST AMENDED COMPLAINT**

239671.4

subject," when, in fact, the execution and performance of its obligations under the SHA violated the terms of the Facility Agreement;

(q)   That Bronzelink was an independent entity that had "the power to execute [and] perform its obligations under and enter into all transactions contemplated by [the SHA]," when, in fact, under the Facility Agreement Bronzelink could not perform all of its obligations and enter into all of the transactions contemplated by the SHA;

(r)   That upon demand Bronzelink would provide its shares in GIP-Cayman as collateral to support a financing arrangement with an ECA or another lender, when, in fact, Bronzelink could not provide its shares in GIP-Cayman as collateral because it had already given Amore a charge over them; and

### *[As to Project Financing.]*

(s)   That GIP-Cayman would have the ability to secure additional financing from a lender other than an ECA, when, in fact, under the Facility Agreement, Bronzelink had agreed that GIP-Cayman could only raise additional funds through financing provided by an ECA.

265.   All of the above representations and promises, and each of them, were important because they would have influenced a reasonable person's judgment or conduct, and Defendants knew that they were likely to influence Plaintiffs' judgment and conduct.

266.   Plaintiffs, and each of them, would have acted differently if they had known that these representations and promises were false.

**B.   Concealment of Material Facts.**

267.   At all relevant times, Defendants, and each of them, owed Plaintiffs a duty of disclosure by virtue of the existence of one or more of the following circumstances:

(a)   To the extent Defendants made any disclosures to Plaintiffs, they

85

**FIRST AMENDED COMPLAINT**

239671.4

disclosed only some facts, but intentionally withheld or caused others to withhold other facts, making the disclosures misleading;

(b) Defendants intentionally failed, or caused others to fail, to disclose important facts that were known to them, and which Plaintiffs could not have discovered on their own; and

(c) Defendants actively concealed and caused others to conceal important facts from Plaintiffs or acted to prevent them from discovering such facts.

268. Beginning in or about July 2015, Defendants, and each of them, intentionally concealed, withheld and failed to disclose, and caused others to conceal, withhold and fail to disclose, the following facts, with the intent to deceive Plaintiffs:

*[As to DONG YIN's Relationships*
*With COSEIG and Bronzelink.]*

(a) At all relevant times, DONG YIN exercised control and dominance over COSEIG;

(b) At all relevant times, Pot Kit Chow was merely the nominal owner of COSEIG acting on behalf of DONG YIN;

(c) At all relevant times, DONG YIN exercised control and dominance over Bronzelink;

*[As to DONG YIN's Role in the Governance,*
*Management and Operations of GIP-Cayman.]*

(d) DONG YIN never intended merely to provide debt financing to COSEIG or Bronzelink, but at all relevant times intended and planned to acquire and exercise control over the governance, management and operations of GIP-Cayman through its dominance and control of COSEIG and Bronzelink;

(e) Fan was appointed to the GIP-Cayman Board of Directors for the purpose of enabling DONG YIN to control, dominate and direct the governance, management and operations of GIP-Cayman;

**FIRST AMENDED COMPLAINT**

239671.4

(f)  At all relevant times, Wong, Liu and Zheng were agents of DONG YIN acting under Fan's control and direction;

*[As to The Facility Agreement.]*

(g)  The Facility Agreement between Bronzelink and Amore gave Amore the power to approve four of the five directors to the Bronzelink Board of Directors;

(h)  Bronzelink was required to appoint the four directors approved by Amore to the GIP-Cayman Board of Directors;

(i)  The Facility Agreement requires Bronzelink to provide Amore with free access at all reasonable times to the GIP-Cayman premises, assets, books, accounts and records;

(j)  The Facility Agreement provides that Amore has the right to meet with the GIP-Cayman senior management upon request;

(k)  The Facility Agreement requires GIP-Cayman to obtain Amore's approval for any contracts in excess of $1,000,000;

(l)  The Facility Agreement gives Amore the right to engage a financial advisor, technical consultant, marketing consultant and tax expert for GIP-Cayman, at GIP-Cayman's expense;

(m)  The Facility Agreement requires Bronzelink to use its control of GIP-Cayman to prevent GIP-Cayman from entering into any joint ventures;

(n)  The Facility Agreement requires Bronzelink to use its control of GIP-Cayman to prevent GIP-Cayman from obtaining debt financing through any lender other than an ECA; and

(o)  The Facility Agreement requires Bronzelink to use its control of GIP-Cayman to prevent GIP-Cayman from creating a stock option pool.

**FIRST AMENDED COMPLAINT**

239671.4

269.   All of these facts, and each of them, were important in that they would have influenced a reasonable person's judgment or conduct, and Defendants knew that their disclosure was likely to influence Plaintiffs' judgment and conduct.

