1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2    Including Professional Corporations
   CHARLES L. KREINDLER, Cal. Bar No. 119933
3  ckreindler@sheppardmullin.com
   JENNIFER G. REDMOND, Cal. Bar No. 144790
4  jredmond@sheppardmullin.com
   TRAVIS J. ANDERSON, Cal. Bar No. 265540
5  tanderson@sheppardmullin.com
   333 South Hope Street, 43rd Floor
6  Los Angeles, California 90071-1422
   Telephone: 213.620.1780
7  Facsimile:  213.620.1398

8  Attorneys for Non-Parties Global-IP
   Cayman and Global-IP USA, Inc.
9

10            UNITED STATES DISTRICT COURT

11         CENTRAL DISTRICT OF CALIFORNIA

12

13 | STM ATLANTIC N.V., a Dutch        Case No. 2:18-cv-01269-JLS-JCG
   | company; STM GROUP, INC., a
14 | Delaware corporation; EMIL        **DECLARATION OF BAHRAM
   | YOUSSEFZADEH, an individual; and  POURMAND IN SUPPORT OF
15 | UMAR JAVED, an individual,         GLOBAL IP CAYMAN AND
                                        GLOBAL IP USA, INC.'S** *EX*
16 |          Plaintiffs,              *PARTE* **APPLICATION TO
                                        INTERVENE AND SEAL THE
17 |     v.                             COMPLAINT AND FIRST
                                        AMENDED COMPLAINT**
18 | DONG YIN DEVELOPMENT
   | (HOLDINGS) LIMITED, a Hong Kong   [Filed concurrently with Notice of *Ex
19 | unlimited company; CHINA ORIENT   Parte* Application and Motion;
   | ASSET MANAGEMENT                  Memorandum of Points and Authorities;
20 | (INTERNATIONAL) HOLDING           and [Proposed] Order]
   | LIMITED, a Hong Kong limited
21 | company; and LUDWIG CHANG, an     The Hon. Josephine L. Staton
   | individual,,
22                                     Courtroom:    10A
   |          Defendants.
23

24

25

26

27

28

1     I, Bahram Pourmand, declare as follows:

2

3     1.    I am the Chief Executive Officer of Global-IP Cayman ("GIP

4 Cayman") and its subsidiary, Global IP USA, Inc. ("GIP USA") (collectively,

5 "GIP"). GIP Cayman hired me as CEO on June 22, 2016. I started working for GIP

6 on August 8, 2016, and have worked for GIP ever since. I am not, and have never

7 been, an agent, employee, or representative of Dong Yin. I have personal

8 knowledge of the matters set forth below, unless otherwise specified herein.

9

10     2.    Bronzelink is a 75% owner of GIP Cayman, and appoints a

11 majority of the Board Members to GIP Cayman's Board of Directors. As GIP's

12 majority owner, Bronzelink from time to time receives privileged and/or

13 confidential information from GIP.

14

15     3.    GIP operates in the aerospace industry—a highly complex and

16 competitive market with significant capital requirements and regulatory oversight.

17 GIP regularly receives and generates information that is sensitive, confidential, and

18 proprietary. GIP takes a number of measures to protect this information, including

19 but not limited to providing access to such information only on a "need-to-know"

20 basis, maintaining password protections on its computers, and entering into non-

21 disclosure agreements with its employees and business partners. Examples of GIP's

22 confidential and proprietary information include its contracts with its business

23 partners Boeing and SpaceX. These contracts are stamped "Proprietary" (Boeing)

24 and "Proprietary and Confidential" (SpaceX). The contracts contain robust

25 nondisclosure agreements which prohibit the parties from disclosing information

26 that has been shared between the parties to the contract except as specifically set

27 forth in the contracts for the limited purposes permissible under the contracts. GIP

28 also takes care to maintain confidentiality with respect to its business strategy, plans

1  and operations, as the satellite industry is highly competitive. For this reason,

2  among others, GIP maintains its Board meeting agendas and minutes as confidential

3  business information and does not disclose them to third parties (unless necessary

4  for business reasons and pursuant to a nondisclosure agreement).

5

6          4.     Plaintiffs Emil Youssefzadeh ("Youssefzadeh") and Umar Javed

7  ("Javed") (collectively, the "Individual Plaintiffs") were directors of GIP Cayman

8  when I joined GIP, and they remained directors until they resigned from their

9  director positions on or about February 25, 2018. The Individual Plaintiffs also

10  served as executives of GIP USA from November 15, 2015 until they resigned on

11  June 26, 2017.

12

13          5.     Both Individual Plaintiffs signed multiple confidentiality

14  agreements obligating them to not publicly disclose GIP's confidential information.

15  They each signed Employee Proprietary Information Agreements ("EPIA") with

16  GIP obligating them to "keep confidential" and "not disclose or make any use of"

17  any of the Company's confidential business information. A true and correct copy

18  of their EPIAs are attached hereto as **Exhibit A**. They further agreed, upon

19  termination of employment, to "promptly surrender" and "deliver to the Company"

20  all confidential information of the Company. *Id.* The EPIAs are governed by

21  California law. *Id.* In addition, they each signed a Shareholders Agreement in

22  connection with their substantial equity interests in GIP Cayman. The Shareholders

23  Agreement is governed by the law of England and Wales, contains a dispute

24  resolution provision obligating the parties to resolve disputes through final and

25  binding arbitration in Hong Kong administered by the Hong Kong International

26  Arbitration Centre ("HKIAC") under the HKIAC Administered Arbitration Rules,

27  and contains yet another confidentiality provision requiring them to keep

28  confidential business information of Global IP Cayman confidential while they

1  remain a shareholder and for two years thereafter.  The form and content of the
2  Shareholders Agreement are considered confidential business information of GIP.
3  Both Javed and Youssefzadeh are also bound by the confidentiality provisions set
4  forth in GIP's Employee Handbook, as well as its Code of Business Conduct and
5  Ethics for Employees, Officers, and Directors.  True and correct copies of the
6  relevant portions of GIP's Employee Handbook and Code of Business Conduct and
7  Ethics for Employees, Officers, and Directors are attached hereto as **Exhibits B and**
8  **C**.

9

10       6.      Throughout my time with GIP, GIP has used the law firm of
11  Milbank, Tweed, Hadley & McCloy LLP, including Partner Dara Panahy
12  (collectively "Milbank"), for the purpose of obtaining confidential legal advice.  In
13  the course and scope of its engagement as counsel for GIP, Milbank prepared a
14  confidential legal memorandum for GIP dated April 25, 2017 (the "Milbank
15  Memo"), and thereafter circulated it to GIP for purposes of providing GIP
16  confidential legal advice.

