1  Jeffrey B. Isaacs, Esq., SBN 117104
   Jerome H. Friedberg, Esq., SBN 125663
2  Paige Shen, Esq., SBN 162122
   Robert Gookin, Esq., SBN 251601
3  **ISAACS | FRIEDBERG LLP**
   555 S. Flower Street, Suite 4250
4  Los Angeles, California 90071
   Telephone: (213) 929-5534
5  Facsimile: (213) 955-5794
   Email:      *jisaacs@ifcounsel.com*
6              *jfriedberg@ifcounsel.com*
               *pshen@ifcounsel.com*
7              *rgookin@ifcounsel.com*

8  *Attorneys for Plaintiffs STM Atlantic N.V.,*
   *STM Group, Inc., Emil Youssefzadeh and Umar Javed*

9              **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11 | STM ATLANTIC N.V., et al., | Case No. 2:18-cv-01269-JLS-JCG |

12             Plaintiffs,        **PLAINTIFFS' REPLY BRIEF IN
                                  SUPPORT OF MOTION FOR
13             vs.                JUDICIAL DETERMINATION THAT
                                  THE MILBANK MEMO, CHEN
14 DONG YIN DEVELOPMENT           MEMO AND RELATED
   (HOLDINGS) LIMITED, et al.,    COMMUNICATIONS ARE NOT
15                                SUBJECT TO THE ATTORNEY-
               Defendants.        CLIENT PRIVILEGE OR WORK
16                                PRODUCT DOCTRINE**

17                               **[FILED UNDER SEAL PER COURT
                                 ORDER OF APRIL 2, 2018]**

18                               [Filed concurrently with Supplemental
                                 Declaration of Umar Javed; Supplemental
19                               Declaration of Emil Youssefzadeh;
                                 Supplemental Declaration of Jerome
20                               Friedberg; Supplemental Compendium of
                                 Exhibits; Objections to Evidence;
21                               Responses to Objections to Evidence; and
                                 Proof of Service]
22
                                 HEARING
23                               Judge:       Hon. Josephine L. Staton
                                 Date:        May 11, 2018
24                               Time:        2:30 p.m.
                                 Place:       Courtroom 10A
25
                                 Complaint Filed:        Feb. 15, 2018
26                               FAC Filed:              Feb. 25, 2018

27

28

---

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

242063.24

# TABLE OF CONTENTS

Page

I.    INTRODUCTION. ...................................................................................1

II.   GIP HAS MATERIALLY MISCHARACTERIZED THE
NATURE OF THE PARTIES' DISPUTE. .............................................2

III.   AS A MATTER OF FACT AND LAW, BRONZELINK AND
GIP-CAYMAN ARE NOT PARENT AND SUBSIDIARY FOR
PRIVILEGE PURPOSES..........................................................................3

     A.     Applicable Law Regarding Attorney-Client Communications
Between Related Entities. ...........................................................3

     B.     GIP-Cayman is Not a Subsidiary of Bronzelink...........................5

     C.     GIP-Cayman and Bronzelink Have Adverse Business and
Legal Interests. ..........................................................................6

IV.   AS A MATTER OF FACT AND LAW, THERE WAS NO
COMMON INTEREST OR JOINT DEFENSE AGREEMENT
BETWEEN GIP-CAYMAN AND BRONZELINK, BOEING, OR
SPACEX REGARDING COMPLIANCE WITH U.S. EXPORT
CONTROL LAWS. ...................................................................................7

     A.     Applicable Law Regarding Common Interest and Joint
Defense Agreements. ..................................................................7

     B.     There Was No Common Interest or Joint Defense Agreement
Between GIP and Bronzelink........................................................8

     C.     There Was No Common Interest or Joint Defense Agreement
Between GIP and Boeing or SpaceX. ..........................................9

V.   AS A MATTER OF FACT AND LAW, MR. YOUSSEFZADEH
AND MR. JAVED REMAINED EMPLOYED BY AND HAD
AUTHORITY TO ACT ON BEHALF OF GIP-CAYMAN AND
GIP-USA THROUGH AUGUST 16, 2017. .........................................10

VI.   ANY PRIVILEGE APPLICABLE TO THE MILBANK AND
CHEN MEMOS HAS BEEN WAIVED BY DISCLOSURES TO
NUMEROUS THIRD PARTIES. ..........................................................12

     A.     The Disclosures to Shiwen Fan Waived the Privilege...................12

     B.     The Disclosures to Dong Yin Employees and Consultants
Waived the Privilege. ...............................................................13

         1.     Terry Long, Xinyi Dong and Yang Zeng. ....................14

         2.     Dr. Michael Altwein and Pin Fen Miao. .......................15

- i -

1

## TABLE OF CONTENTS (CONT.)

2

**Page**

3

   3. The Disclosures to the Bronzelink Directors Waived the
4     Privilege. ...................................................................................... 16

5    4. The Disclosures to Bronzelink Employees Waived the
    Privilege. ...................................................................................... 17

6    5. The Disclosures to Sidley Austin and Sheppard Mullin
7     Waived the Privilege. ................................................................... 18

8   C. The Disclosures to Boeing and SpaceX Waived the Privilege. ............. 19

9    1. Mr. Youssefzadeh Was Authorized to Waive the
    Privilege on Behalf of GIP-Cayman. ........................................... 20

10    2. Mr. Youssefzadeh Did Not Breach His Fiduciary Duties
11     by Making the Disclosures to Boeing and SpaceX. .................... 21

12    3. GIP Ratified the Disclosures to Boeing and SpaceX. ................. 22

13 **VII. GIP HAS WAIVED PRIVILEGE ON THE SUBJECT MATTER
  OF THE MILBANK AND CHEN MEMOS.** .............................................. 22

14 **VIII. CONCLUSION.** ............................................................................................ 25

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**
242063.24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Bakst v. Cmty. Mem'l Health Sys., Inc.*,
  2011 WL 13214315 (C.D. Cal. 2011) ..................................................... 11

*Bittaker v. Woodford*,
  331 F.3d 715 (9th Cir. 2003) ..........................................................24, 25

*U.S. ex rel. Burroughs v. DeNardi Corp.*,
  167 F.R.D. 680 (S.D. Cal. 1996) ............................................................ 7

*Carl Zeiss Vision Int'l Gmbh v. Signet Armorlite Inc*,
  2009 WL 4642388 (S.D. Cal. 2009) ....................................................... 8

*Cohen v. Trump*,
  2015 WL 3617124 (S.D. Cal. 2015) ..................................................... 18

*Commodity Futures Trading Com'n v. Weintraub*,
  471 U.S. 343 (1985) ............................................................................. 20

*Criswell v. City of O'Fallon*,
  2008 WL 250199 (E.D. Mo. 2008) ...................................................... 20

*DeFrees v. Kirkland*,
  2012 WL 1356495 (C.D. Cal. Apr. 11, 2012) ...................................3, 16

*Diversified Indus., Inc. v. Meredith*,
  572 F.2d 596 (8th Cir.1977) ................................................................ 18

*Duplan Corp. v. Deering Milliken, Inc.*,
  397 F. Supp. 1146 (D.S.C. 1974) ........................................................... 5

*Fitzpatrick v. American Intern. Group, Inc.*,
  272 F.R.D. 100 (S.D.N.Y. 2010) ......................................................... 20

*In re Fresh and Process Potatoes Antitrust Litigation*,
  2014 WL 2435581 (D. Idaho 2014) ................................................3, 7, 9

*FSP Stallion 1, LLC v. Luce*,
  2010 WL 3895914 (D. Nev. Sep. 30, 2010) ......................................7, 9

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

242063.24

# TABLE OF AUTHORITIES (CONT.)

**Page(s)**

*Galli v. Pittsburg Unified School Dist.*,
    2010 WL 4315768 (N.D. Cal. 2010) ........................................................ 21

*Glidden Co. v. Jandernoa*,
    173 F.R.D. 459 (W.D. Mich. 1997) .......................................................... 4

*In re Grand Jury Proceedings*,
    219 F.3d 175 (2d Cir. 2000) .................................................................... 21

*In re Grand Jury Subpoena (Mark Tort/Tort Environmental
    Management)*,
    357 F.3d 900 (9th Cir. 2004) .................................................................. 22

*In re Grand Jury Subpoena: Under Seal*,
    415 F.3d 333 (4th Cir. 2005) .................................................................... 8

*Graves v. United States*,
    150 U.S. 118 (1893) ............................................................................... 13

