Jeffrey B. Isaacs, Esq., SBN 117104
Jerome H. Friedberg, Esq., SBN 125663
Paige Shen, Esq., SBN 162122
Robert F. Gookin, Esq., SBN 251601
**ISAACS | FRIEDBERG LLP**
555 South Flower Street, Suite 4250
Los Angeles, California 90071
Telephone: (213) 929-5550/Facsimile: (213) 955-5794
Email:  jisaacs@ifcounsel.com
        jfriedberg@ifcounsel.com
        pshen@ifcounsel.com
        rgookin@ifcounsel.com

*Attorneys for Plaintiffs STM Atlantic N.V.,
STM Group, Inc., Emil Youssefzadeh and Umar Javed*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STM ATLANTIC N.V., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>DONG YIN DEVELOPMENT (HOLDINGS) LIMITED, et al.,<br><br>Defendants. | Case No. 2:18-cv-01269-JLS-JCG<br><br>**SUPPLEMENTAL DECLARATION OF UMAR JAVED IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDICIAL DETERMINATION THAT THE MILBANK MEMO, CHEN MEMO AND RELATED COMMUNICATIONS ARE NOT SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE OR WORK PRODUCT DOCTRINE**<br><br>**[FILED UNDER SEAL PER COURT ORDER OF APRIL 2, 2018]**<br><br>[Filed concurrently with Reply in Support of Motion; Supplemental Declaration of Emil Youssefzadeh; Supplemental Declaration of Jerome Friedberg; Supplemental Compendium of Exhibits; Evidentiary Objections; Response to Evidentiary Objections; and Proof of Service]<br><br>HEARING<br>Judge:  Hon. Josephine L. Staton<br>Date:   May 11, 2016<br>Time:   2:30 p.m.<br>Place:  Courtroom 10A<br><br>Complaint Filed:  Feb. 15, 2018<br>FAC Filed:       Feb. 25, 2018 |

# SUPPLEMENTAL DECLARATION OF UMAR JAVED

I, Umar Javed, declare and state as follows:

1. I am a Plaintiff in the above-captioned action. I make this supplemental declaration of my own personal knowledge. If called as a witness, I could and would testify to the matters set forth herein. I am making this supplemental declaration in support of Plaintiffs' Motion for Judicial Determination that the Milbank Memo, Chen Memo and Related Communications Are Not Subject to the Attorney-Client Privilege or Work Product Doctrine ("Plaintiffs' Motion"). I am making this supplemental declaration to address certain contentions in the Opposition of Global-IP Cayman ("GIP-Cayman") and Global-IP USA ("GIP-USA") (collectively, "GIP") to Plaintiffs' Motion.

**A.  Mr. Youssefzadeh and I Remained Employees of GIP Until On August 16, 2017.**

2. As stated in my prior declaration, Emil Youssefzadeh and I submitted our resignations on June 26, 2017, but remained executives with GIP-Cayman and GIP-USA until August 2017. (*See* Umar Declaration, ¶¶ 51, 107.) Our resignations did not become effective immediately because our employment agreements had 60-day notice provisions and the GIP-Cayman and GIP-USA Boards of Directors did not formally relieve us of our duties and authority at that time. (*See* Umar Decl., ¶ 51; Compendium, **Exhibits 17 and 18**.) As a result, I continued to serve as the President and Chief Operating Officer ("COO") of GIP-Cayman and GIP-USA until August 16, 2017. Moreover, Mr. Youssefzadeh and I continued to be involved in the day-to-day operations of GIP, approving payments and banking transactions, directing the GIP staff, communicating with suppliers and vendors, and participating in marketing, sales and other activities.

3. On June 29, 2017, I sent an email to GIP senior personnel stating: "For clarity, the resignation I have submitted to the board of directors on June 26 has a required 60 days noice [sic] period (expiring Aug 25). I'll continue working and

1

supporting the Company and staff in my role as the Company's cheif [sic] operating officer until such time the board notifies me through a proper board resolution that I'm relieved from my duties and authority." A true and correct copy of this email is **Exhibit 80** in the concurrently-filed Supplemental Compendium of Exhibits ("Supplemental Compendium").

