1  Jeffrey B. Isaacs, Esq., SBN 117104
   Jerome H. Friedberg, Esq., SBN 125663
2  Paige Shen, Esq., SBN 162122
   Robert Gookin, Esq., SBN 251601
3  **ISAACS | FRIEDBERG LLP**
   555 S. Flower Street, Suite 4250
4  Los Angeles, California 90071
   Telephone: (213) 929-5534
5  Facsimile:  (213) 955-5794
   Email:  *jisaacs@ifcounsel.com*
6          *jfriedberg@ifcounsel.com*
           *pshen@ifcounsel.com*
7          *rgookin@ifcounsel.com*

8  *Attorneys for Plaintiffs STM Atlantic N.V.,*
   *STM Group, Inc., Emil Youssefzadeh and Umar Javed*
9

10              **UNITED STATES DISTRICT COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12  STM ATLANTIC N.V., a Dutch          **Case No. 2:18-cv-01269-JLS-JCG**
    company; STM GROUP, INC., a
13  Delaware corporation;               **NOTICE OF MOTION AND MOTION**
    EMIL YOUSSEFZADEH, an               **FOR LEAVE TO FILE [PROPOSED]**
14  individual; and UMAR JAVED, an      **SECOND AMENDED COMPLAINT;**
    individual,                         **[PROPOSED SECOND AMENDED**
15                                      **COMPLAINT]**
                   Plaintiffs,
16                                      [Filed concurrently with: (1) Declaration of
17         vs.                          Jerome H. Friedberg and (2) [Proposed]
                                        Order]
18  DONG YIN DEVELOPMENT
    (HOLDINGS) LIMITED, a Hong          Assigned to Hon. Josephine L. Staton
19  Kong unlimited company; CHINA
    ORIENT ASSET MANAGEMENT             HEARING
20  (INTERNATIONAL) HOLDING             Date:         September 7, 2018
    LIMITED, a Hong Kong limited        Time:         2:30 p.m.
21  company; and LUDWIG CHANG,          Place:        Courtroom 10A
    an individual,
22                                      Complaint Filed:    Feb. 15, 2018
                   Defendants.          FAC Filed:          Feb. 25, 2018
23

24

25

26

27

28

---

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE**
**[PROPOSED] SECOND AMENDED COMPLAINT**

**TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on September 7, 2018, at 2:30 p.m. or as soon thereafter as the matter may be heard, before the Honorable Josephine L. Staton, in Courtroom 10A of the Federal District Court for the Central District of California, located at 411 West Fourth Street, Santa Ana, California 92701, Plaintiffs STM Atlantic N.V., STM Group, Inc., Emil Youssefzadeh and Umar Javed, by and through their counsel of record, will and hereby do move this Court for leave to file their [Proposed] Second Amended Complaint (the "SAC"), a copy of which is attached to this Motion as **Exhibit A**.

The SAC makes the following changes to the operative First Amended Complaint ("FAC"):

- It removes one cause of action, the Eleventh Cause of Action for Constructive Trust;

- It adds the following additional four defendants: Milbank, Tweed, Hadley & McCloy LLP, Shiwen Fan, Yuen Cheung ("Tony") Wong and Shiyue ("Bonnie") Liu, all of whom are referenced but were not named as Defendants in the original Complaint and the FAC;

- It adds allegations regarding the contents of the Milbank Memo and the Chen Memo; and

- It adds, deletes, modifies and reorganizes specific allegations as a result of Plaintiffs' continuing investigation and analysis of this matter, and to address issues raised in the meet and confer discussions between counsel for Plaintiffs, COAMI and Chang.

This Motion is made pursuant to Rule 15(a) of the Federal Rules of Civil Procedure on the following grounds: (1) the existing Defendants will not be prejudiced if leave to file the SAC is granted as none have answered or otherwise filed a responsive pleading to the initial Complaint or the SAC, discovery has not begun and no scheduling order has been issued.  Furthermore, although the SAC includes

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE
FOURTH AMENDED COMPLAINT**

244714.12

1  additional allegations pertaining the Defendants, no new causes of action have been

2  alleged against them, and the gravamen of the existing causes of action is the same;

3  (2) the proposed amendments have been made in good faith; (3) Plaintiffs have not

4  unduly delayed seeking leave to amend; (4) Plaintiffs have not repeatedly failed to cure

5  a deficiency in the complaint or any of the causes of action at issue; and (5) granting

6  leave to amend would not be a futile act.

7          This motion is made following the conference of counsel pursuant to Local

8  Rule 7-3, which took place on June 21, 2018.  *See* Declaration of Jerome H. Friedberg,

9  filed concurrently herewith.  During the conference, Plaintiffs explained the nature of

10  the proposed amendments, including that no new causes of action were being added

11  against the current Defendants.  Defendants indicated that, even though no new causes

12  of action were being asserted against them, they were unable to stipulate to the filing of

13  the SAC unless they had sufficient time to review the final draft of the proposed SAC

14  and discuss it with their clients.  Plaintiffs sent Defendants a draft SAC on

15  July 5, 2018, but could not provide a final SAC seven or more days prior to the filing

16  of this Motion, which was the deadline for meeting and conferring pursuant to the

17  Local Rules.  As the proposed SAC is now in final, the parties expect to conduct a

18  further meet and confer after the filing of this Motion.  Declaration of

19  Jerome H. Friedberg, filed concurrently herewith ("Friedberg Dec."), ¶¶ 4-5.

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE
FOURTH AMENDED COMPLAINT**

244714.12

1    This Motion is based upon this Notice of Motion; the accompanying

2  Memorandum of Points and Authorities; the Declaration of Jerome H. Friedberg; and

3  such further argument, evidence and authorities as may be presented at the hearing on

4  this Motion.

5  Dated: July 9, 2018                **ISAACS | FRIEDBERG LLP**

6

7                                     */s/ Jerome H. Friedberg*
                                      Jeffrey B. Isaacs, Esq.
8                                     Jerome H. Friedberg, Esq.
                                      Paige Shen, Esq.
9                                     Robert Gookin, Esq.
                                      *Attorneys for Plaintiffs STM Atlantic N.V., STM*
10                                    *Group, Inc., Emil Youssefzadeh and*
11                                    *Umar Javed*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE
FOURTH AMENDED COMPLAINT**
244714.12

1

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

Plaintiffs STM Atlantic N.V. ("STM Atlantic"), STM Group, Inc.

3

("STM Group"), Emil Youssefzadeh ("Youssefzadeh") and Umar Javed ("Javed")

4

(collectively, "Plaintiffs") seek leave to file the [Proposed] Second Amended

5

Complaint (the "SAC"), which is attached hereto as **Exhibit A**.

6

## I.      INTRODUCTION.

7

Plaintiffs are seeking leave to file a Second Amended Complaint which names

8

additional defendants, discusses the contents of memoranda which the Court has

9

recently found were not privileged, deletes a cause of action, and makes other changes.

10

The Second Amended Complaint does not add any new causes of action against the

11

current defendants and the gravamen of the existing causes of action asserted against

12

them is the same.  Furthermore, defendants have not yet responded to the operative

13

Complaint, so they will not be prejudiced by the proposed amendment.  In addition,

14

none of the other factors that, in an appropriate case, might justify denying leave to

15

amend are present here:  Plaintiffs are not acting in bad faith, they have not delayed

16

seeking leave to amend, they have not repeatedly (or ever) failed to cure deficiencies in

17

their Complaint, and granting leave to amend will not be futile.  Consistent with the

18

federal policy of granting leave to amend with great liberality, Plaintiffs should be

19

granted leave to file the SAC.

20

## II.      PROCEDURAL HISTORY.

21

Plaintiffs filed this action against defendants Dong Yin Development (Holdings)

22

Limited ("Dong Yin"), China Orient Asset Management (International) Holding

23

Limited ("COAMI"), and Ludwig Chang ("Chang") (collectively, "Defendants"), on

24

February 15, 2018.  The initial Complaint (Dkt. No. 1) asserted causes of action for:

25

civil conspiracy; fraud; civil theft in violation of California Penal Code section 496;

26

Civil RICO in violation of 18 U.S.C. §§ 1962(b) and 1964(c); RICO Conspiracy in

27

violation of 18 U.S.C. §§ 1962(d) and 1964(c); interference with prospective business

28

advantage; unfair business practices under California Business & Professions Code

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE
[PROPOSED] SECOND AMENDED COMPLAINT**

244714.12

§ 17200; unjust enrichment; and imposition of constructive trust.

In the Complaint, Plaintiffs did not include allegations regarding the contents of an April 25, 2017 memorandum prepared by Milbank, Tweed, Hadley & McCloy LLP (the "Milbank Memo") or the June 14, 2017 memorandum prepared by General Counsel for Global-IP Cayman ("GIP-Cayman") and Global-IP USA ("GIP-USA") (collectively, ("GIP"), Chris Chen (the "Chen Memo").  Plaintiffs did not include such allegations out of an abundance of caution, given the contention by GIP (as intervening non-parties) that the Milbank and Chen Memos were privileged.

Plaintiffs filed their First Amended Complaint ("FAC") (Dkt. No. 14) on February 25, 2018.  The FAC does not add any causes of action or any new defendants.  Rather, it merely added factual allegations related to the previously asserted causes of action.  As in the Complaint, Plaintiffs did not include specific allegations regarding the contents of the Milbank Memo or the Chen Memo.

On March 19, 2018, GIP filed an *ex parte* application to seal the Complaint and FAC on the grounds that the Milbank Memo and the Chen Memo were subject to the attorney-client privilege and/or protected by the attorney work product doctrine.  (Dkt. No. 16.)  On March, 20, 2018, the Court granted GIP's ex parte application in part, provisionally sealing the Complaint and the FAC pending a negotiated resolution by the parties, or further briefing and argument.  (Dkt. No. 20.)

On April 6, 2018, Plaintiffs filed their "Motion for Judicial Determination that the Milbank Memo, Chen Memo and Related Communications Are Not Subject to the Attorney-Client Privilege or Work Product Doctrine" ("Motion for Judicial Determination").  (Dkt. No. 29.)

On May 10, 2018, counsel for Plaintiffs, COAMI and Chang engaged in a meet and confer regarding those defendants' anticipated motions to dismiss the FAC.  During the meet and confer, counsel for Plaintiffs indicated that Plaintiffs were contemplating filing an SAC.  (Dkt. No. 51.)

On May 14, 2018, the parties filed a Stipulation to extend the time in which

- 6 -

1  Defendants would respond to the FAC.  The Stipulation stated that Plaintiffs were
2  contemplating filing an SAC and that the parties believed it would be beneficial if they
3  had the benefit of the Court's ruling on the Motion for Judicial Determination prior to
4  the filing of the contemplated SAC.  (Dkt. No. 51.)

5       On May 18, 2018, the Court entered a modified Order on the Stipulation, which
6  granted Defendants an extension time to respond to the FAC.  The Order also stated
7  that Plaintiffs were contemplating filing an SAC and that the pending Motion for
8  Judicial Determination may affect the anticipated SAC, as well as Defendants'
9  contemplated motions to dismiss.  (Dkt. No. 52.)

10      On June 8, 2018, this Court granted in part Plaintiffs' Motion for Judicial
11  Determination, finding that the Milbank Memo and the Chen Memo are not privileged
12  and ordering the record in this action, which included unredacted copies of those
13  memos, to be unsealed.  (Dkt. No. 56.)

14      On June 14, 2018, the parties filed a Stipulation further extending the date by
15  which Defendants had to respond to the FAC.  The also Stipulation stated that
16  Plaintiffs intended to file a Second Amended Complaint, and set July 9 2018 as the
17  deadline for filing a stipulation or motion for leave to file the SAC.  (Dkt. No. 62.)  On
18  June 26, 2018, the Court entered an order on the Stipulation.  (Dkt. No. 64.)

19      As a result, to date, none of the Defendants have answered or otherwise filed a
20  responsive pleading.  Further, no discovery has been served by any party as the Court
21  has not issued a scheduling order or set a trial date.  (Friedberg Dec., ¶ 6.)

22          **III.    THE [PROPOSED] SECOND AMENDED COMPLAINT.**
23      The SAC does not add any causes of action against the defendants named in the
24  FAC.  Rather, the SAC:

25      •    Removes one cause of action, the Eleventh Cause of Action for
26           Constructive Trust;
27      •    Adds the following additional four defendants: Milbank, Tweed,
28           Hadley & McCloy LLP, Shiwen Fan, Yuen Cheung ("Tony") Wong and

- 7 -

1   Shiyue ("Bonnie") Liu, all of whom are referenced but were not named as

2   Defendants in the original Complaint and the FAC;

3   • Adds allegations regarding the contents of the Milbank Memo and the

4   Chen Memo; and

5   • Adds, deletes, modifies and reorganizes specific allegations as a result of

6   Plaintiffs' continuing investigation and analysis of this matter, and to

7   address issues raised in the meet and confer discussions between counsel

8   for Plaintiffs, COAMI and Chang.

9   ## IV.   ARGUMENT.

10  **A.   The Standard for Leave to Amend at this Early Stage of the Proceeding is**

11  **Exceedingly Liberal.**

12  Federal Rule of Civil Procedure 15(a)(2) provides that after a party has amended

13  its pleading once as a matter of course, or its time to do so has expired, "a party may

14  amend its pleading only with the opposing party's written consent or the court's leave.

15  The court should ***freely give leave*** when justice so requires."  Fed. R. Civ. P. 15(a)(2)

16  (emphasis added).

17  The Supreme Court has emphasized that "this mandate is to be heeded," such

18  that "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a

19  proper subject of relief, he ought to be afforded an opportunity to test his claim on the

20  merits."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  The Ninth Circuit has likewise

21  stated that the policy favoring leave to amend "is to be applied with extreme

22  liberality," *Owens v. Kaiser Foundation Health Plan, Inc.*, 244 F.3d 708, 712

23  (9th Cir. 2001), and that "[t]he standard for granting leave to amend is generous,"

24  *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 701 (9th Cir. 1990).

25  In determining whether to grant leave to amend, courts consider five factors

26  (known as the "*Foman* factors"):  (1) prejudice to the opposing party; (2) the presence

27  of bad faith; (3) undue delay; (4) whether the plaintiff has previously amended the

28  complaint; and (5) the futility of amendment.  *See U.S. v. Corinthian Colleges*, 655

- 8 -

1    F.3d 984, 995-95 (9th Cir. 2011) (*citing Foman*, 371 U.S. at 182).  While the

2    determination of whether to grant leave to amend is committed to the sound discretion

3    of the district court, courts may decline to grant leave to amend "only if there is strong

4    evidence" of one or more of the *Foman* factors.  *Sonoma County Ass'n of Retired*

5    *Employees v. Sonoma County*, 708 F.3d 1109, 1117 (9th Cir. 2013); *see M.H. v.*

6    *County of Alameda*, 2012 WL 5835732, *3 (N.D. Cal. Nov. 16, 2012) (granting leave

7    to amend to add new allegations and observing that "[c]ourts routinely allow parties to

8    amend their pleadings").

9    **B.    Defendants Will Not Be Prejudiced By the Proposed Amendments.**

10       Of the five *Foman* factors, "the consideration of prejudice to the opposing party

11   carries the greatest weight."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048,

12   1052 (9th Cir. 2003).  "The party opposing amendment bears the burden of showing

13   prejudice."  *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987).

14   Furthermore, the opposing party must demonstrate that the prejudice is "substantial,"

15   such that it will alter "the nature of the litigation" or require defendants to undertake,

16   "at a late hour, an entirely new course or defense."  *Morongo Band of Mission*

17   *Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990).

18       In this case, Defendants will not suffer any prejudice if leave to amend is

19   granted.  None of the Defendants have answered or otherwise filed a response to the

20   Complaint or the FAC, discovery has not yet begun and the scheduling order has not

21   yet been issued.  Courts have routinely found a lack of substantial prejudice under far

22   more compelling circumstances.  *See, e.g., Scott v. Family Dollar Stores, Inc*., 733

23   F.3d 105, 119 (4th Cir. 2013) (defendant not unduly prejudiced by amendment even

24   though plaintiff had waited three years to seek leave to amend, where discovery was

25   still open and case was "many steps removed from trial"); *Dixon v. Magna-RX, Inc.*,

26   2016 WL1397584 (C.D. Cal., Mar. 31, 2016) (granting motion for leave to file second

27   amended complaint more than a year and a half after filing of initial complaint and five

28   months before trial upon finding that defendant was not unduly prejudiced, because

- 9 -

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE**
**[PROPOSED] SECOND AMENDED COMPLAINT**

1  while the amended complaint added new parties, it did not add any new causes of

2  action against existing defendants and did not "alter the nature of the litigation");

3  *Miramontes v. Mills*, 2015 WL13609449 (C.D. Cal. May, 18, 2015) (granting leave to

4  amend to add two new causes of action and finding defendant not unduly prejudiced

5  because fact discovery cut-off date was still nearly three months away and claims

6  plaintiff sought to add were "based on the factual allegations that underlie the fraud

7  claims asserted in the original complaint").

8      Accordingly, the first and most important *Foman* factor militating against

9  granting leave to amend is entirely absent from this case.

10 **C.    The Remaining *Foman* Factors Also Support Granting Leave to Amend.**

11     Absent prejudice, "there exists a *presumption* under Rule 15(a) in favor of

12 granting leave to amend," unless there is a "strong showing" that the four remaining

13 *Foman* factors make leave to amend inappropriate.  *Eminence Capital*, 316 F.3d at

14 1052 (emphasis in original).  In this case, the opposite is true: an analysis of the

15 remaining *Foman* factors further demonstrates that leave to amend should be granted.

16     *1.    Plaintiffs' Motion Is Not Made in "Bad Faith."*

17     Plaintiffs are not requesting leave to amend in bad faith or for dilatory reasons.

18 As noted, one of the principal reasons for the proposed SAC is that the parties were

19 awaiting the Court's ruling on the Motion for Judicial Determination, both with respect

20 to the privileged status of the Milbank and Chen Memos, and the sealing or unsealing

21 of the court file.  Moreover, the proposed amendment will not delay this action, as

22 discovery has not begun in any event, and is not being sought for any improper

23 purpose.  (Friedberg Dec., ¶ 8.)

24     *2.    Plaintiffs Did Not "Unduly Delay" Seeking Leave to Amend.*

25     There has been no undue delay here.  This action was filed only a few months

26 ago, in February 2018.  The Defendants have not had to respond to the Complaint or

27 the FAC, no discovery has been conducted, the scheduling order has not yet issued and

28 no trial date has been set.

- 10 -

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE [PROPOSED] SECOND AMENDED COMPLAINT**

1   Furthermore, the Court issued its Order regarding the Motion for Judicial
2   Determination just a month ago, on June 8, 2018.  Prior to that, it would not have been
3   appropriate for Plaintiffs to allege the contents of the Milbank and Chen Memos in a
4   complaint given GIP's assertion of privilege.
5       Far longer delays than any which apply here have been found not to constitute
6   an "undue delay" justifying denial of leave to amend.  *See Morongo Band of Mission*
7   *Indians*, 893 F.2d at 1079 (delay of nearly two years after filing original complaint
8   before seeking leave to file amended complaint was "not alone enough to support
9   denial" of motion for leave to amend); *Scott*, 733 F.3d at 119 (granting leave to amend
10  even though plaintiff waited three years to file amended complaint); *cf. Jackson v.*
11  *Bank of Hawaii*, 902 F.2d 1385, 1388 (9th Cir. 1990) (undue delay where plaintiffs
12  informed the court of intention to file an amended complaint in March 1987, but
13  delayed offering amended complaint until May 1988).
14      Moreover, even a finding of delay would not by itself be grounds for denying
15  Plaintiffs' leave to amend.  *See Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir. 1999)
16  (undue delay factor "by itself . . . is insufficient to justify denying a motion to amend").

17      ***3.    Plaintiffs Have Not "Repeatedly Failed to Cure Deficiencies" Through***
18          ***Prior Amendments.***

19      Under the next *Foman* factor, courts assess whether a party has "repeated[ly]
20  fail[ed] to cure deficiencies by previous amendments."  *Moore v. Kayport Package*
21  *Express, Inc.*, 885 F.2d 531, 538 (9th Cir. 1989) (*citing Foman*, 371 U.S. at 182).
22      This *Foman* factor does not apply; the Court has had no occasion to consider the
23  sufficiency of either the Complaint or the FAC previously.  (Friedberg Dec., ¶ 6.)

24      ***4.    Amendment Is Not Futile.***

25      Finally, the proposed amendment is not futile.  Before discovery is complete, a
26  proposed amendment is "futile" only if it is "clear . . . that the complaint could not be
27  saved by any amendment."  *Krainski v. State of Nevada ex rel. Bd. of Regents of*
28  *Nevada System of Higher Ed.*, 616 F.3d 963, 972 (9th Cir. 2010).  Absent clear futility,

- 11 -

1  challenges to the legal sufficiency of a proposed amendment should be "raised in a
2  motion to dismiss rather than in an opposition to a motion for leave to amend."
3  *SAES Getters S.p.A. v. Aeronex, Inc.*, 219 F. Supp. 2d 1081, 1086 (S.D. Cal. 2002).
4  Thus, "[d]enial of leave to amend on this ground is rare."  *Netbula, LLC v. Distinct*
5  *Corp.*, 212 F.R.D. 534, 539 (N.D. Cal. 2003).

6          Here, Plaintiffs are not repleading a cause of action which this Court has found
7  deficient, but rather removing one cause of action, adding four new defendants and
8  pleading additional factual allegations to causes of action which have never been
9  challenged.  Furthermore, the parties being added are all major participants in the
10  alleged fraudulent and illegal conduct underlying this action are all referenced in the
11  Complaint and FAC, although not sued in either.  Accordingly, there is no basis for
12  denying leave to amend based on futility.

13                          **V.    CONCLUSION.**

14          Under Rule 15(a), and given the absence of any of the five *Foman* factors,
15  Plaintiffs' respectfully request leave to file their proposed Second Amended
16  Complaint, a copy of which is attached hereto as **Exhibit A**.

17

18  Dated:  July 9, 2018                    Respectfully submitted,

19                                          **ISAACS | FRIEDBERG LLP**

20

21                                          */s/ Jerome H. Friedberg*
22                                          Jeffrey B. Isaacs, Esq.
                                            Jerome H. Friedberg, Esq.
23                                          Paige Shen, Esq.
24                                          Robert Gookin, Esq.
                                            *Attorneys for Plaintiffs STM Atlantic N.V.,*
25                                          *STM Group, Inc., Emil Youssefzadeh and*
26                                          *Umar Javed*

27

28

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE [PROPOSED] SECOND AMENDED COMPLAINT**

244714.12

# Exhibit A

Jeffrey B. Isaacs, Esq., SBN 117104
Jerome H. Friedberg, Esq., SBN 125663
Paige Shen, Esq., SBN 162122
Robert F. Gookin, Esq., SBN 251601
**ISAACS | FRIEDBERG LLP**
555 South Flower Street, Suite 4250
Los Angeles, California 90071
Telephone: (213) 929-5550/Facsimile: (213) 955-5794
Email:  jisaacs@ifcounsel.com
          jfriedberg@ifcounsel.com
          pshen@ifcounsel.com
          rgookin@ifcounsel.com

*Attorneys for Plaintiffs STM Atlantic N.V.,*
*STM Group, Inc., Emil Youssefzadeh and*
*Umar Javed*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STM ATLANTIC N.V., a Dutch company; STM GROUP, INC., a Delaware corporation; EMIL YOUSSEFZADEH, an individual; and UMAR JAVED, an individual, | Case No. 2:18-cv-01269-JLS-JCG |
| Plaintiffs, | **[PROPOSED] SECOND AMENDED COMPLAINT FOR MONETARY AND OTHER RELIEF FOR:** |
| vs. | 1) **CIVIL CONSPIRACY;** |
| DONG YIN DEVELOPMENT (HOLDINGS) LIMITED, a Hong Kong unlimited company; CHINA ORIENT ASSET MANAGEMENT (INTERNATIONAL) HOLDING LIMITED, a Hong Kong limited company; and LUDWIG CHANG, an individual, | 2) **FRAUD;** |
| | 3) **CIVIL THEFT (CAL. PEN.  CODE § 496);** |
| Defendants. | 4) **VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1962(b), 1964(c));** |
| | 5) **VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1962(c), 1964(c));** |
| | 6) **CONSPIRACY TO VIOLATE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1962(d), 1964(c));** |

7) **INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**

8) **VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200); and**

9) **UNJUST ENRICHMENT.**

**DEMAND FOR JURY TRIAL**

2

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

# TABLE OF CONTENTS

**PAGE**

I.      PRELIMINARY STATEMENT. .................................................................8

II.     THE PARTIES. ......................................................................................11

     A.      Plaintiffs. ................................................................................ 11

     B.      Defendants. .............................................................................. 13

III.    JURISDICTION AND VENUE. .............................................................15

     A.      Subject Matter Jurisdiction. .................................................... 15

     B.      Personal Jurisdiction. .............................................................. 16

     C.      Venue. ...................................................................................... 19

IV.     U.S. Export Control Laws. ...................................................................19

     A.      The International Traffic In Arms Regulations. ...................... 19

     B.      The Export Administration Regulations. ................................ 21

V.      FACTUAL ALLEGATIONS. .................................................................23

     A.      The Satellite Project. ............................................................... 23

           1.      STM Atlantic. ............................................................... 23

           2.      The Orbital Slot Licenses. ............................................ 23

           3.      The Satellite Project Concept and Business Plan. ....... 25

     B.      Introduction to DONG YIN. ................................................... 28

     C.      Defendants Undermine Plaintiffs' Deal with CCTG. ............. 29

     D.      The COSEIG Joint Venture Agreement. ................................. 30

           1.      The October 14, 2015 Letter of Intention. ................... 30

           2.      Ivan Chow Repeatedly Represents that COSEIG Is Independent. .............................................................. 31

3

**[PROPOSED] SECOND AMENDED COMPLAINT**

3.   *The Parties Enter into the COSEIG JVA.*.....................................32

4.   *Plaintiffs Enlist MILBANK to Ensure that the COSEIG JVA Provides Sufficient Firewalls to Avoid Violating U.S. Export Control Laws.*.........................................................33

5.   *The Parties Conduct Their Due Diligence.*................................34

6.   *COSEIG is Replaced by Bronzelink.*............................................35

E.   The Bronzelink Joint Venture Agreement. ............................................37

F.   The Amore Facility Agreement and the Secret Facility Agreement Terms....................................................................39

G.   The Secret Amore Share Charge Over Bronzelink............................41

H.   The Discussions Leading up to the Series A Share Purchase Agreement. ....................................................................42

I.   The Series A Share Purchase Agreement. .......................................44

J.   The Shareholders Agreement...........................................................47

K.   Plaintiffs Discover Material Inconsistencies Between the SHA and the Amore Facility Agreement.........................................49

L.   The Officers and Directors of GIP-Cayman and GIP-USA. ............51

M.   MILBANK Becomes GIP-Cayman's Outside Counsel........................53

N.   GIP-USA Is Formed..........................................................................53

O.   The False Certification to SpaceX and GIP-Cayman's Export Control Obligations Under the Boeing Contract. ..................53

P.   The Employment Contracts. .............................................................55

Q.   DONG YIN's Exercise of Dominance and Control Over the Governance, Management and Operations of the Satellite Project. ......57

R.   The April 25, 2017 Milbank Memo....................................................67

S.   Mr. Youssefzadeh and Mr. Javed Attempt, Unsuccessfully, to Raise and Address Compliance Issues with the GIP-Cayman Board. ......................................................................70

4

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

T.    The Chen Memo...........................................................................73

U.    The GIP-Cayman Board Continues to Rebuff Mr. Youssefzadeh's and  Mr. Javed's Attempts to Raise and Address Compliance and Financing Issues. .....................................................................75

V.    Mr. Youssefzadeh and Mr. Javed are Constructively Discharged.........76

W.    The Cover Up Continues........................................................77

X.    DONG YIN Alters and Falsifies the Official Minutes from the GIP-Cayman Board of Directors Meetings.............................................79

Y.    DONG YIN Attempts to Purchase Plaintiffs' Silence...........................80

Z.    Summary of Money and Property Lost and Stolen................................81

**FIRST CAUSE OF ACTION**
**(For Conspiracy to Defraud)**
(By Plaintiffs Against All Defendants).........................................................82

A.    Formation and Operation of the Conspiracy.........................................82

B.    Wrongful Acts in Furtherance of the Conspiracy. ................................83

C.    Resulting Damages................................................................92

**SECOND CAUSE OF ACTION**
**(For Fraud)**
(By Plaintiffs Against All Defendants).........................................................92

A.    Misrepresentations and False Promises. .................................................92

[As to U.S. Export Control Laws.]...........................................................92

[As to DONG YIN's Role in the Governance, Management and Operations of GIP-Cayman.] ..........................93

[As to COSEIG and its Relationship  With DONG YIN.] ....................94

[As to Bronzelink and its  Relationship With DONG YIN.].................94

[As to Project Financing.] .........95

B.    Concealment of Material Facts. ..........................................................96

[As to DONG YIN's Relationships With COSEIG and Bronzelink.]..................................96

5

**[PROPOSED] SECOND AMENDED COMPLAINT**

[As to DONG YIN's Role in the Governance, Management and Operations of GIP-Cayman.] ..........................97

[As to The Secret FA Terms and Secret Charge.] ..................97

C.      Resulting Damages..................................................................................99

**THIRD CAUSE OF ACTION**
**(For Violation of California Penal Code Section 496)**
**(By Plaintiffs Against DONG YIN)** ...............................................................99

**FOURTH CAUSE OF ACTION**
**(For Civil RICO in Violation of  Title 18, United States Code,**
**Sections 1962(b) and 1964(c))**
**(By Plaintiffs Against DONG YIN)** .............................................................100

A.      The "Victim Enterprise." ......................................................101

B.      The Racketeering Acts. .........................................................101

1.      *Wire Fraud.*.................................................................*102*

2.      *International Money Laundering.*...............................*107*

C.      Injury to Business and Property. ...........................................108

**FIFTH CAUSE OF ACTION**
**(For Civil RICO Conspiracy in Violation of Title 18, United States Code,**
**Sections 1962(d) and 1964(c))**
**(By Plaintiffs Against All Defendants)**....................................................108

**SIXTH CAUSE OF ACTION**
**(For Civil RICO in Violation of  Title 18, United States Code,**
**Sections 1962(c) and 1964(c))**
**(By Plaintiffs Against All Defendants)**....................................................109

A.      The Criminal Enterprise. .......................................................109

B.      The Racketeering Acts. .........................................................109

C.      Injury to Business and Property. ...........................................110

**SEVENTH CAUSE OF ACTION**
**(For Civil RICO Conspiracy in Violation of Title 18, United States Code,**
**Sections 1962(d) and 1964(c))**
**(By Plaintiffs Against All Defendants)**....................................................110

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

**EIGHTH CAUSE OF ACTION**
**(For Interference with Prospective Business Advantage)**
(By Plaintiffs Against DONG YIN) .......................................................................... 111

**NINTH CAUSE OF ACTION**
**(For Violation of California Unfair Competition Law, California**
**Business & Professions Code Section 17200)**
(By Plaintiffs Against All Defendants).................................................................... 114

**TENTH CAUSE OF ACTION**
**(For Unjust Enrichment)**
(By Plaintiffs Against DONG YIN) .......................................................................... 119

**PRAYER FOR RELIEF** ....................................................................................... **120**

**DEMAND FOR JURY TRIAL**............................................................................. **123**

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

Plaintiffs STM Atlantic N.V. ("STM Atlantic"), STM Group, Inc. ("STM Group"), Emil Youssefzadeh and Umar Javed (collectively, "Plaintiffs"), complain in this Second Amended Complaint ("SAC") against defendants Dong Yin Development (Holdings) Limited ("DONG YIN"), China Orient Asset Management (International) Holding Limited ("COAMI"), Ludwig Chang ("CHANG"), Yuen-Cheung (Tony) Wong ("WONG"), Bonnie Shiyue Liu ("LIU"), Shiwen Fan ("FAN") and Milbank, Tweed, Hadley & McCloy LLP ("MILBANK") (collectively, "Defendants"), as follows:

## I.   PRELIMINARY STATEMENT.

1.      Beginning in 2008, Plaintiffs undertook an ambitious project to develop, launch and operate a state-of-the art communications satellite (the "Satellite") that would provide High Speed Internet Access ("HSIA") to under-served parts of Africa (the "Satellite Project" or the "Project").  Plaintiffs spent several years and millions of dollars of their own funds developing the Satellite Project and formed Global-IP Cayman ("GIP-Cayman") as the entity through which they would bring the Satellite Project to fruition.