270.   Plaintiffs, and each of them, would have acted differently if they had known of these undisclosed facts.

**C.   Resulting Damages.**

271.   As a direct and proximate result of Defendants' misrepresentations, false promises and concealment and withholding of important information, Plaintiffs were damaged in an amount to be determined at trial.

272.   In making these false and misleading representations and false promises, and in concealing, withholding and not disclosing these facts, Defendants acted fraudulently, oppressively, maliciously and with a willful and conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to exemplary and punitive damages pursuant to California Civil Code section 3294.

**THIRD CAUSE OF ACTION**

**(For Violation of California Penal Code Section 496)**

**(By Plaintiffs Against DONG YIN)**

273.   Plaintiffs repeat and reallege paragraphs 1 through 272 of this FAC as if fully alleged herein.

274.   California Penal Code section 496(c) provides, in relevant part, that "[a]ny person who has been injured by a violation of subdivision (a) . . . may bring an action for three times the amount of the actual damages, if any, sustained by the plaintiff, cost of suit, and reasonable attorney's fees."

275.   California Penal Code section 496(a) provides, in relevant part, that "[e]very person who receives any property that has been stolen or that has been obtained in any manner constituting theft . . . knowing the property to be so stolen or obtained, or who conceals, . . . withholds, or aids in concealing . . . or withholding any

property from the owner, knowing the property to be so stolen or obtained, [is guilty of a criminal offense]."

276.   California Penal Code section 484 defines "theft" to include: (a) theft by trick, which involves obtaining possession of another's property with his or her consent by fraud or deceit; and (b) theft by false pretenses, which involves obtaining possession and ownership of another's property by false or fraudulent representations or promise.

277.   In or about June 2016, DONG YIN and its agents stole and received the following property from Plaintiffs by fraud, deceit and false pretenses, as described herein: control of the Satellite Project; the tangible and intellectual property comprising the Satellite Project; a 47.25% ownership interest in GIP-Cayman previously owned by Plaintiffs; and the confidential and proprietary information, documentation and data developed as part of the Satellite Project.

278.   In obtaining and receiving this stolen property, DONG YIN and its agents acted knowingly with the intent to steal Plaintiffs' property and receive stolen property, and to conceal, withhold and aid in the concealment and withholding of the property stolen from Plaintiffs.

279.   As a direct and proximate result of these violations of California Penal Code section 496(a), Plaintiffs have been injured in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**

**(For Civil RICO in Violation of**

**Title 18, United States Code, Sections 1962(b) and 1964(c))**

**(By Plaintiffs Against All Defendants)**

280.   Plaintiffs repeat and reallege paragraphs 1 through 279 of this FAC as if fully alleged herein.

281.   Title 18, United States Code, section 1962(b) provides, in relevant part, that "[i]t shall be unlawful for any person through a pattern of racketeering activity . . .

89

**FIRST AMENDED COMPLAINT**

1   to acquire or maintain, directly or indirectly, any interest in or control of any

2   enterprise . . . .”

3       282.   Title 18, United States Code, section 1961(4) defines the term

4   “enterprise” to include “any individual, partnership, or other legal entity, and any . . .

5   group of individuals associated in fact although not a legal entity.”

6       283.   Title 18, United States Code, section 1964(c), provides, in relevant part,

7   that “[a]ny person injured in his business or property be reason of a violation of

8   section 1962 of this chapter may sue thereafter . . . and shall recover threefold the

9   damages he sustains and the cost of the suit, including a reasonable attorney’s

10   fee . . . .”

11       284.   At all relevant times, each Plaintiff was a “person” within the meaning of

12   Title 18, United States Code, sections 1961(3) and 1964(c).

13       285.   At all relevant times, DONG YIN, COAMI, CHANG, COSEIG, Amore,

14   Bronzelink, GIP-Cayman, GIP-USA, Dub Dub and the Washington Law Firm were

15   each a “person” within the meaning of Title 18, United States Code, section 1961(3).

16   **A.   The “Victim Enterprise.”**

17       286.   At all relevant times, STM Atlantic, STM Group, Emil Youssefzadeh,

18   Umar Javed, GIP-Cayman, GIP-USA and Dub Dub were a group of persons

19   associated together for the common purpose of generating legitimate income, revenue

20   and profits by developing and working toward completion of the Satellite Project, and

21   constituted an association-in-fact enterprise within the meaning of Title 18,

22   United States Code, section 1961(4) (the “Victim Enterprise”).

23       287.   At all relevant times, the Victim Enterprise was engaged in, and its

24   activities affected, interstate and foreign commerce in that, among other things, it was

25   involved in acts and transactions occurring in, among other places, California,

26   Washington, D.C., the Cayman Islands and Hong Kong.

27

28

**FIRST AMENDED COMPLAINT**

239671.4

**B.     The Racketeering Acts.**

288.   Beginning in or about July 2015 and continuing until the present, DONG YIN, together with COAMI, CHANG, COSEIG, Amore and Bronzelink, acquired and maintained, directly and indirectly, an interest in and/or control of the Victim Enterprise through a pattern of racketeering activity, as described below, in violation of Title 18, United States Code, section 1962(b).