17

18       7.      I received a copy of the Milbank Memo on or about April 25,
19  2017, in my capacity as a member of the board of directors of GIP and as the GIP
20  CEO.  In those capacities, I reviewed the Milbank Memo and discussed its contents
21  with other GIP executives and directors in confidential settings, for the purpose of
22  assessing what, if any, measures GIP should take in response to the Milbank Memo.
23  I consider the Milbank Memo to be a confidential, privileged communication from
24  GIP's counsel, and I have treated it as such.  I have never disclosed the Milbank
25  Memo or its contents to anyone outside of GIP.  To my knowledge, except for the
26  Individual Plaintiffs, all GIP Board Members and executives have treated the
27  Milbank Memo and its contents confidentially and kept them internal to GIP or
28  Bronzelink.  I am not aware of anyone at GIP disclosing the Milbank Memo or its

1  contents to anyone outside of GIP, including to anyone at Dong Yin, except for the
2  Individual Plaintiffs.  To my knowledge, the Individual Plaintiffs are the only GIP
3  Board Members and executives who have disclosed portions of the Milbank Memo
4  and GIP's internal discussions of same, without authorization, in their Complaint
5  and First Amended Complaint.

6

7      8.    On or about November 21, 2016, GIP hired Chris Chen to serve
8  as GIP's in-house general counsel.  Chen remained GIP's in-house counsel until his
9  resignation, effective July 26, 2017.  Chen's duty as general counsel was to obtain,
10  develop, and provide confidential legal advice to GIP.  In the course and scope of
11  his work as general counsel, Chen prepared a confidential legal memorandum for
12  GIP dated June 14, 2017 (the "Chen Memo"), and thereafter circulated it to GIP for
13  purposes of providing GIP confidential legal advice.

14

15      9.    I received a copy of the Chen Memo on or about June 14, 2017,
16  in my capacity as a member of the board of directors of GIP and as the GIP CEO.
17  In those capacities, I reviewed the Chen Memo and discussed its contents with other
18  GIP directors and executives in confidential settings, for the purpose of determining
19  what, if any, measures GIP should take in response to the Chen Memo.  I consider
20  the Chen Memo to be a confidential, privileged communication from GIP's counsel,
21  and I have treated it as such.  I have never disclosed the Chen Memo or its contents
22  to anyone outside of GIP.  Except for the Individual Plaintiffs, I believe that all GIP
23  Board members and executives have treated the Chen Memo and its contents
24  confidentially and kept them internal to GIP or Bronzelink, its majority owner.  I am
25  not aware of anyone at GIP disclosing the Chen Memo or its contents to anyone
26  outside of GIP, including to anyone at Dong Yin, except for the Individual
27  Plaintiffs.  The Individual Plaintiffs disclosed portions of the Chen Memo and GIP's

28

1  discussions of same, without authorization, in their Complaint and First Amended
2  Complaint.
3
4         10.    To the extent that there have been communications between GIP
5  and its business partners Boeing Satellite Systems International (GIP's satellite
6  provider) and SpaceX (GIP's satellite launch provider) regarding export control
7  compliance, those communications were made during a time period when the parties
8  had and continue to have a shared interest in export control compliance (particularly
9  in the context of the allegations being raised by the Individual Plaintiffs and the
10 multiple lawsuits that they have filed), the communications were reasonably
11 necessary to further that shared interest, and the communications were made on a
12 confidential basis pursuant to the parties' nondisclosure agreements.  I have not
13 disclosed the Chen Memo, the Milbank Memo, or their contents, to Boeing or
14 SpaceX, and I have not directed anyone to do so.
15
16        I declare under penalty of perjury under the laws of the United States
17 that the foregoing is true and correct.  Executed on the _16th_ day of March, 2018, in
18 Los Angeles, California.
19
20
21 DATED: 16 / 03 / 2018
22                                                 BAHRAM POURMAND
23
24
25
26
27
28

**EXHIBIT A**

**GLOBAL IP USA INC.**

**EMPLOYEE PROPRIETARY INFORMATION AGREEMENT**

In consideration and as a condition of my employment, or continued employment, by Global IP USA Inc. and/or by companies which it owns, controls, or is affiliated with, or their successors in business (hereafter referred to as the "Company"), and the compensation paid therefore:

1. **Confidentiality.** I agree to keep confidential, except as the Company may otherwise consent in writing, and not to disclose or make any use of except for the benefit of the Company, at any time, either during or subsequent to my employment, any trade secrets, confidential information, knowledge, data, or other information of the Company relating to products, process, know-how, designs, formulas, test data, customer lists, business plans, marketing plans and strategies, pricing strategies, or other subject matter pertaining to any business of the Company or any of its clients, customers, consultants, licensees, or affiliates, which I may produce, obtain, or otherwise acquire during the course of my employment, except as herein provided. I further agree not to deliver, reproduce, or in any way allow any such trade secrets, confidential information, knowledge, data, or other information, or any documentation relating thereto to be delivered or used by any third parties without specific direction or consent of a duly authorized representative of the Company. I acknowledge that I have been informed that I have rights under 18 U.S.C. Section 1833(b) which states in part: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that – (A) is made  (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal."  Nothing in this Agreement is intended by Company to conflict with or create liability for actions taken that are permitted under 18 U.S.C. Section 1833(b).

2. **Conflicting Employment/Return of Confidential Material.** I agree that during my employment with the Company, I will not engage in any other employment, occupation, consulting or other activity relating to the business in which the Company is now or may hereafter become engaged or which would otherwise conflict with my obligations to the Company. In the event of my termination of employment with the Company for any reason whatsoever, I agree to promptly surrender and deliver to the Company all records, materials, equipment, drawings, documents, and data of any nature pertaining to any invention, trade secret, or confidential information of the Company or to my employment, and I will not take with me any description containing or pertaining to any confidential information, knowledge or data of the Company which I may produce or obtain during the course of my employment. In the event of the termination of my employment, I agree to sign and deliver the "Termination Certificate" attached hereto as Exhibit A.

3. **Assignment of Inventions.** I hereby assign and transfer to the Company my entire right, title and interest in and to all inventions (as used in this Agreement, "inventions" shall include but not be limited to ideas, improvements, designs and discoveries) whether or not patentable and whether or not reduced to practice, made or conceived by me (whether made

solely by me or jointly with others) during the period of my employment with the Company, which relate in any manner to the actual or demonstrably anticipated business, work, or research and development of the Company or its subsidiaries, or result from or are suggested by any task assigned to me or any work performed by me for or on behalf of the Company or its subsidiaries. I agree that all such inventions are the sole property of the Company provided.