*Gregory v. Correction Connection, Inc.*,
    1990 WL 182130 (E.D. Pa. 1990) ........................................................... 21

*Guy v. United Healthcare Corp.*,
    154 F.R.D. 172 (S.D. Ohio 1993) ............................................................ 4

*Harris v. Lang Pharma Nutrition, Inc.*,
    2015 WL 12832093 (C.D. Cal. 2015) .................................................... 7, 9

*Ironwood Country Club v. Liberty Insurance Underwriters, Inc.*,
    2014 WL 12558790 (C.D. Cal. 2014) ..................................................... 20

*Kagel v. First Commonwealth Co.*,
    409 F. Supp. 1396 (N.D. Cal. 1973), *aff'd, 534 F.2d 194* (9th Cir.
    1976) ................................................................................................... 8, 11

*Leybold-Heraeus Techs., Inc. v. Midwest Instrument Co.*,
    118 F.R.D. 609 (E.D. Wis. 1987) ............................................................ 4

*Miller v. Int'l Bus. Machines*,
    2006 WL 1141090 (N.D. Cal. May 1, 2006) ............................................ 4

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

# <u>TABLE OF AUTHORITIES (CONT.)</u>

**Page(s)**

*Nelson v. Millenium Labs., Inc.*,
  2013 WL 11687684 (D. Ariz. 2013) ........................................................... 8

*Nidec Corp. v. Victor Co. of Japan*,
  249 F.R.D. 575 (N.D. Cal. 2007) ............................................................ 7, 9

*O'Leary v. Purcell Co.*,
  108 F.R.D. 641 (M.D.N.C. 1985) ............................................................. 23

*In re OM Group Securities Litig.*,
  226 F.R.D. 579 (N.D. Ohio 2005) ............................................................ 17

*In re Pacific Pictures Corp.*,
  679 F.3d 1121 (9th Cir. 2012) ............................................................ 7, 8, 9

*Pensacola Firefighters' Relief Pension Fund Board of Trustees v. Merrill*
  *Lynch Pierce Fenner & Smith Inc.*,
  2010 WL 11520021 (N.D. Fla. 2010) ....................................................... 20

*Reinsdorf v. Skechers USA Inc.*,
  2013 WL 12116415 (C.D. Cal. May 31, 2013) .......................................... 20

*S.E.C. v. Mircrotune, Inc.*,
  258 F.R.D. 310 (N.D. Tex. 2009) ............................................................. 17

*In re Teleglobe*,
  493 F.3d 345 (3d Cir. 2007) ............................................................. 4, 5, 8

*U.S. v. AT&T*,
  86 F.R.D. 603 (1979) ................................................................................. 4

*U.S. v. ChevronTexaco Corp.*,
  241 F. Supp. 2d 1065 (N.D. Cal. 2003) ..................................................... 4

*U.S. v. Head*,
  2013 WL 5739095 (E.D. Cal. 2013) ......................................................... 20

*U.S. v. Under Seal (In re Under Seal)*,
  902 F.2d 244 (4th Cir. 1990) ..................................................................... 4

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

242063.24

# TABLE OF AUTHORITIES (CONT.)

**Page(s)**

*U.S. v. United Shoe Machinery Corp.*,
   89 F. Supp. 357 (1950) ............................................................. 4

*United States v. Bramble*,
   680 F.2d 590 (9th Cir. 1982) ................................................. 12

*United States v. Davita, Inc.*,
   301 F.R.D. 676 (N.D. Ga. 2014) ............................................ 18

*United States v. Johnson*,
   467 F.2d 804 (1st Cir.), *cert. denied*, 410 U.S. 909(1973) .................................... 13

*United States v. Lewis*,
   40 F.3d 1325 (1st Cir. 1994) .................................................. 12

*United States v. Noah*,
   475 F.2d 688 (9th Cir. 1973) ................................................. 13

*In re Vioxx Prod. Liab. Litig.*,
   501 F. Supp. 2d 789 (E.D. La. 2007) .................................... 18

*In re von Bulow*,
   828 F.2d 94 (2d Cir. 1987) ..................................................... 24

*Waymo LLC v. Uber Technologies, Inc.*,
   2017 WL 2694191 (N.D. Cal. Jun. 21, 2017) ............................ 8

**California Cases**

*Monteleone v. S. California Vending Corp.*,
   264 Cal. App. 2d 798 (1968) ................................................. 11

**Other State Cases**

*Re: Ryan v. Gifford*,
   2007 WL 4259557 (Del. Ch. Nov. 30, 2007) .......................... 17

**Federal Statutes**

28 U.S.C. § 1746 ........................................................................ 13

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**
242063.24

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION.

3       GIP has failed to meet its burden of proving that the Milbank Memo, the Chen

4 Memo and related communications (a) were intended to be kept confidential, (b) were

5 maintained as confidential and (c) were not disclosed to third parties in a manner

6 which waives any privilege applicable to them.[1]  Instead, GIP's Opposition is replete

7 with telling admissions, glaring omissions, gross mischaracterizations and readily

8 provable falsehoods.  For example:

9
10
- GIP admits that it shared privileged information with Bronzelink, a separate entity whose interests are adverse to GIP's;

11
12
13
14
- GIP has mischaracterized Bronzelink as GIP's parent company, when, in fact, it is only an investor and majority shareholder, and the common shareholders have substantial rights and interests in GIP that are adverse to those of Bronzelink;

15
16
17
18
- GIP seeks to mischaracterize this case as involving a shareholder's dispute, when, in fact, it is a dispute between Mr. Youssefzadeh and Mr. Javed and Dong Yin arising from Dong Yin's central role in violating U.S. export control laws and the PRC Proscription;

19
20
- GIP has failed to provide a declaration from Fan, a Dong Yin representative who received the Milbank and Chen Memos;

21
22
23
24
25
- The declarations from Dong Yin executives Terry Long and Xinyi Dong are only two paragraphs long, do not dispute that Dong Yin was informed of the factual findings, legal conclusions and advice Panahy and Chen had provided to GIP, and do not make any mention of the meetings between Dong Yin representatives and Mr. Youssefzadeh and Mr. Javed

26

27
28

_____

[1] This Reply uses the same acronyms, shortened names and collective labels as in the Motion.

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

242063.24

1      at which those matters were discussed;

2      • Panahy's declaration misstates the nature and extent of his

3      communications with Dong Yin, as made clear by his detailed email to

4      Terry Long of Dong Yin dated June 27, 2017;

5      • GIP has failed to provide declarations from the consultants who met with

6      Mr. Youssefzadeh and Mr. Javed in November 2017, to rebut the

7      testimony that the consultants had read the Milbank and Chen Memos, or

8      submit any documentation supporting its claim that the consultants were

9      retained by Bronzelink and not Dong Yin;

10     • GIP's claim that the consultants worked for Bronzelink and met with

11     Mr. Youssefzadeh and Mr. Javed to evaluate GIP's sales potential and

12     not discuss a resolution of the compliance issues is false;

13     • GIP does not dispute, or even address, the disclosure of the Milbank

14     Memo to Sidley, Bronzelink's outside transactional counsel;

15     • GIP likewise does not dispute, or even address, the disclosures to SMRH,

16     at a time when SMRH was representing Bronzelink and not GIP;

17     • GIP's claim that Mr. Youssefzadeh was no longer employed by GIP

18     when he sent the June 26, 2017 emails to Boeing and SpaceX is an easily

19     provable falsehood;

20     • GIP has not disputed that privileged information was disclosed to Boeing

21     and SpaceX, or that GIP ratified those disclosures; and

22     • GIP's claim that Mr. Youssefzadeh lacked the authority to make

23     disclosures to Boeing and SpaceX is false factually and incorrect legally.

24     Both the record and the law are clear: the Milbank and Chen Memos and related

25     communications are not privileged.

26  **II.    GIP HAS MATERIALLY MISCHARACTERIZED THE NATURE OF**

27  **THE PARTIES' DISPUTE.**

28     As a preliminary matter, GIP has mischaracterized this litigation as merely a

- 2 -

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

242063.24

1    dispute between two factions of GIP shareholders – Bronzelink and the common

2    shareholders.  Although Bronzelink and the common shareholders are indeed adverse

3    to each other, this litigation arises from defendant Dong Yin's theft of Plaintiffs'

4    project to develop, launch and operate a state-of-the-art communications satellite, in

5    violation of U.S. export control laws, including the PRC Proscription.  The Milbank

6    Memo and the Chen Memo were prepared in response to this issue, not a shareholder

7    dispute.