4. On August 9, 2017, Bahram Pourmand sent me a letter, via email, stating that the GIP-Cayman and GIP-USA directors "accept your resignation from all Global IP executive officer positions effective August 16, 2017." Mr. Pourmand's letter further stated that, "[y]our separation date and final date of employment is August 16, 2017." A true and correct copy of Mr. Pourmand's August 9, 2017 letter, along with the transmittal email he sent me, is **Exhibit 81** in the Supplemental Compendium.

5. On August 16, 2017, attorney Gerald Klein, who at that time represented Mr. Youssefzadeh and me, sent a letter to Mr. Pourmand, confirming:

> Our office represents Emil Youssefzadeh ("Youssefzadeh") and Umar Javed ("Javed"). We understand Youssefzadeh and Javed were terminated as of today, as outlined in your August 9, 2017 letter accepting their resignations as officers of Global-IP Cayman Limited and Global-IP USA (collectively, "GIP"). Accordingly, Youssefzadeh and Javed are no longer GIP employees.

A true and correct copy of Mr. Klein's August 16, 2017 letter is **Exhibit 82** in the Supplemental Compendium.

6. In sum, my employment at GIP-Cayman and GIP-USA and my tenure as President and COO of GIP-Cayman and GIP-USA ended on or about August 16, 2017.

**B.   Mr. Wong's Response to the Milbank Memo.**

7. I have reviewed Yuen Cheung ("Tony") Wong's declaration, which states at paragraph 9 that he discussed the Milbank Memo with other directors "for the purpose of assessing what, if any, measures GIP should take in response to the

2

**SUPPLEMENTAL DECLARATION OF UMAR JAVED IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDICIAL DETERMINATION**

242066.4

Milbank Memo." At paragraph 16 of his declaration, Mr. Wong also denies that he ever told Mr. Youssefzadeh or me that Dong Yin had threatened to close the project.

8. In fact, Mr. Wong discussed the Milbank Memo in an attempt to "keep it off the record," and did indeed threaten to close the project. **Exhibit 83** in the Supplemental Compendium is a true and correct copy of my April 30, 2017 email to Mr. Wong, which recounts both his threat to "stop the project," and his request that Mr. Pourmand do something to keep the Milbank Memo off the record.

9. My April 30, 2017 email states,

> When I called you, your entire purpose was to question the Milbank memo and calling it ridicules. Threatening that you can stop the project, etc. I explained you during the call that we must follow and respect the law and regulations. But you showed strong displeasure. You also insisted that Chris should call you and you wanted to discuss this "ridicules" memo with him. I told you that he was on vacation all this week. Please be reminded that any influence or attempt of intimidation by you on company's general counsel will not be tolerated.
>
> I also learned from Bahram that you called him and asked if we could do something with Milbank memo and keep it off the record and try to sort out amongst us privately.

**C.  My Communications with Ludwig Chang and Dong Yin Representatives.**

10. I have reviewed Ludwig Chang's declaration, which states that Mr. Chang never worked for Dong Yin Development (Holdings) Ltd. ("Dong Yin"), but acknowledges that he was the Executive Director and Co-President of China Orient Asset Management (International) Holding ("COAMI"). COAMI is a subsidiary and affiliate of Dong Yin. Mr. Chang also told me in our meeting in New York on June 15, 2017, that after his retirement from COAMI, he worked as a consultant for Dong Yin.

11. Mr. Youssefzadeh and I contacted Mr. Chang in June 2017, regarding our concerns about the lack of compliance with U.S. export control laws, and after Dong Yin failed to respond to Mr. Youssefzadeh's May 30, 2017 email requesting a meeting to address corporate governance and export control law compliance issues. (*See* Compendium, **Exhibit 30**.) We contacted Mr. Chang for assistance in alerting

Dong Yin to the seriousness of these issues, precisely because of his relationship with Dong Yin.  We thought it was imperative that Dong Yin address these issues because we believed that Dong Yin's influence over the governance, management and operations of GIP-Cayman and GIP-USA was giving rise to violations of the PRC Regulatory Proscription and U.S. export control laws.