2.      Satellites typically require several hundred million dollars in financing to design, build, launch and operate.  In June 2016, Plaintiffs sold a majority interest in GIP-Cayman to Bronzelink Holdings Ltd. ("Bronzelink") to obtain the first tranche of funding needed for the Satellite Project.  In the guise of providing debt financing to Bronzelink, DONG YIN, through its agents and co-conspirators, fraudulently and wrongfully obtained, and have maintained, control of the Satellite Project.

3.      DONG YIN is owned and controlled by an instrumentality and/or agency of the People's Republic of China (the "PRC").  Through its agents and together with its co-conspirators, DONG YIN agreed, conspired and schemed to obtain control of the Satellite Project from Plaintiffs by various dishonest means, including false and fraudulent representations and promises and the concealment of material facts, in order to: (a) obtain access to confidential and sensitive satellite and launch technology

8

and data, subject to U.S. export control laws; and (b) ultimately cause the ownership of the Satellite to be transferred to a company that it secretly dominates and controls, in violation of U.S. export control laws that preclude any PRC-affiliated entity from directly or indirectly owning or controlling a satellite.

4.      Because DONG YIN is owned and controlled by the PRC, and because the transfer of such technology and data to the PRC or its foreign agents is a violation of U.S. export control laws (and, if done willfully, a violation of federal criminal law), DONG YIN could not openly pursue and maintain its control of the Satellite Project. It therefore sought to conceal and disguise its true relationship to the Satellite Project by engaging in acts of fraud, theft and deception and by curtailing Mr. Youssefzadeh's and Mr. Javed's efforts to ensure that the Project was in compliance with U.S. laws and regulations prohibiting the transfer of satellite and launch technology and data to the PRC, eventually forcing Mr. Youssefzadeh and Mr. Javed to resign their positions and cease their involvement with the Project.

5.      The persons primarily responsible for the fraudulent and other wrongful conduct described in this SAC include (but are not necessarily limited to):

- Defendant DONG YIN, a wholly owned subsidiary of China Orient Asset Management Corporation ("COAMC"), an agency and instrumentality of the PRC;

- Defendant COAMI, a subsidiary and co-conspirator of DONG YIN with offices and assets in New York state;

- Defendant CHANG, the Executive Director and Co-President of COAMI and an agent and co-conspirator of DONG YIN at the time of the events in question;

- China Orient Smart Ecotech Investment Group Limited ("COSEIG"), a British Virgin Islands Company and the original entity to which DONG YIN proposed to lend funds to invest in the Satellite Project;

//

9

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

- Amore Resources Ltd. ("Amore"), a British Virgin Islands company wholly owned by DONG YIN, which is, and at all relevant times has been, acting as an agent and co-conspirator of DONG YIN;

- Global-IP Cayman ("GIP-Cayman"), a Cayman Islands company with its principal place of business in El Segundo, California, that Plaintiffs formed for purposes of completing the Satellite Project and eventually owning and operating the Satellite;

- Global-IP USA ("GIP-USA"), a Delaware corporation with its principal place of business in El Segundo, California, and a wholly owned subsidiary of GIP-Cayman;

- Bronzelink, a British Virgin Islands Company and purportedly independent investment vehicle, to which DONG YIN lent funds through Amore to invest in the Satellite Project;

- Hoiying Charles Yiu ("Yiu"), a resident of Hong Kong SAR and the nominal owner of Bronzelink who, at all relevant times answered to and took direction from DONG YIN;

- Defendant FAN, a PRC citizen, attorney for DONG YIN and member of the Bronzelink and GIP-Cayman Boards of Directors, who is, and at all relevant times has been, acting as an agent and co-conspirator of DONG YIN;

- Defendant WONG, a resident of Hong Kong SAR and member of the Bronzelink, GIP-Cayman and GIP-USA Boards of Directors, who is, and at all relevant times has been, acting as an agent and co-conspirator of DONG YIN;

- Defendant LIU, a member of the Bronzelink, GIP-Cayman and GIP-USA Boards of Directors and Controller of GIP-Cayman and GIP-USA, who is, and at all relevant times has been, acting as an agent and co-conspirator of DONG YIN;

10

**[PROPOSED] SECOND AMENDED COMPLAINT**

- Defendant MILBANK, a Washington D.C. law firm, which at various times relevant to the events in question has represented STM Group, DONG YIN, Amore and GIP-Cayman, and has been a co-conspirator of DONG YIN; and

- Dara Panahy ("Panahy"), a MILBANK partner responsible for its representation of STM Group, DONG YIN, Amore and GIP-Cayman.

6.     Defendants' fraud and theft, and the substantial losses of money and property that that conduct has caused Plaintiffs, is described in detail below.

## II.     THE PARTIES.

**A.     Plaintiffs.**

7.     Plaintiff STM Atlantic is a company organized under the laws of the Netherlands, with its principal place of business located in El Segundo, California. Prior to April 2016, STM's principal place of business was in Irvine, California.

8.     Plaintiff STM Group is a Delaware corporation, with its principal place of business in El Segundo, California.  STM Group is the parent corporation of plaintiff STM Atlantic.

9.     Plaintiff Emil Youssefzadeh is an individual residing in Los Angeles County, California.  Mr. Youssefzadeh is the founder of STM Group, and his family trust owns a majority interest in STM Group.  He is also one of the founders of GIP-Cayman.

10.     Mr. Youssefzadeh holds master degrees in electrical engineering from Stanford University, with a focus on information theory and satellite communications.

11.     Mr. Youssefzadeh is a pioneer in the satellite industry.  From 1979 to 1982, he worked as a satellite systems engineer for Hughes Aircraft, which is now Boeing Satellite Systems International, Inc. ("Boeing").  His responsibilities included research and development programs for advanced satellite communications payloads and system design of commercial satellite programs.

//

11

**[PROPOSED] SECOND AMENDED COMPLAINT**

12.     In 1982, Mr. Youssefzadeh founded STM Wireless, Inc. ("STM Wireless"), which was engaged in the manufacturing of satellite ground terminals.  STM Wireless helped launch the first advanced digital cellular network in Malaysia.  From 2003 to the present, he has been Chairman of STM Group, which acquired the assets of STM Wireless and was engaged in the development of technology, products and services in the communications satellite sector.

13.     While at STM Wireless and STM Group, Mr. Youssefzadeh was involved in matters of corporate governance under the laws of Brazil, France, India, Mexico, Morocco, Nepal, Norway and the United States.

14.     Plaintiff Umar Javed is an individual residing in Orange County, California.  He holds a master's degree in business administration, and has over 20 years of experience in management and business development in the technology and satellite industry.

15.     From 1999 to 2002, Mr. Javed held various positions including commercial manager, sales and marketing director and vice president of sales at STM Wireless.  From 2003 to the present, he has served as President of STM Group, leading the business as it made a number of mergers and acquisitions in Europe, the Americas, the Middle East and Latin America.  While at STM Group, he headed the creation of start-up companies in Brazil and Spain, offering satellite-based solutions and services to the government, enterprise, mobility and maritime sectors.

16.     While at STM Wireless and STM Group, Mr. Javed was involved in matters of corporate governance under the laws of Brazil, the Cayman Islands, Chad, the European Union, Indonesia, the Netherlands, Norway, Spain, the United Arab Emirates and the United States.  Mr. Javed was a member of the board of STM subsidiary companies in all these jurisdictions, and worked with counsel in each of those jurisdictions on matters involving compliance with United States, United Nations and local laws.  Mr. Javed also worked with management executives in each subsidiary to ensure proper corporate governance and compliance with

12

**[PROPOSED] SECOND AMENDED COMPLAINT**

applicable laws and regulations.

17.     From their years of experience in the technology and satellite industry, Mr. Youssefzadeh and Mr. Javed knew that the export of satellite and launch technology and data to foreign persons and countries is subject to U.S. export control laws, including the International Traffic In Arms Regulations ("ITAR") and the Export Administration Regulations ("the EAR").  They understood that the consequences of a violation of ITAR or the EAR are potentially severe and could result in criminal sanctions.  They were also aware that a company with compliance issues may find it difficult or impossible to contract with American companies that are subject to ITAR and the EAR and truthfully make the certifications required by those companies

18.     In 2013, Mr. Youssefzadeh and Mr. Javed founded GIP-Cayman as a corporate entity to own and carry out the Satellite Project.  GIP-Cayman is incorporated under the laws of the Grand Caymans, but its principal place of business is in El Segundo, California.

**B.     Defendants.**

19.     Defendant DONG YIN is a company organized under the laws of Hong Kong SAR, with its principal place of business in Hong Kong SAR.

20.     DONG YIN is a subsidiary of China Orient Asset Management Company ("COAMC"), an agency and/or instrumentality of the PRC.

21.      Defendant COAMI is a Hong Kong limited company, organized under the laws of Hong Kong SAR, and a subsidiary of DONG YIN.  Its principal place of business is in Hong Kong SAR, but it maintains a United States presence and operates through an office located at 1114 Avenue of the Americas, Suite 3405, New York, New York 10036.

22.     DONG YIN is the 100% owner of and controls Wise Leader Assets Ltd. ("Wise Leader"), a company formed in the British Virgin Islands.  DONG YIN and Wise Leader each is a 50% owner of, and together control, defendant COAMI, as a

13

**[PROPOSED] SECOND AMENDED COMPLAINT**

result of which DONG YIN has 100% control over COAMI.

23.     Defendant CHANG was the Executive Director and Co-President of COAMI until at least on or about August 26, 2016.  He was also a Director of Amore.  At all relevant times, CHANG operated from his executive office, located at 1114 Avenue of the Americas, Suite 3405, New York, New York 10036, which is the same address as COAMI.   CHANG is, and at all relevant times was, an agent of COAMI and DONG YIN, acting within the scope of that dual agency and with the intent to benefit COAMI and DONG YIN in whole or in part.

24.     Defendant FAN is, and at all relevant times was, a citizen of the PRC and an attorney practicing law in Beijing, China.  FAN is, and at all relevant times was, a member of the Boards of Directors of Bronzelink and GIP-Cayman.

25.     In the negotiations leading up to Bronzelink's investment in GIP-Cayman, FAN was introduced to Mr. Youssefzadeh and Mr. Javed as an attorney and representative of DONG YIN.  He is, and at all relevant times was, an agent of DONG YIN, acting in whole or in part within the scope of that agency and with the intent to benefit DONG YIN.

26.     Plaintiffs are informed and believe, and based thereon allege, that prior to his appointment to the GIP-Cayman Board of Directors, FAN did not have any experience directing, managing, or governing a company involved in the design, ownership, or operation of satellites or satellite technology.

27.     Defendant WONG is resident of Hong Kong SAR and a relative of Xinyi Dong, who is a Director of DONG YIN and Amore.  In addition, WONG is, and at all relevant times was, a member of the Boards of Directors of Bronzelink, GIP-Cayman and GIP-USA.  In or about April 2017, WONG was appointed Executive Director of GIP-Cayman.  In or about July 2017, he was appointed Chairman of the Board of Directors of GIP-Cayman.  WONG is, and at all relevant times was, an agent of DONG YIN, acting in whole or in part within the scope of that agency and with the intent to benefit DONG YIN.

**[PROPOSED] SECOND AMENDED COMPLAINT**

28.     Plaintiffs are informed and believe, and based thereon allege, that prior to his appointment to the GIP-Cayman Board of Directors, WONG did not have any experience directing, managing, or governing a company involved in the design, ownership and operation of satellites or satellite technology.

29.     Defendant LIU is, and at all relevant times was, a member of the Boards of Directors of Bronzelink, GIP-Cayman and GIP-USA, and the controller of GIP-Cayman and GIP-USA.  In or about July 2017, LIU was appointed Secretary of the Board of Directors of GIP-Cayman.  LIU is, and at all relevant times was, an agent of DONG YIN, acting in whole or in part within the scope of that agency and with the intent to benefit DONG YIN.

30.     Plaintiffs are informed and believe, and based thereon allege, that prior to her appointment to the GIP-Cayman Board of Directors, LIU did not have any experience directing, managing, or governing a company involved in the design, ownership and operation of satellites or satellite technology.

31.     Defendant MILBANK is a New York limited liability partnership with a principal executive office located at 1 Chase Manhattan Plaza, New York, New York, 10005-1413.  At various times relevant to the events in question, MILBANK and Dara Panahy, a MILBANK partner, represented STM Group, DONG YIN, Amore and GIP-Cayman.  Panahy, who is based in the Washington D.C. office of MILBANK, holds himself out as having particular expertise in the area of U.S. export control laws and the structuring of transactions involving those laws.

### III.     JURISDICTION AND VENUE.

**A.     Subject Matter Jurisdiction.**

32.     This Court has subject matter jurisdiction over this action pursuant to Title 28, United States Code, section 1331, in that it includes claims that arise under the laws of the United States, and pursuant to Title 28, United States Code, section 1367, in that the claims arising under state law are so related to the claims arising under federal law that they form part of the same case or controversy under

15

**[PROPOSED] SECOND AMENDED COMPLAINT**

Article III of the United States Constitution.

**B.      Personal Jurisdiction.**

33.     This Court has personal jurisdiction over Defendants in this action pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and California Code of Civil Procedure section 410.10 in that: (a) Defendants, and each of them, have purposefully directed their activities and consummated transactions in and with residents of California and have purposefully availed themselves of the privilege of conducting activities in California, invoking the benefits and protections of its laws; (b) the claims against Defendants, and each of them, arise out of and relate to each Defendants' California-related activities; and (c) the exercise of jurisdiction over Defendants, and each of them, comports with fair play and substantial justice.

34.     More specifically, and as described in detail below, this Court has personal jurisdiction over Defendants, and each of them, because, among other things:

(a)      Plaintiffs resided in California at all relevant times, and Defendants, and each of them, made false and fraudulent representations and promises to Plaintiffs in furtherance of the conspiracy and scheme to defraud Plaintiffs, while Plaintiffs were physically located in California;

(b)      Defendants made false and fraudulent representations and promises to Plaintiffs in furtherance of the conspiracy and scheme to defraud Plaintiffs, while Defendants were physically located in California;

(c)      Some of the property that Defendants obtained by fraud and theft, including Plaintiffs' confidential business plan, was located in California at the time;

(d)      The fraud and theft was carried out in part through agreements that were executed by Mr. Youssefzadeh and Mr. Javed while physically located in California, and which they executed, based in whole or in part, on false and fraudulent representations and promises made to them while they were physically located in California;

16

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

(e)     One of the contracts was also executed by FAN while he was physically located in California;

(f)     The principal place of business of GIP-Cayman is El Segundo, California;

(g)     The principal place of business of GIP-USA is also El Segundo, California;

(h)     LIU worked in the GIP-USA offices in El Segundo, California and lived in Southern California while the controller for GIP-Cayman and GIP-USA, and while acting as an agent of DONG YIN in furtherance of the conspiracy and scheme to defraud Plaintiffs;

(i)     FAN and WONG often travelled to and visited the GIP-USA offices in El Segundo, California, and on these trips as agents of DONG YIN in furtherance of the conspiracy and scheme to defraud Plaintiffs;

(j)     FAN, WONG and LIU attended meetings of the GIP-Cayman Board of Directors in California while acting as agents of DONG YIN in furtherance of the conspiracy and scheme to defraud Plaintiffs;

(k)     CHANG, in his capacity as the Executive Director and Co-President of COAMI and an agent of DONG YIN, had numerous contacts with Plaintiffs while they were in California in furtherance of the conspiracy and scheme to defraud Plaintiffs;

(l)     In or about August 2016, GIP-Cayman entered into a contract with Boeing to manufacture the Satellite and provide other services for the Satellite Project, which was executed and to be performed in California;

(m)    In or about March 2017, GIP-Cayman entered into a contract with Space Explorations Technology Corp. ("SpaceX") to launch the Satellite, which was executed and to be performed in part in California;

(n)     Defendants caused a false certification to be sent to SpaceX, located in Hawthorne, California, falsely certifying that GIP-Cayman was not

17

**[PROPOSED] SECOND AMENDED COMPLAINT**

"owned or controlled, or acting on behalf of, directly or indirectly, any individuals or entities domiciled, headquartered, incorporated, residing in or otherwise affiliated with [the PRC or other specified countries]," in furtherance of the conspiracy and scheme to defraud Plaintiffs;

(o)   DONG YIN caused GIP-Cayman to open at least one bank account at the HSBC Bank branch office in Irvine, California, which was used in furtherance of the conspiracy and scheme to defraud Plaintiffs;

(p)   In or about May and June 2017, WONG had extensive communications and contacts with Chris Chen ("Chen"), General Counsel for GIP-Cayman and GIP-USA, who was in California at the time, which Plaintiffs are informed and believe, and based thereon allege, were in furtherance of the conspiracy and scheme to defraud Plaintiffs;

(q)   In or about June 2017, after Plaintiffs raised the issue of whether Defendants were violating U.S. export control laws, WONG travelled to El Segundo, California, and sought to pressure Mr. Youssefzadeh and Mr. Javed to keep silent about the compliance problems they had discovered;

(r)   In or about November 2017, two DONG YIN consultants travelled to California and offered to pay Mr. Youssefzadeh and Mr. Javed to keep silent about the compliance problems they had discovered;

(s)   At all relevant times, MILBANK has conducted business in California and maintained an office in Los Angeles, California, at 2029 Century Park East, 33rd Floor, Los Angeles, California 90067-3019;

(t)   MILBANK had extensive communications and contacts with Mr. Youssefzadeh and Mr. Javed while they were physically located in California, in furtherance of the conspiracy and scheme to defraud Plaintiffs;

//

18

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

(u)　MILBANK had communications and contacts with Chen, while he was physically located in California, in furtherance of the conspiracy and scheme to defraud Plaintiffs;

(v)　Beginning in or about July 2016, MILBANK ostensibly represented GIP-Cayman, and, in the course of that representation, Panahy travelled to El Segundo, California, on more than one occasion, in furtherance of the conspiracy and scheme to defraud Plaintiffs; and

(w)　In or about April 2017, MILBANK caused a misleading memorandum concerning compliance issues to be circulated to Mr. Youssefzadeh, Mr. Javed and LIU, while they were physically located in California, in furtherance of the conspiracy and scheme to defraud Plaintiffs.

**C.　Venue.**

35.　Venue for this matter properly lies within the Central District of California pursuant to Title 18, United States Code, section 1391(b)(2), in that a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

## IV.　U.S. EXPORT CONTROL LAWS.

36.　To safeguard national security, a comprehensive series of federal regulations provide that certain confidential and sensitive technology and data involved in the construction and launch of satellites cannot be exported or provided to specified foreign countries, including the PRC.  These regulations include the ITAR and the EAR.

**A.　The International Traffic In Arms Regulations.**

37.　ITAR is a series of import/export regulations established under the U.S. Arms Export Control Act, Title 22, United States Code, section 2751, *et seq*.

38.　ITAR provides that it is the policy of the U.S. to deny licenses and other approvals for exports and imports of defense articles and defense services, including satellite technology, to the PRC (the "PRC Proscription").  (Title 22, Code of Federal

19

**[PROPOSED] SECOND AMENDED COMPLAINT**

Regulations, section 126.1(d).)

39.     The transfer of control of a satellite subject to ITAR to a "foreign person" is considered an "export" under ITAR.  (Title 22, Code of Federal Regulations, section 120.17(c).)

40.     ITAR defines "foreign person" to include natural persons who are not lawful permanent U.S. residents, foreign corporations and business associations, as well as any agency or subdivision of a foreign government.  (Title 22, Code of Federal Regulations, section 120.16.)

41.     ITAR further provides that the transfer of certain designated technical data to a foreign person is deemed to be an export to all countries in which the foreign person has held or holds citizenship or holds permanent residency.  (Title 22, Code of Federal Regulations, sections 120.17 and 120.50.)  The satellite and launch technology involved in the Satellite Project includes "technical data" subject to ITAR.

42.     Any person, including a corporation, that engages in the U.S. in the business of manufacturing or exporting, or temporarily importing, defense articles, or furnishing defense services, is required to register with the Directorate of Defense Trade Controls.  If the intended registrant is foreign owned, or foreign controlled, the certification must include an explanation of such ownership or control, including the identities of the foreign person or persons who ultimately own or control the registrant.  (Title 22, Code of Federal Regulations, section 122.2.)

43.     Under ITAR, "foreign ownership" means that more than 50% of the outstanding voting securities of the company are owned by one or more foreign persons.  (Title 22, Code of Federal Regulations, section 120.16.)  "Foreign control" means one or more foreign persons have the authority or ability to establish or direct the general policies or day-to-day operations of the company.  Foreign control is presumed to exist where a foreign person or persons own 25% or more of the outstanding voting securities of the company, unless one U.S. person controls an equal or larger percentage.  (Title 22, Code of Federal Regulations, section 120.37.)

**[PROPOSED] SECOND AMENDED COMPLAINT**

44.     The penalties for violating ITAR are severe.  Any person who knowingly violates any provision of the Arms Control Act could be sentenced to 20 years in federal prison and fined for each violation as much as $1,000,000.  (Title 22, United States Code, section 2778; Title 22, Code of Federal Regulations, section 127.3.)  A violation of ITAR may also result in civil penalties and debarment from participating in any activities that are subject to ITAR.  (Title 22, Code of Federal Regulations, sections 127.7 and 127.10.)

**B.     The Export Administration Regulations.**

45.     The EAR are a set of regulations issued by the U.S. Department of Commerce's Bureau of Industry and Security for the purpose of implementing the U.S. Export Administration Act of 1979, Title 50, United States Code, section 4601, *et seq*.

46.     The Export Administration Act of 1979 (the "EAA"), as amended authorizes the Department of Commerce, in consultation with other appropriate agencies, to regulate the export or re-export of U.S.-origin dual-use goods, software, and technology.  The Department of Commerce implements this authority through the EAR.

47.     The export control provisions of the EAR are intended to further national security, foreign policy, nonproliferation of weapons of mass destruction, and other such interests of the U.S.  The EAR controls are designed, in part, to restrict access to items subject to EAR by countries or persons that might apply such items to uses inimical to U.S. interests.  (Title 15, Code of Federal Regulations, section 730.6.)

48.     Like ITAR, the EAR contains a PRC Proscription, which prohibits certain technology from being exported to the PRC.  Any license application seeking to export items or services to the PRC that may compromise national security is subject to a policy of denial.  (Title 15, Code of Federal Regulations, section 742.4(b)(1)(iii).)  The satellite and launch technology involved in the Satellite Project includes technology that falls within this proscription.

21
**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

49.     The EAR provides that satellites cannot be exported to the PRC.  (Title 15, Code of Federal Regulations, section 772.1.)  The EAR also prohibits the transfer of registration, ownership, or control of a satellite to a PRC entity or national, or to an entity directly or indirectly controlled by a PRC entity or national.  (Title 15, Code of Federal Regulations, section 734.13)

50.     The EAR provides that it is unlawful to "engage in any conduct prohibited by or contrary to, or refrain from engaging in any conduct required by, the EAA, the EAR, or any order, license or authorization issued thereunder."  In addition, "[n]o person may cause or aid, abet, counsel, command, induce, procure, or permit the doing of any act prohibited, or the omission of any act required, by the EAA, the EAR, or any order, license or authorization issued thereunder."  Further, "[n]o person may conspire or act in concert with one or more persons in any manner or for any purpose to bring about or to do any act that constitutes a violation of the EAA, the EAR, or any order, license or authorization issued thereunder."  (Title 15, Code of Federal Regulations, section 764.2(a, (b), (d)).

51.     As with ITAR, violations of the EAR carry significant criminal and civil penalties, including, for a willful violation of the EAR, imprisonment for up to ten years.  (Title 50, United States Code, section 4610.)

52.     Depending upon the facts of the particular case, conduct that constitutes a violation of ITAR or the EAR also often involves a violation of another federal criminal law, such as Title 18, United States Code, sections 371 (criminal conspiracy), 1001 (false statements to a federal agency), 1341 (mail fraud), 1343 (wire fraud) and 1956 and 1957 (money laundering).

53.     Three recent cases demonstrate the potentially serious consequences of violating the export control laws:

(a)     In *U.S. v. Zuccarelli*, U.S. District Court for the Eastern District of Texas, Case No. 4:17-cr-00117-ALM-KPJ, a Texas man was sentenced to 46 months in prison, a $50,000 fine and three years of supervised release for

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

violating U.S. export control laws by conspiring to illegally export radiation hardened integrated circuits to Russia and China for use in their space programs.