**1.     *Wire Fraud.***

289.   Title 18, United States Code, section 1343 provides in relevant part that, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representation, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice [is guilty of a criminal offense]."

290.   Beginning in or about July 2015 and continuing until the present, DONG YIN, COAMI and CHANG, together with COSEIG, Amore, Bronzelink and the Washington Law Firm and each of them, acting through their agents, including Fan, Wong, Liu and others, knowingly and with intent to defraud, devised, participated in and executed a scheme and artifice to defraud Plaintiffs and to obtain their money and property by means of materially false and fraudulent pretenses, representations and promises and the concealment of material facts, as described throughout this FAC.

291.   On or about the dates set forth below, for purposes of carrying out such scheme or artifice, DONG YIN, COAMI and CHANG, together with COSEIG, Amore, Bronzelink and the Washington Law Firm, and each of them, caused the following transmissions by wire or radio communication in interstate and foreign commerce, among others, in violation of Title 18, United States Code, section 1343:

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| **One** | Oct. 5, 2015 | Ivan Chow sent an email to Mr. Youssefzadeh, stating that he was the newly appointed sole representative for Geng Zhiyuan and Yang Zeng of DONG YIN related to Global IP. |
| **Two** | Oct. 5, 2015 | Ivan Chow sent a false and misleading email to Mr. Youssefzadeh representing that neither he nor his company, COSEIG, had any affiliation with TechCap and its associates. |
| **Three** | Oct. 14, 2015 | Ivan Chow sent a false and misleading email to Mr. Javed, enclosing a letter from his company's lawyer, certifying that COSEIG's shareholders and management did not have any connection with TechCap and that COSEIG did not have any existing agreement or business exchanges with TechCap. |
| **Four** | Dec. 16, 2015 | Ivan Chow sent a false and misleading email to Mr. Javed, representing that COSEIG's sole shareholder and director was Pok Kit Chow. |
| **Five** | Jan. 28, 2016 | Ivan Chow sent a false and misleading email to Mr. Youssefzadeh, Mr. Javed and Pourmand, on behalf of Fan, representing that COSEIG's $250 million financial proposal had been formally approved by DONG YIN. |
| **Six** | Jan. – Feb. 2016 | Between late January and early February 2016, DONG YIN's Washington Attorney telephoned Mr. Javed in California, and falsely promised that DONG YIN would have no control or influence over GIP-Cayman. |
| **Seven** | Feb. 16, 2016 | In a telephone conference, CHANG falsely represented and promised Mr. Youssefzadeh, Mr. Javed and Pourmand that after the closing: (1) DONG YIN would have no control of GIP-Cayman; (2) it had no intention of controlling or influencing GIP-Cayman; and (3) it was relying on Mr. Youssefzadeh, Mr. Javed, or Pourmand to run the business. |

**FIRST AMENDED COMPLAINT**

239671.4

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| **Eight** | Feb. 21, 2016 | The Washington Attorney sent a false and misleading email to Mr. Youssefzadeh, Mr. Javed, Fan and others, noting that, as a general matter, parties need to be mindful of any direct or indirect PRC influence or control of GIP-Cayman, via board members or otherwise. |
| **Nine** | Mar. 15, 2016 | The Washington Attorney sent a false and misleading email to Mr. Youssefzadeh and Mr. Javed, stating that his law firm was DONG YIN's counsel and could not act for Bronzelink, and confirming that the Facility Agreement had been signed. |
| **Ten** | Mar. 28, 2016 | The Washington Attorney sent an email responding to a request for written confirmation that DONG YIN was providing financing to Bronzelink, stating, "[g]iven our stated concerns regarding the role of DY as a lender, and the need to attenuate PRC interests in both BL and GIP, having a letter from DY or its counsel 'on the record' does not serve the interests of any of the parties to this transaction." |
| **Eleven** | Apr. 3, 2016 | Henry Fan sent an email to Mr. Youssefzadeh and Mr. Javed, among others, attaching drafts of the SPA and SHA. |
| **Twelve** | Apr. 5, 2016 | The Washington Attorney sent a false and misleading email, providing his comments to the SPA, and representing that he had intended to align the conditions precedent set forth in the SPA with the terms of the Facility Agreement between DONG YIN and Bronzelink. |