4.     **Disclosure of Inventions and Patents.**   I agree that in connection with any "invention" as defined in Paragraph 3 above:

a)     I will disclose such invention promptly in writing to my immediate superior at the Company, with a copy to the Chief Executive Officer, in order to permit the Company to claim rights to which it may be entitled under this Agreement.  Such disclosure shall be received in confidence by the Company.

b)     I will, at the Company's request, promptly execute a written assignment of title to the Company for any invention required to be assigned by Paragraph 3 ("assignable invention") and I will preserve any such assignable invention as confidential information of the Company.

c)     Upon request, I agree to assist the Company or its nominee (at its expense) during and at any time subsequent to my employment in every reasonable way to obtain for its own benefit patents and copyrights for such assignable inventions in any and all countries, which inventions shall be and remain the sole and exclusive property of the Company or its nominee whether or not patented or copyrighted.  I agree to execute such papers and perform such lawful acts as the Company deems to be necessary to allow it to exercise all rights, title and interest in such patents and copyrights.

5.     **Execution of Documents.**   In connection with Paragraph 4(c), I further agree to execute, acknowledge, and deliver to the Company or its nominee upon request and at its expense all such documents, including applications for patents and copyrights and assignments of inventions, patents and copyrights to be issued therefore, as the Company may determine necessary or desirable to apply for and obtain letters, patents and copyrights on such assignable inventions in any and all countries and/or to protect the interests of the Company or its nominee in such inventions, patents and copyrights, and to vest title thereto in the Company or its nominee.

6.     **Maintenance of Records.**   I agree to keep and maintain adequate and current written records of all inventions made by me (in the form of notes, sketches, drawings) and as may be specified by the Company, which records shall be available to and remain the sole property of the Company at all times.

7.     **Prior Inventions**.   It is understood that all inventions, if any, patented or unpatented, which I made prior to my employment by the Company are excluded from the scope of this Agreement. To preclude any possible uncertainty, I have set forth on Exhibit B attached hereto a complete list of all my prior inventions, including numbers of all patents and patent applications, and a brief description of all unpatented inventions which are not the property of a previous employer. I represent and covenant that the list is complete and that, if no items are on the list, I have no such prior inventions. I agree to notify the Company in writing

before I make any disclosure or perform any work on behalf of the Company which appears to threaten or conflict with proprietary rights I claim in any invention or idea. In the event of my failure to give such notice, I agree that I will make no claim against the Company with respect to any such inventions or ideas.

8.      **Other Obligations.**  I acknowledge that the Company from time to time may have agreements with other persons or with foreign governments, or agencies thereof, which impose obligations or restrictions on the Company regarding inventions made during the course of work thereunder or regarding the confidential nature of such work. I agree to be bound by all such obligations and restrictions and to take all action necessary to discharge the obligations of the Company thereunder.

9.      **Trade Secrets of Others.**  I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me in confidence or in trust prior to my employment with the Company and I will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or others. I agree not to enter into any agreement either written or oral in conflict herewith.

10.     **Modification.**  This Agreement may not be changed, modified, released, discharged, abandoned, or otherwise amended, in whole or in part, except by an instrument in writing, signed by me and the Company. I agree that any subsequent change or changes in my duties, salary, or compensation shall not affect the validity or scope of this Agreement.

11.     **Entire Agreement.**  I acknowledge receipt of this Agreement and agree that with respect to the subject matter thereof, it is my entire agreement with the Company, superseding any previous oral or written communications, representations, understanding or agreements with the Company or any officers or representative thereof.

12.     **Severability.**  In the event that any paragraph or provision of this Agreement shall be held to be illegal or unenforceable, such paragraph or provision shall be severed from the Agreement, and the entire Agreement shall not fail on account thereof, but shall otherwise remain in full force and effect.

13.     **Successors and Assigns.**  This Agreement shall be binding upon my heirs, executors, administrators, or other legal representative and is for the benefit of the Company, its successors and assigns.

14.     **Governing Law.**  The laws of the State of California, United States Of America shall govern this Agreement.

15.     **Counterparts.**  This Agreement may be signed in two counterparts, each shall be deemed an original and both of which shall together constitute one agreement.

SIGNATURES ON NEXT PAGE

**COMPANY**

By:

Name:    Bahram Pourmand

Title:    Group CEO

Date:    1 oct 2016

**EMPLOYEE**

By:

Name:    Emil Youssefzadeh

Title:    Chief Technical Officer &
         Chairman of Management Committee

Date:    oct. 1 2016

**Exhibit –A**
**Termination Certificate**

This is to certify that I do not have in my possession, nor have I failed to return any records, documents, data, specifications, drawings, blueprints, reproductions, sketches, notes, reports, proposals, or copies of them, or other documents or materials, equipment, or other property belonging to the Company, its successors and assigns (hereinafter referred to as the "Company").

I further certify that I have complied with and will continue to comply with all the terms of the Employee Proprietary Information Agreement signed by me with the Company, including the reporting of any inventions (as defined therein) conceived or made by me covered by the Agreement.

I further agree that in compliance with the Employee Proprietary and Confidential Information Agreement, I will preserve as confidential all trade secrets, confidential information, knowledge, data, or other information relating to products, processes, know-how, designs, formulas, test data, customer lists, or other subject matter pertaining to any business of the Company or any of its clients, customers, consultants, licensees, or affiliates.

I further agree that my knowledge of the Company's employees, customers and suppliers was obtained as a direct result of my employment with the Company and, as such, I will treat the list of the Company's employees, customers and suppliers as confidential. I further agree to not directly or indirectly solicit or attempt to solicit away from the Company any of its officers or employees or offer employment to any person who, on or during the 5 years immediately preceding the date of such solicitation or offer, is or was an officer or employee of the Company.