8    **III.  AS A MATTER OF FACT AND LAW, BRONZELINK AND**

9          **GIP-CAYMAN ARE NOT PARENT AND SUBSIDIARY FOR**

10          **PRIVILEGE PURPOSES.**

11        GIP admits that the Milbank and Chen Memos were disclosed to Bronzelink.

12    (Opp., pp. 6, 20.)  GIP nonetheless contends that its disclosures to Bronzelink did not

13    constitute a waiver because "a company may disclose privileged information to a

14    parent company without waiving the privilege."  (Opp., p. 13.)  This argument fails

15    both legally and factually.

16        **A.  Applicable Law Regarding Attorney-Client Communications**

17          **Between Related Entities.**

18        In their Moving Papers, Plaintiffs cite several cases establishing that

19    communications shared between a subsidiary and its majority owners are not

20    privileged, unless the corporations are closely affiliated or share an identity of legal

21    interests.  (*See* Motion, at 26 (citing cases).)  The cited cases expressly held that a

22    company waived the privilege by sharing privileged communications with its majority

23    shareholder.  *In re Fresh and Process Potatoes Antitrust Litigation*, 2014 WL

24    2435581, at *11 (D. Idaho 2014) (privilege waived where communications were

25    shared between subsidiary and 51% owners); *DeFrees v. Kirkland,* 2012 WL 1356495

26    at *13 (C.D. Cal. Apr. 11, 2012) (privilege waived when directors forwarded legal

27    memorandum to controlling shareholder).  GIP does not even attempt to distinguish

28    these or the other cases cited by Plaintiffs.

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

242063.24

1    Instead, GIP relies on a string-cite of ten cases, eight of which involved wholly

2    owned subsidiaries or communications within the same corporation.  (Opp., pp. 13,

3    20.)[2]  For example, in *In re Teleglobe*, 493 F.3d 345 (3d Cir. 2007), the court held:

> [P]arents and their wholly owned subsidiaries have the same
> interests because all of the duties owed to the subsidiaries flow
> back up to the parent.  [Citations]  While we normally assume that
> a corporation's primary interest is in maximizing its economic
> value, the only interest of a wholly owned subsidiary is in serving
> its parent.

8    *Id.* at 366–67; *see also U.S. v. Under Seal (In re Under Seal)*, 902 F.2d 244, 245 (4th

9    Cir. 1990) (communications between movant and wholly owned subsidiary); *Glidden*

10   *Co. v. Jandernoa*, 173 F.R.D. 459, 473 (W.D. Mich. 1997) ("As . . . a *wholly owned*

11   subsidiary [its] officers had no legal ability to resist disclosure to [parent], including

12   its attorney-client communications." (emphasis added)); *U.S. v. ChevronTexaco*

13   *Corp.*, 241 F. Supp. 2d 1065, 1077 (N.D. Cal. 2003) (communications between

14   employees of *same* corporation); *Miller v. Int'l Bus. Machines*, 2006 WL 1141090, at

15   *3 (N.D. Cal. May 1, 2006) (where plaintiff moved to compel IBM to produce *non-*

16   *privileged* documents, IBM met the standard that "a corporation must produce

17   documents possessed by a subsidiary that the parent corporation *owns or wholly*

18   *controls*"); *Guy v. United Healthcare Corp.*, 154 F.R.D. 172, 177-78 (S.D. Ohio 1993)

19   ("disclosure . . .by a *wholly owned* subsidiary will not result in a waiver"); *Leybold-*

20   *Heraeus Techs., Inc. v. Midwest Instrument Co.*, 118 F.R.D. 609, 613 (E.D. Wis.

21   1987) (finding that "LHT and LHG are related *as parent and subsidiary* companies"

---

23   [2] In two of the cases cited by GIP, the court referred to "affiliated" entities
24   without specifying the corporate relationship; however, the courts found that the
     corporations were closely related and shared an identity of legal interests.  *See U.S. v.*
25   *United Shoe Machinery Corp.*, 89 F. Supp. 357 (1950) ("These corporations all used
     the same outside and inside counsel.  The legal affairs of these corporations were
26   closely related."); *U.S. v. AT&T*, 86 F.R.D. 603, 615-16 (1979) (concluding that the
27   "related corporations had a substantial identity of legal interest" where "both parties
     contend that the wholly-owned and majority owned affiliates of AT&T have close and
28   long-standing relationships with each other").

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

242063.24

1  and that joint defense exception applied); *Duplan Corp. v. Deering Milliken, Inc.*, 397

2  F. Supp. 1146, 1184 (D.S.C. 1974) (finding the "corporate entities . . . are under

3  *common ownership or control*" and "were interested in the lawsuits") (emphasis

4  added).

5          None of these authorities is applicable here, because GIP-Cayman is not a

6  wholly owned subsidiary.  Rather, the cases cited by Plaintiffs are controlling, and

7  establish that GIP waived the privilege by disclosing the Milbank Memo and the Chen

8  Memo to Bronzelink.

9          **B.      GIP-Cayman is Not a Subsidiary of Bronzelink.**

10         Bronzelink is not GIP-Cayman's parent company, but merely an investor in,

11 and the majority shareholder of, GIP-Cayman.  Unlike the subsidiary in *In re*

12 *Teleglobe*, GIP-Cayman is not solely devoted to serving Bronzelink.  Rather, GIP-

13 Cayman's common shareholders have separate interests and rights in GIP-Cayman,

14 including the right to elect three directors to the nine member Board of Directors.  In

15 addition, the SHA expressly provides that the common shareholders have independent

16 rights, including the right to select the initial CEO of GIP-Cayman and to veto

17 subsequent CEO appointments.  (Supplemental Declaration of Emil Youssefzadeh

18 ("Supp. E.Y. Decl."), ¶ 3; *see also*, Compendium of Exhibits and Appendices filed in

19 support of Plaintiffs' Motion ("Compendium"), **Exhibit 7**, § 3.12(a), (b).)  Indeed,

20 when the Milbank and Chen Memos were distributed, the top management of

21 GIP-Cayman and GIP-USA – Mr. Youssefzadeh, Mr. Javed and Mr. Pourmand - were

22 affiliated with the common shareholders.  (U.J. Decl. ¶¶ 13, 15, 52-59.)  Furthermore,

23 the SHA provides that certain important company matters such as the issuance of new

24 shares and the liquidation and winding up of the company are "Supermajority

25 Matters" requiring the approval of at least two of the common directors.

26 (Compendium, **Exh. 7**, SHA, § 3.9; Supp. E.Y. Decl., ¶ 3.)  GIP's attempt to

27 characterize Bronzelink as its parent company cannot be squared with these facts.

28 ///

- 5 -

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

242063.24

1
2

**C.    GIP-Cayman and Bronzelink Have Adverse Business and Legal Interests.**

3    Nor does Bronzelink share a unity of legal and business interests with

4  GIP-Cayman.  GIP-Cayman owed a duty to all of its shareholders, including the

5  common shareholders, and the common shareholders' interests clearly were adverse to

6  Bronzelink.  Specifically, the common shareholders sought to limit Dong Yin's

7  control over GIP-Cayman by curbing Bronzelink's control and dominance of

8  GIP-Cayman and its Board of Directors.  This issue is spelled out in detail in the

9  June 27, 2017 email from GIP's attorney, Dara Panahy, to Terry Long of Dong Yin.

10  (*See* Supplemental Compendium ("Supp. Compendium"), **Exhibit 86**.)

11    In addition, Bronzelink did not share a unity of interests with, and in fact was

12  adverse to, GIP-Cayman's upper management.  Indeed, on June 4, 2017,

13  Mr. Youssefzadeh, Mr. Javed and Pourmand, the top executives at GIP, sent

14  Bronzelink a notice of their intent to commence a legal action against Bronzelink for

15  violations of the SHA, including violations related to the export compliance issue.

16  (*See* Compendium, **Exhibit 33**.)

17    Moreover, at the time the Milbank and Chen Memos were disclosed,

18  GIP Cayman and Bronzelink had separate counsel, a clear acknowledgement and

19  recognition of the fact that they did not share a unity of legal interests.  (U.J. Decl.,

20  ¶¶ 135, 138.)