12. Mr. Youssefzadeh and I arranged to meet Mr. Chang in New York on June 15, 2017.  After we arrived for the meeting, Mr. Chang told us that he had retired from COAMI and that he now charged for his time on an hourly basis as a consultant.  We agreed to pay him for his time in meeting with us, even though we never entered into or intended to enter into a consulting agreement with him.  Payment was made through STM Group, Inc., not STM Atlantic, as Mr. Chang states.

13. During the meeting, and in subsequent communications, Mr. Youssefzadeh and I sought Mr. Chang's assistance in connecting with Dong Yin.  We sought to enlist Mr. Chang's assistance because we did not have any direct interaction with Dong Yin or its Beijing-based parent China Orient Asset Management Company.

14. On June 22, 2017, Mr. Chang sent me a text message, stating, "I spoke with Beijing and they are taking it seriously."  A true and correct copy of this text message is **Exhibit 84** in the Supplemental Compendium.

15. On June 28, 2017, Mr. Chang sent me another text message, stating, "[e]xpect a call from Terry [Long] . . . .  Anyway, Dong and Zeng now aware of the Dara memo to Terry."   A true and correct copy of this text message is **Exhibit 85** in the Supplemental Compendium.

16. I understood Mr. Chang's reference to "the Dara memo to Terry" to refer to the June 27, 2017 email from Dara Panahy to Terry Long.  (*See* Compendium, **Exhibit 55**.)  A true and correct unredacted version of this email is **Exhibit 86** in the Supplemental Compendium.

17. Mr. Panahy's June 27, 2017 email to Terry Long states, in part:

4
**SUPPLEMENTAL DECLARATION OF UMAR JAVED IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDICIAL DETERMINATION**

242066.4

As you may be aware, Emil, Umar, and Global IP's general counsel, Chris Chen, all resigned yesterday (Monday, June 26th, 2017) as employees and officers of Global IP, citing serious compliance implications with respect to U.S. export control laws and regulations. In the view of Emil and Umar, the Series A (Bronzelink-appointed) Directors, in the last few months, have not only failed to address the critical issue of compliance, but also have taken steps to disregard, or "cover-up" the compliance issue.

Emil and Umar will remain as Directors of Global IP.  Shortly after resigning, I understand that Umar and Emil had also notified certain of Global IP's suppliers, including the U.S. export suppliers Boeing and SpaceX, of their resignations, to satisfy what they believe are their duties as U.S. citizens and fiduciary duties to Global IP under Cayman and U.S. laws and regulations.

In response to DY's request, Emil and Umar asked me to convey the following responses directly to you:

* * *

2.  Emil and Umar for a few months now have expressed concerns about the corporate governance defects of Global IP and the disregard for compliance with U.S. export control laws and regulations that the Series A Directors have demonstrated, and tried in good faith to work with other Directors of Global IP to resolve these matters in the best interest of Global IP and its shareholders, including Bronzelink.  Emil and Umar have no personal issue, and they do not hold any personal "grudge", against Mr. Fan or any of the other Bronzelink-appointed Directors of Global IP, but instead, Emil and Umar have a very serious concern that the Bronzelink-appointed Directors of Global IP do not understand, or do not wish to understand, the critical importance of immediately correcting the corporate governance matters facing Global IP which, if not resolved immediately, could quickly lead to violations under U.S. export controls laws and regulations.  This is a very important point for Emil and Umar.