(b)   In *U.S. v. Xu*, U.S. District Court for the Southern District of New York, Case No. 7:16-cr-00010-KMK, a Chinese national was sentenced to five years in prison, pursuant to a plea agreement, for stealing proprietary source code from his former employer with the intent of benefitting the PRC.

(c)   In *U.S. v. Shih*, U.S. District Court for the Central District of California, Case No. 2:18-cr-00050-JAK, two Southern California men were arrested in January 2018 for conspiring to cause a U.S. company to make special high-speed computer chips that were then exported to a Chinese company, in violation of the export control laws.

## V.   FACTUAL ALLEGATIONS.

**A.   The Satellite Project.**

**1.   *STM Atlantic*.**

54.   STM Atlantic was founded by Mr. Youssefzadeh in 2003. STM Atlantic's original business was to manufacture and sell very small aperture terminal ("VSAT") equipment, which is a two-way ground station that transmits and receives data from satellites.  STM Atlantic was successful in manufacturing and selling VSAT equipment.

55.   In the mid-2000s, STM Atlantic began to transition into the business of providing satellite services, creating the Satellite Project with the goal of designing, financing, fabricating, launching, operating and owning communications satellites that provided HSIA and other Broadband services to portions of Africa and elsewhere.

**2.   *The Orbital Slot Licenses*.**

56.   In or about August 2008, as an initial step in bringing the Satellite Project to fruition, STM Group, through its subsidiary STM Norway, made its first regulatory

23

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

1   filing for Orbital Slots with the International Telecommunications Union ("ITU") in

2   Switzerland and the government of Norway.

3         57.    The ITU is a specialized agency of the United Nations that coordinates

4   the shared global use of the radio spectrum, promotes international cooperation in

5   assigning satellite orbit positions, works to improve telecommunication infrastructure

6   in the developing world, and assists in the development and coordination of

7   worldwide technical standards.

8         58.    A key function of the ITU is to assign and coordinate Orbital Slots for

9   geosynchronous satellites.  Geosynchronous satellites are satellites that have an orbital

10  period that is the same as the Earth's rotation period.  As a result, they stay in the

11  same place in the sky, relative to a position on the ground, which makes them useful

12  for communications, television broadcasting and providing HSIA.

13        59.    Any company or government that wants to place a satellite in

14  geosynchronous orbit is required to obtain a license, known as an Orbital Slot License,

15  from the ITU.  Among other things, this requirement prevents satellites from

16  interfering with each other.

17        60.    In 2012, STM Group, through STM Norway, applied to the government

18  of Norway for Orbital Slot Licenses.  STM Group chose Norway for their filing

19  because it had a strong presence in that country, employed qualified technical staff

20  there, and intended to manage and control the satellite through its presence in Norway.

21        61.    To obtain the desired Orbital Slot Licenses, STM Norway needed to pay

22  filing fees to the ITU and to the government of Norway.  STM Norway also needed to

23  demonstrate that it had sufficient expertise in the satellite field to convince the

24  government of Norway that it would be able to launch a satellite during the license

25  period.  Finally, STM Norway needed to demonstrate that its proposed satellite would

26  not interfere with any existing satellites.  Plaintiffs made the necessary payments and

27  were able to satisfy each of these conditions.

28  //

**[PROPOSED] SECOND AMENDED COMPLAINT**

62.     In or about June 2012, STM Norway obtained Orbital Slot Licenses for 18W and 15.5W (the "STM Orbital Slots").  The STM Orbital Slots were extremely valuable because they were in a priority position relative to others for the expected time the proposed satellite could be Brought Into Use ("BIU"); had a good view towards the earth in relation to the target coverage area (sub-Saharan Africa); and could be coordinated with other adjacent satellites in frequency to be able to access the largest amount of frequency spectrum over the coverage area.

63.     Orbital Slot Licenses are valid for a period of seven years.  If they are not used during that time frame, they expire and have no value.  The STM Project Orbital Slot Licenses expire in June 2019.

64.     In 2013, STM Norway transferred its rights in the Orbital Slot Licenses to Dub Dub, a Norwegian Company that in 2015 became a wholly owned subsidiary of GIP-Cayman.

### *3.      The Satellite Project Concept and Business Plan.*

65.     In or about 2009 and 2010, as part of the Satellite Project, STM Group and STM Atlantic further developed their business concept of providing communication satellite services to sub-Saharan Africa.  Their goal was to design, fabricate and launch a satellite that would make them a dominant provider of Broadband services, including HSIA, in sub-Saharan Africa.  Internet service in Africa is typically limited to the largest cities.  But approximately 70% of Africa's population does not live in the cities.  Accordingly, Plaintiffs wanted to become the driver for providing, and bringing down costs for, Broadband services and HSIA in those unserved, or under-served, parts of Africa.

66.     Plaintiffs planned to profit from the Satellite Project by leasing capacity on the satellite to governments and private HSIA providers.  The Satellite Project was projected to earn approximately US$1.5 billion in profits over the life of the satellite.

67.     STM Atlantic commissioned and paid for marketing studies, identifying their biggest competitors and attempting to ascertain potential customers for the

25

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

Satellite Project.  The target customers were governments, mobile network operators and Internet Service Providers.

68.    In or about 2010, STM Atlantic started discussions with various companies, including Mitsubishi (in Japan), Space Systems Loral (in Palo Alto), Thales (in France) and Boeing (in El Segundo) to manufacture the satellite.

69.    In or about 2010, STM Group engaged MILBANK to provide legal services involving regulations and financing for the Satellite Project.  Panahy was STM Group's primary contact at MILBANK and the attorney with whom Plaintiffs worked most closely and developed a relationship of trust.

70.    In or about February 2012, Plaintiffs completed their first business plan for the Satellite Project.  The plan needed to, and did, address every component of the Project, including: (a) financing; (b) development; (c) manufacture; (d) delivery; (e) launch; (f) maintenance, control and operation; (g) satellite control facilities; (h) orbital locations; (i) ground system and gateways; and (j) required launch and in-orbit insurance.  This was an extremely involved process that required significant time, money and expertise.

71.    A key component of the business plan was the technical design of the satellite.  Plaintiffs prepared the initial design for a state-of-the-art 7.7-ton solar-powered satellite, with maximum Broadband capacity and a 15-year anticipated lifespan.  The design had to factor in the weight, power and performance of the satellite, and had to provide sufficient capacity in the specific markets and at geographic locations where the capacity would be needed.  The design also had to consider the whereabouts of approximately a dozen gateways to the Internet cloud to be established in Europe in such a way that interference with the satellite could be minimized.

72.    The satellite design work was begun at STM Group in or about 2011.  It involved significant amounts of Mr. Youssefzadeh's time and expertise, the participation of the STM Atlantic engineering staff, and the work of a satellite expert

**[PROPOSED] SECOND AMENDED COMPLAINT**

hired by STM Atlantic and supervised by Mr. Youssefzadeh.

73.     In or about 2013, STM Atlantic sold its operating assets so it could focus exclusively on the Satellite Project.  In or about April 2013, Plaintiffs incorporated GIP-Cayman under the laws of the Grand Caymans.  GIP-Cayman became a subsidiary of STM Atlantic.  Plaintiffs created GIP-Cayman to be the company that owned and operated the satellite.

74.     After GIP-Cayman was incorporated, Mr. Youssefzadeh became the sole director.  He remained a director of GIP-Cayman until his resignation following the filing of this lawsuit, on or about February 25, 2018.

75.     In or about July 2012, Mr. Youssefzadeh and Mr. Javed recruited Bahram Pourmand ("Pourmand") to become part of the Satellite Project.  At that time, Pourmand was an executive with Hughes Communications, Inc. ("Hughes"), and was well-known in the satellite industry.  At the time, Mr. Youssefzadeh and Mr. Javed believed that Pourmand could be instrumental in raising funds to further finance the Satellite Project.  Accordingly, they offered to give him a 37% share of GIP-Cayman after it was incorporated.  Pourmand agreed, acquiring and holding his interest in GIP-Cayman through his company Steadyspace Limited ("Steadyspace").

76.     Mr. Javed became a director of GIP-Cayman in November 2015, along with Pourmand.  Mr. Youssefzadeh, Mr. Javed and Pourmand were the only three directors of GIP-Cayman until June 3, 2016, when Bronzelink acquired a majority interest in GIP-Cayman, as discussed below.  Mr. Javed remained a director of GIP-Cayman from November 2015 until his resignation following the filing of this lawsuit, on or about February 25, 2018.

77.     Mr. Javed also served as GIP-Cayman's President and Chief Operating Officer (COO) from November 15, 2015 until June 3, 2016 and was subsequently reappointed to those positions by the full Bronzelink-controlled GIP-Cayman Board of Directors.

//

**[PROPOSED] SECOND AMENDED COMPLAINT**

**B.     Introduction to DONG YIN.**

78.     Satellite projects typically require several hundred million dollars in financing to build, launch and operate the satellite.  Plaintiffs sought to sell an equity interest in GIP-Cayman to obtain the first tranche of funding needed for the next steps in the Satellite Project.

79.     In or about July 2015, Mr. Youssefzadeh, Mr. Javed and Pourmand were contacted by China Orient Asset Management Company ("COAMC") and DONG YIN, both of whom expressed an interest in providing financing for the Satellite Project.  COAMC is a State Owned Enterprise created and owned by the PRC to participate in commercial activities on behalf of the PRC.

80.     At around this time, Mr. Javed first met in person with FAN, who was introduced to him as an attorney in the PRC and a representative of DONG YIN.

81.     On or about August 1, 2015, David Zhang of DONG YIN sent an email to Panahy.  Plaintiffs are informed and believe, and based thereon allege, that Zhang contacted Panahy on behalf of DONG YIN to obtain his assistance in structuring a deal for the Satellite Project.  Panahy responded on September 1, 2015, touting MILBANK's "broad-based experience with HK-based investment transactions, including in the satellite industry," and indicating that he would "be pleased to discuss the options of representing your team as investors, as well as the SPV [special purpose vehicle] for structuring, procurement, etc. as well as fee considerations."  Panahy further responded that he understood CHANG wanted to speak to him about this matter and indicated that he would "try him shortly."

82.     Panahy spoke with CHANG on or about September 2, 2015.  He followed up that conversation with an email to CHANG and Zhang, in which he scheduled a meeting with "the team" for September 9, 2015, in Washington, D.C.  Those preliminary negotiations were discontinued shortly thereafter, however, because Plaintiffs determined that they could not lawfully pursue any business relationship in which COAMC or DONG YIN would obtain control of GIP-Cayman.

**[PROPOSED] SECOND AMENDED COMPLAINT**

83.     On or about September 9, 2015, Pourmand met with Hady Hartanto ("Hartanto") and Charles Lau ("Lau") of TechCap, a company that had expressed an interest in helping Plaintiffs obtain financing for the Satellite Project.  That meeting was also attended by Yang Zeng, the Chairman of the DONG YIN Board of Directors; Din Yi Dong, DONG YIN's Vice Managing Director; Terry Long ("Long"), a DONG YIN executive; and CHANG, in his capacity as COAMI's Executive Director and Co-President.

84.     Mr. Youssefzadeh, Mr. Javed and Pourmand provided a draft financing agreement to TechCap.  On or about September 10, 2015, Lau sent a revised draft of that agreement back to Mr. Youssefzadeh, Mr. Javed and Pourmand, proposing to acquire 75% of GIP-Cayman in return for a $100 million investment.

85.     On or about September 10, 2015, Pourmand responded to Hartanto's email, rejecting the proposed terms.

**C.     Defendants Undermine Plaintiffs' Deal with CCTG.**

86.     As of September 2015, Plaintiffs had come to believe that Hartanto and his partner had misrepresented their ability to provide and/or raise financing for the Satellite Project.  While they had initially represented themselves as businessmen and investors, it became clear that they were just middlemen looking to connect Plaintiffs with potential funding sources in the PRC.  As a result, Plaintiffs began to seriously question Hartanto's and Lau's ability to actually structure a viable financing transaction, and decided that they did not want to have any further business involvement with TechCap.  Accordingly, in or about August 2015, Plaintiffs entered into direct negotiations with another potential financing source, Huaxun Shenzhen/CCT Group ("CCTG").

87.     The negotiations with CCTG gained momentum in or about September 2015, and, on or about September 12, 2015, Mr. Youssefzadeh and Mr. Javed signed a Memorandum of Understanding ("MOU") with CCTG.

//

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

88.     Pursuant to the terms of the MOU, CCTG assumed responsibility for securing equity and debt financing for the Satellite Project in return for 63% of the shares in GIP-Cayman.

89.     On September 17, 2015, Pourmand sent an email to Mr. Youssefzadeh and Mr. Javed, referring to the CCTG deal as "a dream," and indicating that he was no longer interested in working with Hartanto.

90.     On or about September 19, 2015, Lau sent an email to Pourmand, Mr. Youssefzadeh and Mr. Javed, copying Hartanto, stating that "[w]e have come this far and really hate to see this project go."  Lau then proposed certain steps to preserve TechCap's participation in the project, including producing a letter from COAMC confirming its "in-principle approval for the $200m loan."

91.     In or about late September 2016, CCTG's representative informed Mr. Youssefzadeh and Mr. Javed that CCTG had to withdraw from the deal.  The CCTG representative indicated that he had been pressured by Hartanto and Lyu, as well as persons representing COAMC and DONG YIN, to withdraw.

**D.     The COSEIG Joint Venture Agreement.**

92.     On or about October 5, 2015, Mr. Youssefzadeh received an email from Ivan Chow, who introduced himself as "the sole representative of Mr. Geng Zhiyuan and Yang Zeng of Dong Yin Development (Holdings) Limited regarding the business dealings related to the [*sic*] Global IP."

***1.     The October 14, 2015 Letter of Intention.***

93.     On or about October 14, 2015, DONG YIN provided a Letter of Intention to Mr. Youssefzadeh and Mr. Javed.  That letter certified that DONG YIN "intends to provide a total budget of up to USD200 million to the SPC, China Orient Smart Ecotech Investment Group Limited ("COSEIG") and authorizes Mr. Fan Shiwen to represent our company for the negotiations with relevant parties to the transaction regarding the specific terms and conditions."

*//*

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

94.     On or about October 15, 2015, Mr. Javed sent an email to Ivan Chow, asking for additional information regarding COSEIG, as well as information regarding FAN and his involvement in any deal with COSEIG.

95.     Ivan Chow responded to Mr. Javed's email, representing that: (a) COSEIG was a Special-Purpose Vehicle for investment; (b) its attorney had advised it against releasing COSEIG's company registration documents "at the current initial stage of contact," but that it would fully disclose its registry documents (registration certificate, Memorandum and Articles of Association, directors, shareholders and beneficiaries) once both parties were ready to pursue a deal; (c) DONG YIN was COSEIG's financial partner; (d) DONG YIN has sent FAN to work with Ivan Chow at COSEIG and that FAN "worked for DONG YIN as its lawyer"; and (e) Ivan Chow's role was "to identify, evaluate and negotiate with the potential companies to invest in as the fund is already sitting in a bank in Hong Kong."

**2.     *Ivan Chow Repeatedly Represents that COSEIG Is Independent.***

96.     In or about October 2015, Ivan Chow travelled to California to meet with Mr. Youssefzadeh and Mr. Javed.  In the course of arranging this meeting, both Ivan Chow and FAN confirmed to Mr. Youssefzadeh and Mr. Javed that they were acting as representatives of DONG YIN.

97.     During that October 2015 visit, Ivan Chow met with Mr. Youssefzadeh and Mr. Javed in Newport Beach, California.  In that meeting, Mr. Youssefzadeh asked for assurances that DONG YIN did not own or control COSEIG, and Ivan Chow responded by providing those assurances.  In fact, contrary to Ivan Chow's representation, COSEIG was under the control, dominance and direction of DONG YIN.

98.     Ivan Chow further represented to Mr. Youssefzadeh and Mr. Javed that COSEIG was solely owned by Pok Kit Chow, a wealthy Hong Kong businessman and investor who intended to borrow money from DONG YIN to invest in GIP-Cayman,

31

**[PROPOSED] SECOND AMENDED COMPLAINT**

1   and that COSEIG was completely independent of PRC influence and control.  In fact,

2   these representations were false and misleading:  among other things, Ivan Chow did

3   not disclose that Pok Kit Chow was his brother and that Pok Kit Chow had recently

4   obtained ownership of COSEIG when Hoi Ying (Charles) Yiu ("Yiu") transferred the

5   ownership of all 50,000 shares of COSEIG stock to him, at a nominal price of $1 per

6   share, in or about August 2015.

7       ***3.        The Parties Enter into the COSEIG JVA.***

8       99.    During a meeting in Irvine, California, on or about December 3, 2015,

9   Ivan Chow represented to Mr. Youssefzadeh and Mr. Javed that COSEIG was a

10  special purpose investment company with no desire or intent to become engaged in

11  the operations of GIP-Cayman.  In fact, COSEIG was under the control, dominance

12  and direction of DONG YIN and DONG YIN planned and intended to use COSEIG

13  as a vehicle to gain and maintain dominance and control of the governance,

14  management and operations of GIP-Cayman.

15      100.   On or about December 3 and 4, 2015, Mr. Youssefzadeh and Mr. Javed

16  attended meetings at STM Atlantic's offices in Irvine, California.  Those meetings

17  were also attended by FAN, Ivan Chow, Pourmand and Amir Irani ("Irani"),

18  Pourmand's stepson.  The purpose of those meetings was to finalize the terms of a

19  Joint Venture Agreement between COSEIG, Plaintiffs, Pourmand and Steadyspace

20  (the "COSEIG JVA").

21      101.   During these meetings, FAN asked if there would be any compliance

22  issues under U.S. export control laws given that COSEIG intended to borrow money

23  from DONG YIN.  Mr. Youssefzadeh and Mr. Javed told FAN that DONG YIN's

24  involvement as a lender would not create a compliance problem provided that:

25  (a) DONG YIN's role was limited to providing debt financing; (b) COSEIG was truly

26  independent; and (c) the GIP-Cayman Board of Directors would be independent and

27  free of any PRC influence.  FAN expressly represented and promised

28  Mr. Youssefzadeh and Mr. Javed that a structure that complied with U.S. export

32

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

control laws was being put into place.

102.   In fact, the representations that FAN made to Plaintiffs were false and misleading in that DONG YIN's role was not limited to providing debt financing. Rather, it planned and intended to gain and maintain control of the Satellite Project through its dominance and control of the GIP-Cayman Board of Directors, which would enable it to obtain access to confidential and sensitive satellite and launch technology and data.  Furthermore, at all relevant times, COSEIG was controlled by DONG YIN and DONG YIN had merely arranged for Pot Kit Chow to be the nominal owner of COSEIG, for purposes of concealing and disguising its plan and intention to obtain ownership and control of the Satellite Project.

103.   On or about December 4, 2015, FAN signed the COSEIG JVA on behalf of COSEIG.  The COSEIG JVA was executed in Irvine, California.  STM Atlantic, Mr. Youssefzadeh and Mr. Javed all signed the COSEIG JVA in reliance on the false and fraudulent representations and promises that COSEIG was, and would remain, an independent company and that it was not under DONG YIN's control.

104.   The COSEIG JVA provided that, subject to certain "due diligence conditions and other conditions for Completion," COSEIG would make a $175 million dollar equity investment in GIP-Cayman in return for 30,000,000 newly issued shares in GIP-Cayman, which would give COSEIG a 75% ownership interest in GIP-Cayman.  The COSEIG JVA further provided that COSEIG would have the right to appoint six directors to the nine-member GIP-Cayman Board of Directors.

**4.      _Plaintiffs Enlist MILBANK to Ensure that the COSEIG JVA Provides Sufficient Firewalls to Avoid Violating U.S. Export Control Laws._**

105.   Subsequent to entering into the COSEIG JVA, Mr. Youssefzadeh and Mr. Javed asked Panahy to review the JVA to determine if it created sufficient safeguards to ensure compliance with export control laws considering that DONG YIN was the lender that would be providing the financing.

//

33

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

106.   In or about early December 2015, after reviewing the COSEIG JVA, Panahy told Mr. Youssefzadeh and Mr. Javed that he could help ensure compliance with the applicable export control laws if MILBANK represented DONG YIN in the transaction.  That way, according to Panahy, MILBANK could make sure that DONG YIN knew and complied with the limits on its participation as a lender to COSEIG.  Plaintiffs agreed with this approach, and, based on Panahy's representations, trusted MILBANK to ensure that DONG YIN's role in the transaction was appropriately limited.  In fact, rather than assisting Plaintiffs in making sure that COSEIG would be an effective firewall between DONG YIN and GIP-Cayman, as described further below, MILBANK and Panahy actively conspired with and assisted DONG YIN in its effort to obtain dominance and control over the Satellite Project by furthering DONG YIN's deception of Plaintiffs.

**5.**      ***The Parties Conduct Their Due Diligence.***

107.   On or about January 5, 2016, Panahy sent an email to Mr. Javed.  In that email, Panahy indicated that MILBANK had set up a data room for the COSEIG due diligence in the DONG YIN offices in Hong Kong.  Panahy further noted that, "[o]ne other item we should cover is what discussions have occurred with COSEIG and/or U.S. satellite manufacturers in connection with the contemplated HK/PRC significant investment in GIP (as 'purchaser' of the satellite) from an [sic] U.S. export compliance standpoint.  If GIP is majority owned, even if indirectly by a PRC entity, there could be significant issues.  If the investment is indeed sourced and made from bona fide HK entity or investors, then it should be okay."

108.   After entering into the COSEIG JVA, COSEIG proposed conducting due diligence jointly with DONG YIN.  That due diligence took place in Dubai on or about January 11 and 12, 2016.  Mr. Youssefzadeh and Mr. Javed arranged for COSEIG and DONG YIN to meet with a potential customer.  The attendees at these meetings were FAN; CHANG, in his capacity as COAMI's Executive Director and Co-President; Yang Zeng, Chairman of the DONG YIN Board; Xinyi Dong, Vice

**[PROPOSED] SECOND AMENDED COMPLAINT**

Managing Director of DONG YIN; Zhanyu ("David") Zhang, a DONG YIN executive; Terry Long, also a DONG YIN executive; Zhaohui Sui and Senlin Liang, DONG YIN representatives; Ivan Chow, on behalf of COSEIG; and Mr. Javed.

109.   During the January 11 and 12, 2016 due diligence meetings in Dubai, FAN; CHANG, acting on behalf of COAMI; and Ivan Chow, Yang Zeng, David Zhang and Xinyi Dong repeatedly represented to Mr. Javed that COSEIG was independent from DONG YIN and that DONG YIN was only a lender.  In fact, these representations were false and misleading because, at all relevant times, COSEIG was controlled by DONG YIN and it was always DONG YIN's plan and intent to obtain and maintain control of the Satellite Project.

110.   On or about January 28, 2016, Ivan Chow emailed Mr. Youssefzadeh, Mr. Javed and Pourmand, on behalf of FAN, that COSEIG's $250 million financial proposal had been formally approved by DONG YIN, adding to the false and misleading impression that DONG YIN was only a lender and that COSEIG and DONG YIN were independent, unrelated entities, when, in reality, DONG YIN was more than a lender and COSEIG was under the control of DONG YIN.

111.   In or about early February 2016, Ivan Chow suddenly disappeared from the transaction.  Mr. Youssefzadeh and Mr. Javed attempted to locate him, but they were told by FAN to cease their efforts.

### 6.   *COSEIG is Replaced by Bronzelink.*

112.   On or about February 7, 2016, Mr. Youssefzadeh and Mr. Javed attended a meeting arranged by FAN at the offices of a law firm in Washington, D.C.  The meeting was also attended by, among others, FAN; Panahy, acting as DONG YIN's counsel; and Henry Fan, who was a paid advisor to DONG YIN and FAN.  At that meeting, Panahy told Plaintiffs that COSEIG was being replaced in the joint venture by a different entity, later identified as Bronzelink.

113.   Panahy explained that the change from COSEIG to Bronzelink was being made at DONG YIN's behest.  At that time, FAN falsely represented to Plaintiffs that

35

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

Bronzelink, like COSEIG, was owned by "wealthy" Hong Kong investors, including Yiu, the prior owner of COSEIG, who had no affiliation to DONG YIN.  In fact Yiu was only a nominal owner of Bronzelink who answered to and took his directions from DONG YIN; (b) Bronzelink's Board of Directors was selected by DONG YIN; (c) DONG YIN's true role in the Satellite Project was more than that of a lender; and (d) DONG YIN's plan and intent was to gain dominance and control over GIP-Cayman and the Satellite Project and to use that dominance and control to obtain access to confidential and sensitive satellite and launch technology and data subject to ITAR, the EAR and the PRC Proscription.

114.   On or about February 11, 2016, FAN emailed Plaintiffs a "bridge" document identifying terms of the then-existing COSEIG – GIP-Cayman Agreement that had to be revised and eventually separated into an investment agreement and a shareholder agreement with the new, yet to be identified, Hong Kong entity ("NewCo").  The "bridge" document included terms allowing COSEIG/NewCo to have the right to appoint a majority of the directors to GIP-Cayman's Board, and provided that this right attached to the terms of the stock in GIP-Cayman that COSEIG/NewCo was to receive, such that if DONG YIN foreclosed on the shares, it would have the right to control the Board.

115.   On or about February 16, 2016, during an in-person meeting at the offices of Bronzelink's Washington, D.C. attorneys, CHANG, acting in his capacity as COAMI's Executive Director and Co-President, falsely represented and promised to Mr. Youssefzadeh (participating telephonically from California), Mr. Javed and Pourmand that: (a) after the closing, DONG YIN would have no control of GIP-Cayman; and (b) DONG YIN had no intention of controlling or seeking to influence GIP-Cayman and was relying on the founders, including Mr. Youssefzadeh and Mr. Javed, to oversee completion of the Satellite Project after the closing.

116.   On or about February 18, 2016, Bronzelink issued an authorization that "Mr. FAN Shiwen be [the] authorized representative to sign the agreement related to

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

1   equity investment into GLOBAL-IP CAYMAN."  That authorization was executed by

2   Yiu, acting as the nominal owner of Bronzelink.

3   117.   On or about February 21, 2016, Panahy, acting as a MILBANK partner

4   and as counsel for DONG YIN, emailed Mr. Youssefzadeh, Mr. Javed, FAN and

5   others, noting that, as a general matter, the parties needed "to be mindful of any

6   direct/indirect PRC (not HK) influence or control of GIP, via Board Members or

7   otherwise, and need to be accordingly careful as regards the identity, domicile and

8   bona fides of the Board Members."  At the time Panahy made those comments, he

9   intentionally concealed and knowingly failed to disclose that MILBANK was

10   representing DONG YIN in negotiating the Amore Facility Agreement, which would

11   give DONG YIN the ability to appoint and exercise dominance and control over the

12   Bronzelink Board of Directors and, through Bronzelink, over the GIP-Cayman Board

13   of Directors.

14   118.   On or about February 23, 2016, during a meeting at the offices of

15   Bronzelink's Washington, D.C. attorneys, FAN and Henry Fan falsely represented to

16   Plaintiffs that Bronzelink was an independent, stand-alone entity with no affiliation to

17   DONG YIN.

18   **E.      The Bronzelink Joint Venture Agreement.**

19   119.   On or about February 25, 2016, the COSEIG JVA was terminated.  It was

20   replaced by the Bronzelink Joint Venture Agreement ("Bronzelink JVA"), dated

21   February 25, 2016, which was virtually the same as the COSEIG JVA, except for the

22   name change.  Bronzelink, like COSEIG, did not intend to passively allow Plaintiffs

23   to manage GIP-Cayman and rely upon them to complete the Satellite Project, but

24   instead would demand a role in the governance, management and operations of

25   GIP-Cayman.

26   120.   Prior to entering into the Bronzelink JVA, Mr. Youssefzadeh and

27   Mr. Javed were falsely assured by DONG YIN's agents and representatives, on

28   multiple occasions, that Bronzelink was fully independent of DONG YIN.  By way

**[PROPOSED] SECOND AMENDED COMPLAINT**

of example:

    (a)    In or about early 2016, Panahy telephoned Mr. Javed in California and represented that COSEIG would be swapped out in the Joint Venture Agreement for another company, which was yet to be identified, because COSEIG's name was too similar to COAMC.  In this and other telephone conversations during this time period, Panahy, acting as DONG YIN's counsel, falsely promised Plaintiffs that DONG YIN would not be permitted to gain control or direct the governance, management, or operations of GIP-Cayman.