**FIRST AMENDED COMPLAINT**

239671.4

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| **Thirteen** | May 31, 2016 | In a telephone call between the Washington Attorney and Mr. Javed, the Washington Attorney falsely represented that: (1) four of the Bronzelink-appointed directors were completely independent of and unaffiliated with DONG YIN; (2) with four independent Bronzelink-appointed directors and three Common directors, GIP-Cayman would have solid protection from PRC influence and control; and (3) although Wong worked for Bronzelink, he was not affiliated with DONG YIN. |
| **Fourteen** | Jun. 2, 2016 | In a telephone call from Fan to Mr. Javed, Fan falsely represented that: (1) DONG YIN and Bronzelink were two completely different entities and were unrelated; (2) after the closing, DONG YIN would not have control of or any say in any GIP-Cayman matters; and (3) after the closing, Bronzelink would have an independent Board of Directors that would make all the decisions free of DONG YIN's influence. |
| **Fifteen** | Jun. 3, 2016 | Bronzelink caused HSBC Bank to execute a wire transfer of $25 million from its bank in Hong Kong to GIP-Cayman's HSBC account in California, as part of Bronzelink's payment for its controlling interest in GIP-Cayman. |

**2.** ***International Money Laundering.***

292.   Title 18, United States Code, section 1956(a)(2) provides in relevant part that, **"**[w]hoever transports, transmits, or transfers . . . funds . . . to a place in the United States from or through a place outside the United States . . . [¶] [w]ith the intent to promote the carrying on of specified unlawful activity [is guilty of a criminal offense]."

293.   On or about June 3, 2016, in violation of Title 18, United States Code, section 1956(a)(2)(A ), DONG YIN and Bronzelink, knowingly conducted and conspired to conduct the wire transfer of $25,000,000 from a place outside the

**FIRST AMENDED COMPLAINT**

239671.4

United States (Bronzelink's Hong Kong bank account) to a place in the United States (GIP-Cayman's HSBC bank account in California) with the intent to promote the carrying on of Specified Unlawful Activity, namely, wire fraud in violation of Title 18, United States Code, section 1343.

**C.    Injury to Business and Property.**

294.   By reason of the foregoing violations of Title 18, United States Code, section 1962(b), Plaintiffs have been injured in their business and property in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**

**(For Civil RICO Conspiracy in Violation of**

**Title 18, United States Code, Sections 1962(d) and 1964(c))**

**(By Plaintiffs Against All Defendants)**

295.   Plaintiffs repeat and reallege paragraphs 1 through 294 of this FAC as if fully alleged herein.

296.   Title 18, United States Code, section 1962(d) provides, in relevant part, that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection[] . . . (b) . . . of this section [1962]."

297.   Beginning in or about July 2015 and continuing until the present, DONG YIN, COAMI and CHANG, together with COSEIG, Amore, Bronzelink and TechCap, and each of them, knowingly and willfully conspired and agreed to:

    (a)   Violate Title 18, United States Code, section 1962(b), by acquiring and maintaining, directly and indirectly, an interest in or control of the Victim Enterprise through the pattern of racketeering activity described in the Fourth Cause of Action; and

    (b)   Commit two or more of the racketeering acts of wire fraud and money laundering described in the Fourth Cause of Action, knowing of the essential nature and scope of the Victim Enterprise and intending to acquire or maintain an interest in or control of it.

95

**FIRST AMENDED COMPLAINT**

239671.4

298.   GIP-Cayman joined the conspiracy in or about June 2016, and GIP-USA joined the conspiracy in or about August 2016, when DONG YIN assumed control of them.

299.   By reason of the foregoing violations of Title 18, United States Code, section 1962(d), Plaintiffs have been injured in their business and property in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**

**(For Civil RICO in Violation of**

**Title 18, United States Code, Sections 1962(c) and 1964(c))**

**(By Plaintiffs Against All Defendants)**

300.   Plaintiffs repeat and reallege paragraphs 1 through 299 of this FAC as if fully alleged herein.

301.   Title 18, United States Code, section 1962(c) provides, in relevant part, that "[i]t shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

**A.     The Criminal Enterprise.**

302.   At all relevant times, DONG YIN, COAMI and CHANG, together with COSEIG, Amore, Bronzelink, TechCap, the Washington Law Firm and others known and unknown to Plaintiffs, were a group of persons associated for the common purpose of defrauding Plaintiffs of their ownership interests and control of the Satellite Project, and constituted an association-in-fact enterprise within the meaning of Title 18, United States Code, section 1961(4) (the "Criminal Enterprise"). GIP-Cayman joined the Criminal Enterprise in or about June 2016, and GIP-USA joined the Criminal Enterprise in or about August 2016, when DONG YIN assumed control of them.

**FIRST AMENDED COMPLAINT**

239671.4

303.   At all relevant times, the Criminal Enterprise was engaged in, and its activities affected, interstate and foreign commerce as alleged in the Fourth Cause of Action.

**B.     The Racketeering Acts.**

304.   Beginning in or about July 2015 and continuing until the present, DONG YIN, COAMI and CHANG, together with COSEIG, Amore, Bronzelink, TechCap and the Washington Law Firm, and subsequently GIP-Cayman and GIP-USA, and each of them, being employed by or associated with the Criminal Enterprise, conducted and participated in the conduct of the affairs of the Criminal Enterprise, directly and indirectly, through a pattern of racketeering activity that included the acts of wire fraud and money laundering described in the Fourth Cause of Action, in violation of Title 18, United States Code, section 1962(c).