_____
Employee's Signature

_____
Date



**Exhibit-B**
**List of Prior Inventions**

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

None

**GLOBAL CAYMAN**

**EMPLOYEE PROPRIETARY INFORMATION AGREEMENT**

In consideration and as a condition of my employment, or continued employment, by Global IP Cayman and/or by companies which it owns, controls, or is affiliated with, or their successors in business (hereafter referred to as the "Company"), and the compensation paid therefore:

1.      **Confidentiality.**   I agree to keep confidential, except as the Company may otherwise consent in writing, and not to disclose or make any use of except for the benefit of the Company, at any time, either during or subsequent to my employment, any trade secrets, confidential information, knowledge, data, or other information of the Company relating to products, process, know-how, designs, formulas, test data, customer lists, business plans, marketing plans and strategies, pricing strategies, or other subject matter pertaining to any business of the Company or any of its clients, customers, consultants, licensees, or affiliates, which I may produce, obtain, or otherwise acquire during the course of my employment, except as herein provided.  I further agree not to deliver, reproduce, or in any way allow any such trade secrets, confidential information, knowledge, data, or other information, or any documentation relating thereto to be delivered or used by any third parties without specific direction or consent of a duly authorized representative of the Company.  I acknowledge that I have been informed that I have rights under 18 U.S.C. Section 1833(b) which states in part: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that – (A) is made  (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal."   Nothing in this Agreement is intended by Company to conflict with or create liability for actions taken that are permitted under 18 U.S.C. Section 1833(b).

2.      **Conflicting Employment/Return of Confidential Material.**  I agree that during my employment with the Company, I will not engage in any other employment, occupation, consulting or other activity relating to the business in which the Company is now or may hereafter become engaged or which would otherwise conflict with my obligations to the Company.  In the event of my termination of employment with the Company for any reason whatsoever, I agree to promptly surrender and deliver to the Company all records, materials, equipment, drawings, documents, and data of any nature pertaining to any invention, trade secret, or confidential information of the Company or to my employment, and I will not take with me any description containing or pertaining to any confidential information, knowledge or data of the Company which I may produce or obtain during the course of my employment.  In the event of the termination of my employment, I agree to sign and deliver the "Termination Certificate" attached hereto as Exhibit A.

3.      **Assignment of Inventions.**  I hereby assign and transfer to the Company my entire right, title and interest in and to all inventions (as used in this Agreement, "inventions" shall include but not be limited to ideas, improvements, designs and discoveries) whether or not patentable and whether or not reduced to practice, made or conceived by me (whether made solely by me or jointly with others) during the period of my employment with the Company,

which relate in any manner to the actual or demonstrably anticipated business, work, or research and development of the Company or its subsidiaries, or result from or are suggested by any task assigned to me or any work performed by me for or on behalf of the Company or its subsidiaries. I agree that all such inventions are the sole property of the Company provided.

    4.    **Disclosure of Inventions and Patents.**  I agree that in connection with any "invention" as defined in Paragraph 3 above:

    a)    I will disclose such invention promptly in writing to my immediate superior at the Company, with a copy to the Chief Executive Officer, in order to permit the Company to claim rights to which it may be entitled under this Agreement.  Such disclosure shall be received in confidence by the Company.

    b)    I will, at the Company's request, promptly execute a written assignment of title to the Company for any invention required to be assigned by Paragraph 3 ("assignable invention") and I will preserve any such assignable invention as confidential information of the Company.

    c)    Upon request, I agree to assist the Company or its nominee (at its expense) during and at any time subsequent to my employment in every reasonable way to obtain for its own benefit patents and copyrights for such assignable inventions in any and all countries, which inventions shall be and remain the sole and exclusive property of the Company or its nominee whether or not patented or copyrighted.  I agree to execute such papers and perform such lawful acts as the Company deems to be necessary to allow it to exercise all rights, title and interest in such patents and copyrights.

    5.    **Execution of Documents.**  In connection with Paragraph 4(c), I further agree to execute, acknowledge, and deliver to the Company or its nominee upon request and at its expense all such documents, including applications for patents and copyrights and assignments of inventions, patents and copyrights to be issued therefore, as the Company may determine necessary or desirable to apply for and obtain letters, patents and copyrights on such assignable inventions in any and all countries and/or to protect the interests of the Company or its nominee in such inventions, patents and copyrights, and to vest title thereto in the Company or its nominee.

    6.    **Maintenance of Records.**  I agree to keep and maintain adequate and current written records of all inventions made by me (in the form of notes, sketches, drawings) and as may be specified by the Company, which records shall be available to and remain the sole property of the Company at all times.

    7.    **Prior Inventions.**  It is understood that all inventions, if any, patented or unpatented, which I made prior to my employment by the Company are excluded from the scope of this Agreement.  To preclude any possible uncertainty, I have set forth on Exhibit B attached hereto a complete list of all my prior inventions, including numbers of all patents and patent applications, and a brief description of all unpatented inventions which are not the property of a previous employer. I represent and covenant that the list is complete and that, if no items are on the list, I have no such prior inventions. I agree to notify the Company in writing before I make any disclosure or perform any work on behalf of the Company which appears to

threaten or conflict with proprietary rights I claim in any invention or idea. In the event of my failure to give such notice, I agree that I will make no claim against the Company with respect to any such inventions or ideas.

8.  **Other Obligations.**  I acknowledge that the Company from time to time may have agreements with other persons or with foreign governments, or agencies thereof, which impose obligations or restrictions on the Company regarding inventions made during the course of work thereunder or regarding the confidential nature of such work. I agree to be bound by all such obligations and restrictions and to take all action necessary to discharge the obligations of the Company thereunder.

9.  **Trade Secrets of Others.**  I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me in confidence or in trust prior to my employment with the Company and I will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or others. I agree not to enter into any agreement either written or oral in conflict herewith.

10.  **Modification.**  This Agreement may not be changed, modified, released, discharged, abandoned, or otherwise amended, in whole or in part, except by an instrument in writing, signed by me and the Company. I agree that any subsequent change or changes in my duties, salary, or compensation shall not affect the validity or scope of this Agreement.

11.  **Entire Agreement.** I acknowledge receipt of this Agreement and agree that with respect to the subject matter thereof, it is my entire agreement with the Company, superseding any previous oral or written communications, representations, understanding or agreements with the Company or any officers or representative thereof.

12.  **Severability.**  In the event that any paragraph or provision of this Agreement shall be held to be illegal or unenforceable, such paragraph or provision shall be severed from the Agreement, and the entire Agreement shall not fail on account thereof, but shall otherwise remain in full force and effect.

13.  **Successors and Assigns.**  This Agreement shall be binding upon my heirs, executors, administrators, or other legal representative and is for the benefit of the Company, its successors and assigns.

14.  **Governing Law.**  The laws of the State of California, United States Of America shall govern this Agreement.

15.  **Counterparts.**  This Agreement may be signed in two counterparts, each shall be deemed an original and both of which shall together constitute one agreement.