21    To this day, GIP-Cayman and Bronzelink do not share a unity of interests.

22  Despite Bronzelink's professed interest in compliance, Fan, Wong and Liu are still

23  members of the GIP-Cayman Board of Directors.  In fact, Wong is now the Chairman

24  of the GIP Board.  (Supp. U.J. Decl., ¶ 28.)  In addition, the Bronzelink-appointed

25  directors are still refusing to convene board meetings noticed by the directors

26  appointed by the common shareholders or give those directors even the most basic

27  information about GIP-Cayman's financial condition.  (Supp. E.Y. Decl., ¶¶ 6-10.)

28    Finally, GIP's business interests are not aligned with Bronzelink.   Bronzelink

1   is obligated to provide, but has not provided, a $25 million line of credit to GIP-

2   Cayman, so the two companies are adverse to each other with respect to this multi-

3   million dollar obligation.  (Supp. E.Y. Decl., ¶ 4.)

4   **IV.   AS A MATTER OF FACT AND LAW, THERE WAS NO COMMON**

5        **INTEREST OR JOINT DEFENSE AGREEMENT BETWEEN**

6        **GIP-CAYMAN AND BRONZELINK, BOEING, OR SPACEX**

7        **REGARDING COMPLIANCE WITH U.S. EXPORT CONTROL LAWS.**

8        **A.   Applicable Law Regarding Common Interest and Joint**

9             **Defense Agreements.**

10   "[T]he 'common interest' or 'joint defense' rule is an exception to ordinary

11   waiver rules," designed to allow "attorney for different clients . . . to communicate

12   with each other."  *In re Pacific Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012).

13   For the exception to apply, several criteria must be met.

14        First, "attorneys for different clients" must be "pursuing a common legal

15   strategy."  *Id.* at 1129; *see also U.S. ex rel. Burroughs v. DeNardi Corp.*, 167 F.R.D.

16   680, 685 (S.D. Cal. 1996) (there must be "an on-going and joint effort to set up a

17   common defense strategy").  A common "commercial" interest between the parties is

18   not enough.  *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 579 (N.D. Cal.

19   2007).  Nor is a common interest in "legal compliance."  *See Harris v. Lang Pharma*

20   *Nutrition, Inc.*, 2015 WL 12832093, at *2 (C.D. Cal. 2015) ("[T]he only common

21   legal interest between Lang and CVS would have been to comply with the laws

22   applicable to the products they sold.  If such a general legal interest were sufficient,

23   the common interest exception would swallow the waiver rule."); *FSP Stallion 1, LLC*

24   *v. Luce*, 2010 WL 3895914, at *21 (D. Nev. Sep. 30, 2010) (interest in structuring and

25   implementing transaction "in compliance with applicable securities law and

26   regulations" was "insufficient to show [parties] shared a common legal interest" for

27   purposes of common interest doctrine); *In re Fresh & Process Potatoes Antitrust*

28   *Litig.*, 2014 WL 2435581, at *7 (D. Idaho 2014) ("The fact they may have had a

- 7 -
**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

1  shared desire to maintain compliance [with the Capper-Volstead Act] and avoid

2  litigation . . . does not transform the cooperatives' common interest . . . into a legal, as

3  opposed to commercial, matter.") (internal quotation marks omitted).

4      Second, the communications must be made pursuant to "some form of

5  agreement" entered into "before the disclosure." *Pacific Pictures*, 679 F.3d at 1129;

6  *see also Nelson v. Millenium Labs., Inc*., 2013 WL 11687684, at *3 (D. Ariz. 2013)

7  ("Before applying the common interest doctrine, a court must find that a common

8  interest ***agreement*** exists.") (emphasis added); *In re Grand Jury Subpoena: Under*

9  *Seal*, 415 F.3d 333, 341 (4th Cir. 2005) (where "agreement to share information

10 pursuant to a common interest did not exist prior to December 2001," party had "no

11 joint defense privilege before that time").

12     Finally, the communications must be made to counsel.  *See Waymo LLC v.*

13 *Uber Technologies, Inc*., 2017 WL 2694191, at *4 (N.D. Cal. Jun. 21, 2017) ("[The

14 common interest doctrine] extends the [attorney-client] privilege to protect . . . the

15 confidentiality of communications passing . . . from one party to ***the attorney*** for

16 another party . . . .") (emphasis added); *Carl Zeiss Vision Int'l Gmbh v. Signet*

17 *Armorlite Inc*, 2009 WL 4642388, at *7 (S.D. Cal. 2009) (where "the *employees* of the

18 respective entities shared in the communications, not the *attorneys*," the

19 communications were "stripped of the attorney-client privilege") (emphasis in

20 original); *In re Teleglobe Communications Corp.,* 493 F.3d 345, 364 (3d Cir. 2007)

21 ("[T]o be eligible for continued protection, the communication must be shared with

22 the *attorney* of the member of the community of interest") (emphasis in original).

23     **B.    There Was No Common Interest or Joint Defense Agreement**

24          **Between GIP and Bronzelink.**

25     To the extent GIP asserts that the common interest exception applies to its

26 disclosures to Bronzelink, its argument fails on multiple grounds.  *First*, as set forth

27 above, GIP and Bronzelink did not share a common legal interest.  *Second*, GIP has

28 presented no evidence – because there is none – that the attorneys for GIP and

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

1    Bronzelink entered into a common interest agreement before the disclosures to

2    Bronzelink were made.  In fact, the declarations of Mr. Youssefzadeh and Mr. Javed

3    establish that GIP never entered into any such agreement.  (U.J. Decl., ¶ 144,

4    E.Y. Decl. ¶ 106.)  *Third*, the parties were not engaged in litigation at the time of the

5    disclosures, and a shared interest in conducting commercial transactions in

6    compliance with the law is insufficient.  *Finally*, there is no indication that the

7    disclosures to Bronzelink were made by or to counsel.

8    **C.    There Was No Common Interest or Joint Defense Agreement**

9    **Between GIP and Boeing or SpaceX.**

10    GIP has not identified any common legal interest it had with SpaceX.  With

11    respect to Boeing, GIP asserts that "those communications were made confidentially

12    and pursuant to a common legal compliance interest."  (Opp., pp. 22-23.)  As noted

13    above, however, a common interest in "legal compliance" is insufficient.  *See FSP*

14    *Stallion 1,* 2010 WL 3895914, at *21; *Harris v, Inc*., 2015 WL 12832093, at *2; *Fresh*

15    *& Process Potatoes Antitrust Litig*., 2014 WL 2435581, at *7.

16    GIP also argues that "[c]ommunications such as those sent by Youssefzadeh

17    would be treated as confidential pursuant to the non-disclosure agreement between

18    GIP and Boeing."  (Opp., p. 8.)  None of the cases cited by GIP, including *Nidec*, 249

19    F.R.D. 575, on which it principally relies, mention non-disclosure agreements, let

20    alone hold that non-disclosure agreements are tantamount to common interest

21    agreements.  Non-disclosure agreements are simply agreements to keep specified

22    information confidential.  *See, e.g.,* "Confidentiality or Nondisclosure Agreement,"

23    Basic Legal Transactions § 25:2 (Nov. 2010).  By contrast, common interest

24    agreements specifically cover the exchange of communications in the course of

25    "pursuing a common legal strategy."  *Pacific Pictures*, 679 F.3d at 1129.  Here,

26    neither of the two non-disclosure agreements identify any common legal interest

27    between the parties, and the excerpts that GIP has submitted do not even define what

28    constitutes "Confidential Information" (in the case of the SpaceX agreement) or

- 9 -

1    "Proprietary Information" (in the case of the Boeing agreement).  (*See* Opp.

2    Compendium, Ex. A.)  Accordingly, GIP has thus not satisfied its burden of

3    establishing the "agreement" element under the common interest rule.

4            Finally, GIP has presented no evidence that its communications were with

5    *counsel* for Boeing or SpaceX.  To the contrary, in the case of Boeing, Plaintiffs have

6    submitted evidence that Mr. Youssefzadeh and Pourmand communicated directly with

7    William Masters, its Contract Manager.  (Compendium, **Exhs. 45, 54**.)

8    **V.    AS A MATTER OF FACT AND LAW, MR. YOUSSEFZADEH AND**

9           **MR. JAVED REMAINED EMPLOYED BY AND HAD AUTHORITY TO**

10          **ACT ON BEHALF OF GIP-CAYMAN AND GIP-USA THROUGH**

11          **AUGUST 16, 2017.**

12           While he was employed by GIP, Mr. Youssefzadeh was the acting CEO, Chief

13   Technical Officer and Chairman of the Management Committee.  He continued to

14   serve as the acting CEO until Pourmand was given the CEO's authority on

15   July 17, 2017, and continued to serve as the Chief Technical Officer and Chairman of

16   the Management Committee until his resignation became effective on

17   August 16, 2017.  (Supp. E.Y. Decl. ¶ 12.)  Mr. Javed served as the President and

18   Chief Operating Officer of GIP until August 16, 2017.  (Supp. U.J. Decl. ¶ 2.)

19   Therefore, prior to August 16, 2017, Mr. Youssefzadeh and Mr. Javed had the

20   authority to act on behalf of the GIP-Cayman and GIP-USA.