3. One potential solution that Emil and Umar have suggested is for Bronzelink to have a truly independent, outside third party (such as an independent executive/director search firm) identify a number of appropriately qualified and truly independent Director candidates with no past or existing personal or business connections or ties to Bronzelink, or Bronzelink's shareholder(s), and have Bronzelink select and appoint from this group of candidates a minimum of 4 truly independent Directors on the Board of Global IP, to serve alongside with the 3 Founder Directors, Mr. Fan and 1 director identified and appointed directly by Bronzelink (or any other qualified 1 Director identified and appointed directly by Bronzelink). If such a solution is achievable, safeguards need to be put in place so that Bronzelink cannot thereafter arbitrarily terminate or replace the appointed independent Directors. For example, Umar and Emil understand that the 2 previous U.S. citizen, Chinese-heritage Directors appointed by Bronzelink to the Global IP Board decided to leave the Board of Directors after being informed of the U.S. export control laws and regulations compliance issues and associated risks, however Bronzelink maintains that these Directors were actually fired.

>If such a solution is agreed and adopted, with 2 Bronzelink Directors, 4 truly independent Directors and the 3 Founder Directors, in the view of Emil and Umar, it would establish the necessary foundation and balance for a properly functioning Board of Directors for Global IP, and in such a circumstance, Emil and Umar (as well as Chris Chen) would in good faith consider resuming their officer roles at Global IP with the comfort that they can demonstrate that Global IP has established appropriate controls to mitigate and address potential PRC foreign ownership, control or influence.

18. As stated in paragraph 129 of my original declaration, I was able to meet with Xinyi Dong (and his translator) on June 29, 2017, the day after I received Mr. Chang's text message telling me to expect a call from Mr. Long. The purpose of the meeting was to discuss the concerns that Mr. Youssefzadeh, Mr. Panahy, Mr. Chen and I had been raising regarding U.S. export control laws. The meeting lasted for approximately an hour and a half. As stated in my original declaration, during our discussion of compliance issues, Mr. Dong made several comments, some in English and some through his translator, indicating that he was aware of the contents of both the Milbank Memo and the Chen Memo. As stated in my original declaration, in a subsequent meeting to discuss export control law compliance concerns, which occurred on July 9, 2017, both Mr. Long and Mr. Dong also indicated that they were familiar with the contents of the Milbank Memo and the Chen Memo. He also made comments indicating that he was aware of the contents of the letters and emails that GIP-Cayman had exchanged with Boeing and SpaceX.

19. Mr. Chang states in his declaration that Mr. Youssefzadeh and I showed him the Milbank Memo during the July 19, 2017 meeting in Los Angeles, and that he had not seen it prior to that date. This is false. The meeting in Los Angeles was called by Mr. Chang, and it was clear from our communications that by then he was fully aware of Milbank Memo and its contents.

**D.    Mr. Pourmand Has Incorrectly Characterized GIP-Cayman's Relationship with Boeing and SpaceX.**

20. I have reviewed Mr. Pourmand's declaration, which states that his communications on behalf of GIP with Boeing Satellite Systems International, Inc.

6

("Boeing") and Space Explorations Technology Corp. ("SpaceX") "were made during a time period in which the parties had and continued to have a shared interest in export control compliance." (Pourmand Decl., ¶ 13) This statement is false. First, this entire dispute arises from the fact that GIP did not have a genuine interest in compliance, as explained in great detail in my original declaration and as alleged in the First Amended Complaint. Second, Boeing and SpaceX both dealt with GIP-Cayman at arm's length regarding compliance issues, making it clear that compliance was GIP-Cayman's responsibility.

21. I was the designated point of contact for GIP-Cayman for both Boeing and SpaceX. As the following correspondence illustrates, neither Boeing nor SpaceX treated compliance as a matter in which the parties had the same or otherwise aligned interests.