    (b)    On or about February 16, 2016, during a meeting in Washington, D.C., CHANG, acting in his capacity as COAMI's Executive Director and Co-President,  falsely represented to Mr. Youssefzadeh, Mr. Javed and Pourmand that after the closing DONG YIN had no intention to assert, and would not seek to assert, control over GIP-Cayman or the Satellite Project.  FAN was present when this statement was made and did not disagree with it.

121.   The terms and language of the proposed Bronzelink JVA also conveyed the false and misleading impression that Bronzelink was a stand-alone and legitimate investment vehicle, independent of DONG YIN.  In the JVA, Bronzelink represented that it was an independent entity that "has the power to execute, perform its obligations under and enter into all transactions contemplated by this Agreement," and that "the execution and performance of this Agreement . . . do not violate . . . any agreement or instrument to which it is subject."  This representation was false and misleading in that it omitted material information concerning Bronzelink's true relationship with DONG YIN.

122.   As a result of these falsehoods and half-truths, Plaintiffs believed that Bronzelink was an independent stand-alone and legitimate investment vehicle not subject to DONG YIN's dominance and control.  In fact, however, DONG YIN was

38

**[PROPOSED] SECOND AMENDED COMPLAINT**

using Bronzelink, like COSEIG, as a fraudulent device that DONG YIN was using to further its plans and efforts to gain and maintain dominance and control over GIP-Cayman and the Satellite Project, and to use that dominance and control to obtain access to confidential and sensitive satellite and launch technology and data.

123.   In or about February and March 2016, Mr. Youssefzadeh and Mr. Javed were told by FAN and Panahy, acting as DONG YIN's counsel, that the Bronzelink JVA was essentially a "placeholder" agreement that would eventually be superseded by a Share Purchase Agreement ("SPA") and a Shareholders Agreement ("SHA").

**F.     The Amore Facility Agreement and the Secret Facility Agreement Terms.**

124.   Amore was incorporated in the British Virgin Islands on January 11, 2016.

125.   At all relevant times, Amore was controlled by DONG YIN.  As of March 10, 2016, Amore's Board of Directors was comprised of at least two high level DONG YIN executives, including Yang Zeng, Chairman of the DONG YIN Board, and Xinyi Dong, a DONG YIN executive.  CHANG and Guoxing Zhong, who were both directors of COAMI, were also members of the Amore Board of Directors.

126.   Unbeknownst to Plaintiffs, on or about March 15, 2016, Bronzelink entered into a Facility Agreement with Amore (the "Facility Agreement"), the material terms of which were intentionally concealed from Plaintiffs (the "Secret FA Terms").  Xinyi Dong of DONG YIN signed the Facility Agreement on behalf of Amore.

127.   MILBANK represented both DONG YIN and Amore in the negotiations and preparation of the Facility Agreement.  Plaintiffs are informed and believe, and based thereon allege, that MILBANK and Panahy knew of, and were  responsible for, the terms of the Facility Agreement, including the terms by which DONG YIN exercised control over Amore, and through Amore, Bronzelink and GIP-Cayman.

//

//

**[PROPOSED] SECOND AMENDED COMPLAINT**

128.   The Facility Agreement gave Amore control over Bronzelink.  But because Amore was at all times controlled by DONG YIN, the Facility Agreement also gave DONG YIN control over Bronzelink, and, therefore, GIP-Cayman, once Bronzelink acquired its majority ownership interest in GIP-Cayman.  Among other things:

(a)     Part 3 of Schedule 2 to the Facility Agreement provides that Amore has the right to approve the appointment of four members to the five-member Bronzelink Board of Directors, all of whom would then be appointed as GIP-Cayman Board members.

(b)     Paragraph 3.1(a)(ii) of the Facility Agreement provides that Bronzelink shall use the funds it borrows from Amore for "investing in the preferred equity of [GIP-Cayman] on terms satisfactory to [Amore]."

(c)     In Paragraph 14.3 of the Facility Agreement, Bronzelink represents that the "entry into and performance by it of, and the transactions contemplated by [the Facility Agreement]," do not and will not conflict with "any law or regulation applicable to it" or "*any agreement or instrument binding upon it*."  (Emphasis added.)

129.   The result of these relationships and transactions was to secretly eliminate the firewall between GIP-Cayman, the Satellite Project and the Satellite, on the one hand, and DONG YIN and the PRC, on the other hand.

130.   On or about March 15, 2016, Panahy emailed Mr. Youssefzadeh and Mr. Javed, stating that his law firm was DONG YIN's counsel and could not act for Bronzelink, adding to the false and misleading impression that DONG YIN and Bronzelink were independent entities.

131.   On or about the same day, March 15, 2016, Panahy confirmed that his partner in MILBANK's Hong Kong office had coordinated the Facility Agreement between Amore and Bronzelink, that it had been signed and that funding was "imminent."  These representations were misleading in that they concealed and failed

40

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

to disclose that:  (a) certain terms of the Facility Agreement were in conflict with the pending agreement between Bronzelink and Plaintiffs; and (b) DONG YIN and Bronzelink were not independently owned and controlled entities that dealt with each other at arms' length, but rather Bronzelink was a fraudulent device for DONG YIN to gain and maintain dominance and control over GIP-Cayman and the Satellite Project.

132.   As Panahy well knew, the Secret FA Terms effectively gave DONG YIN control over the Bronzelink and GIP-Cayman Boards of Directors, notwithstanding that Panahy had previously warned Mr. Youssefzadeh and Mr. Javed that even indirect control over GIP-Cayman by a PRC-related entity could create "significant issues."

133.   Notwithstanding numerous requests, Panahy refused to provide Mr. Youssefzadeh or Mr. Javed with a copy of the Facility Agreement.

**G.     The Secret Amore Share Charge Over Bronzelink.**

134.   To further solidify its control over Bronzelink, GIP-Cayman and the Satellite Project, DONG YIN required Charles Yiu, the (nominal) owner of Bronzelink, to execute a Share Charge (the "Secret Charge") that, among other things, pledged Yiu's interest in Bronzelink to Amore as security for its loan to Bronzelink and gave Amore virtually unfettered authority to assume full control of Bronzelink in the event of any default of either the Facility Agreement or the Secret Charge.

135.   Yiu executed the Secret Charge on March 11, 2016.  As security for Bronzelink's obligations under the Facility Agreement, Yiu agreed to charge his interest in all of his Bronzelink shares to Amore.

136.   The Secret Charge defines an "Event of Default" as "any breach by [Yiu] of any of the provisions of the Loan Agreement or this Charge."

137.   The Secret Charge provides that if an "Event of Default" occurs, Amore has the right to remove Yiu, with or without cause.  In conjunction with the Secret Charge, Yiu provided (a) a signed "Share Transfer Form" in favor of Amore, which provided that in the Event of Default, all of Yiu's shares in Bronzelink would

41

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

be sold, transferred or assigned to Amore; (b) a signed "Proxy," giving Amore his proxy to vote on his behalf at any meeting of the Bronzelink shareholders, or to execute a written resolution as the sole shareholder of Bronzelink; (c) a signed but undated Letter of Resignation and Release; (d) a signed "Authority to Date Letter of Resignation and Release," irrevocably authorizing Amore to date and submit the Letter of Resignation and Release" on behalf of Yiu; (e) a signed "Undertaking" from Bronzelink to register transfers of the charged shares to Amore; and (f) an irrevocable letter of instruction to Bronzelink's registered agent.

138.   The existence of the Secret Charge was intentionally concealed and knowingly withheld by MILBANK, DONG YIN and the other Defendant from Plaintiffs.

**H.     The Discussions Leading up to the Series A Share Purchase Agreement.**

139.   On or about March 28, 2016, Mr. Youssefzadeh sent an email to Panahy requesting a "source of funds" letter for the funds that were to be used to pay for Bronzelink's investment in GIP-Cayman.  Panahy initially refused to provide the letter, stating that "[g]iven our stated concerns regarding the role of DY as a lender, and the need to attenuate PRC interests in both Bronzelink and GIP, having a letter from DY or its counsel 'on the record' does not serve the interests of any of the parties to this transaction."

140.   On or about April 5, 2016, Panahy, acting as DONG YIN's counsel, provided his comments to a draft of the SPA by email, representing that he had intended to align the conditions precedent in the SPA with the terms of the Facility Agreement between Amore and Bronzelink.  These representations were, at a minimum, misleading in that other material terms of the SPA were contrary to, undermined by, or otherwise subject to the terms of the Facility Agreement.

141.   On or about April 5, 2016, David Zhang of DONG YIN hand delivered to Mr. Youssefzadeh and Mr. Javed in Washington, D.C. a copy of a letter from DONG YIN to Bronzelink, stating that DONG YIN, acting through Amore, had

42

**[PROPOSED] SECOND AMENDED COMPLAINT**

provided debt financing to Bronzelink.  The letter further stated that the proceeds of
the loan were being used by Bronzelink to make a $175 million investment in
GIP-Cayman, in accordance with the SPA and the Bronzelink JVA, dated
February 25, 2016.  The letter and the cover email were, at a minimum, misleading in
that neither disclosed that Bronzelink was dominated and controlled by DONG YIN,
and was not the independent and stand-alone investment vehicle it had been
represented to be.

142.   On or about April 15, 2016, CHANG, using his COAMI email and acting
in his capacity as COAMI's Executive Director and Co-President, emailed Mr. Javed,
whom CHANG knew was in California at the time.  CHANG indicated that "we are
unable to ask Bronzelink to dispense funds without a much more detailed operating
plan.  For this we would need, [sic.] including but not limited to a schedule of tasks
and critical path to be met, timing and the personnel involved.  We can't disperse
funds without knowing specific uses and the milestones and condition to be reached
before each payment is made."

143.   On or about April 27, 2016, Calvin Tang ("Tang"), a Bronzelink and
Plaintiffs are informed and believed, and based thereon allege, a DONG YIN agent,
emailed documents to Mr. Javed relating to Amore, including the Certificate of
Incorporation and the Certificate of Incumbency.  Tang noted that the documents were
from DONG YIN with instructions that they were only for opening a HSBC bank
account for GIP-Cayman.

144.   On or about April 27, 2016, CHANG, acting in his capacity as COAMI's
Executive Director and Co-President, spoke by telephone with Mr. Youssefzadeh,
who was in Los Angeles County, California, and Mr. Javed, who was in
Orange County, California, at that time.  CHANG informed Mr. Youssefzadeh and
Mr. Javed that DONG YIN wished to hire consultants that CHANG knew and
recommended to assist in the operation of GIP-Cayman.  Mr. Youssefzadeh and
Mr. Javed told CHANG that this was not acceptable and refused to have anyone

43

**[PROPOSED] SECOND AMENDED COMPLAINT**

appointed by COAMI or DONG YIN involved in the Satellite Project.

145.   On or about April 27 or 28, 2016, David Zhang of DONG YIN and Panahy, acting as DONG YIN's counsel, represented to Plaintiffs that Amore was a wholly-owned subsidiary of DONG YIN.

146.   On or about April 28, 2016, Zhang sent an email to Mr. Javed confirming that DONG YIN owned 100% of Amore.

**I.     The Series A Share Purchase Agreement.**

147.   On or about May 11, 2016, the various parties signed the SPA, the SHA and the First Amendment to the SHA (the "SHA Amendment").  The parties to those agreements were:  GIP-Cayman, Bronzelink, STM Atlantic, Steadyspace, Pourmand (as an individual), Mr. Youssefzadeh (as an individual), Mr. Javed (as an individual) and Irani (as an individual).  FAN signed the SPA, the SHA and the SHA Amendment on behalf of Bronzelink; however he is not a party to these agreements and did not sign them in his individual capacity.  Neither DONG YIN, COAMI, CHANG, WONG, nor LIU are signatories or parties to the SPA, the SHA, or the SHA Amendment.

148.   Mr. Youssefzadeh signed all of these documents in California.

149.   To induce Plaintiffs to enter into the SPA, DONG YIN's agents and representatives continued to falsely represent to Plaintiffs that DONG YIN would have no control over GIP-Cayman or the Satellite Project, and that Bronzelink was a stand-alone, fully independent investment vehicle, thus ensuring compliance with U.S. export control laws.  By way of example:

(a)     On or about February 23, 2016, during a meeting in Washington, D.C., FAN falsely represented to Mr. Youssefzadeh, Mr. Javed, Pourmand and Irani that Bronzelink was an independent, stand-alone entity with no affiliation to DONG YIN.

(b)     On or about May 11, 2016, the day after the signing of the SPA, during a dinner in Hong Kong organized by Bronzelink, Yang Zeng of

44

**[PROPOSED] SECOND AMENDED COMPLAINT**

DONG YIN falsely confirmed that DONG YIN was merely a lender, and that it would have no control or influence over GIP-Cayman or the Satellite Project.

150.   As a result of these false representations, Plaintiffs continued to believe that DONG YIN was merely a lender and that Bronzelink was an independent entity that was not and would not be subject to DONG YIN's control or influence.

151.   Pursuant to the SPA, GIP-Cayman agreed to issue and sell to Bronzelink an aggregate of 30,000,000 newly issued Series A convertible preferred shares (the "Series A Preferred Shares").  These Series A Preferred Shares represented a 75% ownership interest in GIP-Cayman.  At the same time, the SPA reduced Plaintiffs' controlling ownership interest in GIP-Cayman from 63% to a minority interest of 15.75%.  Plaintiffs understood, based on the false representations and promises made to them by DONG YIN's agents, that GIP-Cayman would be under the control of an independent Board of Directors and managed by a CEO approved by Plaintiffs, without any control or influence by DONG YIN or its representatives.  In fact, not only was the Board dominated and controlled by DONG YIN, but it ultimately did not allow Plaintiffs to have any say in the governance of GIP-Cayman.

152.   Bronzelink agreed to purchase the Series A Preferred Shares for a lump sum payment of US$175,000,000, paid to GIP-Cayman (the "Equity Investment").  Bronzelink also agreed to provide a US$25,000,000 line of credit to GIP-Cayman.  As a result of these transactions, and the false and fraudulent representations and promises and concealment of material facts described above, Plaintiffs parted with their controlling ownership interest in the Satellite Project without receiving any remuneration under the SPA.

153.   In addition, as a condition to the closing between Bronzelink and GIP-Cayman, Plaintiffs were required to provide Bronzelink with confidential, proprietary and valuable documents, information and data that had been created as part of the Satellite Project, including:

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

(a)    A signed Letter of Intent ("LOI") for entering into a Satellite Manufacture Agreement between GIP-Cayman and a reputable satellite manufacturer (such as SSL-Loral, Boeing, or Airbus), along with a draft agreement;

(b)    A signed insurance rate-locking instrument issued by a reputable insurance broker to GIP-Cayman;

(c)    The "High Throughput Ka-Band Satellite Project for Africa Demand and Supply Analysis and Outline Project for Africa Demand and Supply Analysis and Outline Project Assessment," conducted by COMSYS of the United Kingdom;

(d)    A "Milestones of Progress" document setting forth in detail planning schedules, payment schedules, timetables, milestones and documents for the development, fabrication and launch of the satellite;

(e)    GIP-Cayman's confidential marketing plan for the Pre-Launch Market Development;

(f)    A comfort letter from the satellite manufacturer that it will support an application for a loan from EXIM Bank; and

(g)    Written confirmation from Norwegian counsel for GIP-Cayman, in form and substance reasonably satisfactory to Bronzelink and its lenders, confirming that the ownership of Dub Dub had been properly transferred to GIP-Cayman, and that the transfer did not invalidate, or in any way otherwise adversely affect, Dub Dub's rights to the Orbital Slots and associated radio-frequency use licenses.

154.    As a further condition to the closing, STM Group was required to assign the valuable Global-IP trademark to GIP-Cayman.

155.    All of these deliverables were of tremendous value, representing years of work and millions of dollars of investment by Plaintiffs.  They were all transferred or conveyed to Bronzelink or GIP-Cayman prior to the closing, in reliance on

46

**[PROPOSED] SECOND AMENDED COMPLAINT**

Defendants' false pretenses, representations, promises and concealment of material facts.

156.   At all relevant times, Plaintiffs maintained their share certificates in GIP-Cayman and the confidential and proprietary documents, information and data that they provided to Bronzelink in California.

**J.     The Shareholders Agreement.**

157.   On or about June 1, 2016, GIP-Cayman amended and restated its Memorandum of Association and Articles of Association to reflect the terms of the SHA.

158.   On or about June 2, 2016, during a Skype call amongst FAN, WONG, Yiu, Tang and Mr. Javed, FAN began requesting additional materials that were not deliverables under the SHA.  FAN indicated that these materials were requested by DONG YIN.  Mr. Javed objected because DONG YIN was only the lender and had no right to, or any need for, any of these materials.  FAN later telephoned Mr. Javed to convince him to proceed with the closing, again falsely representing and promising that DONG YIN and Bronzelink were, and would remain, two completely distinct and unrelated entities, and that after the closing DONG YIN would not have any control over or say in the governance, management, or operations of GIP-Cayman.  Further, FAN falsely assured Mr. Javed that after the closing, Bronzelink would have an independent Board of Directors, which would make all decisions free of DONG YIN's influence.

159.   On or about June 3, 2016, Bronzelink and Plaintiffs finalized and executed the closing documents for the SHA.  Mr. Youssefzadeh executed the closing documents in California.

160.   Under the SHA, Bronzelink was not supposed to be a mere passive investor in GIP-Cayman; rather, it was supposed to have an independent role in the governance, management and operations of GIP-Cayman.  By way of example:

//

47

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

(a) The SHA provided that Bronzelink would control the GIP-Cayman Board of Directors.  Paragraph 3.2 of the SHA provided that the GIP-Cayman Board of Directors shall have nine members.  Paragraph 3.3 provided that Bronzelink is entitled to appoint six members to the GIP-Cayman Board (the "Bronzelink Directors"), and that Plaintiffs and Pourmand are entitled to appoint three members (the "Common Directors").

(b) Paragraph 3.5 provided that Bronzelink has the right to designate the Chairman of the GIP-Cayman Board of Directors.

(c) Paragraph 3.12 provided that Plaintiffs have the right to select the CEO of GIP-Cayman, but that Bronzelink had the right to select the Chief Financial Officer.

(d) Paragraph 6 provided that GIP-Cayman is responsible for securing Export Credit Agency ("ECA") or other non-recourse or limited-recourse project financing in an amount anticipated to be up to US$475,000,000.

(e) Paragraph 8 placed significant restrictions on the ability of Plaintiffs to transfer their shares in GIP-Cayman.

161.   After the SHA was signed, DONG YIN continued to conceal and disguise its ownership and control of GIP-Cayman and the Satellite Project.  As one example, soon after the closing, in early June 2016, Mr. Youssefzadeh drafted a press release to announce Bronzelink's investment.  On or about June 7, 2016, WONG rejected the idea of issuing a press release at that time.  In an email, he stated that he did not want to jeopardize the $25 million line of credit from Amore and, "therefore for the moment being, we should corporate [*sic*] and listen to the opinion from relevant party in order to facilitate more smooth business corporation [*sic*] going forward."  WONG's professed concern that Bronzelink needed to appease Amore was pretextual; Plaintiffs are informed and believe, and based thereon allege, that WONG's actual concern was to keep the true extent of DONG YIN's ownership and

**[PROPOSED] SECOND AMENDED COMPLAINT**

control of Amore and Bronzelink hidden.

## K.     Plaintiffs Discover Material Inconsistencies Between the SHA and the Amore Facility Agreement.

162.   In discussions with DONG YIN's agents and attorneys, including FAN, Henry Fan and Panahy, about various issues related to the SHA, Plaintiffs repeatedly asked to see the Amore Facility Agreement.  Those requests were consistently rejected without explanation.

163.   In or about mid-2017, after resigning from their employment at GIP, Plaintiffs by happenstance found and were able to review an electronic copy of the Facility Agreement.

164.   As a result of that review, Mr. Youssefzadeh and Mr. Javed discovered that the Facility Agreement contained provisions that gave Amore control of Bronzelink and GIP-Cayman, which meant that, in reality, DONG YIN was, all along, in control of Bronzelink and GIP-Cayman.  Moreover, some of the other provisions in the Facility Agreement were in direct conflict with the terms of the SHA, precluding Bronzelink from meeting its obligations under the SHA.

165.   Based on this review, Plaintiffs realized that, despite their promise to limit DONG YIN's role to that of a lender, MILBANK and Panahy had actually agreed, conspired and schemed with DONG YIN and its agents to obtain control of the Satellite Project.  Among other things:

(a)     Under the Facility Agreement, Amore has the power to approve the appointment of four directors to the Bronzelink Board of Directors, and those same four directors had to be appointed to the GIP-Cayman Board of Directors.  Given that Amore was controlled and dominated by DONG YIN, this provision effectively gave DONG YIN control over GIP-Cayman.

(b)     The Facility Agreement requires Bronzelink to provide Amore with free access at all reasonable times to the GIP-Cayman premises, assets, books,

49

**[PROPOSED] SECOND AMENDED COMPLAINT**

accounts, records and senior management.  The SHA does not provide for such access.  Plaintiffs would never have agreed to or allowed such access, especially given DONG YIN's dominance and control over Amore, and its affiliation with the PRC.

(c)     The Facility Agreement provides that Amore must approve all GIP-Cayman contracts in excess of $1,000,000.  There is no such restriction in the SHA.  Furthermore, that restriction is inconsistent with the understanding between Bronzelink and Plaintiffs that GIP-Cayman would be a stand-alone company governed by an independent board of directors.

(d)     The Facility Agreement requires GIP-Cayman to allow Amore to engage a financial advisor, technical consultant, marketing consultant and tax expert for GIP-Cayman, *at GIP-Cayman's expense*.  The SHA has no such provision.  Moreover, especially given DONG YIN's dominance and control over Amore, Plaintiffs would never have agreed to or allowed Amore to have such involvement in and influence over the policies, direction and operations of GIP-Cayman.

(e)     Under the Facility Agreement, Bronzelink was required to use reasonable efforts to prevent GIP-Cayman from entering into any joint venture.  There is no such restriction in the SHA, nor would Plaintiffs have agreed to or allowed such a restriction.  In fact, this secret restriction directly impacted GIP-Cayman's ability to enter into a proposed joint venture with a technology company that Mr. Youssefzadeh and Mr. Javed had determined was a fundamental element of the Satellite Project's business plan.  When, on or about June 12, 2017, Mr. Youssefzadeh sent a detailed memorandum to the GIP-Cayman Board of Directors outlining the proposed joint venture and asking for permission to proceed, the Board did not respond.  Plaintiffs are informed and believe, and based thereon

50

**[PROPOSED] SECOND AMENDED COMPLAINT**

allege, that the Board failed to act because, under the Facility Agreement, Bronzelink could not permit GIP-Cayman to enter into any such joint venture.

(f) Under the Facility Agreement, Bronzelink gave Amore a charge over the GIP-Cayman shares owned by Bronzelink.  This provision conflicts with the SHA, which allows GIP-Cayman to demand that Bronzelink provide its shares in GIP-Cayman to an ECA, or alternative lender, as additional collateral.

(g) Under the Facility Agreement, GIP-Cayman is precluded from creating a stock option pool.  The SHA, however, allows GIP-Cayman to create such a pool for its key employees, which was important if GIP-Cayman was to attract personnel with the skills, expertise and experience needed to work on the Satellite Project.

(h) Under the Facility Agreement, GIP-Cayman could only raise additional funds through ECA financing.  But neither the Bronzelink JVA nor the SHA contain any such limitation.  To the contrary, both of those agreements allow GIP-Cayman to raise funds from either an ECA or an alternative lending source.  Plaintiffs are informed and believe, and based thereon allege, that this secret restriction in the Facility Agreement was one reason that the GIP-Cayman Board refused to consider the Citigroup debt financing proposal (discussed below), because approving that proposal would have placed Bronzelink in breach of its agreement with Amore.

**L.     The Officers and Directors of GIP-Cayman and GIP-USA.**

166.   In accordance with an oral agreement between Plaintiffs and Bronzelink, three of the six directors Bronzelink appointed to the GIP-Cayman Board were to be independent (*i.e.*, not have any affiliation with Bronzelink other than their directorships) and would be satellite industry professionals.

51

**[PROPOSED] SECOND AMENDED COMPLAINT**

167.   On or about May 31, 2016, Plaintiffs were informed that Bronzelink's nominations of its GIP-Cayman Series-A directors consisted of: (a) FAN; (b) WONG; (c) LIU; (d) Guanhong (Jason) Luo ("Luo"); (e) Julian Zhongliang Zhao ("Zhao"); and (f) Wang Zheng ("Zheng").

168.   Mr. Javed requested a call with Panahy to ask if these nominees were independent of, and unaffiliated with, the PRC, and sent a text listing the names of the Bronzelink directors to Panahy.  During a telephone conference on or about May 31, 2016, Panahy, acting as DONG YIN's counsel, represented to Mr. Javed that: (a) four of the Bronzelink-nominated directors—LIU, Zheng, Luo and Zhao—were completely independent and unaffiliated with DONG YIN; and (b) since there would be four independent Bronzelink-appointed directors and three Common directors, GIP-Cayman would have solid protection from PRC control and influence.  Panahy further represented to Mr. Javed that, although WONG worked for Bronzelink, he was not affiliated with DONG YIN.

169.   Panahy's representations were false and misleading.  In fact, at all relevant times: (a) FAN, WONG and LIU were agents of DONG YIN, and were acting within the course and scope of their agency and for the sole or primary benefit of DONG YIN; (b) WONG and LIU routinely acted at FAN's direction and did his bidding; (c) neither WONG nor LIU exercised any meaningful independence in making decisions as members of the GIP-Cayman Board of Directors or with respect to the governance, management and operations of GIP-Cayman and GIP-USA; and (d) WONG was related to Xinyi Dong, an Amore director and high-level DONG YIN executive.

170.   On or about June 21, 2016, the first GIP-Cayman Board of Directors meeting was held in Hong Kong.  The Board appointed Luo as the Chairman of the Board.  Pourmand was appointed CEO of GIP-Cayman.

171.   In fact, prior to the Board meeting, Pourmand had secretly negotiated his compensation as the CEO of GIP-Cayman with FAN, and had received a very

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

favorable contract to ensure his loyalty to FAN and ultimately DONG YIN.  FAN negotiated Pourmand's contract without Plaintiffs' involvement or approval even though: (a) the SHA provides that Plaintiffs and Pourmand would collectively nominate the CEO; and (b) the CEO's compensation should have been approved by the GIP-Cayman Board of Directors and/or the GIP-Cayman Compensation Committee, of which Mr. Youssefzadeh was a member.

**M.     MILBANK Becomes GIP-Cayman's Outside Counsel.**

172.   On or about July 13, 2016, GIP-Cayman engaged MILBANK as its outside corporate counsel to advise it about, among other things, regulatory matters. MILBANK accepted that engagement even though it continued to represent DONG YIN in other, purportedly unrelated matters.

**N.     GIP-USA Is Formed.**

173.   In or about August 2016, GIP-USA was formed as a wholly owned subsidiary of GIP-Cayman.  At all relevant times, the GIP-Cayman Board of Directors controlled the direction and governance of GIP-USA, which meant that DONG YIN, through Amore, Bronzelink and GIP-Cayman, controlled GIP-USA.

174.   After GIP-USA was formed, WONG and LIU, along with Mr. Javed, became members of the GIP-USA Board of Directors.  Because the GIP-USA Board consisted of only three members, at all relevant times, DONG YIN, through WONG and LIU, possessed and was able to exercise control over the GIP-USA board.

**O.     The False Certification to SpaceX and GIP-Cayman's Export Control Obligations Under the Boeing Contract.**

175.   On or about August 5, 2016, in reliance on the false representations and promises described above, Mr. Javed, on behalf of GIP-Cayman, certified to SpaceX that GIP-Cayman was not "owned or controlled, or acting on behalf of, directly or indirectly, any individuals or entities domiciled, headquartered, incorporated, residing in or otherwise affiliated with [the PRC or other specified countries]."  Unbeknownst to Mr. Javed at the time, this certification was false because GIP-Cayman was under

the dominance and control of DONG YIN.  If Mr. Javed had known the true facts, he would not have made this certification to SpaceX.

176.   On or about August 28, 2016, GIP-Cayman entered into a contract with Boeing to design, develop, manufacture, test and transport the satellite to the launch site, and to provide launch support and other services for the Satellite Project.  The contract specifically provided that:

(a)   "The Contract Deliverable Data, Satellite, and any other hardware ('<u>Products</u>') furnished under this Contract are subject the U.S. International Traffic in Arms Regulations (the '<u>ITAR</u>') or the U.S. Export Administration Regulations (the '<u>EAR</u>')."