**C.     Injury to Business and Property.**

305.   By reason of the foregoing violations of Title 18, United States Code, section 1962(c), Plaintiffs have been injured in their business and property in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**

**(For Civil RICO Conspiracy in Violation of**

**Title 18, United States Code, Sections 1962(d) and 1964(c))**

**(By Plaintiffs Against All Defendants)**

306.   Plaintiffs repeat and reallege paragraphs 1 through 305 of this FAC as if fully alleged herein.

307.   Beginning in or about July 2015 and continuing until the present, DONG YIN, COAMI and CHANG, together with COSEIG, Amore, Bronzelink, TechCap and the Washington Law Firm, and each of them, knowingly and willfully conspired and agreed to:

   (a)     Violate Title 18, United States Code, section 1962(c), by conducting the
           affairs and participating in the conduct of the affairs of the Criminal

97

**FIRST AMENDED COMPLAINT**

239671.4

Enterprise, directly and indirectly, through the pattern of racketeering activity described in the Fourth Cause of Action; and/or

(b)    Commit two or more of the racketeering acts of wire fraud and money laundering described in the Fourth Cause of Action, knowing of the essential nature and scope of the Criminal Enterprise and intending to participate in it.

308.    GIP-Cayman joined the conspiracy in or about June 2016, and GIP-USA joined the conspiracy in or about August 2016, when DONG YIN assumed control of them.

309.    By reason of the foregoing violations of Title 18, United States Code, section 1962(d), Plaintiffs have been injured in their business and property in an amount to be determined at trial.

**EIGHTH CAUSE OF ACTION**

**(For Interference with Prospective Business Advantage)**

**(By Plaintiffs Against DONG YIN)**

310.    Plaintiffs repeat and reallege paragraphs 1 through 309 of this FAC as if fully alleged herein.

311.    In or about February 2016, Plaintiffs entered into an economic relationship with Bronzelink, in which Bronzelink would substitute for COSEIG and enter into a transaction to provide financing for the Satellite Project in exchange for equity in GIP-Cayman and other consideration, as described above.  That economic relationship was substantially likely to result in economic benefits to Plaintiffs, including a share of the projected US$1.5 billion or more in anticipated profits if the Satellite Project was brought to fruition.

312.    In or about March 2016, DONG YIN caused Amore to enter into the secret Facility Agreement with Bronzelink, which contained provisions that were contrary to and inconsistent with DONG YIN's representations and promises to Plaintiffs, and which prevented Bronzelink from providing the benefits that Plaintiffs

98

**FIRST AMENDED COMPLAINT**

were substantially certain to receive under their intended transaction with Bronzelink. Specifically, the Facility Agreement:

  (a)  Gives DONG YIN, through Amore, access to and control over GIP-Cayman and the Satellite Project;

  (b)  Undermines Plaintiffs' ability to obtain additional financing necessary to complete the Satellite Project by preventing GIP-Cayman from obtaining financing through any source other than an ECA; and

  (c)  Places limitations and restrictions on the operations of GIP-Cayman that were never disclosed to Plaintiffs and to which Plaintiffs would never have agreed.

313.  In entering into the Facility Agreement, and at all relevant times prior to on or about June 3, 2016, DONG YIN knew of Plaintiffs' prospective economic relationship with Bronzelink.

314.  In entering into the Facility Agreement, DONG YIN intended to interfere with Plaintiffs' economic relationship with Bronzelink, or knew that its conduct was substantially certain to interfere with that relationship.

315.  In fact, DONG YIN did interfere with Plaintiffs' economic relationship with Bronzelink.  In particular, although Bronzelink entered into the SPA and the SHA on or about May 10, 2016, its performance under those contracts has been undermined and substantially diminished by its contrary and inconsistent obligations to Amore and DONG YIN under the Facility Agreement.

316.  As a direct and proximate result of DONG YIN's knowing and intentional interference with Plaintiffs' prospective economic relationship with Bronzelink, Plaintiffs have suffered damages in an amount to be determined at trial.

317.  By engaging in the conduct described in this cause of action, DONG YIN acted fraudulently, oppressively, maliciously and with a willful and conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to exemplary and punitive damages pursuant to California Civil Code section 3294.

**FIRST AMENDED COMPLAINT**

# NINTH CAUSE OF ACTION

## (For Violation of California Unfair Competition Law,

## California Business & Professions Code Section 17200)

### (By Plaintiffs Against All Defendants)

318.   Plaintiffs repeat and reallege paragraphs 1 through 317 of this FAC as if fully alleged herein.

319.   California's Unfair Competition Law, California Business and Professions Code section 17200, *et seq*. (the "UCL"), creates a statutory private right of action for "unfair competition," which is defined to include "any unlawful, unfair or fraudulent business act or practice . . . ."