SIGNATURES ON NEXT PAGE

| COMPANY | | EMPLOYEE | |
|---|---|---|---|
| By: | _[signature]_ | By: | _[signature]_ |
| Name: | Bahram Pourmand | Name: | Salim Group, Inc. / Emil Youssefzadeh |
| Title: | Group CEO | Title: | Consultant / CTO & Chairman of Management Committee |
| Date: | 1 oct 2016 | Date: | Oct 1 2016 |

**Exhibit –A**
**Termination Certificate**

This is to certify that I do not have in my possession, nor have I failed to return any records, documents, data, specifications, drawings, blueprints, reproductions, sketches, notes, reports, proposals, or copies of them, or other documents or materials, equipment, or other property belonging to the Company, its successors and assigns (hereinafter referred to as the "Company").

     I further certify that I have complied with and will continue to comply with all the terms of the Employee Proprietary Information Agreement signed by me with the Company, including the reporting of any inventions (as defined therein) conceived or made by me covered by the Agreement.

     I further agree that in compliance with the Employee Proprietary and Confidential Information Agreement, I will preserve as confidential all trade secrets, confidential information, knowledge, data, or other information relating to products, processes, know-how, designs, formulas, test data, customer lists, or other subject matter pertaining to any business of the Company or any of its clients, customers, consultants, licensees, or affiliates.

     I further agree that my knowledge of the Company's employees, customers and suppliers was obtained as a direct result of my employment with the Company and, as such, I will treat the list of the Company's employees, customers and suppliers as confidential. I further agree to not directly or indirectly solicit or attempt to solicit away from the Company any of its officers or employees or offer employment to any person who, on or during the 5 years immediately preceding the date of such solicitation or offer, is or was an officer or employee of the Company.

_____
Employee's Signature

_____
Date



**Exhibit-B**
**List of Prior Inventions**

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

None

**GLOBAL IP USA INC.**

**EMPLOYEE PROPRIETARY INFORMATION AGREEMENT**

In consideration and as a condition of my employment, or continued employment, by Global IP USA Inc. and/or by companies which it owns, controls, or is affiliated with, or their successors in business (hereafter referred to as the "Company"), and the compensation paid therefore:

1.    **Confidentiality.**  I agree to keep confidential, except as the Company may otherwise consent in writing, and not to disclose or make any use of except for the benefit of the Company, at any time, either during or subsequent to my employment, any trade secrets, confidential information, knowledge, data, or other information of the Company relating to products, process, know-how, designs, formulas, test data, customer lists, business plans, marketing plans and strategies, pricing strategies, or other subject matter pertaining to any business of the Company or any of its clients, customers, consultants, licensees, or affiliates, which I may produce, obtain, or otherwise acquire during the course of my employment, except as herein provided.  I further agree not to deliver, reproduce, or in any way allow any such trade secrets, confidential information, knowledge, data, or other information, or any documentation relating thereto to be delivered or used by any third parties without specific direction or consent of a duly authorized representative of the Company.  I acknowledge that I have been informed that I have rights under 18 U.S.C. Section 1833(b) which states in part: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that – (A) is made  (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal."   Nothing in this Agreement is intended by Company to conflict with or create liability for actions taken that are permitted under 18 U.S.C. Section 1833(b).

2.    **Conflicting Employment/Return of Confidential Material.**  I agree that during my employment with the Company, I will not engage in any other employment, occupation, consulting or other activity relating to the business in which the Company is now or may hereafter become engaged or which would otherwise conflict with my obligations to the Company.  In the event of my termination of employment with the Company for any reason whatsoever, I agree to promptly surrender and deliver to the Company all records, materials, equipment, drawings, documents, and data of any nature pertaining to any invention, trade secret, or confidential information of the Company or to my employment, and I will not take with me any description containing or pertaining to any confidential information, knowledge or data of the Company which I may produce or obtain during the course of my employment.  In the event of the termination of my employment, I agree to sign and deliver the "Termination Certificate" attached hereto as Exhibit A.

3.    **Assignment of Inventions.**  I hereby assign and transfer to the Company my entire right, title and interest in and to all inventions (as used in this Agreement, "inventions" shall include but not be limited to ideas, improvements, designs and discoveries) whether or not

patentable and whether or not reduced to practice, made or conceived by me (whether made solely by me or jointly with others) during the period of my employment with the Company, which relate in any manner to the actual or demonstrably anticipated business, work, or research and development of the Company or its subsidiaries, or result from or are suggested by any task assigned to me or any work performed by me for or on behalf of the Company or its subsidiaries. I agree that all such inventions are the sole property of the Company provided.

4.    **Disclosure of Inventions and Patents.**  I agree that in connection with any "invention" as defined in Paragraph 3 above:

a)    I will disclose such Invention promptly in writing to my immediate superior at the Company, with a copy to the Chief Executive Officer, in order to permit the Company to claim rights to which it may be entitled under this Agreement. Such disclosure shall be received in confidence by the Company.

b)    I will, at the Company's request, promptly execute a written assignment of title to the Company for any invention required to be assigned by Paragraph 3 ("assignable invention") and I will preserve any such assignable invention as confidential information of the Company.

c)    Upon request, I agree to assist the Company or its nominee (at its expense) during and at any time subsequent to my employment in every reasonable way to obtain for its own benefit patents and copyrights for such assignable inventions in any and all countries, which inventions shall be and remain the sole and exclusive property of the Company or its nominee whether or not patented or copyrighted. I agree to execute such papers and perform such lawful acts as the Company deems to be necessary to allow it to exercise all rights, title and interest in such patents and copyrights.

5.    **Execution of Documents.**  In connection with Paragraph 4(c), I further agree to execute, acknowledge, and deliver to the Company or its nominee upon request and at its expense all such documents, including applications for patents and copyrights and assignments of inventions, patents and copyrights to be issued therefore, as the Company may determine necessary or desirable to apply for and obtain letters, patents and copyrights on such assignable inventions in any and all countries and/or to protect the interests of the Company or its nominee in such inventions, patents and copyrights, and to vest title thereto in the Company or its nominee.

6.    **Maintenance of Records.**  I agree to keep and maintain adequate and current written records of all inventions made by me (in the form of notes, sketches, drawings) and as may be specified by the Company, which records shall be available to and remain the sole property of the Company at all times.

7.    **Prior Inventions.**  It is understood that all inventions, if any, patented or unpatented, which I made prior to my employment by the Company are excluded from the scope of this Agreement. To preclude any possible uncertainty, I have set forth on Exhibit B attached hereto a complete list of all my prior inventions, including numbers of all patents and patent applications, and a brief description of all unpatented inventions which are not the property of a previous employer. I represent and covenant that the list is complete and that, if

no items are on the list, I have no such prior inventions. I agree to notify the Company in writing before I make any disclosure or perform any work on behalf of the Company which appears to threaten or conflict with proprietary rights I claim in any invention or idea. In the event of my failure to give such notice, I agree that I will make no claim against the Company with respect to any such inventions or ideas.