21           GIP contends that after Mr. Youssefzadeh tendered his resignation, he was no

22   longer an employee of GIP-Cayman and therefore lacked the authority to act on behalf

23   of the company or waive the privilege.  (Opp., p. 21.)  This claim is demonstrably

24   false. The Supplemental Compendium of Exhibits filed concurrently herewith

25   includes documentation proving that Mr. Youssefzadeh and Mr. Javed were both

26   employed by GIP until August 16, 2018.  That documentation includes letters from

27   GIP to Mr. Youssefzadeh and Mr. Javed dated August 9, 2018, informing each of

28   them that the GIP-Cayman and GIP-USA directors "accept your resignation from all

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

1   Global IP executive officer positions effective August 16, 2017," and that, "[y]our

2   separation date and final date of employment is August 16, 2017."  The letters were

3   signed by none other than Pourmand, whose declaration GIP is relying on in support

4   of its Opposition.  (Supp. U.J. Decl., ¶ 4; Supp. Compendium, **Exh. 81**; Supp.

5   E.Y. Decl., ¶ 14; Supp. Compendium, **Exh. 97**.)

6        Mr. Youssefzadeh and Mr. Javed negotiated and executed the Boeing and

7   SpaceX contracts and provided certifications under the contracts; Mr. Javed was also

8   the designated point of contact for both Boeing and SpaceX.  (E.Y. Decl., ¶¶ 46-47,

9   67; U.J. Decl., ¶¶ 61-66; Supp. U.J. Decl., ¶ 21.)  Each of them clearly had the

10  authority to make disclosures to Boeing and SpaceX which were material to these

11  contracts.

12       Furthermore, Mr. Youssefzadeh had express authority from the Board to make

13  any necessary disclosures to SpaceX, as provided in the Board's March 3, 2017

14  resolution authorizing GIP-Cayman to enter into and perform that contract.  That

15  resolution gave Mr. Youssefzadeh, as the Chief Technical Officer, "absolute

16  discretion" to deliver any notices or other documents or perform any other acts and

17  things as in his "sole opinion and absolute discretion" was "necessary or desirable" for

18  the performance of the SpaceX contract.  (Supp. E.Y. Decl., ¶ 19; Supp.

19  Compendium, **Exh. 98**.)

20       In addition, corporate executives are generally authorized to perform

21  transactions which bind the company without first obtaining board approval.  *Bakst v.*

22  *Cmty. Mem'l Health Sys., Inc*., 2011 WL 13214315, at *4 (C.D. Cal. 2011) ("[I]t is

23  well established that the general manager has implied authority to bind the corporation

24  and do in the transaction of its ordinary affairs whatever the corporation itself could

25  do within the scope of its powers."); *Monteleone v. S. California Vending Corp*., 264

26  Cal. App. 2d 798, 806 (1968) ("[A]n executive officer of a corporation . . . is more

27  than an agent and acts and speaks directly for the corporation in conducting its

28  activities and objects"); *Kagel v. First Commonwealth Co*., 409 F. Supp. 1396, 1400

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

1   (N.D. Cal. 1973), *aff'd, 534 F.2d 194* (9th Cir. 1976) (same; holding "Kimball was

2   clearly acting in his corporate capacity [as EVP] and, therefore, required no written

3   authorization from First Commonwealth to enter into a contract with SFO for the

4   purchase of Larkin").

5   **VI.   ANY PRIVILEGE APPLICABLE TO THE MILBANK AND**

6         **CHEN MEMOS HAS BEEN WAIVED BY DISCLOSURES TO**

7         **NUMEROUS THIRD PARTIES.**

8         GIP's disclosures of the Milbank and Chen Memos to third parties prove that

9   the Memos were not intended to be confidential and that any claim of privilege has

10   been waived.

11         **A.   The Disclosures to Shiwen Fan Waived the Privilege.**

12         It is beyond dispute that Shiwen Fan, who was a member of the GIP-Cayman

13   Board of Directors, received both the Milbank and the Chen Memos.  (U.J. Decl.,

14   ¶¶ 71-72, 95; Compendium, **Exhs. 26, 27, 39**.)

15         As set forth in detail in the FAC, Fan is in many respects the central figure in

16   Dong Yin's scheme to obtain control over the governance, management and

17   operations of GIP-Cayman in order to gain access to embargoed data.  In their Motion,

18   Plaintiffs argue that the GIP waived any claim of privilege by providing the Milbank

19   and Chen Memos to Fan – an attorney and authorized representative of Dong Yin and

20   a member of the Bronzelink Board – without making any attempt to ensure that Fan

21   would keep those memoranda confidential.  GIP does not address this argument in its

22   Opposition, instead relegating its entire discussion of Fan to a pair of misleadingly

23   innocuous references in a footnote.  (*See* Opp. p. 17, fn. 9.)

24         GIP has also chosen not to provide a declaration from Fan.  The court can and

25   should draw an adverse inference from this glaring omission.  *See United States v.*

26   *Bramble*, 680 F.2d 590, 592 (9th Cir. 1982) ("[A]n inference of unfavorable testimony

27   from an absent witness is a natural and reasonable one."); *United States v. Lewis*, 40

28   F.3d 1325, 1336 (1st Cir. 1994) ( a party's failure to produce a particular witness may

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

1    justify the inference that the witness' testimony would have been unfavorable to that

2    party ); *United States v. Noah*, 475 F.2d 688, 691 (9th Cir. 1973) ("The failure of a

3    party to produce a material witness who could elucidate matters under investigation

4    gives rise to a presumption that the testimony of that witness would be unfavorable to

5    that party if the witness is peculiarly within the party's control.") (citations omitted).

6         The basis for such an inference "is the simple proposition that if a party has

7    evidence which will illuminate questions in issue and fails to present it, it may be

8    inferred that such evidence would be harmful to his case." *United States v. Johnson*,

9    467 F.2d 804, 808 (1st Cir.), *cert. denied*, 410 U.S. 909(1973); *accord Graves v.*

10   *United States*, 150 U.S. 118, 121 (1893) ("[I]f a party has it peculiarly within his

11   power to produce witnesses whose testimony would elucidate the transaction, the fact

12   that he does not do it creates the presumption that the testimony, if produced, would

13   be unfavorable.").

14        The Court should draw the logical inference that GIP has chosen to ignore Fan

15   because they are unable to address their disclosures to him on the merits.

16        **B.     The Disclosures to Dong Yin Employees and Consultants**

17             **Waived the Privilege.**

18        As set forth in the Motion, there is considerable evidence that the Memos were

19   read by and/or substantively discussed with Dong Yin employees and consultants.

20   (Motion, pp. 16-18; 25-26.)  Ignoring this evidence, and without providing any

21   evidence to the contrary, GIP contends that it did not disclose the Milbank and Chen

22   Memos or their contents to anyone at Dong Yin.  (Opp. p. 16.)  GIP's assertions are

23   demonstrably false.[3]

24   _____

25        [3] GIP provides a declaration from defendant Ludwig Chang in support of its
     position that Plaintiffs had sought to enlist the help of Dong Yin to resolve their
26   dispute.  *See* Declaration of Ludwig Chang (Dkt. No. 34-2).   The Chang Declaration
     was not executed by Mr. Chang.  As such, it is improper and must be stricken,
27   pursuant to 28 U.S.C. Section 1746.  *See* Plaintiff's Evidentiary Objections, p. 5, ¶ 14.
     That said, however, the Chang Declaration completely supports Plaintiffs' argument
28

*Continued on next page...*

1          **1.      *Terry Long, Xinyi Dong and Yang Zeng.***

2          The Milbank and Chen Memos were disclosed to Dong Yin executives Terry

3   Long ("Long"), Xinyi Dong ("Dong") and Yang Zeng ("Zeng").  (Motion, p. 25.)  In

4   its Opposition, GIP completely ignores Zeng, failing to either mention him or provide

5   a declaration from him.