22. On July 7, 2017, I received a letter from Peter Capozzoli, the Director of Commercial Mission Management of SpaceX. A true and correct copy of Mr. Capozzili's July 7, 2017 letter is **Exhibit 87** in the Supplemental Compendium. In his letter, Mr. Capozzoli stated, in part:

> Global IP previously executed a certification that it is not "owned or controlled, or acting on behalf, directly or indirectly," any person or entity affiliated with China. We have attached this certification for reference. SpaceX and Global IP have also agreed in writing that SpaceX will only transfer defense articles in support of the LSA [Launch Services Agreement] to Global IP US, a Delaware company, and its U.S. Person employees, and that no assistance of any kind will be furnished to foreign persons under the LSA.
>
> However, the e-mail referenced above indicated that there may be reason to believe Global IP US and/or Global IP Cayman is acting on behalf of a Chinese person or entity. If so, further transfers of defense articles in support of the LSA to Global IP US or its employees may be a violation of the ITAR. SpaceX contacted Global IP's outside counsel to address this concern and was informed that an investigation of the allegations contained in the e-mail is underway.
>
> Accordingly, SpaceX is temporarily standing down on work under the LSA until this investigation is concluded and Global IP again certifies to SpaceX that Global IP US, Global IP Cayman, and the employees of both companies are not acting on behalf of one or more Chinese persons or entities. If SpaceX is not satisfied with any such certification, or if such a

7
**SUPPLEMENTAL DECLARATION OF UMAR JAVED IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDICIAL DETERMINATION**

242066.4

certification cannot be made, SpaceX may seek authorization from the U.S. State Department to proceed with work under the LSA.

23. On or about July 18, 2017, I received a letter from William Masters, the Contracts Manager at Boeing. A true and correct copy of Mr. Masters' July 18, 2017 letter is **Exhibit 88** in the Supplemental Compendium. In his letter, Mr. Masters stated, in part:

> On July 13, 2017, Boeing requested that your legal representative, Dara Panahy of Milbank, Tweed, Hadley & McCoy LLP, pursuant to Global IP's obligations under the August 28, 2016 contract, provide Boeing with adequate assurances that you are compliant with all matters related to the legal requirements of the Export Administration Regulations ("EAR") 15 C.F.R. Parts 730-774 (2017) and the International Traffic in Arms Regulations ("ITAR") (22 C.F.R. Parts 120-130) (2017). On July 14, 2017, Milbank sent an email responding that it was unable to provide a letter of assurance on your behalf as a matter of policy and professional responsibility.
>
> Therefore, we request that an authorized Global IP official provide Boeing with written confirmation that you are compliant with all applicable export control laws and regulations, including EAR and ITAR, as well as Boeing contractual requirements, with enough specificity to allow us to conduct an independent verification of your representation, no later than **Thursday, July 20.**
>
> Given that we have not received the assurances requested to date, we are holding access to export controlled and Boeing proprietary information from Global IP at this time. Though we continue to support the Global IP program and schedule requirements, the failure to receive such assurances would further jeopardize our ability to provide export controlled and Proprietary information to Global IP in the future, as well as impede our ability to conduct future Design Reviews. Boeing takes compliance with regulations and the protection of our proprietary information very seriously.

**E.     Mr. Youssefzadeh and I Meet with the Consultants in November 2017.**

24. My original declaration discusses the November 16, 2017 meeting that Mr. Youssefzadeh and I had with Dr. Michael Altwein and Ms. Pin Fen Miao. (*See* Umar Decl., ¶¶ 139-142.) I have reviewed William Wade's declaration, stating that he "assumed" that Dr. Altwein and Ms. Miao had been sent on behalf of Bronzelink "to help Bronzelink gauge the economic prospects of GIP's plans to launch satellites and provide telecommunications services for Africa." Mr. Wade's assumption is incorrect. Mr. Youssefzadeh and I did not discuss GIP's economic

8
**SUPPLEMENTAL DECLARATION OF UMAR JAVED IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDICIAL DETERMINATION**

242066.4

prospects in our meeting with Dr. Altwein and Ms. Miao; nor did Dr. Altwein or Ms. Miao ask us for any financial data or sales forecasts. Nor was there any reason for Bronzelink to send consultants to discuss GIP's economic prospects with Mr. Youssefzadeh and me three months after we had left GIP. In fact, neither Dr. Altwein nor Ms. Miao ever gave me any reason to believe that they were sent or qualified to evaluate the financial viability of the satellite project.