(b)   "The Products furnished under this Contract are subject to the ITAR or the EAR and will be authorized by the United States Government for export only to Customer in North Atlantic Treaty Organization or major non-North Atlantic Treaty Organization ally countries, as recognized at the time by the USG, or to the Designated Launch Site for launch into space.  Customer represents and warrants that the ultimate end use of the Products is for commercial purposes.  The Products may not be resold, diverted, transferred, trans-shipped or otherwise disposed of in any other country or in any other manner, either in their original form or after being incorporated through an intermediate process into other end items, without the prior written approval of the United States Government, which approvals are the sole responsibility of Customer.  Additionally, transferring registration, control or ownership to any other person or business entity of the Products furnished under this Contract is considered an export and as such also requires prior written approval from the United States Government, which approvals are the sole responsibility of Customer."

//

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

177.   Mr. Youssefzadeh signed the contract on behalf of GIP-Cayman, not knowing that GIP-Cayman was under the dominance and control of DONG YIN. If Mr. Youssefzadeh had known the true facts, he would not have signed this contract.

178.   Plaintiffs are informed and believe, and based thereon allege, that if Defendants had disclosed to Boeing and SpaceX the true relationship between DONG YIN and the PRC, on the one hand, and GIP-Cayman, GIP-USA and the Satellite Project, on the other hand, Boeing and SpaceX would never have entered into contracts with GIP-Cayman to build and launch the satellite, and would never have given GIP-Cayman and GIP-USA access to satellite and launch technology and data subject to ITAR, the EAR and the PRC Proscription.

179.   Plaintiffs are further informed and believe, and based thereon allege, that the false and fraudulent representations Defendants caused Plaintiffs and GIP-Cayman to make to SpaceX and Boeing were intended to cause SpaceX and Boeing to transfer satellite and launch technology and data to GIP-Cayman.  As a result, DONG YIN, through its control of GIP-Cayman, would then be able to obtain access to that technology and data, in violation of the export control laws, including without limitation, Title 15, Code of Federal Regulations, section 734.13.

**P.      The Employment Contracts.**

180.   In or about September 2016, Pourmand's employment agreement was modified.  Although he retained the title of CEO, he was stripped of his authority and responsibilities as CEO.  The amendment to Mr. Pourmand's employment agreement states: "The Employee shall not be expected to perform the duties customarily associated with the title of Chief Executive Officer and shall not have the authority to bind the Company as the Chief Executive Officer . . . notwithstanding anything to the contrary in the organizational documents of the Company."  At that time, Mr. Youssefzadeh was asked by FAN, and orally agreed, to act as the de facto CEO of GIP-Cayman and GIP-USA, and assumed the duties, responsibilities and authority of CEO of both companies.

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

181.   Effective October 1, 2016, Mr. Youssefzadeh entered into parallel written employment agreements with GIP-Cayman and GIP-USA.

182.   Mr. Youssefzadeh's employment agreement with GIP-USA provided that he was to perform the duties of GIP-USA's Chief Technical Officer ("CTO") and Chairman of the Management Committee.  It provided that he was to render those services at GIP-USA's offices in El Segundo, California.

183.   Mr. Youssefzadeh's employment agreement with GIP-USA further provided that his annual compensation was $500,000, which would automatically be adjusted upward to $620,000 per year, with a cash bonus, on the date that GIP-Cayman or GIP-USA received debt financing.

184.   Mr. Youssefzadeh's employment agreement with GIP-Cayman contained similar provisions, and named him GIP-Cayman's CTO and Chairman of the Management Committee.

185.   Mr. Youssefzadeh's GIP-Cayman employment agreement provided for an additional $250,000 in annual compensation, to be automatically increased to $300,000 per year, with an additional cash bonus, on the date that GIP-Cayman or GIP-USA received debt financing.

186.   Effective October 1, 2016, Mr. Javed also entered into written employment agreements with GIP-Cayman and GIP-USA.

187.   Mr. Javed's employment agreement with GIP-USA provided that he was to perform the duties of GIP-USA's President and Chief Operating Officer ("COO"). It provided that he was to render those services at GIP-USA's offices in El Segundo, California.

188.   Mr. Javed's employment agreement with GIP-USA further provided that his annual compensation was $400,000, which would be automatically adjusted upward to $500,000 per year, with a cash bonus, on the date that GIP-Cayman or GIP-USA received debt financing.

//

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

189.   Mr. Javed's employment agreement with GIP-Cayman contained similar provisions and named him GIP-Cayman's President and COO.  It provided for an additional $150,000 in annual compensation, to be automatically increased to $190,000 per year, with a cash bonus, on the date that GIP-Cayman or GIP-USA received debt financing.

**Q.    DONG YIN's Exercise of Dominance and Control Over the Governance, Management and Operations of the Satellite Project.**

190.   Prior to the execution of the SPA and SHA, and even before appointment of the GIP-Cayman Board of Directors, DONG YIN, through its agents and co-conspirators, began to assert dominance and control over the governance, management and operations of the Satellite Project.

191.   On or about April 15, 2016, CHANG, acting in his capacity as COAMI's Executive Director and Co-President, emailed Mr. Javed in California, requesting GIP-Cayman's detailed operating plan, including schedule of tasks, critical paths, timing and personnel needed, and indicating that Amore was unwilling to grant authorization for Bronzelink to disburse funds without knowing more about the specific uses, milestones and conditions.

192.   On multiple occasions, including on or about April 18, 27, 29 and May 3, 2016, FAN, WONG and Yiu, each separately emailed Mr. Youssefzadeh and Mr. Javed to request a detailed operating plan, including the schedule of tasks, critical paths, timing, personnel needed and milestones for the Satellite Project.

193.   During a telephone call on or about April 23, 2016, Bronzelink notified Mr. Youssefzadeh and Mr. Javed that FAN would lead the Bronzelink team; WONG would coordinate all Bronzelink related matters; Yiu would be the contact for Bronzelink's business decisions; and Tang would be the contact for the parties' legal team.  Soon after the call, WONG emailed Mr. Javed, indicating that FAN had appointed WONG as signatory to the GIP-Cayman HSBC bank account, even though FAN lacked the executive powers or authority to do so.

**[PROPOSED] SECOND AMENDED COMPLAINT**

194.   On or about April 27, 2016, FAN emailed Mr. Youssefzadeh and Mr. Javed, asking that they travel to Hong Kong to meet the following week, and requesting a detailed work plan (including milestones, timeframe and staff arrangements), a detailed budget plan and a detailed operation plan for GIP-Cayman.

195.   On or about April 27, 2016, CHANG, acting in his capacity as COAMI's Executive Director and Co-President, had a telephone conversation with Mr. Youssefzadeh, who was in Orange County, California, and Mr. Javed, who was in Los Angeles, California at the time, stating that DONG YIN wished to hire management consultants that CHANG knew to assist in the operation of GIP-Cayman.

196.   On or about April 29, 2016, WONG emailed Pourmand, copying Mr. Youssefzadeh and Mr. Javed, indicating that FAN expected to receive the documents and information he had demanded, relating to the work, budget and operational plans, by May 4, 2016, prior to Mr. Youssefzadeh's and Mr. Javed's planned visit to Hong Kong.

197.   On or about May 3, 2016, Tang emailed Pourmand, requesting that the GIP-Cayman team bring the work, budget and operational plans with them to Hong Kong, so that they could be discussed during meetings scheduled for May 9 and 10, 2016.

198.   On or about July 8, 2016, Tang prepared and circulated drafts of charts showing GIP-Cayman's organizational structure, delineating the respective duties and responsibilities of the GIP-Cayman Board and its executives.  The proposed charts required GIP-Cayman executives to seek approval from the DONG YIN controlled Board of Directors for decisions and activities that are typically within the exclusive purview of a company's executives and managers, including, for example: (a) issuance of press releases, company publications and public statements that do not involve financial matters; (b) entering into equipment leases; (c) maintenance of general ledger and operating expenditures; (d) contact with regulators and other governmental authorities; (e) hiring and termination of staff; (f) computer access;

**[PROPOSED] SECOND AMENDED COMPLAINT**

(g) authorizing sales and marketing at operational levels; (h) authorizing domestic and international travel for staff; and (i) authorizing communications with the company's bankers and signing checks on behalf of the company.

199.   On or about July 15, 2016, FAN travelled to Washington, D.C. to meet with Mr. Youssefzadeh, Mr. Javed and Pourmand, in advance of holding a GIP-Cayman Board meeting in Washington, D.C.  FAN wanted to inspect and approve offices that Pourmand had located in Maryland and formalize LIU's position as GIP-Cayman's Controller, which are typically matters handled by the company's executives and managers and not by an individual director.

200.   At the July 18, 2016 GIP-Cayman Board meeting in Washington, D.C., Mr. Youssefzadeh presented the status of negotiations with Boeing and another contractor, SSL, and recommended that the company sign an LOI with Boeing, which was approved by the Board.

201.   At the same Board meeting, it was agreed that after execution of the Boeing LOI, $10 million would be transferred from GIP-Cayman's Hong Kong bank account for capital expenditures.  Despite that this was the Board's decision, WONG took control of the transaction, emailed GIP-Cayman and instructed that the $10 million payment instead be made from GIP-Cayman's HSBC account in the U.S.

202.   On or about July 29, 2016, after the Boeing LOI was finalized and reviewed by Panahy, Mr. Youssefzadeh requested authorization from Luo, Chairman of the GIP-Cayman Board of Directors, to execute the Boeing LOI.  In response, Luo emailed that "[he] would like Mr. FAN/DONG YIN to review/agreed [sic][the Letter of Intent] before we move on."   Later that day, WONG sent an email, copying Terry Long of DONG YIN.  In further response to Mr. Youssefzadeh's request, WONG wrote that "[t]his is to confirm we can move on, you have the agreement from both parties to proceed."

203.   FAN, WONG and Yiu came to Los Angeles on or about August 23, 2016, to meet with Mr. Youssefzadeh, Mr. Javed and Pourmand

**[PROPOSED] SECOND AMENDED COMPLAINT**

individually, followed by a group meeting.  During these meetings, FAN and WONG made several statements revealing that they were acting at DONG YIN's direction and on its behalf in matters relating to the Satellite Project.  By way of example:

(a)   Even though the GIP-Cayman Board had authorized Mr. Youssefzadeh to proceed with finalizing a definitive agreement with Boeing, WONG told Mr. Javed that he was reluctant to release the formal authorization to do so because of pressure from FAN, who was waiting for the final "go ahead" from DONG YIN.

(b)   When Mr. Javed warned FAN that GIP-Cayman was on the verge of missing a deadline with Boeing, FAN refused to take any action, saying that he did not have permission from DONG YIN to act.

(c)   At every opportunity, FAN sought to interject himself into the day-to-day operations of GIP-Cayman and GIP-USA, which was inappropriate for an individual director with no executive or managerial position within the company.  Among other things, FAN and his team wanted to read each and every document that was being negotiated between GIP-Cayman and Boeing, and demanded to know every detail of the commercial and technical negotiations and updates.

204.   Concerned with FAN's encroachment into the company's management and operations, on or about August 24, 2016, Mr. Javed sent an email to Tang, insisting on full compliance with the export control laws.

205.   On or about September 20, 2016, WONG emailed Mr. Youssefzadeh, Mr. Javed and Pourmand with an agenda for the third GIP-Cayman Board meeting, which was to be held in Hong Kong.  WONG requested updates from Pourmand (CEO update); Mr. Javed (business & market plan update) and Mr. Youssefzadeh (technical update).

206.   On or about October 14, 2016, WONG emailed Mr. Youssefzadeh, Mr. Javed and Pourmand concerning FAN's and WONG's plans to visit Los Angeles,

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

California, on October 18, 2016, and requesting a meeting to discuss: (a) the relationship and strategic partnership with Boeing; (b) ECA debt financing; (c) sales and marketing; (d) the roles and duties of GIP-Cayman's management team; (e) the GIP-Cayman business plan; and (f) hiring staff.

207.   FAN and WONG visited the GIP-Cayman offices in El Segundo, California, on or about October 18, 19 and 20, 2016.  The purpose of that visit was to discuss the six matters listed above, even though those matters were within the purview of GIP-Cayman's executives and managers and not individual members of the GIP-Cayman Board of Directors.

208.   During the months that followed, Mr. Youssefzadeh and Mr. Javed observed that FAN controlled the GIP-Cayman Board of Directors, and that WONG, LIU and other directors routinely acted at his direction and did his bidding, without regard for their duties and responsibilities to GIP-Cayman.  By way of example:

(a)   On or about October 26, 2016, WONG emailed Mr. Javed, attaching a revised GIP-Cayman financial model, requesting his input before he sent it to FAN.

(b)   On or about October 26 and 27, 2016, WONG and Mr. Javed exchanged drafts of the GIP-Cayman internal organization chart by email, which was subject to review and finalization by FAN.

(c)   On or about November 1, 2016, FAN requested that a financial advisor at Wells Fargo Advisors open an investment account for GIP-Cayman for cash management purposes.  When the advisor asked for clarification, LIU responded that they would need clarification from FAN.

(d)   On or about November 5, 2016, WONG emailed Mr. Javed to request his input on the GIP-Cayman financial model, stating that he wanted to present the financial model to FAN for his final review.

(e)   On or about November 17, 2016, FAN emailed Mr. Youssefzadeh, Mr. Javed and Pourmand requesting an update on the meeting in

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

South Africa, and the status of marketing attempts in Ethiopia.

    (f)    On or about November 18, 2016, Tang emailed Mr. Javed, requesting technical details for Multi-Beam Architecture, Beam Size, Broadcasting, Design Process, Capacity Allocation and coverage map, which raised red flags for Mr. Javed regarding compliance with U.S. export control laws.

    (g)    On or about November 18, 2016, FAN emailed Mr. Javed, suggesting creation of a price management department responsible for pricing mechanism implementation, control and incentives.

    (h)    On or about December 20, 2016, Mr. Youssefzadeh provided WONG with an update concerning negotiations with SpaceX and Arianespace as potential launch service providers.  WONG thereafter replied by email that he would "inform Mr. FAN [of] the same."

    (i)    On or about December 21, 2016, Peter Lui, GIP-Cayman's CFO, forwarded to LIU email exchanges between Mr. Youssefzadeh and Arianespace relating to launch services.  LIU requested that Peter Lui copy "Tony & Co" on any correspondence between GIP-Cayman and Arianespace.

    209.   These requests, actions and approvals are normally within the purview of a company's executives or managers and not individual board members, much less a lender's attorney and agent such as FAN.

    210.   On or about November 18, 2016, Tang sent an email to Mr. Javed requesting confidential and sensitive technical information regarding the Satellite Project that was subject to ITAR, the EAR and the PRC Proscription.  Mr. Javed responded on November 19, 2016, refusing to provide the requested technical data.  In his email, Mr. Javed stated as follows:

> Your questions below has raised a red flag and made Emil quite concerned.  He has shared his concerns with Bahram [Pourmand] and I and as such you will not receive any reply from him.

**[PROPOSED] SECOND AMENDED COMPLAINT**

As you are well aware, we all are operating based on the understanding that Bronzelink is an investor in Global-IP and other than its investment interest it has no intentions to extract technical information which may violate Global-IP's [export laws] compliance obligations.

Your questions below for sure has crossed the line.  Please confirm to us urgently that NO information from Global-IP is being shared with anyone outside Bronzelink and Bronzelink is not using the information for any purpose other than monitoring the company's general progress.  Also, in the future, please refrain from inquiring about information which goes beyond what Global-IP can share publicly.

211.   On or about November 20, 2016, Tang responded, falsely assuring Plaintiffs that the information he had requested was intended to be "used internally for monitoring the general progress of the company."  Plaintiffs are informed and believe, and based thereon allege, that, in fact, Defendants did not request this information to monitor GIP-Cayman's progress, but in an attempt to obtain confidential and sensitive technical information in violation of U.S. export control laws and in furtherance of DONG YIN's plans and efforts to obtain control of the Satellite Project.

212.   In or about November 2016, GIP-Cayman and GIP-USA hired Chris Chen as their General Counsel.  Prior to hiring Chen, FAN and WONG had mandated that while the General Counsel would report to Mr. Javed, he had to be fluent in Chinese (so that they could freely interact with him).  After Mr. Javed referred Chen as a qualified candidate, unbeknownst to Mr. Javed, WONG flew Chen to Hong Kong for interviews with DONG YIN representatives before allowing the Board to consider and approve his hiring.

213.   On or about December 8, 2016, the GIP-Cayman Board of Directors held a meeting at the company's office in El Segundo, California.  At that meeting, WONG requested a two-week delay before any Board resolutions were approved.  Plaintiffs are informed and believe, and based thereon allege, that the reason WONG requested this delay was to have time to first present the resolutions to DONG YIN for its approval, before any contemplated Board actions.

214.   At the December 8, 2016 Board meeting, the Board approved the selection of SpaceX as the launch service provider.  The formal approval of the

**[PROPOSED] SECOND AMENDED COMPLAINT**

SpaceX contract, however, was delayed for three months by FAN and WONG. Plaintiffs are informed and believe, and based thereon allege, that FAN and WONG delayed Board approval of the SpaceX contract because they first needed to obtain DONG YIN's approval.  As a result, the SpaceX contract was not signed until on or about March 7, 2017.

215.   Also at the December 8, 2016 Board meeting, WONG proposed that Board members be compensated.  Mr. Youssefzadeh objected, stating that this was typically an issue that should be addressed by the Board's Compensation Committee. Although WONG had no authority to decide the issue, he overruled Mr. Youssefzadeh and stated that compensation would be paid pursuant to previous agreements between Bronzelink and directors who had contracts.

216.   On or about January 9, 2017, Luo inquired regarding when GIP-Cayman would pay Board members their fees for 2016.  WONG responded that, "[w]e are currently arranging for the payment for the outstanding directors' fee in 2016." WONG also emailed Mr. Javed informing him that Luo's director fees for GIP-Cayman were $35,000 per quarter (or $140,000 annually).

217.   After reviewing WONG's email, Mr. Youssefzadeh researched the standard compensation for board members in similarly situated companies.  He determined that the proposed compensation for Luo ($140,000 annually) was excessive for a company like GIP-Cayman.

218.   On or about January 18, 2017, Mr. Youssefzadeh emailed WONG to suggest that non-executive, non-investor directors each receive $2,500 per meeting, while the Chairman would receive $5,000, with these directors also receiving GIP-Cayman stock options.  WONG replied that the remuneration package to non-investor directors had been the subject of lengthy negotiations and discussions as part of "[Bronzelink's] appointment process."  Prior to this disclosure, Plaintiffs were not aware that Bronzelink had separately negotiated compensation agreements with GIP-Cayman Board members.

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

219.   Plaintiffs are informed and believe, and based thereon allege, that Bronzelink, acting at DONG YIN's direction, made secret deals with the GIP-Cayman Directors, agreeing to dramatically overpay Luo in an attempt to ensure his allegiance to DONG YIN, rather than to GIP-Cayman, when WONG insisted on the $140,000 in annual payments to Luo.

220.   On or about January 20, 2017, WONG emailed modifications to the December 8, 2016 GIP-Cayman board minutes to Mr. Javed, removing references to a discussion regarding technical satellite program updates and that FAN had led discussions regarding ECA Financing, GIP-Cayman business plan, sales and marketing.

221.   On or about February 1, 2017, FAN and WONG travelled to California, visiting the GIP-Cayman offices in El Segundo, California.  During that visit:

(a)   FAN told Mr. Youssefzadeh that he was under pressure from DONG YIN for GIP-Cayman to obtain more orbital slots;

(b)   FAN insisted that he participate in GIP-Cayman's planning and strategy discussions and decision-making and advised that he intended to take an active role in sales and marketing;

(c)   FAN and WONG sought to become deeply involved in budgeting and daily operational matters;

(d)   FAN asked to meet privately with senior staff; and

(e)   FAN and WONG insisted on meeting privately with LIU.

222.   On or about February 25, 2017, WONG and Yiu visited the GIP-Cayman and GIP-USA offices in El Segundo, California, on very short notice.  WONG and Yiu informed Mr. Youssefzadeh and Mr. Javed that they had instructions from FAN and DONG YIN to terminate GIP-Cayman's then CFO, Peter Lui.  Mr. Youssefzadeh and Mr. Javed explained that only the GIP-Cayman Board could terminate Lui.  In response, WONG insisted on calling an immediate telephonic board meeting. However, because a board meeting could not be called on less than five days' notice,

65

**[PROPOSED] SECOND AMENDED COMPLAINT**

1    he was unsuccessful.

2        223.   Adamant that Peter Lui must be fired immediately, WONG informed

3    Mr. Youssefzadeh and Mr. Javed that he and FAN would delay authorization for the

4    SpaceX contract unless Lui was terminated.  Eventually, on or about March 1, 2017,

5    the GIP-Cayman Board terminated Lui as CFO by unanimous written consent.  Lui's

6    termination left WONG with full and unfettered control of all GIP-Cayman bank

7    accounts.

8        224.   On or about March 3, 2017, the GIP-Cayman Board held a telephonic

9    board meeting, at which it reviewed and approved the proposed SpaceX contract.

10       225.   On or about March 7, 2017, GIP-Cayman entered into a contract with

11   SpaceX to provide launch services for the satellite.  The SpaceX contract provided

12   that, "[p]rovision of all items and information identified in this [Statement of Work]

13   by SpaceX to any non-US parties (including Customer and/or Customer's Related

14   Third Parties, if applicable) is subject to US export control restrictions imposed by

15   regulatory authorities including the U.S. Department of State.  Customer shall be

16   responsible for any U.S. Customs or other export/import compliance with respect to

17   the Payload and any Customer provided hardware . . . ."

18       226.   The term, "Related Third Parties" is defined in the SpaceX contract to

19   include GIP-Cayman's "directors, officers, employees and agents," as well as "any

20   entity or person with any financial, property or other material interest" in the satellite.

21       227.   A GIP-Cayman Board of Directors meeting was held in Hong Kong on

22   April 20 and 21, 2017.  A day before that meeting, FAN and WONG requested a

23   private meeting with Mr. Javed at the JW Marriott Hotel in Hong Kong to discuss

24   corporate governance matters.  During that meeting, FAN told Mr. Javed that Jason

25   Luo was not the "real" Chairman of the Board; that Luo was just a front man to show

26   to outsiders; and that from the perspective of DONG YIN, who had provided the

27   investment funds, FAN was the real Chairman of the Board and WONG was his

28   subordinate.

**[PROPOSED] SECOND AMENDED COMPLAINT**

228.   On or about April 21, 2017, WONG purported to assume the position of "Executive Director" of GIP-Cayman, with authority to act on behalf of the GIP-Cayman Board of Directors, even though the corporate governance documents did not recognize any such position.  Plaintiffs are informed and believe, and based thereon allege, that FAN and WONG agreed that WONG would become the Executive Director of GIP-Cayman and, with the support of the other Bronzelink-appointed directors, installed WONG as the Executive Director in furtherance of DONG YIN's plans and efforts to gain and maintain dominance and control over the governance, management and operations of GIP-Cayman and GIP-USA.

**R.     The April 25, 2017 Milbank Memo.**

229.   In or about March and April 2017, Mr. Youssefzadeh and Mr. Javed had multiple discussions with Jason Luo, expressing their concerns that GIP-Cayman was not being properly governed by its Board of Directors and that FAN, WONG, LIU and others were violating, and conspiring to violate, U.S. export control laws.

230.   In or about April 2017, Luo instructed Chen to direct MILBANK to prepare a memorandum analyzing GIP-Cayman's compliance with U.S. export control laws.

231.   Panahy, acting ostensibly as counsel for GIP-Cayman, authored the requested memorandum, which was dated April 25, 2017 (the "Milbank Memo" or "Memo").

232.   On or about April 27, 2017, Chen emailed the Milbank Memo to the GIP-Cayman Board of Directors, including Mr. Youssefzadeh, Mr. Javed, FAN, WONG and LIU.  Mr. Youssefzadeh, Mr. Javed and LIU were all in California at the time they received the Memo.

233.   The Milbank Memo validated Mr. Youssefzadeh's and Mr. Javed's concerns.  Among other things:

(a)     The Memo explained that "the ITAR and EAR prohibit the transfer or export (*i.e.*, explicit ineligibility for licensing) of U.S. – source satellites

67

244180.37

(including components), launch services, and associated technical data to certain Foreign Persons, including a comprehensive embargo on all PRC persons or entities, persons or entities owned or controlled by PRC interests, or parties acting on behalf [sic] PRC interests, directly or indirectly, wherever located (together, the 'PRC Regulatory Proscription')."

(b)    The Memo noted that the penalties for violating ITAR and the EAR can be extremely serious:  "[f]or U.S. Person, penalties for violation of the ITAR and the EAR include: (i) civil penalties of up to $1,094,010 per violation and denial of export privileges/eligibility; and/or (ii) criminal penalties of $1,000,000 and up to 10 years imprisonment per violation, as well as denial of export privileges/eligibility (criminal penalties are generally applied in cases of knowing and willful non-compliance with the requirements of ITAR or EAR)."

(c)    The Memo cautioned that, "[g]iven the PRC Regulatory Proscription, it is important for GIP to ensure that it does not, and is not perceived to be, owned, controlled, or have its day-to-day operations or management activities substantially influenced by PRC persons or entities, or person or entities acting on their behalf, directly or indirectly (together, 'PRC Influence').  This is particularly relevant to, and a material risk for GIP, given the following existing factors: (i) Bronzelink is the majority shareholder of GIP; (ii) the debt facility used to finance the purchase of Bronzelink's majority shareholding in GIP is provided by Amore, a PRC-affiliated entity; and (iii) there are PRC nationals on the Board of GIP."

(d)    The Memo concluded that these facts "could establish a potential presumption of PRC Influence on the operations or management activities of GIP," and thus, "it is incumbent for GIP to be able to

68

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

1       objectively rebut, and demonstrate, that its corporate governance,

2       operations and management is not subject to PRC Influence."

3   (e)     The Memo warned that the failure to rebut the presumption of PRC

4       Influence "would result in a violation of the ITAR and EAR," and that

5       such a violation could have serious "ramifications" for "GIP's U.S.

6       Person officers, directors or other relevant employees," including "civil

7       and/or criminal liability under the ITAR and EAR."

8   (f)     The Memo further warned that GIP's inability to rebut the presumption

9       of PRC Influence "would be catastrophic" to GIP-Caymans' business and

10      that "any potential provider or arranger of debt capital to GIP, or

11      potential future GIP equity investor, arranger or underwriter, is very

12      likely to carefully scrutinize and diligence GIP's compliance with the

13      ITAR, EAR and PRC Regulatory Proscription, given the existence and

14      details of the [Facility Agreement]."

15      234.    Although the Milbank Memo referenced the Facility Agreement,

16  MILBANK, having negotiated that Agreement, deliberately failed to disclose the

17  terms of that Agreement to Plaintiffs.  This omission made the Milbank Memo

18  materially incomplete and misleading, in that it concealed DONG YIN's actual

19  control over the Satellite Project through the Secret FA Terms.

20      235.    On or about April 30, 2017, Mr. Javed received a telephone call from

21  WONG.  During that call, WONG expressed his displeasure at not having been given

22  the opportunity to preview and comment on the Milbank Memo prior to its

23  distribution to the full GIP-Cayman Board.  WONG also told Mr. Javed that

24  DONG YIN was very upset after reading the Milbank Memo and was threatening to

25  "close the project."

26  //

27  //

28  //

69

**[PROPOSED] SECOND AMENDED COMPLAINT**

**S.        Mr. Youssefzadeh and Mr. Javed Attempt, Unsuccessfully, to Raise and Address Compliance Issues with the GIP-Cayman Board.**

236.    On or about May 16, 2017, Mr. Youssefzadeh obtained a proposal for debt financing for the next stage of the Satellite Project from Citigroup.  This was a major achievement as debt financing was necessary for GIP-Cayman and GIP-USA to survive as going concerns, given the high cost of building, launching and operating the Satellite.

237.    On or about May 24, 2017, Mr. Youssefzadeh noticed a meeting of the GIP-Cayman Board of Directors for June 1, 2017, to discuss: (a) whether GIP-Cayman's corporate governance was in compliance with U.S. export control laws in light of the troubling conclusions of the Milbank Memo, and, if not, what corrective action to take; and (b) the proposal to engage Citigroup to obtain debt financing.  The board meeting was noticed as a telephonic meeting, with Mr. Youssefzadeh, Mr. Javed, Chen and LIU participating from locations in Southern California.