320.   Beginning in or about October 2015, and continuing until the present, Defendants, and each of them, engaged in unlawful, unfair and fraudulent business acts and practices in violation of the UCL as described more fully above.

321.   Defendants, and each of them, engaged in, aided and abetted and conspired to commit the following *unlawful* business acts and practices, among others, in violation of the UCL:

(a)   Willfully violating ITAR and EAR, in violation of  Title 22, United States Code, section 2778 and Title 50, United States Code, section 4610;

(b)   Conspiring to violate ITAR and EAR, in violation of Title 18, United States Code, section 371;

(c)   Committing wire fraud, in violation of Title 18, United States Code, section 1343;

(d)   Engaging in international money laundering, in violation of Title 18, United States Code, section 1956(a)(2);

(e)   Violating and conspiring to violate RICO, in violation of Title 18, United States Code, sections 1962(b), (c) and (d);

**FIRST AMENDED COMPLAINT**

239671.4

1          (f)     Obtaining and receiving stolen property, in violation of California

2                  Penal Code section 494(a); and

3          (g)     Engaging in the tort of deceit, in violation of California Civil Code

4                  section 1709.

5          322.    Defendants, and each of them, also engaged in, aided and abetted and

6   conspired to commit the following *unfair* business practices, among others, in

7   violation of the UCL:

8          (a)     Causing Amore to enter into the secret Facility Agreement with

9                  Bronzelink that gave DONG YIN, through Amore, the ability to place its

10                 agents on the Board of Directors of GIP-Cayman and GIP-USA; gave

11                 DONG YIN ownership and control of GIP-Cayman, GIP-USA and the

12                 Satellite Project; interfered with Plaintiffs' ability to obtain the additional

13                 financing necessary to complete the Satellite Project; and placed

14                 limitations and restrictions on the operations of GIP-Cayman that were

15                 never disclosed to Plaintiffs and to which Plaintiffs never agreed;

16         (b)     Placing agents of DONG YIN on the Board of Directors of GIP-Cayman;

17         (c)     Placing agents of DONG YIN on the Board of Directors of GIP-USA;

18         (d)     Concealing from Plaintiffs that Wong, Liu and others were agents of

19                 DONG YIN acting under Fan's control and direction;

20         (e)     Causing GIP-Cayman to enter into an employment agreement with

21                 Pourmand without Plaintiffs' say or approval and which paid Pourmand

22                 far in excess of his value;

23         (f)     Causing GIP-Cayman to enter into contracts to compensate the

24                 Bronzelink-appointed directors on the GIP-Cayman and GIP-USA

25                 Boards of Directors without obtaining the approval of the GIP-Cayman

26                 Compensation Committee;

27

28

**FIRST AMENDED COMPLAINT**

239671.4

(g) Overcompensating Jason Luo, the Chairman of the GIP-Cayman Board of Directors, without the approval of the GIP-Cayman Compensation Committee;

(h) Permitting Fan and Wong, as individual directors at GIP-Cayman, to make business decisions and exercise authority typically reserved for the company's executive officers;

(i) Permitting Fan and Wong to make business decisions independent of the GIP-Cayman Board of Directors as a whole, which Fan and Wong did not have the authority to make as individual directors;

(j) Appointing Wong Executive Director of GIP-Cayman without the authority to do so;

(k) Retaliating against Mr. Youssefzadeh and Mr. Javed for questioning whether the PRC, through DONG YIN, controlled GIP-Cayman in violation of U.S. export control laws;

(l) Causing the resignations of Luo and Zhao as directors of GIP-Cayman;

(m) Replacing Luo and Zhao as directors of GIP-Cayman with agents of DONG YIN, who were under the control of and took their direction exclusively from Fan;

(n) Causing Wong to be appointed Chairman of the GIP-Cayman Board of Directors;

(o) Reappointing Pourmand as CEO, over Mr. Youssefzadeh's and Mr. Javed's objection and veto;

(p) Refusing to convene duly noticed meetings of the GIP-Cayman Board of Directors to discuss and address the issue of whether GIP-Cayman's corporate governance, management and operations were in compliance with U.S. export control laws;

**FIRST AMENDED COMPLAINT**

239671.4

(q)     Refusing to convene duly noticed meetings of the GIP-Cayman Board of
Directors to consider and resolve whether to engage Citigroup to obtain
the next tranche of debt financing;

(r)     Forcing Mr. Youssefzadeh and Mr. Javed to resign as executives of
GIP-Cayman and GIP-USA;

(s)     Forcing Chen's resignation as General Counsel of GIP-Cayman;

(t)     Altering and falsifying minutes of GIP-Cayman Board of Director
meetings;