8.     **Other Obligations.**  I acknowledge that the Company from time to time may have agreements with other persons or with foreign governments, or agencies thereof, which impose obligations or restrictions on the Company regarding inventions made during the course of work thereunder or regarding the confidential nature of such work. I agree to be bound by all such obligations and restrictions and to take all action necessary to discharge the obligations of the Company thereunder.

9.     **Trade Secrets of Others.**  I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me in confidence or in trust prior to my employment with the Company and I will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or others. I agree not to enter into any agreement either written or oral in conflict herewith.

10.    **Modification.**  This Agreement may not be changed, modified, released, discharged, abandoned, or otherwise amended, in whole or in part, except by an instrument in writing, signed by me and the Company. I agree that any subsequent change or changes in my duties, salary, or compensation shall not affect the validity or scope of this Agreement.

11.    **Entire Agreement.**  I acknowledge receipt of this Agreement and agree that with respect to the subject matter thereof, it is my entire agreement with the Company, superseding any previous oral or written communications, representations, understanding or agreements with the Company or any officers or representative thereof.

12.    **Severability.**  In the event that any paragraph or provision of this Agreement shall be held to be illegal or unenforceable, such paragraph or provision shall be severed from the Agreement, and the entire Agreement shall not fail on account thereof, but shall otherwise remain in full force and effect.

13.    **Successors and Assigns.**  This Agreement shall be binding upon my heirs, executors, administrators, or other legal representative and is for the benefit of the Company, its successors and assigns.

14.    **Governing Law.**  The laws of the State of California, United States Of America shall govern this Agreement.

15.    **Counterparts.**  This Agreement may be signed in two counterparts, each shall be deemed an original and both of which shall together constitute one agreement.

SIGNATURES ON NEXT PAGE

**COMPANY**

By: _____

Name: Bahram Pourmand

Title: Group CEO

Date: 10/7/2016

**EMPLOYEE**

By: _____

Name: Umar Javed

Title: President & Chief Operating Officer

Date: Oct 1, 2016

**Exhibit –A**
**Termination Certificate**

This is to certify that I do not have in my possession, nor have I failed to return any records, documents, data, specifications, drawings, blueprints, reproductions, sketches, notes, reports, proposals, or copies of them, or other documents or materials, equipment, or other property belonging to the Company, its successors and assigns (hereinafter referred to as the "Company").

I further certify that I have complied with and will continue to comply with all the terms of the Employee Proprietary Information Agreement signed by me with the Company, including the reporting of any inventions (as defined therein) conceived or made by me covered by the Agreement.

I further agree that in compliance with the Employee Proprietary and Confidential Information Agreement, I will preserve as confidential all trade secrets, confidential information, knowledge, data, or other information relating to products, processes, know-how, designs, formulas, test data, customer lists, or other subject matter pertaining to any business of the Company or any of its clients, customers, consultants, licensees, or affiliates.

I further agree that my knowledge of the Company's employees, customers and suppliers was obtained as a direct result of my employment with the Company and, as such, I will treat the list of the Company's employees, customers and suppliers as confidential. I further agree to not directly or indirectly solicit or attempt to solicit away from the Company any of its officers or employees or offer employment to any person who, on or during the 5 years immediately preceding the date of such solicitation or offer, is or was an officer or employee of the Company.

_____

Employee's Signature

_____

Date



**Exhibit-B**
**List of Prior Inventions**

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

NONE

GLOBAL CAYMAN

EMPLOYEE PROPRIETARY INFORMATION AGREEMENT

In consideration and as a condition of my employment, or continued employment, by Global IP Cayman and/or by companies which it owns, controls, or is affiliated with, or their successors in business (hereafter referred to as the "Company"), and the compensation paid therefore:

1.      **Confidentiality.**   I agree to keep confidential, except as the Company may otherwise consent in writing, and not to disclose or make any use of except for the benefit of the Company, at any time, either during or subsequent to my employment, any trade secrets, confidential information, knowledge, data, or other information of the Company relating to products, process, know-how, designs, formulas, test data, customer lists, business plans, marketing plans and strategies, pricing strategies, or other subject matter pertaining to any business of the Company or any of its clients, customers, consultants, licensees, or affiliates, which I may produce, obtain, or otherwise acquire during the course of my employment, except as herein provided.  I further agree not to deliver, reproduce, or in any way allow any such trade secrets, confidential information, knowledge, data, or other information, or any documentation relating thereto to be delivered or used by any third parties without specific direction or consent of a duly authorized representative of the Company.  I acknowledge that I have been informed that I have rights under 18 U.S.C. Section 1833(b) which states in part: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that – (A) is made  (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal."   Nothing in this Agreement is intended by Company to conflict with or create liability for actions taken that are permitted under 18 U.S.C. Section 1833(b).

2.      **Conflicting Employment/Return of Confidential Material.**  I agree that during my employment with the Company, I will not engage in any other employment, occupation, consulting or other activity relating to the business in which the Company is now or may hereafter become engaged or which would otherwise conflict with my obligations to the Company.  In the event of my termination of employment with the Company for any reason whatsoever, I agree to promptly surrender and deliver to the Company all records, materials, equipment, drawings, documents, and data of any nature pertaining to any invention, trade secret, or confidential information of the Company or to my employment, and I will not take with me any description containing or pertaining to any confidential information, knowledge or data of the Company which I may produce or obtain during the course of my employment.  In the event of the termination of my employment, I agree to sign and deliver the "Termination Certificate" attached hereto as Exhibit A.

3.      **Assignment of Inventions.**  I hereby assign and transfer to the Company my entire right, title and interest in and to all inventions (as used in this Agreement, "inventions" shall include but not be limited to ideas, improvements, designs and discoveries) whether or not

patentable and whether or not reduced to practice, made or conceived by me (whether made solely by me or jointly with others) during the period of my employment with the Company, which relate in any manner to the actual or demonstrably anticipated business, work, or research and development of the Company or its subsidiaries, or result from or are suggested by any task assigned to me or any work performed by me for or on behalf of the Company or its subsidiaries. I agree that all such inventions are the sole property of the Company provided.