6          GIP asserts that neither Long nor Dong received the Memos.  This assertion is

7   supported by two-paragraph declarations from Dong Yin executives Long and Dong,

8   which are notable only for how little they say.  The declarations offer the identical

9   assertion that neither declarant "recall[s] seeing or reviewing the contents of a legal

10  memorandum prepared by Chris Chen for GIP and dated on or about June 2017 or a

11  legal memorandum prepared by Milbank for GIP and dated on or about April 2017."

12  Declaration of Terry Long (Dkt. No. 34-4), ¶ 2; Declaration of Xinyi Dong (Dkt. No.

13  34-7), ¶ 2.  Neither declarant stated whether he was aware of the legal advice and

14  analysis set forth in the Milbank and Chen Memos or otherwise obtained GIP's

15  privileged information.  Neither declarant discusses Dong Yin's communications with

16  Panahy regarding U.S. export control laws, or the meetings he had with

17  Mr. Youssefzadeh and Mr. Javed at which compliance with the export control laws

18  was discussed.  Accordingly, neither declarant rebuts the evidence that Dong Yin was

19  aware of the legal analysis and advice set forth in the Milbank and Chen Memos.

20         Furthermore, it is beyond dispute that Mr. Long was fully briefed on U.S.

21  export compliance issues by Dara Panahy, the author of the Milbank Memo.  In a

22  June 27, 2017 email, Mr. Panahy informed Mr. Long that Mr. Youssefzadeh,

23  Mr. Javed and Chris Chen had resigned, all "citing serious concerns about the

24

25  _____

26  that this was not merely a dispute between the common shareholders and the
    Bronzelink-appointed shareholders.  It was also a dispute about Dong Yin's
27  overreaching and using Bronzelink as a vehicle to gain operational control over the
    GIP-Cayman Board.  That is why Mr. Youssefzadeh and Mr. Javed reached out to
28  Mr. Chang and asked him to intercede with Dong Yin.  (Supp. U.J. Decl., ¶¶ 7-16.)

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**
242063.24

1   corporate governance of Global IP by its Board of Directors and the resulting

2   compliance implications with respect to U.S. export control laws and regulations."

3   (Supp. U.J. Decl., ¶¶ 13-14; Supp. Compendium, **Exh. 85**.)   Mr. Panahy's email also

4   includes a discussion of the compliance issues that caused Mr. Youssefzadeh,

5   Mr. Javed and Chen to resign and suggestions about how to reconfigure the Board of

6   Directors to comply with the PRC Proscription, explaining that:

7
>        Emil and Umar for a few months now have expressed concerns
8        about the corporate governance defects of Global IP and the
>        disregard for compliance with U.S. export control laws and
9        regulations that the Series A Directors have demonstrated, and
>        tried in good faith to work with other Directors of Global IP to
10       resolve these matters in the best interest of Global IP and its
>        shareholders, including Bronzelink. . . Emil and Umar have a very
11       serious concern that the Bronzelink-appointed Directors of Global
>        IP do not understand, or do not wish to understand, the critical
12       importance of immediately correcting the corporate governance
>        matters facing Global IP which, if not resolved immediately, could
13       quickly lead to violations under U.S. export controls laws and
>        regulations. . .
14
>        One potential solution that Emil and Umar have suggested is for
15       Bronzelink to have a truly independent, outside third party (such as
>        an independent executive/director search firm) identify a number
16       of appropriately qualified and truly independent Director
>        candidates with no past or existing personal or business
17       connections or ties to Bronzelink, or Bronzelink's shareholder(s),
>        and have Bronzelink select and appoint from this group of
18       candidates a minimum of 4 truly independent Directors on the
>        Board of Global IP, to serve alongside with the 3 Founder
19       Directors, Mr. Fan and 1 director identified and appointed directly
>        by Bronzelink (or any other qualified 1 Director identified and
20       appointed directly by Bronzelink).
21

22

23   *Id*.  Dong Yin's declarations are brief precisely because GIP is unable to address such

24   disclosures on the merits.

25   ## 2.   *Dr. Michael Altwein and Pin Fen Miao.*

26       On or about November 16, 2017, Mr. Youssefzadeh and Mr. Javed met with Dr.

27   Michael Altwein ("Altwein") and Pin Fen Miao ("Miao"), whom they were told were

28   consultants retained by Dong Yin.  (E.Y. Decl., ¶ 103; U.J. Decl., ¶ 141.)

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**
242063.24

1    In its Opposition, GIP contends that Altwein and Miao were Bronzelink

2  consultants who had "come to Los Angeles to meet with individuals at GIP USA for

3  the purpose of gauging the economic possibilities of the satellite and

4  telecommunications market for sub-Sahara Africa."  (Opp. at p. 18.)

5    This assertion is not credible.  The consultants never discussed GIP's economic

6  prospects in their meeting with Mr. Youssefzadeh and Mr. Javed, never asked for any

7  financial or sales forecasts or data, and had no reason to meet with Mr. Youssefzadeh

8  and Mr. Javed about sales issues three months after their employment with GIP had

9  ended.  (Supp. E.Y. Decl. ¶ 23; Supp. U.J. Decl., ¶ 16.)  GIP has also failed to produce

10 contracts or other documents supporting its assertion that the consultants worked for

11 Bronzelink rather than Dong Yin, even though any such evidence is uniquely within

12 its control.

13    GIP does not dispute that Altwein and Miao read the Milbank and Chen

14 Memos, has not explained why they were given the Memos, and has not provided a

15 declaration from either consultant.  The unrebutted evidence that Altwein and Miao

16 received the Memos establishes that GIP waived any possible claim of privilege.

17      ***3.      The Disclosures to the Bronzelink Directors Waived the***

18              ***Privilege.***

19    The Milbank and Chen Memos were disclosed to GIP-Cayman directors,

20 including Wong, Liu and Zheng, who were also members of the Bronzelink Board of

21 Directors.  By providing the Memos to these board members without any restrictions

22 on their use, GIP disclosed the Memos to Bronzelink.  As Liu admits in her

23 declaration, "due to duplication of director appointments, Bronzelink from time to

24 time receives privileged and/or confidential information relating to GIP."

25 (Declaration of Shiyue Liu ("Liu Decl."), pp. 2-3.)  (Dkt. No. 34-3.)

26    The privilege is waived where, as here, attorney-client communications are

27 disclosed to board members with conflicting interests.  *See DeFrees v. Kirkland*, 2012

28 WL 1356495, at *10 (C.D. Cal. Apr. 11, 2012) (holding that CEO's voluntary

1    disclosure of privileged legal memoranda to the full board waived the attorney-client

2    privilege on behalf of the corporation, where the majority directors were "persons who

3    possessed interests adverse to" the company); *S.E.C. v. Mircrotune, Inc.*, 258 F.R.D.

4    310, 317 (N.D. Tex. 2009) (holding that attorney-client privilege was waived with

5    respect to "all documents relating to internal investigation of company's stock option

6    practices" when, among other things, the corporation's audit committee shared the

7    results of its internal investigation with the company's entire board); *Re: Ryan v.*

8    *Gifford*, 2007 WL 4259557, at *3 (Del. Ch. Nov. 30, 2007) (applying Delaware law;

9    attorney-client privilege was waived when special committee orally reported the result

10    of an internal investigation to board members, some of whom were subjects of the

11    investigation and "whose interests [were] not common with the client"); *In re OM*

12    *Group Securities Litig.*, 226 F.R.D. 579, 592 (N.D. Ohio 2005) (holding that privilege

13    was waived with respect to all documents that related to, referred to, or were relied on

14    in a power point presentation to the company's board of directors about an internal

15    investigation).

16           Any privilege that may have applied to the Milbank and Chen Memos was

17    waived when they were disclosed to GIP-Cayman's entire Board, including the

18    Bronzelink Board members, without any limitation being placed on their ability to

19    disclose the Memos or use them on behalf of Bronzelink. [4]

20           ***4.    The Disclosures to Bronzelink Employees Waived the Privilege.***

21           In their moving papers, Plaintiffs presented evidence that Calvin Tang

22    ("Tang"), a Bronzelink employee, admitted to Mr. Youssefzadeh and Mr. Javed that

23

24           [4] In addition, the disclosures to Bronzelink were not confidential.  GIP has
      submitted declarations stating that GIP took steps to maintain the confidentiality of
25    certain information, but it has not submitted any evidence that Bronzelink entered into
      nondisclosure or confidentiality agreements.  Moreover, the Amore Facility
26    Agreement expressly provides that Amore has access to the GIP documents received
      by Bronzelink, necessarily including the Milbank Memo and the Chen Memo.
27    (Compendium, **Exh. 43**, p. 445.)