25. What we discussed with Dr. Altwein and Ms. Miao was the compliance issues Mr. Youssefzadeh and I had raised in our earlier meetings with Dong Yin representatives. As stated previously, both consultants confirmed that they had read the Milbank Memo and the Chen Memo and told us that Dong Yin would reward us if we were willing to back down and drop the compliance issue.

26. Mr. Wade also confirmed to me at that time that the consultants had been sent by Dong Yin, and expressed cautious optimism that by dispatching these consultants, Dong Yin might be able to achieve an amicable resolution among the parties. It became clear during our meeting with the consultants, however, that their real objective was to find a way to buy our silence.

**F.     The Governance of GIP-Cayman.**

27. Mr. Wade was not appointed to GIP-Cayman Board of Directors until August 15, 2017, and was not involved with the governance, management, or operations of GIP-Cayman prior to his appointment. **Exhibit 89** in the Supplemental Compendium is a true and correct copy of the Register of Directors of GIP-Cayman showing the date of Mr. Wade's appointment to the GIP-Cayman Board as August 15, 2017.

28. GIP-Cayman's compliance issues persist to this day. As the Register of Directors shows, Shiwen Fan, Tony Wong and Shiyue ("Bonnie") Liu remain members of the GIP-Cayman Board of Directors, and Bronzelink continues to control six of the nine board positions. Mr. Wong is now the Chairman of the Board of Directors of GIP-Cayman, a fact he fails to mention in his declaration. In addition,

9

1 although Mr. Wong is not an employee or executive of GIP-Cayman, he is a signatory
2 on the company's bank accounts and has to approve any company expenditure.

3       29.     In addition, I have no reason to believe that the secret Facility Agreement
4 between Bronzelink and Dong Yin's subsidiary, Amore Resources, Ltd ("Amore"),
5 has been amended or that Dong Yin's control over Bronzelink has been limited in any
6 way since Mr. Youssefzadeh and I stepped down as directors of GIP in
7 February 2018. In fact, Amore has a charge over Bronzelink's shares under which
8 Amore can foreclose on Bronzelink's Series A shares in the event of a default, which
9 would give Amore direct control over GIP-Cayman. A true and correct copy of the
10 Share Charge (the "Charge") providing that Amore can foreclose on Bronzelink's
11 shares is **Exhibit 90** in the Supplemental Compendium.

12       30.     The Facility Agreement also provides that Amore can enforce the Charge
13 if GIP-Cayman does not obtain debt financing within 24 months after Bronzelink first
14 receives funds under the agreement. (*See* Compendium, **Exhibit 43**, §§ 17.17, 17.21.)
15 Bronzelink received its initial funding in March 2016, over 24 months ago, and
16 GIP-Cayman has never obtained debt financing. As a result, Amore can enforce the
17 Charge and take direct control of Bronzelink at any time.

18       31.     Moreover, the Charge executed by Hoi Ying Yiu aka Charles Yiu
19 ("Yiu")—the purported owner of Bronzelink—in favor of Amore allows for the
20 expedited seizure of Bronzelink's shares upon the occurrence of an Event of
21 Default—which are enumerated in the Facility Agreement. (*See* Compendium,
22 **Exhibit 43**, § 17 *et seq*.) Pursuant to the terms of this Charge, upon default, the
23 security interest becomes immediately enforceable, without further notice to,
24 consultation with, or the consent of, Mr. Yiu. (*See* **Exhibit 90**, § 7, p. 9.) In addition,
25 undated documents have already been executed by Mr. Yiu that expedite transfer of
26 his shares of Bronzelink (*see id*., Schedule 1, Exh. 90-22); expedite appointment of an
27 officer of Amore as Mr. Yiu's proxy to vote at "any meeting of shareholders"
28 (*see id*., Schedule 2, Exh. 90-23); and expedite Mr. Yiu's resignation and release of

his claims and rights against Bronzelink for damages or for compensation for the loss of his position as director (*see id.*, Schedule 3(i), Exh. 90-24). Amore therefore can enforce this Charge at any time.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 27th day of April 2018, at El Segundo, California.

_____
UMAR JAVED