238.    The board meeting did not occur, however.  FAN, WONG and LIU, together with other Board members under their control, refused to participate in the meeting, as a result of which there was no quorum for the Board to take action. Jason Luo immediately resigned his position as the Chairman of the GIP-Cayman Board of Directors.  In his resignation email, Luo stated: "As a formal [sic] board member and Chairman of the Board, I really would like to encourage all of you taking [sic] your responsibility to continue enhancing the compliance/governance of the company, which is a very critical part of Board responsibility."  Shortly thereafter, Julian Zhao also resigned from the GIP-Cayman Board of Directors.

239.    WONG told Mr. Javed that FAN and DONG YIN had fired Luo and Zhao because they were not pleased with them.  The formal justification given for their removal was that all of the Bronzelink-appointed directors to the GIP-Cayman Board of Directors had one year terms that ended on June 1, 2017.  (This was the first time that Mr. Youssefzadeh and Mr. Javed had been informed that all of the

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

Bronzelink-appointed directors to the GIP-Cayman Board were under formal contract to Bronzelink.)  Plaintiffs are informed and believe, and based thereon allege, that these representations were false and misleading, and that, in fact, Luo and Zhao had resigned because of GIP-Cayman's unwillingness to address the export control law issues discussed in the Milbank Memo.

240.   On or about June 2, 2017, Mr. Youssefzadeh, in his capacity as acting CEO, instructed Chen to independently investigate and assess the compliance issues and warnings reported in the Milbank Memo.

241.   On or about the same day, June 2, 2017, Chen, in his capacity as Corporate Secretary, emailed the members of the GIP-Cayman Board of Directors from California, noticing a special telephonic meeting of the GIP-Cayman Board for June 8, 2017, to discuss compliance issues.  FAN, WONG and the other Board members under their control, however, refused to participate in the board meeting, once more denying a quorum.  Instead, WONG sent an email to Mr. Youssefzadeh and Mr. Javed (in California) and to other GIP-Cayman Board members stating that the terms of the contracts for the Bronzelink-appointed directors had expired, and they were therefore unable to attend the meeting until such time as Bronzelink completed its re-appointments.  Plaintiffs are informed and believe, and based thereon allege, that these representations were false and misleading, and that, in fact, FAN, WONG, LIU and the other Bronzelink-appointed Board members did not want to address the compliance issues discussed in the Milbank Memo.

242.   On or about June 4, 2017, Mr. Youssefzadeh, Mr. Javed and Pourmand sent a letter to Yiu, the purported owner of Bronzelink, and to Bronzelink's counsel, titled "Notice of Breach."  The letter notified Bronzelink that it was in breach of the SHA on various grounds, including for frustrating efforts to address export control law compliance issues, and its failure to approve the Citigroup debt financing proposal.

//

**[PROPOSED] SECOND AMENDED COMPLAINT**

243.   On or about June 5, 2017, WONG and Tang met with Mr. Youssefzadeh and Mr. Javed at the GIP offices in El Segundo, California.  During this meeting, WONG stated that he was in charge of GIP-Cayman and had the authority to make decisions about the governance, direction and management of the company. Additionally, WONG informed Mr. Youssefzadeh and Mr. Javed that there were no issues with GIP-Cayman's compliance with U.S. export control laws and that they should not concern themselves with such matters.

244.   Mr. Youssefzadeh and Mr. Javed told WONG that they believed there were serious compliance issues and that the GIP-Cayman Board of Directors needed to address them immediately.  WONG responded by advising Mr. Youssefzadeh and Mr. Javed that they could no longer be both executives and directors of GIP-Cayman. Plaintiffs are informed and believe, and based thereon allege, that WONG was sent to this meeting by FAN, and that WONG told Plaintiffs that they could not remain as both executives and directors at FAN's direction, to pressure them to drop the compliance problems they had uncovered.

245.   The resignations of Jason Luo and Julian Zhao created two open positions on the GIP-Cayman Board of Directors.  On or about June 13, 2017, the open positions were filled with two new members: (a) Henry Fan, who had previously worked as an outside consultant for FAN and/or DONG YIN; and (b) Hai Ming Zhang, who had previously been a paid advisor to Bronzelink.  These appointments further cemented DONG YIN's control of GIP-Cayman, GIP-USA and the Satellite Project.

246.   On or about June 14, 2017, FAN held a telephone call via Skype with Mr. Youssefzadeh and Mr. Javed, who participated in the call from Washington, D.C. During the telephone conference, FAN echoed WONG and declared that GIP-Cayman had no export control law compliance issues.  In response, Mr. Youssefzadeh and Mr. Javed stated their disagreement, reiterating that it was apparent that there were serious compliance problems.  FAN replied by reiterating WONG's prior demand that

72

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

1    Mr. Youssefzadeh and Mr. Javed resign as either executives or directors of

2    GIP-Cayman, because they could no longer hold both positions.

3    **T.    The Chen Memo.**

4        247.   On or about May 30, 2017, Mr. Youssefzadeh, in his capacity as acting-

5    CEO, instructed Chen to independently investigate and assess the corporate

6    governance and compliance issues discussed in the Milbank Memo.

7        248.   In response, on or about June 14, 2017, Chen sent Mr. Youssefzadeh a

8    memorandum (the "Chen Memo") stating his conclusions following his independent

9    investigation and review of the issues raised in the Milbank Memo.  Chen's

10   conclusions were reported to the GIP-Cayman Board of Directors, including FAN,

11   WONG and LIU

12       249.   The Chen Memo confirmed all of Mr. Youssefzadeh and Mr. Javed's

13   previously expressed concerns about DONG YIN's excessive interference with the

14   governance, management and operations of GIP-Cayman and the resulting potential

15   for violations of U.S. export control laws.

16       250.   Based on Chen's "independent legal review and assessment of the current

17   state of corporate governance [of GIP-Cayman]," and "in light of the U.S. regulatory

18   considerations outlined in [the Milbank Memo]," the Chen Memo found that, among

19   other things:

20       •     It was "apparent to all members of Company management that most (if

21             not all) of the Series A directors nominated by Bronzelink do not

22             function independently; but rather, they all act based on the instructions

23             and/or influence or guidance of Mr. Shiwen Fan, a PRC national, and/or

24             his close associate, Mr. Tony Wong.";

25       •     "It has come to light that four of the [Amore-nominated, Bronzelink-

26             appointed] Series A directors all serve on the board of directors of

27             Bronzelink and most of the Series A director[s], including Mr. Jason Luo

28             and Mr. Julian Zhao both who recently resigned from the Board, all had

73

**[PROPOSED] SECOND AMENDED COMPLAINT**

or have written contracts with Bronzelink directly concerning their service on [the GIP-Cayman] Board.";

- "Mr. Fan, Mr. Wong and other members of Bronzelink have repeatedly attempted to exert influence and/or control through intimidation and other tactics on members of management to unilaterally demand certain Company operational information and demand revisions to Board meeting minutes and resolutions, all without proper Board action or authority."

- "[A]fter the distribution of the Milbank Memo to the Board at the request of the then Chairman of the Board, Mr. Wong had expressed displeasure to management that he did not have an opportunity to preview and comment on the Milbank Memo prior to full Board distribution and discredited the content of the Milbank Memo."

- "On numerous occasions it was made clear to certain members of management that the Series A directors, led by Mr. Fan, made their Board-level decision[s] based on direct input and instruction from Bronzelink's lender, a PRC-affiliated entity."

251. Based on these findings, the Chen Memo concluded that GIP-Cayman cannot "objectively demonstrate that its corporate governance, operations and management is not subject to PRC Influence," and that "if the Company does not promptly implement structural and effective changes in its corporate governance and the current course of conduct by Bronzelink and its appointed directors is not promptly remediated, the continuing exertion or attempted exertion of influence and/or control on the Company's Board, operations and management by a PRC person and persons representing PRC interests may very well lead to [violations of U.S. export control laws]."

252. Based on Chen's observations of GIP-Cayman's operations, the Chen Memo recommended that "the Company promptly undertake[] an audit to assess the

**[PROPOSED] SECOND AMENDED COMPLAINT**

1  security of its U.S. export-controlled information and materials to confirm that no

2  unauthorized disclosures or transfers have occurred, and determine if any changes or

3  enhancements of the Company's applicable policies and procedures are necessary."

4  The Chen Memo further recommended that "the Company's shareholders

5  immediately undertake actions to implement structural and meaningful changes and

6  protective measures in the Company's corporate governance, with the advice of

7  outside counsel and/or third-party professional experts, that can ensure the Company's

8  ability to objectively demonstrate that its corporate governance, operations and

9  management is not subject to PRC influence."

10  253.  Chen did not analyze or otherwise consider the effect of the Secret FA

11  Terms or the Secret Charge because they had been concealed from him by MILBANK

12  and Panahy and were not discussed in the Milbank Memo.

13  **U.  The GIP-Cayman Board Continues to Rebuff Mr. Youssefzadeh's and**

14  **Mr. Javed's Attempts to Raise and Address Compliance and**

15  **Financing Issues.**

16  254.  Immediately following the issuance of the Chen Memo, on or about

17  June 14, 2014, Mr. Youssefzadeh once again noticed a meeting of the GIP-Cayman

18  Board of Directors to discuss the same two agenda items he had attempted to raise

19  previously: lack of compliance with export control laws and the proposal to engage

20  Citigroup to obtain debt financing.  This time, he noticed the meeting for June 22,

21  2017, and invited Panahy, as GIP-Cayman's outside counsel, to attend the meeting

22  telephonically.  The Board meeting was noticed as a telephonic meeting.  WONG also

23  separately noticed a telephonic meeting for the same date.

24  255.  On or about June 22, 2017, Mr. Youssefzadeh and Mr. Javed called in on

25  the company conference bridge to participate in the board meeting that

26  Mr. Youssefzadeh had noticed.  Chen, Pourmand and Panahy also called in.  FAN,

27  WONG and the other directors under their control failed to call in on the company

28  conference bridge, and while LIU called into the meeting, she quickly disconnected.

**[PROPOSED] SECOND AMENDED COMPLAINT**

As a result, Mr. Youssefzadeh, Mr. Javed and Chen were forced to declare that there was no quorum and cancel the meeting.

256.   Immediately thereafter, WONG noticed a GIP-Cayman Board meeting for June 29, 2017, in Hong Kong.  His agenda included: (a) appointing himself as Chairman of the GIP-Cayman Board; (b) accepting the resignations of Mr. Youssefzadeh and Mr. Javed (who did not have offers to resign outstanding); (c) the removal of Chen as the Board Secretary; and (d) the reappointment of Pourmand as the GIP-Cayman CEO.  WONG transmitted this agenda directly and through Chen to Mr. Youssefzadeh's and Mr. Javed's offices in El Segundo, California, as well as to the other GIP-Cayman directors.

**V.    Mr. Youssefzadeh and Mr. Javed are Constructively Discharged.**

257.   On or about June 26, 2017, Mr. Youssefzadeh resigned his positions as CTO and Chairman of the Management Committees of GIP-Cayman and GIP-USA. That same day, Mr. Javed resigned his positions as President and COO of GIP-Cayman and GIP-USA.  Their resignations were effective August 16, 2017.

258.   Both Mr. Youssefzadeh and Mr. Javed had no alternative but to resign from these positions, or else risk becoming knowing participants in Defendants' conspiracy to violate U.S. export control laws.

259.   In his resignation letter, which was sent to the GIP-Cayman Board of Directors, Mr. Youssefzadeh stated his belief that GIP-Cayman "cannot demonstrate compliance with the export control rules of the United States."  He also noted that he had communicated this problem to the GIP-Cayman Board of Directors, but that, instead of addressing it, the Board had "stonewalled" in an effort to cover-up its wrongdoing and silence him, Mr. Javed and Chen.

260.   In his resignation letter, which was also sent to the GIP-Cayman Board of Directors, Mr. Javed similarly expressed concern with the Board's refusal to address t compliance problems.  He further observed that, "WONG has taken full control of the Company and has paralyzed the management structure and its authority," and is

**[PROPOSED] SECOND AMENDED COMPLAINT**

1    "apparently under the control of PRC person[s] and PRC related parties."

2          261.   Neither FAN, WONG, LIU, nor any other GIP-Cayman Board members

3    denied or otherwise expressed disagreement with Mr. Youssefzadeh's and Mr. Javed's

4    statements in their resignation letters.

5          262.   On or about August 9, 2017, Pourmand sent letters to Mr. Youssefzadeh

6    and Mr. Javed, accepting their resignations and noting that their "separation date and

7    final date of employment" was August 16, 2017.

8          263.   Chen resigned as General Counsel, Senior Vice President and Secretary

9    of GIP-Cayman and GIP-USA on the same day that Mr. Youssefzadeh and Mr. Javed

10   submitted their resignations, June 26, 2017.  Chen's resignation became effective

11   July 25, 2017.

12   **W.    The Cover Up Continues.**

13         264.   On or about July 10, 2017, WONG assembled the GIP-Cayman Board of

14   Directors in Hong Kong and nominated himself as Chairman of the Board.  Before

15   WONG put his nomination to a vote, Mr. Youssefzadeh asked for WONG's

16   qualifications, other than being a relative of a DONG YIN executive.  No answer was

17   forthcoming.  Over the objections of Mr. Youssefzadeh and Mr. Javed, the

18   DONG YIN-approved, Bronzelink-appointed directors voted to appoint WONG as

19   Chairman of the Board.

20         265.   The Board then considered the re-appointment of Pourmand as

21   GIP-Cayman CEO.  Mr. Youssefzadeh objected on the grounds that, pursuant to the

22   SHA, Plaintiffs controlled the decision of who should be appointed CEO.  In

23   response, FAN instructed WONG to adjourn the meeting, to be reconvened on

24   July 17, 2017.

25         266.   Plaintiffs are informed and believe, and based thereon allege, that FAN

26   and WONG agreed that WONG would become the Chairman of the Board of GIP-

27   Cayman and Pourmand the CEO, and with the support of the other Bronzelink-

28   appointed directors, caused WONG and Pourmand to be installed in those positions.

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

Plaintiffs are further informed and believe, and based thereon allege, that these actions were in furtherance of DONG YIN's plan and efforts to gain and maintain control of GIP-Cayman, GIP-USA and the Satellite Project.

267.   In a private meeting during a break in the July 10, 2017 Board of Directors meeting, FAN told Mr. Youssefzadeh and Mr. Javed that he and DONG YIN intended to maintain full control over all matters related to the Satellite Project.  FAN asserted that the Board of Directors was supposed to simply follow his lead and to raise their hands and vote.

268.   On or about July 13, 2017, Boeing requested MILBANK to provide a letter of assurance that GIP-Cayman was compliant with all matters related to U.S. export control laws.  On or about July 14, 2017, Panahy rejected Boeing's request, declining on behalf of GIP-Cayman to provide such assurances "as a matter of policy and professional responsibility."

269.   On or about July 15, 2017, Mr. Youssefzadeh and Mr. Javed emailed WONG a detailed list of questions concerning the relationships between DONG YIN and Bronzelink and its shareholders and officers, for purposes of determining whether GIP-Cayman and GIP-USA were in compliance with ITAR and the EAR.

270.   On or about July 16, 2017, WONG responded by indicating that Mr. Youssefzadeh and Mr. Javed's questions were "the very same type of questions [Bronzelink's] ITAR lawyer is addressing in his detailed review of Bronzelink," and that "the most proper way forward is for our ITAR lawyer to respond on these points to your ITAR lawyer."  In fact, Plaintiffs never received the promised response, notwithstanding multiple inquiries.

271.   On or about July 17, 2017, FAN and WONG put Pourmand's appointment as CEO to a vote.  The GIP-Cayman Board approved him over the objections of Mr. Youssefzadeh and Mr. Javed.

272.   On or about July 18, 2017, Boeing sent a letter to Mr. Javed, informing him that MILBANK had refused to provide the requested letter of assurance and

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

1   requesting that "an authorized Global IP official provide Boeing with written

2   confirmation that you are compliant with all applicable export control laws and

3   regulations, including EAR and ITAR."

4       273.   In response to Boeing's letter, on or about July 20, 2017, Pourmand

5   falsely stated that "GIP is fully committed to compliance with the Export

6   Administration Regulations ('EAR') and the International Traffic in Arms

7   Regulations ('ITAR')."

8       274.   With the appointments of WONG as Chairman of the GIP-Cayman

9   Board, Pourmand as CEO and Henry Fan and Hai Ming Zhang as directors,

10   DONG YIN cemented its dominance and control over the governance, management

11   and operations of GIP-Cayman, GIP-USA and the Satellite Project.

12   **X.   DONG YIN Alters and Falsifies the Official Minutes from the**

13        **GIP-Cayman Board of Directors Meetings.**

14       275.   To maintain and continue to conceal its total control of GIP-Cayman,

15   DONG YIN, through its agents WONG and LIU, systematically altered and falsified

16   GIP-Cayman corporate records, including board minutes.  By way of example:

17       (a)   On or about January 20, 2017, WONG emailed alterations to the minutes

18          of the December 8, 2016 GIP-Cayman board meeting to Mr. Javed,

19          removing references to discussions regarding technical satellite program

20          updates, and to FAN's role in leading discussions concerning ECA

21          financing, the GIP-Cayman business plan and sales and marketing.

22          Plaintiffs are informed and believe, and based thereon allege, that

23          WONG sought to alter these corporate records to hide evidence of

24          DONG YIN's control of GIP-Cayman and to avoid any questions about

25          whether the export control laws were violated when DONG YIN and its

26          agents received technical information and data concerning the Satellite

27          Project.

28   //

79

**[PROPOSED] SECOND AMENDED COMPLAINT**

(b)     On or about April 20 and 21, 2017, a GIP-Cayman board meeting was held in Hong Kong, during which WONG was purportedly appointed "Executive Director" for the specific purpose of facilitating communications between the GIP-Cayman Management Committee and the Board of Directors concerning various operational and management matters.  It was noted in the draft minutes that WONG was not an officer of GIP-Cayman, and that the title did not bestow any additional authority on him.  These limitations, however, were not reflected in the final version of the minutes prepared by LIU and adopted by the Board after July 2017.

(c)     The final version of the minutes of the April 2017 board meeting was altered by LIU, to falsely state that WONG had been authorized to require Chen, as the Board Secretary, to submit draft minutes to WONG for his modifications and "comment" prior to circulation to the other Board members, including Mr. Youssefzadeh and Mr. Javed.

(d)     During the July 7, 2017 GIP-Cayman board meeting, Pourmand was appointed GIP-Cayman's CEO by the DONG YIN-controlled board members, in disregard of Plaintiffs' veto rights.  In his closing statements, Pourmand denied that GIP-Cayman had any compliance problems, stating that it was "Bronzelink's God given right" to do as it pleased.  These remarks were omitted from the formal minutes that LIU prepared.

276.   On or about September 13, 2017, the GIP-Cayman Board of Directors approved the minutes of their April and July 2017 board meetings, as altered and falsified as described above.

**Y.     DONG YIN Attempts to Purchase Plaintiffs' Silence.**

277.   At WONG's request, Mr. Youssefzadeh and Mr. Javed met two DONG YIN consultants, Michael Altwein and Pin Fen Miao, on or about

80

**[PROPOSED] SECOND AMENDED COMPLAINT**

November 16, 2017, at the GIP-USA offices in El Segundo, California.  The consultants informed Mr. Youssefzadeh and Mr. Javed that DONG YIN wanted them to remain involved in GIP-Cayman and would reward them if they did not pursue the export control law compliance issues.  Altwein specifically asked Mr. Youssefzadeh and Mr. Javed what it would take for them to stay with the company and back off the compliance issues.  Mr. Youssefzadeh and Mr. Javed understood this to be an offer to financially reward them if they agreed to ignore DONG YIN's export control law violations.  They declined this offer and terminated the meeting.

**Z.      Summary of Money and Property Lost and Stolen.**

278.   Defendants' wrongful conduct caused Plaintiffs to suffer losses of their money and their property, including, without limitation:

(a)      Control of the Satellite Project that they had spent years developing;

(b)      A 75% ownership interest in GIP-Cayman, the parent corporation of GIP-USA and Dub Dub (including 47.25% of GIP-Cayman that had been previously owned by Plaintiffs);

(c)      The benefits of the contracts they had negotiated with Boeing and SpaceX;

(d)      The benefits of the insurance terms that they had negotiated;

(e)      Confidential and proprietary reports, studies, designs, analyses and other documents and information that Plaintiffs prepared, or had prepared, at their expense, including

(i)      Plaintiffs' design of the 7.7 ton state-of-the-art satellite;

(ii)     Plaintiffs' confidential business plan; and

(iii)    Plaintiffs' confidential marketing studies.

(f)       Plaintiffs' intellectual property, including the Global-IP trademark; and

(g)      The opportunity for Plaintiffs to obtain a share of the projected US$1.5 billion or more in anticipated profits from the Satellite Project when completed and the satellite is operational.

81

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

# FIRST CAUSE OF ACTION

## (For Conspiracy to Defraud)

## (By Plaintiffs Against All Defendants)

279.   Plaintiffs repeat and reallege paragraphs 1 through 278 of this SAC as if fully alleged herein.

**A.   Formation and Operation of the Conspiracy.**

280.   Beginning in or about December 2015, and continuing until the present, DONG YIN, FAN, WONG, LIU, CHANG, COAMI and MILBANK, together with COSEIG, Amore, Bronzelink, Yiu, Panahy and others known and unknown to Plaintiffs, and each of them, conspired and agreed to:

(a)   Make false and misleading representations regarding important facts, knowing that the representations were false or misleading and intending that Plaintiffs would rely upon them, as described further in this SAC, including, but not limited to, in paragraphs 97-99, 102, 107, 110-111, 115, 117, 120, 123, 141-142, 150, 159, 169-170, 213, 286 and 351;

(b)   Make false promises regarding important matters with no intention of performing those promises, intending that Plaintiffs would rely upon them, as described further in this SAC, including, but not limited to, in paragraphs 101, 103, 110, 117, 122 and 286;

(c)   Conceal and withhold from Plaintiffs important facts that Defendants had a duty to disclose, knowingly and with the intent to deceive Plaintiffs, as described further in this SAC, including, but not limited to, in paragraphs 119, 128-139, 162, 172, 221, 234, 253, 275-276, 290 and 334; and

(d)   Obtain ownership and control of Plaintiffs' property comprising the Satellite Project by theft, including theft by trick and by false pretenses, as described further in this SAC, including, but not limited to, in paragraphs 154-156, 166, 205, 230, 233, 239-246, 240-252, 264-274,

82

299, 313 and 350.

281.   Plaintiffs acted reasonably in relying upon the false and misleading representations, false promises and concealed and withheld facts in relinquishing ownership and control of the Satellite Project, including 75% of their ownership interest in GIP-Cayman, and the property comprising that Project, including confidential and sensitive reports, studies, analyses, designs, data, intellectual property, contracts, rights, title and interests, as described further in this SAC, including, but not limited to, in paragraphs 154-156, 166, 205, 230, 233, 239-246, 240-252, 264-274, 299, 313 and 350.

**B.      Wrongful Acts in Furtherance of the Conspiracy.**

282.   On or about the dates indicated below, DONG YIN, FAN, WONG, LIU, CHANG, COAMI and MILBANK, together with COSEIG, Amore, Bronzelink, Yiu, Panahy and others known and unknown to Plaintiffs, and each of them, committed, caused and aided and abetted the following acts, among others, in furtherance of and to accomplish the objectives of the conspiracy:

Act No. 1:  In or about October 2015, Ivan Chow falsely represented to Mr. Youssefzadeh and Mr. Javed that DONG YIN did not own or control COSEIG.

Act No. 2:  On or about December 3, 2015, Ivan Chow falsely represented to Mr. Youssefzadeh and Mr. Javed that COSEIG had no desire or intention of becoming involved in GIP-Cayman operations.

Act No. 3:  On or about December 4, 2015, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Youssefzadeh signed the COSEIG JVA on behalf of STM Atlantic.

Act No. 4:  On or about December 4, 2015, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Youssefzadeh signed the COSEIG JVA on behalf of himself.

//

//

83

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

Act No. 5:  On or about December 4, 2015, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Javed signed the COSEIG JVA on behalf of himself.

Act No. 6:  In or about early December 2015, after reviewing the COSEIG JVA, Panahy telephoned Mr. Youssefzadeh and Mr. Javed, stated that he could help ensure compliance with the export control laws, and suggested that MILBANK represent DONG YIN in the transaction to make sure that DONG YIN knew and complied with the limits on its participation as a lender to COSEIG.

Act No. 7:  On or about December 16, 2015, Ivan Chow emailed Mr. Javed, falsely representing that COSEIG's sole shareholder and director was Pok Kit Chow, when, in fact, Pok Kit Chow was merely the nominal owner of COSEIG and acting on behalf of DONG YIN.

Act No. 8:  On or about January 28, 2016, Ivan Chow emailed Mr. Youssefzadeh, Mr. Javed and Pourmand, on behalf of FAN, that COSEIG's $250 million financial proposal had been formally approved by DONG YIN, creating the false and misleading impression that COSEIG and DONG YIN were independent, unrelated entities, when, in fact, COSEIG was controlled and dominated by DONG YIN.

Act No. 9:  Between in or about late January and early February 2016, Panahy told Mr. Javed that COSEIG would be swapped out in the JVA for another,  yet to be identified company, and falsely promising that DONG YIN would have no control or influence over GIP-Cayman.

Act No. 10:  On or about February 16, 2016, CHANG, acting in his capacity as COAMI's Executive Director and Co-President, falsely represented to Mr. Youssefzadeh, Mr. Javed and Pourmand that after the closing: (a) DONG YIN would have no control over GIP-Cayman; (b) it had no intention of controlling or seeking to influence GIP-Cayman; and (c) it was relying on Mr. Youssefzadeh and Mr. Javed to run the business.

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

Act No. 11:  On or about February 23, 2016, FAN, Henry Fan and their attorneys disclosed for the first time the identity of the new company, Bronzelink, to Mr. Youssefzadeh, Mr. Javed and others, falsely representing that Bronzelink was an independent, stand-alone entity with no affiliation to DONG YIN.

Act No. 12:  On or about February 25, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Youssefzadeh signed the Bronzelink JVA on behalf of STM Atlantic.

Act No. 13:  On or about February 25, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Youssefzadeh signed the Bronzelink JVA on behalf of himself.

Act No. 14:  On or about February 25, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Javed signed the Bronzelink JVA on behalf of himself.

Act No. 15:  On or about March 9, 2016, Amore appointed four individuals to its Board of Directors, all of whom were closely affiliated with DONG YIN or COAMI, in furtherance of its plan and efforts to gain and exercise dominance and control over the governance, management and operation of GIP-Cayman.

Act No. 16:  On or about March 15, 2016, Amore and Bronzelink executed the Facility Agreement, but did not disclose its terms to Plaintiffs.

Act No. 17:  On or about March 11, 2016, Amore and Yiu entered into the Secret Charge, giving Amore the ability to remove Yiu from his position at Bronzelink at any time, with or without cause, but concealed the existence of that document from Plaintiffs.

Act No. 18:  On or about March 15, 2016, Panahy, acting as DONG YIN's counsel, emailed Mr. Youssefzadeh and Mr. Javed: (a) stating that MILBANK was DONG YIN's counsel and thus could not represent Bronzelink, confirming the false and misleading impression that DONG YIN and Bronzelink were independent, stand-alone companies; (b) confirmed that the Facility Agreement had been signed, but

85

**[PROPOSED] SECOND AMENDED COMPLAINT**

concealed and failed to disclose that material terms of the Facility Agreement were in conflict with the intended Bronzelink SHA; and (c) likewise intentionally and knowingly failed to disclose the terms of the Share Charge.

Act No. 19:  On or about March 28, 2016, Panahy, acting as DONG YIN's counsel, responded to a request for written confirmation that DONG YIN was providing financing to Bronzelink, stating, "[g]iven our stated concerns regarding the role of DY as a lender, and the need to attenuate PRC interests in both BL and GIP, having a letter from DY or its counsel 'on the record' does not serve the interests of any of the parties to this transaction."

Act No. 20:  On or about April 5, 2016, Panahy, acting as DONG YIN's counsel, provided his comments to the SPA, representing that he had intended to align the conditions precedent set forth in the SPA with the terms of the Facility Agreement, but failing to disclose that other material terms of the SPA were contrary to, inconsistent with, or undermined by the Facility Agreement.