(u)     Preparing records of GIP-Cayman Board of Director meetings that
omitted important information and made the records false and
misleading;

(v)     Offering to pay Plaintiffs for not pursuing the issue of whether
DONG YIN was in violation of U.S. export control laws;

(w)     Gaining and exercising control and dominance over the governance,
management and operations of GIP-Cayman by the false, fraudulent and
dishonest means described herein;

(x)     Gaining and exercising control and dominance over the governance,
management and operations of GIP-USA by the false, fraudulent and
dishonest means described herein;

(y)     Gaining and exercising control and dominance over the Satellite Project
by the false, fraudulent and dishonest means described herein; and

(z)     Concealing and disguising DONG YIN's ownership and control of
GIP-Cayman, GIP-USA and the Satellite Project and its access to
confidential and sensitive satellite and launch technology and data
subject to U.S. export control laws.

323.    Defendants, and each of them, also engaged in, aided and abetted and
conspired to commit the following *fraudulent* business acts and practices, among
others, in violation of the UCL:

**FIRST AMENDED COMPLAINT**

239671.4

(a)     Falsely representing that DONG YIN's role in the transactions at issue was as a lender and limited to providing indirect debt financing for the Satellite Project;

(b)     Falsely representing to Plaintiffs that DONG YIN did not intend to exercise control or exert influence over GIP-Cayman's governance, management and operations;

(c)     Falsely representing to Plaintiffs that DONG YIN did not intend to have any direct dealings with GIP-Cayman;

(d)     Falsely representing to Plaintiffs that DONG YIN was relying on Mr. Youssefzadeh and Mr. Javed to run GIP-Cayman after the closing;

(e)     Falsely representing to Plaintiffs that the Bronzelink-appointed directors Wong, Liu and Zheng were completely independent of and not affiliated with DONG YIN;

(f)     Falsely representing to Plaintiffs that DONG YIN did not own or control COSEIG;

(g)     Falsely representing to Plaintiffs that COSEIG was an independent company owned by a wealthy Hong Kong investor, Pok Kit Chow;

(h)     Falsely denying to Plaintiffs that TechCap had an interest in the proposed transaction between COSEIG and Plaintiffs;

(i)     Falsely representing to Plaintiffs that Bronzelink was an independent, stand-alone company that did not have any affiliation with DONG YIN; and

(j)     Falsely representing to Plaintiffs in the SHA that Bronzelink had "the power to execute [and] perform its obligations under and enter into all transactions contemplated by [the SHA]".

324.    Plaintiffs have lost money and property as a direct and proximate result of Defendant's unfair, unlawful and fraudulent business acts and practices.  As a

**FIRST AMENDED COMPLAINT**

239671.4

result, Plaintiffs are entitled to restitutionary disgorgement in an amount to be determined at trial.

325.   In addition, Plaintiffs are entitled to injunctive relief, enjoining Defendants, and each of them, from engaging in such further unlawful, unfair and fraudulent business acts and practices.  The requested injunctive relief will benefit the general public as it will prevent Defendants from transferring confidential and sensitive satellite and launch technology and data to the PRC, in violation of ITAR, EAR and the PRC Proscription.

## TENTH CAUSE OF ACTION

### (For Unjust Enrichment)

### (By Plaintiffs Against DONG YIN)

326.   Plaintiffs repeat and reallege paragraphs 1 through 325 of this FAC as if fully alleged herein.

327.   The Satellite Project was the culmination of Mr. Youssefzadeh's and Mr. Javed's combined four decades of experience in the satellite industry.  Between 2008 and 2016, they personally invested thousands of hours and millions of dollars in developing and advancing the Satellite Project.  As a direct result of Plaintiffs' hard work and multi-million-dollar investments, the Satellite Project became a viable enterprise with an estimated profit potential of US$1.5 billion or more over the life of the satellite, with the potential for the development, fabrication, launch and operation of additional communication satellites.

328.   As a consequence, DONG YIN has received valuable benefits from Plaintiffs in the form of ownership and control of the Satellite Project, including contracts, rights, titles and interests; intellectual property; confidential and proprietary information, documentation and data; and a 75% interest in GIP-Cayman, of which 47.25% previously belonged to Plaintiffs.  Furthermore, DONG YIN obtained these benefits by unjust and inequitable means, including false and fraudulent pretenses, representations and promises, the concealment of material facts and theft by trick and

**FIRST AMENDED COMPLAINT**

239671.4

false pretenses.  DONG YIN has been, and is being, unjustly enriched by its retention of those benefits.

329.   Plaintiffs are entitled to be compensated for the value of the benefits that DONG YIN has received and is retaining unjustly, in an amount to be determined at trial.