    4.    **Disclosure of Inventions and Patents.** I agree that in connection with any "invention" as defined in Paragraph 3 above:

    a)    I will disclose such invention promptly in writing to my immediate superior at the Company, with a copy to the Chief Executive Officer, in order to permit the Company to claim rights to which it may be entitled under this Agreement. Such disclosure shall be received in confidence by the Company.

    b)    I will, at the Company's request, promptly execute a written assignment of title to the Company for any invention required to be assigned by Paragraph 3 ("assignable invention") and I will preserve any such assignable invention as confidential information of the Company.

    c)    Upon request, I agree to assist the Company or its nominee (at its expense) during and at any time subsequent to my employment in every reasonable way to obtain for its own benefit patents and copyrights for such assignable inventions in any and all countries, which inventions shall be and remain the sole and exclusive property of the Company or its nominee whether or not patented or copyrighted. I agree to execute such papers and perform such lawful acts as the Company deems to be necessary to allow it to exercise all rights, title and interest in such patents and copyrights

    5.    **Execution of Documents.** In connection with Paragraph 4(c), I further agree to execute, acknowledge, and deliver to the Company or its nominee upon request and at its expense all such documents, including applications for patents and copyrights and assignments of inventions, patents and copyrights to be issued therefore, as the Company may determine necessary or desirable to apply for and obtain letters, patents and copyrights on such assignable inventions in any and all countries and/or to protect the interests of the Company or its nominee in such inventions, patents and copyrights, and to vest title thereto in the Company or its nominee.

    6.    **Maintenance of Records.** I agree to keep and maintain adequate and current written records of all inventions made by me (in the form of notes, sketches, drawings) and as may be specified by the Company, which records shall be available to and remain the sole property of the Company at all times.

    7.    **Prior Inventions.** It is understood that all inventions, if any, patented or unpatented, which I made prior to my employment by the Company are excluded from the scope of this Agreement. To preclude any possible uncertainty, I have set forth on Exhibit B attached hereto a complete list of all my prior inventions, including numbers of all patents and patent applications, and a brief description of all unpatented inventions which are not the property of a previous employer. I represent and covenant that the list is complete and that, if

no items are on the list, I have no such prior inventions. I agree to notify the Company in writing before I make any disclosure or perform any work on behalf of the Company which appears to threaten or conflict with proprietary rights I claim in any invention or idea. In the event of my failure to give such notice, I agree that I will make no claim against the Company with respect to any such inventions or ideas.

8.    **Other Obligations.** I acknowledge that the Company from time to time may have agreements with other persons or with foreign governments, or agencies thereof, which impose obligations or restrictions on the Company regarding inventions made during the course of work thereunder or regarding the confidential nature of such work. I agree to be bound by all such obligations and restrictions and to take all action necessary to discharge the obligations of the Company thereunder.

9.    **Trade Secrets of Others.** I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me in confidence or in trust prior to my employment with the Company and I will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or others. I agree not to enter into any agreement either written or oral in conflict herewith.

10.   **Modification.** This Agreement may not be changed, modified, released, discharged, abandoned, or otherwise amended, in whole or in part, except by an instrument in writing, signed by me and the Company. I agree that any subsequent change or changes in my duties, salary, or compensation shall not affect the validity or scope of this Agreement.

11.   **Entire Agreement.** I acknowledge receipt of this Agreement and agree that with respect to the subject matter thereof, it is my entire agreement with the Company, superseding any previous oral or written communications, representations, understanding or agreements with the Company or any officers or representative thereof.

12.   **Severability.** In the event that any paragraph or provision of this Agreement shall be held to be illegal or unenforceable, such paragraph or provision shall be severed from the Agreement, and the entire Agreement shall not fail on account thereof, but shall otherwise remain in full force and effect.

13.   **Successors and Assigns.** This Agreement shall be binding upon my heirs, executors, administrators, or other legal representative and is for the benefit of the Company, its successors and assigns.

14.   **Governing Law.** The laws of the State of California, United States Of America shall govern this Agreement.

15.   **Counterparts.** This Agreement may be signed in two counterparts, each shall be deemed an original and both of which shall together constitute one agreement.

SIGNATURES ON NEXT PAGE

COMPANY

By:

Name:   Bahram Pourmand

Title:   Group CEO

Date:   1001 2016

EMPLOYEE

By:

Name:   Umar Javed

Title:   President & Chief Operating Officer

Date:   Oct. 1, 2016

**Exhibit –A**
**Termination Certificate**

This is to certify that I do not have in my possession, nor have I failed to return any records, documents, data, specifications, drawings, blueprints, reproductions, sketches, notes, reports, proposals, or copies of them, or other documents or materials, equipment, or other property belonging to the Company, its successors and assigns (hereinafter referred to as the "Company").

I further certify that I have complied with and will continue to comply with all the terms of the Employee Proprietary Information Agreement signed by me with the Company, including the reporting of any inventions (as defined therein) conceived or made by me covered by the Agreement.

I further agree that in compliance with the Employee Proprietary and Confidential Information Agreement, I will preserve as confidential all trade secrets, confidential information, knowledge, data, or other information relating to products, processes, know-how, designs, formulas, test data, customer lists, or other subject matter pertaining to any business of the Company or any of its clients, customers, consultants, licensees, or affiliates.

I further agree that my knowledge of the Company's employees, customers and suppliers was obtained as a direct result of my employment with the Company and, as such, I will treat the list of the Company's employees, customers and suppliers as confidential. I further agree to not directly or indirectly solicit or attempt to solicit away from the Company any of its officers or employees or offer employment to any person who, on or during the 5 years immediately preceding the date of such solicitation or offer, is or was an officer or employee of the Company.

_____

Employee's Signature

_____

Date



**Exhibit-B**
**List of Prior Inventions**

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

NONE



**EXHIBIT B**

Employee Handbook - GLOBAL IP USA, INC.

# Employee Handbook
### GLOBAL IP USA, INC.
### ("Global IP")

**Revised February 1, 2017**

*OC 287648739v2*

Employee Handbook - GLOBAL IP USA, INC.

## Confidentiality

Each employee is responsible for safeguarding confidential information obtained during employment. In the course of your work, you may have access to confidential information regarding the Company, its suppliers, its customers or perhaps even fellow employees. It is your responsibility to in no way reveal or divulge any such information unless it is necessary for you to do so in the performance of your duties. Access to confidential information should be on a "need-to-know" basis and must be authorized by your supervisor. Any breach of this policy will not be tolerated and legal action may be taken by the Company.

In addition to this policy, the Company may require you to execute a specific agreement related to your confidentiality obligations.