28

1    he had read the Milbank Memo and that Wenjie Li ("Li"), a Bronzelink consultant,

2    confirmed to Mr. Javed that she had read both the Milbank and Chen Memos.

3    (Motion, p. 16-18; U.J. Decl., ¶¶ 90, 139, E.Y. Decl. ¶ 70.)

4         Even if GIP were permitted to disclose privileged information to Bronzelink

5    and its consultants, these disclosures would waive the privilege because GIP has not

6    shown that the disclosures were made "for the purpose of securing legal

7    advice; . . . the subject matter of the communication is within the scope of the

8    employee's corporate duties; and . . . the communication is not disseminated beyond

9    those persons who, because of the corporate structure, need to know its contents."

10   *See Cohen v. Trump*, 2015 WL 3617124, at *14 (S.D. Cal. 2015), *citing Diversified*

11   *Indus., Inc. v. Meredith*, 572 F.2d 596, 609 (8th Cir.1977); *see also United States v.*

12   *Davita, Inc.*, 301 F.R.D. 676, 682 (N.D. Ga. 2014) ("a communication loses its

13   protection if . . . disseminated beyond the group of corporate employees who have a

14   need to know in the scope of their corporate responsibilities.") (internal quotation

15   marks omitted); *In re Vioxx Prod. Liab. Litig.*, 501 F. Supp. 2d 789, 796 (E.D. La.

16   2007) (same).

17        Tang and Li are barely mentioned in the Opposition.  GIP does not dispute that

18   Tang read the Milbank Memo or that Li read both the Milbank and Chen Memos.

19   GIP does not attempt to justify these disclosures as necessary for Bronzelink to obtain

20   or evaluate legal advice.  And GIP does not present a declaration from either of them.

21   Accordingly, GIP has not met its burden of demonstrating that those disclosures did

22   not waive privilege.

23              **5.    *The Disclosures to Sidley Austin and Sheppard Mullin Waived***

24                     ***the Privilege.***

25        In its Opposition, GIP fails to address the disclosure of the Milbank Memo and

26   other attorney-client communications to Bronzelink's transactional counsel, Sidley.

27   (U.J. Decl., ¶ 134, Compendium, **Exh. 59**.)  Panahy, who sent the Milbank Memo to

28   Sidley on July 10, 2017, does not discuss or attempt to justify this disclosure in his

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

1    declaration, and GIP has not provided a declaration from any of the Sidley attorneys.

2        Furthermore, GIP cannot invoke the common interest or joint defense doctrine

3    to justify the disclosures to Sidley.  Panahy's July 10, 2017 email was sent, not only to

4    Sidley, but also to Mr. Youssefzadeh, Mr. Javed, and the Bronzelink-appointed

5    directors.  At that time, Mr. Youssefzadeh and Mr. Javed were clearly adverse to the

6    Bronzelink-appointed directors, and had even threatened to sue Bronzelink.  By no

7    stretch of the imagination can this be considered a communication in furtherance of

8    the common interests of the recipients.  Nor is there any evidence of an agreement

9    between Milbank and Sidley to exchange privileged information, and as stated above,

10   the joint defense privilege only applies when the disclosure is made pursuant to an

11   agreement.

12       GIP's Opposition also fails to address the disclosure of GIP's privileged

13   communications to SMRH at a time when SMRH was acting solely as Bronzelink's

14   counsel.  GIP has not provided a declaration from SMRH discussing the disclosures,

15   and has not set forth any evidence of a joint defense agreement, or even contended

16   that one existed at that time.  For all of these reasons, GIP's disclosure to Sidley and

17   SMRH waives the privilege.

18       **C.    The Disclosures to Boeing and SpaceX Waived the Privilege.**

19       In their moving papers, Plaintiffs contend that GIP waived its attorney-client

20   privilege as a result of disclosing the subject matter of the Milbank and Chen Memos

21   to Boeing and SpaceX and by failing to take reasonable steps to limit the

22   consequences of those disclosures.  (Motion, pp. 28-29.)

23       In its Opposition, GIP does not dispute those disclosures.  Indeed, GIP

24   submitted discovery responses by Chris Chen stating that GIP disclosed privileged

25   information to third parties.  Opp. Compendium, Exh. L, pp. 4, 8.  Chen's further

26   discovery responses establish that GIP disclosed privileged information to numerous

27   employees of Boeing and SpaceX.  (Supp. J.F. Decl., ¶ 6; Supp. Compendium,

28   **Exh. 99**, pp. 3-5.)

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**
242063.24

1        ***1.    Mr. Youssefzadeh Was Authorized to Waive the Privilege on***

2                        ***Behalf of GIP-Cayman.***

3        GIP argues that the disclosures to Boeing and SpaceX by Mr. Youssefzadeh

4    were unauthorized and a breach of Mr. Youssefzadeh's fiduciary duties.  (Opp.,

5    pp. 21-22.)  Neither argument has any merit.

6        The case law cited above demonstrates that corporate executives have broad

7    authority to act on behalf of their corporations.  The case-law further establishes that

8    corporate executives can waive a privilege held by the corporation.  *Commodity*

9    *Futures Trading Com'n v. Weintraub* ("*Weintraub*"), 471 U.S. 343, 348-49 (1985) (In

10   the corporate context, "the power to waive the corporate attorney-client privilege rests

11   with the corporation's management and is normally exercised by its officers and

12   directors."); *see also Reinsdorf v. Skechers USA Inc*., 2013 WL 12116415 at *4 (C.D.

13   Cal. May 31, 2013) (The power to waive the privilege "rests with the corporation's

14   management and is normally exercised by its officers and directors.");  *Ironwood*

15   *Country Club v. Liberty Insurance Underwriters, Inc*., 2014 WL 12558790, at *9

16   (C.D. Cal. 2014) (COO/General Manager authorized to waive privilege on behalf of

17   corporation); *Pensacola Firefighters' Relief Pension Fund Board of Trustees v.*

18   *Merrill Lynch Pierce Fenner & Smith Inc*., 2010 WL 11520021 at *4 (N.D. Fla. 2010)

19   (senior vice-president with "some managerial or supervisory duties" also authorized).

20   (*See also* Motion, pp. 21-22.)  GIP does not even attempt to distinguish these

21   authorities, which are discussed in Plaintiff's Moving Papers.

22       Instead, GIP cites cases holding that a former employee may not invoke or

23   waive an organization's privilege – a rule that is neither disputed nor relevant, as

24   Plaintiffs were executives at the time of the disclosures.[5]

25

26        [5] *Criswell v. City of O'Fallon*, 2008 WL 250199 (E.D. Mo. 2008) held that a

27   former city employee may not waive the city's privilege rights.  In *U.S. v. Head*, 2013
    WL 5739095 (E.D. Cal. 2013) the court held that a former officer has no right to

28   *assert* corporation's privilege.  Likewise, *Fitzpatrick v. American Intern. Group, Inc*.,

*Continued on next page...*

- 20 -

1    The other authorities cited by GIP are similarly inapposite.  In *In re Grand Jury*

2    *Proceedings*, 219 F.3d 175 (2d Cir. 2000), the court held merely that a CEO's

3    compelled testimony, offered in his individual capacity, does not necessarily waive a

4    corporation's privilege.  *Galli v. Pittsburg Unified School Dist.*, 2010 WL 4315768,

5    *4 (N.D. Cal. 2010), held that "an individual Board member alone cannot waive the

6    privilege."  In this case, Mr. Youssefzadeh was not acting in his individual capacity,

7    and was not merely a director, but rather the acting CEO, Chief Technical Officer and

8    Chairman of the GIP-Cayman Management Committee.  Moreover, Mr. Youssefzadeh

9    acted with the approval of Mr. Javed, the President and Chief Operating Officer of

10    GIP-Cayman and GIP-USA.  (E.Y. Decl., ¶¶ 41, 44; U.J. Decl., ¶¶ 51, 107.)

11            **2.    *Mr. Youssefzadeh Did Not Breach His Fiduciary Duties by***

12                    ***Making the Disclosures to Boeing and SpaceX.***

13        GIP next argues, without any citation to authority, that Mr. Youssefzadeh's

14    disclosures to Boeing and SpaceX did not waive the privilege because

15    Mr. Youssefzadeh did not obtain approval from the GIP Board and therefore was in

16    breach of his fiduciary duties to GIP.  GIP's unsupported argument is unavailing.  As

17    set forth above, Mr. Youssefzadeh had express authority to exercise his sole and

18    absolute discretion in determining what disclosures to make to SpaceX.  Moreover,

19    the case law cited above establishes that, as a corporate executive, Mr. Youssefzadeh

20    had broad authority to act on behalf of GIP, including the authority to waive the

21    privilege.[6]

22        Furthermore, Mr. Youssefzadeh did not breach his fiduciary duty to GIP-

23    Cayman.  Rather, he made the disclosures to Boeing and SpaceX because he and

24    _____

25    272 F.R.D. 100 (S.D.N.Y. 2010) denied a former director's demand for privileged
     communications to assist in his suit against the corporation.