Act No. 21:  On or about April 5, 2016, both David Zhang of DONG YIN and Panahy, acting as DONG YIN's counsel, stated that DONG YIN understood that any PRC control or influence, directly or indirectly, would be in violation of U.S. laws, falsely representing and promising that DONG YIN had no intention or plan of exerting control over GIP-Cayman.

Act No. 22:   On April 15, 2016, CHANG, acting in his capacity as COAMI's Executive Director and Co-President, emailed Mr. Javed, who was in California, stating that:  "[W]e are unable to ask Bronzelink to dispense funds without a much more detailed operating plan.  For this we would need, including but not limited to a schedule of tasks and critical path to be met, timing and the personnel involved.  We can't disperse funds without knowing specific uses and the milestones and condition to be reached before each payment is made."

Act No. 23:  On or about May 11, 2016, FAN executed the SPA, the SHA and the First Amendment to the SHA on behalf of Bronzelink.

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

Act No. 24:  On or about May 11, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Youssefzadeh signed the SPA, the SHA and the SHA Amendment on behalf of STM Atlantic.

Act No. 25:  On or about May 11, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Youssefzadeh signed the SPA, the SHA and the SHA Amendment on behalf of himself.

Act No. 26:  On or about May 11, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Javed signed the SPA, the SHA and the SHA Amendment on behalf of himself.

Act No. 27:  On or about May 11, 2016, Yang Zeng of DONG YIN falsely represented to Mr. Javed that DONG YIN was merely a lender to Bronzelink, and that, after the closing, DONG YIN would not have any control over or seek to influence GIP-Cayman governance, direction, management, or operations.

Act No. 28:  In or about May, 2016, FAN, WONG, LIU and Zhang were appointed to the 5-member Board of Directors of Bronzelink.

Act No. 29:  On or about May 31, 2016, Panahy, acting as DONG YIN's counsel, falsely represented to Mr. Javed that: (a) four of the Bronzelink-appointed directors—LIU, Zheng, Luo and Zhao—were completely independent of and had no affiliation to DONG YIN; (b) since there would be four independent Bronzelink-appointed directors and three Common directors, GIP-Cayman would have solid protection from PRC control and influence; and (c) although WONG worked for Bronzelink, he was not affiliated with DONG YIN.

Act No. 30:  On or about June 2, 2016, FAN (a) falsely represented and promised to Mr. Javed that DONG YIN and Bronzelink were completely different entities and were not related; (b) falsely represented and promised that after the closing, DONG YIN would not have control over or any say in GIP-Cayman's direction and operations; and (c) falsely represented and promised Mr. Javed that, after the closing, Bronzelink would have an independent Board of Directors that

87

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

would make all of the decisions free of DONG YIN's influence.

Act No. 31:  On or about June 3, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Youssefzadeh signed the closing documents for the SHA on behalf of STM Atlantic.

Act No. 32:  On or about June 3, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Youssefzadeh signed the closing documents for the SHA on behalf of himself.

Act No. 33:  On or about June 3, 2016, in reliance on the false and fraudulent representations and promises of DONG YIN's agents, Mr. Javed signed the closing documents for the SHA on behalf of himself.

Act No. 34:  On or about June 3, 2016, Bronzelink caused HSBC Bank to execute a wire transfer of $25 million from Hong Kong to GIP-Cayman's HSBC account in California.

Act No. 35:  On or about June, 3, 2016, FAN, WONG, LIU and Zhang were appointed by Bronzelink to the GIP-Cayman Board of Directors.

Act No. 36:  On or about July 29, 2016, after the Boeing LOI was finalized, Luo, as the Chairman of the GIP-Cayman Board, deferred the decision to execute the LOI, stating in an email that "[he] would like Mr. FAN/DONG YIN to review/agreed [sic][the Letter of Intent] before we move on."

Act No. 37:  On or about July 29, 2016, WONG responded to Luo's email, copying Terry Long of DONG YIN, and stating that "[t]his is to confirm we can move on, you have the agreement from both parties to proceed."

Act No. 38:  On or about November 18, 2016, Tang emailed Mr. Javed requesting confidential and sensitive technical information about the Satellite Project.

Act No. 39:  On or about November 20, 2016, Tang falsely assured Plaintiffs that the sensitive technical information he had requested was intended to be "used internally for monitoring the general progress of the company."

//

88

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

Act No. 40:  Beginning in or about January 2017, Luo was paid $140,000 annually for serving as a GIP-Cayman director to buy his loyalty.

Act No. 41:  On or about January 20, 2017, WONG emailed alterations to the minutes of the December 8, 2016 GIP-Cayman Board of Directors meeting to Mr. Javed, removing references to a discussion concerning technical satellite program updates and to FAN having led the discussions about ECA financing, the GIP-Cayman business plan, and sales and marketing.

Act No. 42: On or about April 21, 2017, WONG purported to assume the position of "Executive Director" of GIP-Cayman, with authority to act on behalf of the GIP-Cayman Board of Directors, even though the corporate governance documents did not recognize any such position.

Act No. 43: On or about April 27, 2017, Panahy caused Chen to send the Milbank Memo to the GIP-Cayman Board of Directors, although that Memo neither addressed nor disclosed the Secret FA Terms or the Secret Charge.

Act No. 44:  On or about April 27, 2017, WONG telephoned Mr. Javed to express his displeasure at not having been given an opportunity to preview and comment on the Milbank Memo prior to its distribution to the GIP-Cayman Board of Directors.

Act No. 45:  In preparing the final version of the minutes of the April 2017 GIP-Cayman Board meeting, LIU altered them to falsely state that WONG had been authorized to require Chen, as the Board Secretary, to submit draft minutes to WONG for his modifications and "comment" prior to circulation to the other Board members.

Act No. 46:  On or about May 18, 2017, during a phone call amongst WONG, Luo and Chen, WONG threatened to have Chen fired if Chen, as the Board Secretary, did not write the board minutes the way WONG wanted them written, or did not send the minutes to WONG to review them prior to sending them to the Board.

//

//

89

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

Act No. 47:  On or about May 24, 2017, Mr. Youssefzadeh noticed a special meeting of the GIP-Cayman Board of Directors, but WONG responded that all of the Bronzelink-appointed directors were unavailable.

Act No. 48:  On or about May 25, 2017, FAN sent an email to Mr. Javed, falsely denying that WONG was his proxy.

Act No. 49:  On or about May 30, 2017, FAN sent an email to Mr. Javed, copying the other members of the GIP-Cayman Board of Directors, in which he falsely denied that governance of the Board was extremely defective.

Act No. 50:  On or about June 2, 2017, WONG again thwarted Mr. Youssefzadeh's efforts to call a special meeting of the GIP-Cayman Board of Directors to discuss the company's lack of compliance with U.S. export control laws.

Act No. 51:  On or about June 5, 2017, WONG and Tang met with Mr. Youssefzadeh and Mr. Javed, at which time WONG falsely stated there were no issues concerning GIP-Cayman's compliance with the export control laws, and told Mr. Youssefzadeh and Mr. Javed that they should not concern themselves with such issues.

Act No. 52:  On or about June 13, 2017, Bronzelink selected Henry Fan and Hai Ming Zhang to fill the vacancies on the GIP-Cayman Board of Directors, both of whom had allegiances to and took their direction from DONG YIN.

Act No. 53:  On or about June 14, 2017, Panahy, ostensibly as counsel for GIP-Cayman, caused Chen to omit any mention of the Secret FA Terms and Secret Charge from the Chen Memo by concealing and withholding that information.

Act No. 54:  On or about June 14, 2017, FAN held a telephone call via Skype with Mr. Youssefzadeh and Mr. Javed, during which he falsely stated that there were no export control law compliance issues.

Act No. 55:  On or about June 20, 2017, WONG sent an email to Mr. Javed, copying Mr. Youssefzadeh and others, falsely denying that his role and actions as a GIP-Cayman director were subject to PRC influence.

**[PROPOSED] SECOND AMENDED COMPLAINT**

Act No. 56:  On or about June 22, 2017, FAN, WONG and other GIP-Cayman directors under their control refused to participate in a Board of Directors meeting that Mr. Youssefzadeh had noticed to discuss, among other things, compliance with U.S. export control laws.

Act No. 57:  On or about July 10, 2017, at a GIP-Cayman Board meeting, WONG was appointed Chairman of the Board over the objections of Mr. Youssefzadeh and Mr. Javed, with all six of the Bronzelink-appointed directors voting in favor of WONG's appointment.

Act No. 58:  At the July 10, 2017 GIP-Cayman Board meeting, Pourmand was appointed the CEO of GIP-Cayman, over the objection and veto of Mr. Youssefzadeh and Mr. Javed, with all six of the Bronzelink-appointed directors voting in favor of Pourmand's appointment.

Act No. 59:  In a private meeting during a break in the July 10, 2017 GIP-Cayman Board of Directors meeting, FAN told Mr. Youssefzadeh and Mr. Javed that he and DONG YIN wanted to keep full control over all matters related to the Satellite Project, and Board members were supposed to simply follow his lead and raise their hands and vote.

Act No. 60:  On or about July 18, 2017, at a GIP-Cayman Board of Directors meeting called by the Bronzelink-appointed directors, WONG indicated that since the issue of compliance with U.S. export control laws was not on the agenda, it would not be discussed.

Act No. 61:  In preparing the minutes of the July 18, 2017 GIP-Cayman Board meeting, LIU omitted all reference to discussions concerning compliance with U.S. export control laws or questions about DONG YIN's affiliation with Bronzelink.

Act No. 62:  On July 20, 2017, Pourmand sent a letter to Boeing, falsely stating that, "GIP is fully committed to compliance with the Export Administration Regulations ('EAR') and the International Traffic in Arms Regulations ('ITAR')."

//

**[PROPOSED] SECOND AMENDED COMPLAINT**

Act No. 63:  On or about September 4, 2017, LIU distributed the minutes that she had prepared of the April 21, 2018, July 11, 2018 and July 18, 2017 GIP-Cayman Board meetings, which were falsified to omit any mention of the Board's refusal to discuss export control law compliance issues beyond Pourmand's denial that there were any such issues.

Act No. 64:  On or about September 13, 2017, the Bronzelink-appointed directors approved and adopted the altered and falsified minutes of the April and July 2017 GIP-Cayman Board meetings.

**C.    Resulting Damages.**

283.   As a direct and proximate result of the conspiracy to defraud, Plaintiffs were damaged, and continue to incur damages, in an amount to be determined at trial.

284.   In engaging in the conspiracy to defraud Plaintiffs, Defendants acted fraudulently, oppressively, maliciously and with a willful and conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to exemplary and punitive damages pursuant to California Civil Code section 3294.

**SECOND CAUSE OF ACTION**

**(For Fraud)**

**(By Plaintiffs Against All Defendants)**

285.   Plaintiffs repeat and reallege paragraphs 1 through 284 of this SAC as if fully alleged herein.

**A.    Misrepresentations and False Promises.**

286.   Beginning in or about July 2015, and continuing until the present, Defendants, and each of them, made and caused others to make the following false and misleading representations and false promises, among others, to Plaintiffs, knowing that they were false and misleading and with the intention that Plaintiffs would rely upon them:

***[As to U.S. Export Control Laws.]***

(a)    That DONG YIN intended to comply with the U.S. export control laws,

92

**[PROPOSED] SECOND AMENDED COMPLAINT**

when, in fact, DONG YIN always planned and intended to obtain confidential and sensitive satellite and launch technology and data and ownership and control of the Satellite in violation of those laws;

(b)     That DONG YIN intended to comply with the U.S. export control laws, when, in fact, DONG YIN was conspiring to violate those laws with FAN, WONG, LIU, COAMI, CHANG, MILBANK and others;

*[As to DONG YIN's Role in the Governance,*

*Management and Operations of GIP-Cayman.]*

(c)     That DONG YIN did not intend to exercise control and influence over GIP-Cayman, when, in fact, DONG YIN always planned and intended to control, dominate and direct the governance, management and operations of GIP-Cayman;

(d)     That DONG YIN did not intend to have any direct dealings with GIP-Cayman, when, in fact, DONG YIN always planned and intended to place its agents on the GIP-Cayman Board of Directors to gain and maintain dominance and  over, and be able to direct, the governance, management and operations of GIP-Cayman;

(e)     That DONG YIN was relying on the founders, including Mr. Youssefzadeh and Mr. Javed, to manage and operate GIP-Cayman after the closing, when, in fact, it always planned and intended that its agents would control and direct the governance, management and operations of GIP-Cayman;

(f)     That four of the Bronzelink-appointed members of the GIP-Cayman Board of Directors would be independent of DONG YIN, when, in fact, there were never four independent Bronzelink-appointed members and Defendants never intended that the Bronzelink-appointed members would be independent of DONG YIN;

//

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

(g)  That Bronzelink-appointed directors WONG, LIU and Zheng were independent of and unaffiliated with DONG YIN, when, in fact, each of them was an agent and acting at the direction and in the interests of DONG YIN;

(h)  That the GIP-Cayman Board of Directors would not be under the influence and control of the PRC, when, in fact, the PRC planned and intended to control, dominate and direct the GIP-Cayman Board of Directors, through DONG YIN, Amore, Bronzelink, Yiu, FAN, WONG, LIU and others;

*[As to COSEIG and its Relationship*

*With DONG YIN.]*

(i)  That DONG YIN did not own or control COSEIG, when, in fact, COSEIG was under the control, dominance and direction of DONG YIN;

(j)  That COSEIG was an independent company 100% owned by Pok Kit Chow, when, in fact, Pot Kit Chow was merely a nominal owner acting on behalf of DONG YIN;

(k)  That Pot Kit Chow was a wealthy businessman and investor from Hong Kong, when, in fact, he was neither wealthy nor a *bona fide* investor;

(l)  That DONG YIN's only role in the transaction between Plaintiffs and COSEIG would be as a lender to COSEIG, when, in fact, that was a pretext and COSEIG was always under the control, dominance and direction of DONG YIN;

*[As to Bronzelink and its*

*Relationship With DONG YIN.]*

(m)  That Bronzelink was an independent, stand-alone entity that did not have any affiliation with DONG YIN, when, in fact, that was a pretext and Bronzelink was always under the control, dominance and direction of

94

**[PROPOSED] SECOND AMENDED COMPLAINT**

DONG YIN;

(n)   That Bronzelink would have an independent Board of Directors that would make all decisions free of DONG YIN's control and influence, when, in fact, the Bronzelink Board consisted of agents of DONG YIN and was always under the control and direction of DONG YIN;

(o)   That Bronzelink's execution and performance of its obligations under the SHA would "not violate . . . any agreement or instrument to which it is subject," when, in fact, the execution and performance of its obligations under the SHA violated the Secret FA Terms;

(p)   That Bronzelink was an independent entity that had "the power to execute [and] perform its obligations under and enter into all transactions contemplated by [the SHA]," when, in fact, under the Secret FA Terms, Bronzelink could not perform all of its obligations and enter into all of the transactions contemplated by the SHA;

(q)   That upon demand Bronzelink would provide its shares in GIP-Cayman as collateral to support a financing arrangement with an ECA or another lender, when, in fact, Bronzelink could not provide its shares in GIP-Cayman as collateral because it had already given Amore (and hence DONG YIN) a secret charge over them; and

*[As to Project Financing.]*

(r)   That GIP-Cayman would have the ability to secure additional financing from a lender other than an ECA, when, in fact, under the Secret FA Terms, Bronzelink had agreed that GIP-Cayman could only raise additional funds through financing provided by an ECA.

287.   All of these false and misleading representations and false promises, and each of them, were important because they would have influenced a reasonable person's judgment or conduct, and Defendants knew that they were likely to influence Plaintiffs' judgment and conduct.

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

288.   Plaintiffs, and each of them, would have acted differently if they had known that these representations and promises were false.

**B.   Concealment of Material Facts.**

289.   At all relevant times, Defendants, and each of them, owed Plaintiffs a duty of disclosure by virtue of the existence of one or more of the following circumstances:

(a)   To the extent Defendants made any disclosures to Plaintiffs, they disclosed only some facts, but intentionally withheld or caused others to withhold other facts, making the disclosures misleading;

(b)   Defendants intentionally withheld, or caused others to withhold, important facts that were known to them, and which Plaintiffs could not have discovered on their own; and

(c)   Defendants actively concealed and caused others to conceal important facts from Plaintiffs, or acted to prevent Plaintiffs from discovering such facts.

290.   Beginning in or about July 2015, Defendants, and each of them, intentionally concealed, withheld and failed to disclose, and caused others to conceal, withhold and fail to disclose, the following facts, with the intent to deceive Plaintiffs:

*[As to DONG YIN's Relationships*

*With COSEIG and Bronzelink.]*

(a)   At all relevant times, DONG YIN exercised dominance and control over COSEIG;

(b)   At all relevant times, Pot Kit Chow was merely the nominal owner of COSEIG acting on behalf of DONG YIN;

(c)   At all relevant times, DONG YIN exercised dominance and control over Bronzelink;

//

//

96

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

*[As to DONG YIN's Role in the Governance,*

*Management and Operations of GIP-Cayman.]*

(d)    DONG YIN never intended to be merely a lender to COSEIG or Bronzelink, but rather planned and intended to acquire, exercise and maintain control over the governance, management and operations of GIP-Cayman through its dominance and control of COSEIG and Bronzelink;

(e)    FAN was appointed to the GIP-Cayman Board of Directors so that DONG YIN could dominate, control and direct the governance, management and operations of GIP-Cayman;

(f)    At all relevant times, WONG, LIU and Zheng were agents of DONG YIN acting under FAN's control and direction;

*[As to The Secret FA Terms and Secret Charge.]*

(g)    The Facility Agreement between Bronzelink and Amore gave Amore the power to approve four of the five directors to the Bronzelink Board of Directors;

(h)    Bronzelink was required to appoint the four directors approved by Amore to the GIP-Cayman Board of Directors;

(i)    The Facility Agreement requires Bronzelink to provide Amore with free access at all reasonable times to the GIP-Cayman premises, assets, books, accounts and records;

(j)    The Facility Agreement provides that Amore has the right to meet with the GIP-Cayman senior management upon request;

(k)    The Facility Agreement requires GIP-Cayman to obtain Amore's approval for any contracts in excess of $1,000,000;

(l)    The Facility Agreement gives Amore the right to engage a financial advisor, technical consultant, marketing consultant and tax expert for GIP-Cayman, at GIP-Cayman's expense;

97

**[PROPOSED] SECOND AMENDED COMPLAINT**

(m)   The Facility Agreement requires Bronzelink to use its control of GIP-Cayman to prevent GIP-Cayman from entering into any joint ventures;

(n)   The Facility Agreement requires Bronzelink to use its control of GIP-Cayman to prevent GIP-Cayman from obtaining debt financing through any lender other than an ECA;

(o)   The Facility Agreement requires Bronzelink to use its control of GIP-Cayman to prevent GIP-Cayman from creating a stock option pool.

(p)   The Secret Charge gives Amore the ability to remove Yiu, with or without cause, in the event Bronzelink breaches any provision of the Facility Agreement or the Secret Charge.

(q)   As part of the Secret Charge, Yiu provided (i) a signed "Share Transfer Form" in favor of Amore, which provided that in the Event of Default, all of Yiu's shares in Bronzelink would be sold, transferred or assigned to Amore; (ii) a signed "Proxy," giving Amore his proxy to vote on his behalf at any meeting of the Bronzelink shareholders, or to execute a written resolution as the sole shareholder of Bronzelink; (iii) a signed but undated Letter of Resignation and Release; (iv) a signed "Authority to Date Letter of Resignation and Release," irrevocably authorizing Amore to date and submit the Letter of Resignation and Release" on behalf of Yiu; (v) a signed "Undertaking" from Bronzelink to register transfers of the charged shares to Amore; and (vi) an irrevocable letter of instruction to Bronzelink's registered agent.

291.   All of these facts, and each of them, were important in that they would have influenced a reasonable person's judgment or conduct, and Defendants knew that their disclosure was likely to influence Plaintiffs' judgment and conduct.

292.   Plaintiffs, and each of them, would have acted differently if they had known of these undisclosed facts.

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

**C.    Resulting Damages.**

293.   As a direct and proximate result of Defendants' false and misleading representations, false promises and concealment and withholding of important information, Plaintiffs were damaged, and continue to incur damages, in an amount to be determined at trial.

294.   In making these false and misleading representations and false promises, and in concealing, withholding and not disclosing these facts, Defendants acted fraudulently, oppressively, maliciously and with a willful and conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to exemplary and punitive damages pursuant to California Civil Code section 3294.

**THIRD CAUSE OF ACTION**

**(For Violation of California Penal Code Section 496)**

**(By Plaintiffs Against DONG YIN)**

295.   Plaintiffs repeat and reallege paragraphs 1 through 294 of this SAC as if fully alleged herein.

296.   California Penal Code section 496(c) provides, in relevant part, that "[a]ny person who has been injured by a violation of subdivision (a) . . . may bring an action for three times the amount of the actual damages, if any, sustained by the plaintiff, cost of suit, and reasonable attorney's fees."

297.   California Penal Code section 496(a) provides, in relevant part, that "[e]very person who receives any property that has been stolen or that has been obtained in any manner constituting theft . . . knowing the property to be so stolen or obtained, or who conceals, . . . withholds, or aids in concealing . . . or withholding any property from the owner, knowing the property to be so stolen or obtained, [is guilty of a criminal offense]."

298.   California Penal Code section 484 defines "theft" to include: (a) theft by trick, which involves obtaining possession of another's property with his or her consent by fraud or deceit; and (b) theft by false pretenses, which involves obtaining

99

**[PROPOSED] SECOND AMENDED COMPLAINT**

possession and ownership of another's property by false or fraudulent representations or promise.

299.   In or about June 2016, DONG YIN and its agents stole and received the following property from Plaintiffs by fraud, deceit and false pretenses, as described in this SAC: control of the Satellite Project; the tangible and intellectual property comprising the Satellite Project; a 47.25% ownership interest in GIP-Cayman previously owned by Plaintiffs; and the confidential and proprietary information, documentation and data developed as part of the Satellite Project.

300.   In obtaining and receiving this stolen property, DONG YIN and its agents acted knowingly with the intent to deprive Plaintiffs of their property, to receive stolen property, and to conceal, withhold and aid in the concealment and withholding of property stolen from Plaintiffs.

301.   As a direct and proximate result of these violations of California Penal Code section 496(a), Plaintiffs have been injured in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (For Civil RICO in Violation of
### Title 18, United States Code, Sections 1962(b) and 1964(c))
### (By Plaintiffs Against DONG YIN)

302.   Plaintiffs repeat and reallege paragraphs 1 through 301 of this SAC as if fully alleged herein.

303.   Title 18, United States Code, section 1962(b) provides, in relevant part, that "[i]t shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise . . . ."

304.   Title 18, United States Code, section 1961(4) defines the term "enterprise" to include "any individual, partnership, or other legal entity, and any . . . group of individuals associated in fact although not a legal entity."

100

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

305.   Title 18, United States Code, section 1964(c), provides, in relevant part, that "[a]ny person injured in his business or property be reason of a violation of section 1962 of this chapter may sue thereafter . . . and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ."

306.   At all relevant times, each Plaintiff was a "person" within the meaning of Title 18, United States Code, sections 1961(3) and 1964(c).

307.   At all relevant times, DONG YIN, FAN, WONG, LIU, COAMI, CHANG, COSEIG, Amore, Bronzelink, Yiu, GIP-Cayman, GIP-USA, Dub Dub, MILBANK and Panahy were each a "person" within the meaning of Title 18, United States Code, section 1961(3).

**A.     The "Victim Enterprise."**

308.   At all relevant times, STM Atlantic, STM Group, Emil Youssefzadeh, Umar Javed, GIP-Cayman, GIP-USA and Dub Dub were a group of persons associated together for the common purpose of generating legitimate income, revenue and profits by developing and pursuing completion of the Satellite Project, and constituted an association-in-fact enterprise within the meaning of Title 18, United States Code, section 1961(4) (the "Victim Enterprise").

309.   At all relevant times, the Victim Enterprise was engaged in, and its activities affected, interstate and foreign commerce in that, among other things, it was involved in acts and transactions occurring in, among other places, California, Washington, D.C., the Cayman Islands and Hong Kong.

**B.     The Racketeering Acts.**

310.   Beginning in or about July 2015, and continuing until the present, DONG YIN, together with Amore and Bronzelink, acquired and maintained, directly and indirectly, an interest in and/or control of the Victim Enterprise through a pattern of racketeering activity, as described below, in violation of Title 18, United States Code, section 1962(b).

**[PROPOSED] SECOND AMENDED COMPLAINT**

### 1.    *Wire Fraud.*

311.    Title 18, United States Code, section 1343 provides in relevant part that, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representation, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice [is guilty of a criminal offense]."

312.    Beginning in or about July 2015, and continuing until the present, DONG YIN, together with COAMI, CHANG, COSEIG, Amore, Bronzelink and MILBANK, and each of them, acting through their agents, including FAN, WONG, LIU, Yiu, Panahy and others, knowingly and with intent to defraud, devised, participated in and executed a scheme and artifice to defraud Plaintiffs and to obtain their money and property by means of materially false and fraudulent pretenses, representations and promises and the concealment of material facts, as described further in this SAC, including, but not limited to, in paragraphs 97-99, 101-102, 107, 110-111, 115, 117, 119-120, 122-123, 128-139, 141-142, 150, 154-156, 159, 162, 166, 169-170, 172, 205, 213, 221, 230, 233-234, 239-253, 264-276, 286, 290, 299, 313, 334 and 351.