**ELEVENTH CAUSE OF ACTION**

**(For Imposition of Constructive Trust)**

**(By Plaintiffs Against DONG YIN)**

330.   Plaintiffs repeat and reallege paragraphs 1 through 329 of this FAC as if fully alleged herein.

331.   By reason of the fraudulent, wrongful and criminal manner in which DONG YIN obtained ownership and control of the Satellite Project, it has no legal or equitable right, claim, or interest in that Project or the property comprising it.

332.   Plaintiffs therefore request that the Court impose a constructive trust on DONG YIN's interest in and control of the Satellite Project and any proceeds, directly or indirectly, derived therefrom.  Furthermore, DONG YIN should be required to hold its interest in and control of the Satellite Project, and any proceeds derived therefrom, in trust for Plaintiffs, to provide those proceeds to Plaintiffs, and to restore any and all of its rights, title and interest in and control of the Satellite Project to Plaintiffs.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment against Defendants, as follows:

**As to the First Cause of Action for Conspiracy to Defraud:**

    1.   For compensatory and special damages; and

    2.   For punitive and exemplary damages.

**As to the Second Cause of Action for Fraud:**

    1.   For compensatory and special damages; and

    2.   For punitive and exemplary damages.

**FIRST AMENDED COMPLAINT**

239671.4

**As to the Third Cause of Action for Violation of California Penal Code Section 496:**

    1.     For compensatory and special damages;

    2.     For the trebling of those damages; and

    3.     For Plaintiffs' reasonable costs, including reasonable attorney's fees.

**As to the Fourth Cause of Action for Civil RICO – Victim Enterprise:**

    1.     For compensatory and special damages;

    2.     For the trebling of those damages;

    3.     For punitive and exemplary damages; and

    4.     For Plaintiffs' reasonable costs, including reasonable attorney's fees.

**As to the Fifth Cause of Action RICO Conspiracy –Victim Enterprise:**

    1.     For compensatory and special damages;

    2.     For the trebling of those damages;

    3.     For punitive and exemplary damages; and

    4.     For Plaintiffs' reasonable costs, including reasonable attorney's fees.

**As to the Sixth Cause of Action Civil RICO – Criminal Enterprise:**

    1.     For compensatory and special damages;

    2.     For the trebling of those damages;

    3.     For punitive and exemplary damages; and

    4.     For Plaintiffs' reasonable costs, including reasonable attorney's fees.

**As to the Seventh Cause of Action for RICO Conspiracy – Criminal Enterprise:**

    1.     For compensatory and special damages;

    2.     For the trebling of those damages;

    3.     For punitive and exemplary damages; and

    4.     For Plaintiffs' reasonable costs, including reasonable attorney's fees.

**As to the Eighth Cause of Action for Interference with Prospective Business Advantage:**

    1.     For compensatory and special damages; and

**FIRST AMENDED COMPLAINT**

239671.4

2.    For punitive and exemplary damages.

**As to the Ninth Cause of Action for Violation of the UCL:**

1.    For restitutionary disgorgement; and

2.    For injunctive relief.

**As to the Tenth Cause of Action for Unjust Enrichment:**

1.    To be compensated for the value of any and all benefits conferred by Plaintiffs that DONG YIN has unjustly received and retained.

**As to the Eleventh Cause of Action for a Constructive Trust:**

1.    For the imposition of a constructive trust on any of DONG YIN's rights, title and interest in and control of the Satellite Project and any proceeds derived therefrom.

**For All Causes of Action:**

1.    For prejudgment interest at the maximum rate permitted by law;

2.    For costs of suit; and

3.    For such other and further relief as the Court may deem just and proper.

Dated:  February 25, 2018            **ISAACS | FRIEDBERG LLP**

By:  */s/ Jerome H. Friedberg*
    JEFFREY B. ISAACS, ESQ.
    JEROME H. FRIEDBERG, ESQ.
    PAIGE SHEN, ESQ.
    ROBERT GOOKIN, ESQ.

*Attorneys for Plaintiffs STM Atlantic N.V., STM Group, Inc., Emil Youssefzadeh and Umar Javed*

108
**FIRST AMENDED COMPLAINT**

239671.4

1

## DEMAND FOR JURY TRIAL

2          Plaintiffs STM Atlantic N.V, STM Group, Inc., Emil Youssefzadeh and

3   Umar Javed hereby request a jury trial on all issues properly triable to a jury.

4

5   Dated:  February 25, 2018                    **ISAACS | FRIEDBERG LLP**

6

7                                          By:    */s/ Jerome H. Friedberg*
                                                 _____
8                                                JEFFREY B. ISAACS, ESQ.
                                                 JEROME H. FRIEDBERG, ESQ.
9                                                PAIGE SHEN, ESQ.
                                                 ROBERT GOOKIN, ESQ.
10

11                                               *Attorneys for Plaintiffs STM Atlantic N.V.,*
                                                 *STM Group, Inc., Emil Youssefzadeh and*
12                                               *Umar Javed*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED COMPLAINT**

239671.4