OC 287648739v2

**EXHIBIT C**

**Code of Business Conduct and Ethics**
**For Employees, Officers and Directors**

**Global-IP Cayman**

I.    **Purpose and Scope**

The Board of Directors of Global-IP Cayman (the "*Company*") has established this Code of
Business Conduct and Ethics (the "*Code*") as a guide for all employees, officers and directors in
making ethical and legal decisions when conducting the Company's business and performing day-to-
day duties on behalf of the Company.  This Code shall apply to all of the Company's employees,
officers, and directors (collectively, "*Employees*").  Certain agents and contractors of the Company
may also be required to read, understand and abide by this Code.

The Code is not the exclusive source of guidance and information regarding conduct of the
Company's business.  Each Employee should consult applicable policies and procedures in specific
areas as they apply.  The Company may occasionally modify or update these more specific policies
and procedures and adopt new Company policies and procedures in the future.  Nothing in this Code
is intended to alter the existing legal rights and obligations of the Company or any of its Employees,
including "at-will" employment arrangements or the terms of any employment or compensation-
related agreements.  The standards in this Code should be viewed as the minimum standards that the
Company expects to be maintained by its Employees in the conduct of the Company's business and
the performance of their day-to-day duties.

II.    **Responsibility**

It is every Employee's responsibility to read and understand this Code, and to use it as a
guide to the performance of his or her responsibilities for the Company.  Each Employee must
uphold these standards in the performance of his or her day-to-day duties and comply with all
applicable procedures in the Code.

This Code cannot address every ethical issue or circumstance that may arise. In complying
with the letter and spirit of this Code, Employees must apply common sense, together with high
personal standards of ethics, honesty and accountability, in making business decisions where this
Code has no specific guideline.  In complying with this Code, Employees should also consider the
conduct of their family members and other members of their household.

Part of each Employee's ethical responsibility is to help enforce the Code and encourage
others to comply with the Code. The Company expects all of its Employees to help engender a sense
of commitment to this Code, and to foster a culture of fairness, honesty and accountability within the
Company.  Each Employee should be alert to possible violations and promptly report violations or
suspected violations of the Code to the Employee's supervisor or the Compliance Officer (as defined
below).

reputation for integrity, and potentially harmful to the Company's business.  Employees may not take unfair advantage of anyone through misuse of confidential information, misrepresentation of material facts or any other unfair business practice.

The United States and most other countries have well-developed bodies of law designed to encourage and protect free and fair competition.  These laws are broad and generally regulate the Company's relationship with its customers, suppliers and service providers.  Competition laws generally address the following areas: pricing practices (including predatory pricing, price fixing and price discrimination), discounting, terms of sale, credit terms, promotional allowances, secret rebates, exclusive dealerships or distributorships, product bundling, restrictions on carrying competing products, termination and many other practices.

Employees involved in procurement have a special responsibility to adhere to principles of fair competition in the purchase of products and services by selecting suppliers based exclusively on normal commercial considerations, such as quality, cost, availability, service and reputation, and not on the receipt of special benefits.  Employees involved in sales have a special responsibility to abide by all Company policies regarding selling activities, including policies relevant to revenue recognition by the Company.

Competition laws also govern relationships between the Company and its competitors.  Collusion among competitors is illegal, and the consequences of a violation are severe.  All Employees are prohibited from entering into an agreement or understanding, written or oral, express or implied, with any competitor concerning prices, discounts or other terms or conditions of sale; profits or profit margins; costs; allocation of product, customers, markets or territories; limitations on production or supply; boycotts of customers or suppliers; bids or the intent to bid; or even discussing or exchanging information regarding any of the foregoing subjects.

The Company is committed to obeying both the letter and spirit of these laws, which are often referred to as antitrust, consumer protection, competition or unfair competition laws.  Noncompliance with these laws can have extremely negative consequences for the Company, including long and costly investigations and lawsuits, substantial fines or damages, and adverse publicity.  Understanding the requirements of antitrust and unfair competition laws of the jurisdictions where the Company does business can be difficult, so Employees are urged to seek assistance from their supervisor or the Compliance Officer whenever they have a question relating to these laws.

VI.    **Confidentiality and Proprietary Information**

Proprietary information of the Company and its customers, suppliers and third parties plays a vital role in the Company's business, its ability to compete and its future prospects.  Employees may not, at any time, without the prior consent of the Compliance Officer, either during or after service to or employment with the Company, (a) discuss the Company's business or disclose any proprietary information of the Company or any customers, suppliers and third parties to anyone outside of the Company, or (b) use or permit to be used any proprietary information for any purpose other than the performance of duties to the Company.  Each Employee also has an obligation to use best efforts to prevent the unauthorized disclosure of proprietary information of the Company and its customers,

suppliers and third parties and to deliver to the Company all copies of proprietary information when he or she ceases to be employed by or otherwise ceases to serve the Company.

Proprietary information may include information or material which has not been made generally available to the public, such as: (i) corporate information, including plans, strategies, methods, or policies; (ii) marketing information, including strategies, methods, information about customers, suppliers and third parties or market analyses or projections; (iii) financial information, including historical financial results, sales forecasts, pricing information, cost and performance data, capitalization and information about investors; (iv) operational and technological information, including plans, specifications, manuals, forms, templates, software, designs, procedures, formulas, discoveries, inventions, improvements, concepts and ideas; and (v) personnel information, including personnel lists, reporting or organizational structure, resumes, personnel data, compensation structure, performance evaluations and termination arrangements.   Proprietary information also includes information received in confidence by the Company from its customers, suppliers and third parties.

## VII.   Maintenance of Corporate Books, Records and Accounts

The integrity, reliability and accuracy of the Company's books, records and financial statements are fundamental to the Company's continued future business success. No Employee may cause the Company to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner.  In addition, no Employee may create any false or artificial documentation or book entry for any transaction entered into by the Company.  Similarly, Employees who have the responsibility for accounting and financial reporting matters have a responsibility to accurately record all funds, assets and transactions on the Company's books and records.

To help ensure the integrity of its records and public disclosure, the Company requires that:

- No entry be made in the Company's books and records that is intentionally false or misleading;
- Transactions be supported by appropriate documentation;
- The terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in Company books and records;
- Employees comply with the Company's system of internal controls and be held accountable for their entries;
- Any off-balance sheet arrangements of the Company be clearly and appropriately disclosed; and
- Assets and liabilities of the Company shall be recognized and stated in accordance with the Company's written policies and standard practices.

If an Employee believes that questionable accounting or auditing conduct or practices have occurred or are occurring, the Employee should notify the Compliance Officer.