26        [6] In *Gregory v. Correction Connection, Inc.*, 1990 WL 182130, at *3 (E.D. Pa.
27    1990), the court held that a director and CEO may waive a corporation's attorney-
     client privilege, but risks action for breach of fiduciary duty "if such disclosure is not
28    in the best interest of [company]."

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

242063.24

1    Mr. Javed had made representations about compliance to Boeing and SpaceX which

2    had to be corrected, he believed it was in GIP-Cayman's best interest to keep the

3    company's two key suppliers fully informed so that they could ensure that data and

4    technology subject to the export control laws was not compromised in the course of

5    performing their contracts, and he needed to inform Boeing and SpaceX of his and

6    Mr. Javed's resignations, and the reasons why they resigned. (Supp. E.Y. Decl.,

7    ¶ 22.)  Moreover, Mr. Youssefzadeh's emails to Boeing and SpaceX made a point of

8    assuring those companies that their data has not been compromised.  (Supp. E.Y.

9    Decl., ¶ 18, Compendium, **Exh. 45**.)[7]  Accordingly, when he made the disclosures to

10   Boeing and SpaceX, Mr. Youssefzadeh was carrying out, rather than breaching, his

11   fiduciary duties.

12              ***3.        GIP Ratified the Disclosures to Boeing and SpaceX.***

13              GIP never attempted to claw back the disclosures to Boeing and SpaceX that it

14   now claims were improper.  Plaintiff's Moving Papers argue, with citation to

15   appropriate authorities, that GIP ratified the disclosures by failing to take any action in

16   response to them.  (Motion, p. 29.)  GIP has not even attempted to address this

17   argument, thereby effectively conceding that this argument is meritorious.[8]

18   **VII.    GIP HAS WAIVED PRIVILEGE ON THE SUBJECT MATTER OF THE**

19              **MILBANK AND CHEN MEMOS.**

20              GIP argues that even if the Court finds that the privilege has been waived as to

21   the Milbank and Chen Memos, it should not find a subject matter waiver.  However,

22   _____

23   [7] Remarkably, this language was deleted from the emails that GIP submitted to
     the court. (Opposition Compendium, Exhs. I, J)

24   [8] GIP has not even close to meeting its burden under the work product doctrine

25   of showing that the Memos were prepared "because of" anticipated litigation and
     "would not have been created in substantially similar form but for the prospect

26   of . . . litigation." *In re Grand Jury Subpoena (Mark Tort/Tort Environmental
     Management)*, 357 F.3d 900, 907 (9th Cir. 2004).  Instead, GIP relegates this argument

27   to a single footnote which fails to identify any anticipated litigation whatsoever
     involving GIP or any threats of litigation which predate the Milbank Memo.

28

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

1    GIP admits that it freely shared privileged information with Bronzelink's directors,

2    employees and consultants, and these disclosures were not limited to the Milbank

3    Memo and the Chen Memo.  Instead, all disclosures of privileged information to the

4    GIP-Cayman Board were as a matter of course provided to Bronzelink, given the dual

5    roles of several directors and the lack of safeguards preventing such disclosures;

6    moreover all such information was available to Amore under the Facility Agreement.

7    Accordingly, GIP has generally waived the privilege.  *See O'Leary v. Purcell Co.*, 108

8    F.R.D. 641, 645–46 (M.D.N.C. 1985) (concluding that defendants "treated the

9    documents here in issue so loosely that they should not be considered confidential for

10   purposes of the attorney-client privilege.  The attorney-client privilege may be lost

11   when parties fail to take reasonable precautions to insure and maintain the

12   confidentiality of attorney-client documents.").

13          GIP also admits that, under the "fairness doctrine" courts have rejected

14   "attempts to use the privilege as both a sword and a shield, and have held that a

15   subject matter waiver applies in that context."  (Opp., p. 23.)

16          In this case, GIP is attempting to use the privilege as both a sword and a shield,

17   and considerations of fairness militate in favor of finding a subject matter waiver.

18   GIP contends that it shared a unity of interests with Bronzelink on the compliance

19   issue and further contends that Dong Yin merely acted as a lender, but it has refused

20   to reveal counsel's legal analysis of the conduct of Bronzelink and Dong Yin, and

21   whether counsel was recommending changes to limit their authority.  GIP also argues

22   that Mr. Youssefzadeh and Mr. Javed breached their fiduciary duties by making

23   disclosures to Boeing and SpaceX, while at the same time refusing to reveal the

24   contents of the disclosures, or of the legal analyses which led them to conclude that

25   such disclosures were necessary.  In addition, GIP argues that it shared privileged

26   information with Boeing to further a common interest in compliance, while at the

27   same time prohibiting an inquiry into its disclosures to, and communications with,

28   Boeing.  GIP has also hidden behind the privilege to minimize Panahy's role as an

- 23 -

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

1    honest broker between GIP and Dong Yin, and misstate Chen's role in those

2    communications.

3         More fundamentally, GIP is hiding behind the attorney-client privilege to

4    portray the false picture that it no longer has ongoing compliance issues.  William

5    Wade asserts in his declaration that the Bronzelink-appointed Board Members are

6    "committed . . . to ensuring that [GIP] fully complies with ITAR and EAR."[9]

7    (Declaration of William Wade, ¶ 3.)  However, GIP has refused to disclose what

8    compliance issues their outside and in-house counsel identified, and whether those

9    issues have been addressed, as Mr. Wade states.  This is a classic example of using the

10   privilege as both a sword and a shield.

11        Because GIP has waived the privilege in its entirety in its dealings with

12   Bronzelink and Amore, and because it would be fundamentally unfair to allow GIP to

13   use the privilege as both a sword and a shield, the Court should find that GIP has

14   waived the privilege as to all communications related to the compliance and/or lack of

15   compliance by GIP-Cayman and GIP-USA with U.S. export control laws relating to

16   satellite and launch technology and data.

17        The two cases cited by GIP do not compel a different result.  In *In re von*

18   *Bulow*, 828 F.2d 94, 102 (2d Cir. 1987), the court found that an attorney's publication

19   of a book about his client's criminal trial, which included privileged communications,

20   did not result in waiver of privilege as to any undisclosed portions of such

21   communications.  The facts of *von Bulow* are not remotely similar to this case.

22        GIP also relies on *Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003), which

23   did not even involve a waiver of the attorney-client privilege.  Rather, in *Bittaker*, the

24   court held that the scope of a habeas petitioner's waiver arising from a claim of

25   _____

26        [9] Notably, Mr. Wade was not appointed to the GIP-Cayman Board of Directors
     until August 15, 2017, and was not involved with the governance, management or
27   operations of GIP-Cayman prior to his appointment.  (Supp. U.J. Decl., ¶ 18; Supp.
28   Compendium, **Exh. 88**.)

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**

242063.24

ineffective assistance of counsel in a habeas petition could extend only to litigation of the federal habeas petition. *Bittaker*, 331 F.3d at 721-26. *Bittaker* is not remotely relevant to this dispute.

## VIII. CONCLUSION.

For the reasons presented, the Court should find and order that the Milbank Memo, the Chen Memo and related communications are not subject to the attorney-client privilege or the work product doctrine. Furthermore, because the Memos and related communications are not privileged, the Court should also order that the Complaint, the FAC, and all of the Motion, Opposition and Reply papers filed in this action be unsealed.

DATED:  April 27, 2018                **ISAACS | FRIEDBERG LLP**

                                          */s/  Jerome H. Friedberg*
                                              Jerome H. Friedberg, Esq.

                                          *Attorneys for Plaintiffs STM Atlantic N.V., STM Group, Inc., Emil Youssefzadeh and Umar Javed*

**PLAINTIFFS' REPLY BRIEF ISO MOTION FOR JUDICIAL DETERMINATION**
242063.24