313.    On or about the dates set forth below, for purposes of carrying out such scheme or artifice, DONG YIN, together with COAMI, CHANG, COSEIG, Amore and Bronzelink and MILBANK, and each of them, acting through their agents, including FAN, WONG, LIU, Yiu, Panahy and others, caused the following transmissions by wire or radio communication in interstate and foreign commerce, among others, in violation of Title 18, United States Code, section 1343:

///

///

///

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| **One** | Oct. 5, 2015 | Ivan Chow sends an email to Mr. Youssefzadeh, stating that he was the newly appointed sole representative for Geng Zhiyuan and Yang Zeng of DONG YIN for purposes of the Global IP transaction. |
| **Two** | Early December 2015 | After reviewing the COSEIG JVA, Panahy telephones Mr. Youssefzadeh and Mr. Javed and states that he could help ensure compliance with U.S. export control laws if MILBANK represented DONG YIN in the COSEIG transaction. |
| **Three** | Dec. 16, 2015 | Ivan Chow sends an email to Mr. Javed, misrepresenting that COSEIG's sole shareholder and director was Pok Kit Chow. |
| **Four** | Jan. 28, 2016 | Ivan Chow sends an email to Mr. Youssefzadeh, Mr. Javed and Pourmand, on behalf of FAN, misrepresenting that COSEIG's $250 million financial proposal had been formally approved by DONG YIN. |
| **Five** | Jan. – Feb. 2016 | Panahy, acting as DONG YIN's counsel, telephones Mr. Javed in California, and falsely promises that DONG YIN would have no control or influence over GIP-Cayman. |
| **Six** | Feb. 16, 2016 | In a telephone conference, CHANG, acting in his capacity as COAMI's Executive Director and Co-President, falsely represents to Mr. Youssefzadeh, Mr. Javed and Pourmand that after the closing: (1) DONG YIN would have no control of GIP-Cayman; (2) DONG YIN had no intention of controlling or influencing GIP-Cayman; and (3) DONG YIN was relying on Mr. Youssefzadeh, Mr. Javed and Pourmand to run the business. |

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| **Seven** | Mar. 15, 2016 | Panahy, acting as DONG YIN's counsel, sends an email to Mr. Youssefzadeh and Mr. Javed, furthering the false impression that Bronzelink was an independent, stand-alone, and legitimate investment vehicle by stating that his law firm was DONG YIN's counsel and could not act for Bronzelink. |
| **Eight** | Mar. 28, 2016 | Panahy, acting as DONG YIN's counsel, sends an email responding to a request for written confirmation that DONG YIN was providing financing to Bronzelink, stating, "[g]iven our stated concerns regarding the role of DY as a lender, and the need to attenuate PRC interests in both BL and GIP, having a letter from DY or its counsel 'on the record' does not serve the interests of any of the parties to this transaction." |
| **Nine** | Apr. 3, 2016 | Henry Fan sends an email to Mr. Youssefzadeh and Mr. Javed, among others, attaching drafts of the SPA and SHA. |
| **Ten** | Apr. 5, 2016 | Panahy, acting as DONG YIN's counsel, sends an email providing his comments to the SPA, and falsely representing that he had aligned the conditions precedent in the SPA with the terms of the Facility Agreement between Amore and Bronzelink. |
| **Eleven** | May 31, 2016 | In a telephone call between Panahy and Mr. Javed, Panahy, acting as DONG YIN's counsel, falsely represents that: (1) four of the Bronzelink-appointed directors are completely independent of and unaffiliated with DONG YIN; (2) with four independent Bronzelink-appointed directors, GIP-Cayman would have solid protection from PRC influence and control; and (3) although WONG worked for Bronzelink, he is not affiliated with DONG YIN. |

104

**[PROPOSED] SECOND AMENDED COMPLAINT**

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| **Twelve** | Jun. 2, 2016 | In a telephone call from FAN to Mr. Javed, FAN falsely represents that: (1) DONG YIN and Bronzelink are two completely different entities and were unrelated; (2) after the closing, DONG YIN would not have control of or any say in any GIP-Cayman matters; and (3) after the closing, Bronzelink would have an independent Board of Directors that would make all of its decisions free of DONG YIN's influence. |
| **Thirteen** | Jun. 7, 2016 | WONG emails Mr. Youssefzadeh and Mr. Javed to state that a press release they wanted to issue about the Bronzelink transaction must be held to avoid any "unnecessary interference" from outsiders. |
| **Fourteen** | Jun 24, 2016 | Panahy sends a letter to Mr. Youssefzadeh, Mr. Javed and Pourmand via email confirming that MILBANK could now represent GIP-Cayman on corporate, satellite system, launch services, launch, in-orbit insurance procurement, financing and regulatory matters. |
| **Fifteen** | Jul. 8, 2016 | Tang circulates by email a draft of GIP-Cayman's authority/delegation chart, which indicates that the GIP-Cayman Board is authorized to approve and oversee activities typically approved and overseen by the company's executives and managers. |
| **Sixteen** | Jul. 29, 2016 | Jason Luo emails Mr. Youssefzadeh that "[he] would like Mr. Fan/DONG YIN to review/agreed [sic][the LOI with Boeing] before we move on." |
| **Seventeen** | July 29, 2016 | WONG responds to Luo's email with his own email, indicating that "you have the agreement from both parties to proceed," copying Terry Long of DONG YIN. |
| **Eighteen** | Nov. 1, 2016 | WONG emails Mr. Javed requesting the updated Business Plan for GIP-Cayman by the following day. |
| **Nineteen** | Nov. 5, 2016 | WONG emails Mr. Javed requesting his input on the GIP-Cayman financial model so he could present it to FAN for his final review. |

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| **Twenty** | Nov. 18, 2016 | Tang emails Mr. Javed requesting technical details for Multi-Beam Architecture, Beam Size, Broadcasting, Design Process, Capacity Allocation and coverage map. |
| **Twenty-one** | Jan. 9, 2017 | WONG emails Mr. Javed directing him to have LIU pay director fees of $35,000 per quarter to Jason Luo and $2,500 per quarter to Julian Zhao from GIP-Cayman accounts. |
| **Twenty-two** | Jan. 20, 2017 | WONG emails the December 8, 2016 GIP-Cayman board minutes to Mr. Javed, altering the minutes by, among other things, removing references about a discussion regarding technical satellite program updates. |
| **Twenty-three** | Feb. 25, 2017 | FAN, WONG and LIU vote by email to terminate Peter Lui's employment as GIP-Cayman's CFO, leaving WONG in full control of GIP-Cayman's bank accounts. |
| **Twenty-four** | Apr. 25, 2017 | Panahy, acting ostensibly as GIP-Cayman's counsel, emails the Milbank Memo to Chen for distribution to the GIP-Cayman Board of Directors, omitting any discussion of the Secret FA Terms and the Secret Charge, both of which MILBANK helped to negotiate. |
| **Twenty-five** | May 24, 2017 | WONG sends an email denying a quorum for a special meeting of the GIP-Cayman Board of Directors noticed by Mr. Youssefzadeh to discuss (1) the Milbank Memo and corporate governance; and (2) the Citigroup debt offering. |
| **Twenty-six** | Jun. 1, 2017 | WONG sends an email again denying a quorum for a special meeting of the GIP-Cayman Board of Directors noticed by Mr. Youssefzadeh to discuss (1) the Milbank Memo and corporate governance; and (2) the Citigroup debt offering. |
| **Twenty-seven** | Jun. 2, 2017 | WONG sends an email refusing to identify the GIP-Cayman directors appointed by Bronzelink. |

106

**[PROPOSED] SECOND AMENDED COMPLAINT**

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| **Twenty-eight** | Jun. 14, 2017 | Chen emails the Chen Memo to the GIP-Cayman Board of Directors, omitting any discussion of the Secret FA Terms and the Secret Charge as a result of MILBANK and Panahy having concealed and withheld that information from him, Mr. Youssefzadeh and Mr. Javed. |
| **Twenty-nine** | Sep. 4, 2017 | LIU circulates the minutes of the April 21, 2018. July 11, 2018 and July 18, 2017 GIP-Cayman Board meetings by email to Mr. Youssefzadeh, Mr. Javed, WONG, FAN, Pourmand, Henry Fan and Zhang Hai Min, omitting mention of the Board's refusal to address compliance issues. |
| **Thirty** | Sep. 13, 2017 | During a telephonic meeting of the GIP-Cayman Board of Directors, the Board approves the altered minutes of the July 18, 2017 board meeting, which, among other things, omits mention of the Board's refusal to address compliance issues. |

### 2. *International Money Laundering.*

314.   Title 18, United States Code, section 1956(a)(2) provides in relevant part that, "[w]hoever transports, transmits, or transfers . . . funds . . . to a place in the United States from or through a place outside the United States . . . [¶] [w]ith the intent to promote the carrying on of specified unlawful activity [is guilty of a criminal offense]."

315.   On or about June 3, 2016, in violation of Title 18, United States Code, section 1956(a)(2)(A ), DONG YIN and Bronzelink, knowingly conducted and conspired to conduct the wire transfer of $25,000,000 from a place outside the United States (Bronzelink's Hong Kong bank account) to a place in the United States (GIP-Cayman's HSBC bank account in California), with the intent to promote the carrying on of Specified Unlawful Activity, namely, wire fraud in violation of Title 18, United States Code, section 1343, as described above.

//

//

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

**C.**     **Injury to Business and Property.**

316.   By reason of the foregoing violations of Title 18, United States Code, section 1962(b), Plaintiffs have been injured in their business and property in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**

**(For Civil RICO Conspiracy in Violation of**

**Title 18, United States Code, Sections 1962(d) and 1964(c))**

**(By Plaintiffs Against All Defendants)**

317.   Plaintiffs repeat and reallege paragraphs 1 through 316 of this SAC as if fully alleged herein.

318.   Title 18, United States Code, section 1962(d) provides, in relevant part, that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection[] . . . (b) . . . of this section [1962]."

319.   Beginning in or about July 2015, and continuing until the present, DONG YIN, FAN, WONG, LIU, COAMI, CHANG and MILBANK, together with COSEIG, Amore and Bronzelink, and each of them, knowingly and willfully conspired and agreed to:

(a)     Violate Title 18, United States Code, section 1962(b), by DONG YIN acquiring and maintaining, directly and indirectly, an interest in or control of the Victim Enterprise through the pattern of racketeering activity described in the Fourth Cause of Action; and

(b)     Commit two or more of the racketeering acts of wire fraud and money laundering described in the Fourth Cause of Action, knowing of the essential nature and scope of the Victim Enterprise and intending for DONG YIN to acquire or maintain an interest in or control of it.

320.   GIP-Cayman joined the conspiracy in or about June 2016, and GIP-USA joined the conspiracy in or about August 2016, when DONG YIN assumed control of them.

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

321.   By reason of the foregoing violations of Title 18, United States Code, section 1962(d), Plaintiffs have been injured in their business and property, in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**

**(For Civil RICO in Violation of**

**Title 18, United States Code, Sections 1962(c) and 1964(c))**

**(By Plaintiffs Against All Defendants)**

322.   Plaintiffs repeat and reallege paragraphs 1 through 321 of this SAC as if fully alleged herein.

323.   Title 18, United States Code, section 1962(c) provides, in relevant part, that "[i]t shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

**A.     The Criminal Enterprise.**

324.   At all relevant times, DONG YIN, COSEIG, Amore and Bronzelink were a group of persons associated for the common purpose of defrauding Plaintiffs of their ownership interests in and control of the Satellite Project, and constituted an association-in-fact enterprise within the meaning of Title 18, United States Code, section 1961(4) (the "Criminal Enterprise").  GIP-Cayman joined the Criminal Enterprise in or about June 2016, and GIP-USA joined the Criminal Enterprise in or about August 2016, when DONG YIN assumed control of them.

325.   At all relevant times, the Criminal Enterprise was engaged in, and its activities affected, interstate and foreign commerce as alleged in the Fourth Cause of Action.

**B.     The Racketeering Acts.**

326.   Beginning in or about July 2015, and continuing until the present, DONG YIN, FAN, WONG, LIU, COAMI, CHANG and MILBANK, together with COSEIG, Amore, Bronzelink, Yiu, Panahy and subsequently GIP-Cayman and

109

**[PROPOSED] SECOND AMENDED COMPLAINT**

GIP-USA, and each of them, being employed by or associated with the Criminal Enterprise, conducted and participated in the conduct of the affairs of the Criminal Enterprise, directly and indirectly, through a pattern of racketeering activity that included the acts of wire fraud and money laundering described in the Fourth Cause of Action, in violation of Title 18, United States Code, section 1962(c).

**C.    Injury to Business and Property.**

327.   By reason of the foregoing violations of Title 18, United States Code, section 1962(c), Plaintiffs have been injured in their business and property, in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**

**(For Civil RICO Conspiracy in Violation of**

**Title 18, United States Code, Sections 1962(d) and 1964(c))**

**(By Plaintiffs Against All Defendants)**

328.   Plaintiffs repeat and reallege paragraphs 1 through 327 of this SAC as if fully alleged herein.

329.   Beginning in or about July 2015, and continuing until the present, DONG YIN, FAN, WONG, LIU, COAMI, CHANG and MILBANK, together with COSEIG, Amore, Bronzelink, Yiu and Panahy, and each of them, knowingly and willfully conspired and agreed to:

(a)    Violate Title 18, United States Code, section 1962(c), by conducting the affairs and participating in the conduct of the affairs of the Criminal Enterprise, directly and indirectly, through the pattern of racketeering activity described in the Fourth Cause of Action; and/or

(b)    Commit two or more of the racketeering acts of wire fraud and money laundering described in the Fourth Cause of Action, knowing of the essential nature and scope of the Criminal Enterprise and intending to participate in it.

//

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

330.   GIP-Cayman joined the conspiracy in or about June 2016, and GIP-USA joined the conspiracy in or about August 2016, when DONG YIN assumed control of them.

331.   By reason of the foregoing violations of Title 18, United States Code, section 1962(d), Plaintiffs have been injured in their business and property, in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

### (For Interference with Prospective Business Advantage)

### (By Plaintiffs Against DONG YIN)

332.   Plaintiffs repeat and reallege paragraphs 1 through 331 of this SAC as if fully alleged herein.

333.   In or about February 2016, Plaintiffs entered into an economic relationship with Bronzelink, in which Bronzelink would substitute for COSEIG and enter into a transaction to provide financing for the Satellite Project in exchange for equity in GIP-Cayman and other consideration, as described above.  That economic relationship was substantially likely to result in economic benefits to Plaintiffs, including a share of the projected US$1.5 billion or more in anticipated profits when the Satellite Project was successfully completed.

334.   In or about March 2016, DONG YIN caused Amore to enter into the Facility Agreement with Bronzelink, which contained provisions (the Secret FA Terms) that were contrary to and inconsistent with DONG YIN's representations and promises to Plaintiffs, and which prevented Bronzelink from providing the benefits that Plaintiffs were substantially certain to receive under their intended transaction with Bronzelink.  Specifically, the Facility Agreement:

   (a)   Gives DONG YIN, through Amore, access to and control over GIP-Cayman and the Satellite Project;

   (b)   Undermines Plaintiffs' ability to obtain additional financing necessary to complete the Satellite Project by preventing GIP-Cayman from obtaining

111

**[PROPOSED] SECOND AMENDED COMPLAINT**

financing through any source other than an ECA; and

(c)     Places limitations and restrictions on the operations of GIP-Cayman that were never disclosed to Plaintiffs and to which Plaintiffs would never have agreed.

335.   In entering into the Facility Agreement, and at all relevant times prior to on or about June 3, 2016, DONG YIN knew of Plaintiffs' prospective economic relationship with Bronzelink.

336.   In entering into the Facility Agreement, DONG YIN intended to interfere with Plaintiffs' economic relationship with Bronzelink, or knew that its conduct was substantially certain to interfere with that relationship.

337.   In fact, DONG YIN did interfere with Plaintiffs' economic relationship with Bronzelink.  In particular, although Bronzelink entered into the SPA and the SHA on or about May 10, 2016, its performance under those contracts has been undermined and substantially diminished by its contrary and inconsistent obligations to DONG YIN and Amore under the Facility Agreement.

338.   As a direct and proximate result of DONG YIN's knowing and intentional interference with Plaintiffs' prospective economic relationship with Bronzelink, Plaintiffs have suffered damages in an amount to be determined at trial.

339.   In addition, beginning in or about October 2016, both Mr. Youssefzadeh and Mr. Javed received substantial income for the work they were performing for GIP-Cayman and GIP-USA, and had been promised increased compensation and bonuses from GIP-Cayman and GIP-USA when those companies obtained debt financing.

//

340.   At all relevant times, DONG YIN knew that Mr. Youssefzadeh and Mr. Javed were receiving substantial income from, and had been promised increased compensation and bonuses by, GIP-USA and GIP-Cayman.

341.   Between in or about October 2016 and August 2017, DONG YIN, acting

112

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

through its agents FAN, WONG, LIU and others known and unknown to Plaintiffs, intentionally engaged in wrongful conduct that: (a) interfered with Mr. Youssefzadeh's and Mr. Javed's receipt of future income, increased compensation and bonuses by creating intolerable working conditions that forced them to resign their executive positions at and stop working for GIP-Cayman and GIP-USA; and (b) caused GIP-Cayman and GIP-USA to refuse to consider and approve the Citigroup debt financing proposal or otherwise obtain debt financing, thus depriving Mr. Youssefzadeh and Mr. Javed of the opportunity and ability to receive the salary increases and bonuses they would otherwise have realized if the debt financing had been obtained.

342.   In engaging in this conduct, DONG YIN at all times intended to interfere with Mr. Youssefzadeh's and Mr. Javed's receipt of future income, increased compensation and bonuses from GIP-Cayman and GIP-USA, or knew that its conduct was substantially certain to interfere with these opportunities.

343.   In fact, DONG YIN did interfere with Mr. Youssefzadeh's and Mr. Javed's receipt of future income, increased compensation and bonuses from GIP-Cayman and GIP-USA by, among other things, forcing them to resign their executive positions with GIP-Cayman and GIP-USA and preventing GIP-Cayman and GIP-USA from pursuing debt financing through Citigroup.

344.   As a direct and proximate result of DONG YIN's conduct, Mr. Youssefzadeh and Mr. Javed have suffered damages including, without limitation, emotional distress, in an amount to be determined at trial.

345.   By engaging in the conduct described in this cause of action, DONG YIN acted fraudulently, oppressively, maliciously and with a willful and conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to exemplary and punitive damages pursuant to California Civil Code section 3294.

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

# NINTH CAUSE OF ACTION

## (For Violation of California Unfair Competition Law,

## California Business & Professions Code Section 17200)

## (By Plaintiffs Against All Defendants)

346.   Plaintiffs repeat and reallege paragraphs 1 through 345 of this SAC as if fully alleged herein.

347.   California's Unfair Competition Law, California Business and Professions Code section 17200, *et seq*. (the "UCL"), creates a statutory private right of action for "unfair competition," which is defined to include "any unlawful, unfair or fraudulent business act or practice . . . ."

348.   Beginning in or about October 2015, and continuing until the present, Defendants, and each of them, engaged in unlawful, unfair and fraudulent business acts and practices in violation of the UCL, as described more fully above.

349.   Defendants, and each of them, engaged in, aided and abetted and conspired to commit the following *unlawful* business acts and practices, among others, in violation of the UCL:

   (a)   Willfully violating ITAR and the EAR, in violation of  Title 22, United States Code, section 2778 and Title 50, United States Code, section 4610;

   (b)   Conspiring to violate ITAR and the EAR, in violation of Title 18, United States Code, section 371;

   (c)   Committing wire fraud, in violation of Title 18, United States Code, section 1343;

   (d)   Engaging in international money laundering, in violation of Title 18, United States Code, section 1956(a)(2);

//

   (e)   Violating and conspiring to violate RICO, in violation of Title 18, United States Code, sections 1962(b), (c) and (d);

114

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

(f)     Obtaining and receiving stolen property, in violation of California Penal Code section 494(a); and

(g)     Engaging in the tort of deceit, in violation of California Civil Code section 1709.

350.    Defendants, and each of them, also engaged in, aided and abetted and conspired to commit the following *unfair* business practices, among others, in violation of the UCL:

(a)     Causing Amore to enter into the Facility Agreement with Bronzelink that gave DONG YIN, through Amore, the ability to place its agents on the Board of Directors of GIP-Cayman and GIP-USA; gave DONG YIN secret control of GIP-Cayman, GIP-USA and the Satellite Project; interfered with Plaintiffs' ability to obtain the additional financing necessary to complete the Satellite Project; and placed limitations and restrictions on the operations of GIP-Cayman that were never disclosed to Plaintiffs and to which Plaintiffs never agreed;

(b)     Placing agents of DONG YIN on the Board of Directors of GIP-Cayman;

(c)     Placing agents of DONG YIN on the Board of Directors of GIP-USA;

(d)     Concealing from Plaintiffs that WONG, LIU and others were agents of DONG YIN acting under FAN's control and direction;

(e)     Causing GIP-Cayman to enter into an employment agreement with Pourmand without Plaintiffs' say or approval and which paid Pourmand far in excess of his value;

(f)     Causing GIP-Cayman to enter into contracts to compensate the Amore-approved, Bronzelink-appointed directors on the GIP-Cayman and GIP-USA Boards of Directors without obtaining the approval of the GIP-Cayman Compensation Committee;

---

115

**[PROPOSED] SECOND AMENDED COMPLAINT**

(g)     Overcompensating Jason Luo, the Chairman of the GIP-Cayman Board of Directors, without the approval of the GIP-Cayman Compensation Committee;

(h)     Permitting FAN and WONG, as individual GIP-Cayman directors, to make business decisions and exercise authority typically reserved for the company's executives and managers;

(i)     Permitting FAN and WONG to make business decisions independent of the GIP-Cayman Board of Directors as a whole, which FAN and WONG did not have the authority to make as individual directors;

(j)     Appointing WONG Executive Director of GIP-Cayman without the authority to do so;

(k)     Retaliating against Mr. Youssefzadeh and Mr. Javed for questioning whether the PRC, through DONG YIN, controlled GIP-Cayman in violation of U.S. export control laws;

(l)     Causing the resignations of Jason Luo and Julian Zhao as directors of GIP-Cayman;

(m)     Replacing Luo and Zhao as directors of GIP-Cayman with agents of DONG YIN, who were under the control of and took their direction exclusively from FAN;

(n)     Causing WONG to be appointed Chairman of the GIP-Cayman Board of Directors;

(o)     Reappointing Pourmand as CEO, over Mr. Youssefzadeh's and Mr. Javed's objections and veto;

(p)     Refusing to convene duly noticed meetings of the GIP-Cayman Board of Directors to discuss and address the issue of whether GIP-Cayman's corporate governance, management and operations were in compliance with U.S. export control laws;

//

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

(q)     Refusing to convene duly noticed meetings of the GIP-Cayman Board of Directors to consider and resolve whether to engage Citigroup to obtain the next tranche of debt financing;

(r)     Forcing Mr. Youssefzadeh and Mr. Javed to resign as executives of GIP-Cayman and GIP-USA;

(s)     Forcing Chen to resign as General Counsel of GIP-Cayman and GIP-USA;

(t)     Altering and falsifying minutes of GIP-Cayman Board of Director meetings;

(u)     Preparing records of GIP-Cayman Board of Director meetings that omitted material information and made the records false and misleading;

(v)     Offering to pay Plaintiffs for not pursuing the issue of whether DONG YIN was in violation of U.S. export control laws;

(w)     Gaining, exercising and maintaining dominance and control over the governance, management and operations of GIP-Cayman by false and fraudulent representations and the concealment of material facts;

(x)     Gaining, exercising and maintaining dominance and control over the governance, management and operations of GIP-USA by false and fraudulent promises;

(y)     Gaining, exercising and maintaining dominance and control over the Satellite Project by false and fraudulent representations and promises and the concealment of material facts; and

(z)     Concealing and disguising DONG YIN's control of GIP-Cayman, GIP-USA and the Satellite Project and its access to confidential and sensitive satellite and launch technology and data subject to U.S. export control laws.

351.    Defendants, and each of them, also engaged in, aided and abetted and conspired to commit the following *fraudulent* business acts and practices, among

117

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

others, in violation of the UCL:

    (a)    Falsely representing that DONG YIN's role in the COSEIG and Bronzelink transactions was solely as a lender and limited to providing indirect debt financing for the Satellite Project;

    (b)    Falsely representing to Plaintiffs that DONG YIN did not intend to exercise control or exert influence over GIP-Cayman's governance, management and operations;

    (c)    Falsely representing to Plaintiffs that DONG YIN did not intend to have any direct dealings with GIP-Cayman;

    (d)    Falsely representing to Plaintiffs that DONG YIN was relying on Mr. Youssefzadeh and Mr. Javed and Pourmand to run GIP-Cayman after the closing;

    (e)    Falsely representing to Plaintiffs that the Bronzelink-appointed directors WONG, LIU and Yang Zheng were completely independent of and not affiliated with DONG YIN;

    (f)    Falsely representing to Plaintiffs that DONG YIN did not own or control COSEIG;

    (g)    Falsely representing to Plaintiffs that COSEIG was an independent company owned by a wealthy Hong Kong investor, Pok Kit Chow;

    (h)    Falsely representing to Plaintiffs that Bronzelink was an independent, stand-alone and legitimate investment vehicle that did not have any affiliation with DONG YIN; and

    (i)    Falsely representing to Plaintiffs in the SHA that Bronzelink had "the power to execute [and] perform its obligations under and enter into all transactions contemplated by [the SHA]."

    352.    Plaintiffs have lost money and property as a direct and proximate result of Defendant's unfair, unlawful and fraudulent business acts and practices.  As a result, Plaintiffs are entitled to restitutionary disgorgement in an amount to be

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

1    determined at trial.

2        353.   In addition, Plaintiffs are entitled to injunctive relief, enjoining

3    Defendants, and each of them, from engaging in such further unlawful, unfair and

4    fraudulent business acts and practices.  The requested injunctive relief will benefit the

5    general public as it will prevent Defendants from transferring confidential and

6    sensitive satellite and launch technology and data to the PRC, and will prevent

7    DONG YIN from obtaining control ownership and of the Satellite, in violation of

8    ITAR, the EAR and the PRC Proscription.

9                              **TENTH CAUSE OF ACTION**

10                              **(For Unjust Enrichment)**

11                          **(By Plaintiffs Against DONG YIN)**

12       354.   Plaintiffs repeat and reallege paragraphs 1 through 353 of this SAC as if

13   fully alleged herein.

14       355.   The Satellite Project was the culmination of Mr. Youssefzadeh's and

15   Mr. Javed's combined four decades of experience in the satellite industry.  Between

16   2008 and 2016, they invested thousands of hours and millions of dollars in developing

17   and pursuing the Satellite Project.  As a direct result of Plaintiffs' hard work and

18   multi-million-dollar investment, the Satellite Project became a viable enterprise with

19   an estimated profit potential of US$1.5 billion or more over the life of the Satellite,

20   and with the potential for the development, fabrication, launch and operation of

21   additional communication satellites.

22       356.   As a consequence, DONG YIN has received valuable benefits from

23   Plaintiffs in the form of ownership and control of the Satellite Project, including

24   contracts, rights, titles and interests; intellectual property; confidential and proprietary

25   information, documentation and data; and a 75% interest in GIP-Cayman, of which

26   47.25% previously belonged to Plaintiffs.  Furthermore, DONG YIN obtained these

27   benefits by unjust and inequitable means, including false and fraudulent

28   representations and promises, the concealment of material facts, and theft by trick and

                              119
                   **[PROPOSED] SECOND AMENDED COMPLAINT**

false pretenses.  DONG YIN has been, and is being, unjustly enriched by its retention of those benefits.

357.   Plaintiffs are entitled to be compensated for the value of the benefits that DONG YIN has received and is retaining unjustly, in an amount to be determined at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment against Defendants, as follows:

**As to the First Cause of Action for Conspiracy to Defraud:**

    1.    For compensatory and special damages;

    2.    For injunctive relief; and

    3.    For punitive and exemplary damages.

**As to the Second Cause of Action for Fraud:**

    1.    For compensatory and special damages; and

    2.    For punitive and exemplary damages.

**As to the Third Cause of Action for Violation of California Penal Code Section 496:**

    1.    For compensatory and special damages;

    2.    For the trebling of those damages; and

    3.    For Plaintiffs' reasonable costs, including reasonable attorney's fees.

**As to the Fourth Cause of Action for Civil RICO – Victim Enterprise:**

    1.    For compensatory and special damages;

    2.    For the trebling of those damages;

    3.    For punitive and exemplary damages; and

    4.    For Plaintiffs' reasonable costs, including reasonable attorney's fees.

**As to the Fifth Cause of Action RICO Conspiracy –Victim Enterprise:**

    1.    For compensatory and special damages;

    2.    For the trebling of those damages;

    3.    For punitive and exemplary damages; and

120

**[PROPOSED] SECOND AMENDED COMPLAINT**

4.      For Plaintiffs' reasonable costs, including reasonable attorney's fees.

**As to the Sixth Cause of Action Civil RICO – Criminal Enterprise:**

1.      For compensatory and special damages;

2.      For the trebling of those damages;

3.      For punitive and exemplary damages; and

4.      For Plaintiffs' reasonable costs, including reasonable attorney's fees.

**As to the Seventh Cause of Action for RICO Conspiracy – Criminal Enterprise:**

1.      For compensatory and special damages;

2.      For the trebling of those damages;

3.      For punitive and exemplary damages; and

4.      For Plaintiffs' reasonable costs, including reasonable attorney's fees.

**As to the Eighth Cause of Action for Interference with Prospective Business Advantage:**

1.      For compensatory and special damages; and

2.      For punitive and exemplary damages.

**As to the Ninth Cause of Action for Violation of the UCL:**

1.      For restitutionary disgorgement; and

2.      For injunctive relief.

**As to the Tenth Cause of Action for Unjust Enrichment:**

1.      To be compensated for the value of any and all benefits conferred by Plaintiffs that DONG YIN has unjustly received and retained.

//
//
//
//
//
//
//

121

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

**For All Causes of Action:**

   1.   For prejudgment interest at the maximum rate permitted by law;

   2.   For costs of suit; and

   3.   For such other and further relief as the Court may deem just and proper.

Dated: July 9, 2018                    **ISAACS | FRIEDBERG LLP**

                          By:   */s/ Jerome H. Friedberg*
                                _____
                                JEFFREY B. ISAACS, ESQ.
                                JEROME H. FRIEDBERG, ESQ.
                                PAIGE SHEN, ESQ.
                                ROBERT GOOKIN, ESQ.

                                *Attorneys for Plaintiffs STM Atlantic N.V.,*
                                *STM Group, Inc., Emil Youssefzadeh and*
                                *Umar Javed*

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37

# DEMAND FOR JURY TRIAL

Plaintiffs STM Atlantic N.V, STM Group, Inc., Emil Youssefzadeh and Umar Javed hereby request a jury trial on all issues properly triable to a jury.


Dated:  July 9, 2018                    **ISAACS | FRIEDBERG LLP**


                              By:   _/s/ Jerome H. Friedberg_
                                    JEFFREY B. ISAACS, ESQ.
                                    JEROME H. FRIEDBERG, ESQ.
                                    PAIGE SHEN, ESQ.
                                    ROBERT GOOKIN, ESQ.

                                    _Attorneys for Plaintiffs STM Atlantic N.V.,_
                                    _STM Group, Inc., Emil Youssefzadeh and_
                                    _Umar Javed_

**[PROPOSED] SECOND AMENDED COMPLAINT**

244180.37